IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| D.B., | ) | |
| | ) | |
| Plaintiff, | ) | Cause 4:12-CV-00654-JAR |
| | ) | |
| vs. | ) | |
| | ) | |
| ST. CHARLES COUNTY, | ) | |
| MISSOURI; and JASON | ) | |
| KING, | ) | |
| | ) | |
| Defendants. | ) | |

DEPOSITION OF SHERIFF TOM NEER
TAKEN ON BEHALF OF PLAINTIFF
JULY 23, 2013

REPORTED BY TINA MARIE CATLETT
CERTIFIED COURT REPORTER, #946

**167 Lamp & Lantern Village, Suite 205**
**Chesterfield, Missouri 63017**
**Telephone 314-726-0800**
**Facsimile 314-726-0849**
**catlettreporting@charter.net**

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

D.B., )
      )
      Plaintiff, )
      ) Cause 4:12-CV-00654-JAR
vs. )
      )
ST. CHARLES COUNTY, )
MISSOURI; and JASON )
KING, )
      )
      Defendants. )

DEPOSITION OF SHERIFF TOM NEER
TAKEN ON BEHALF OF PLAINTIFF
JULY 23, 2013

REPORTED BY TINA MARIE CATLETT
CERTIFIED COURT REPORTER, #946

---

## INDEX

### PAGE NO.

INDEX............................................ 2
CERTIFIED QUESTIONS..............................3
DEPOSITION INFORMATION........................ 4
APPEARANCES.................................... 5
EXAMINATIONS
   Direct Examination by Mr. Ryals..............6
   Cross Examination by Mr. Hood.............160
   Redirect Examination by Mr. Ryals..........167
   Cross Examination by Ms. Temple...........173
OBJECTIONS
   By Ms. Temple......8, 23, 63
EXHIBITS (Exhibits retained by attorneys)
-Plaintiff's Exhibit 1
   (Portion of policy manual)
-Plaintiff's Exhibit 2
   (Record of disciplinary action)
-Plaintiff's Exhibit 3
   (Synopsis of supervisor incident form)
-Plaintiff's Exhibit 4
   (List of internal affairs investigation)
-Plaintiff's Exhibit 5
   (Documents pertaining to Jason King)
-Plaintiff's Exhibit 6
   (Table of organization/Sheriff's Department)
-Plaintiff's Exhibit 7
   (Changes made in policies relevant to IA
   Investigations or other policy violations)
-Plaintiff's Exhibit 8
   (Documents signed by Jason King accepting
   receipt of St. Charles County personnel
   administration program and policy manual and
   updates of sheriff's department policies and
   procedures.
CERTIFICATION OF TRANSCRIPT.....................177

---

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

D.B., )
      )
      Plaintiff, )
      ) Cause #4:12-CV-00654-JAR
vs. )
      )
ST. CHARLES COUNTY, )
MISSOURI; AND, JASON )
KING, )
      )
      Defendants. )

### CERTIFIED QUESTION

I, Tina Marie Catlett, a court reporter in and
for the County of St. Louis, State of Missouri, do
hereby certify that on the 23rd day of July, 2013,
beginning at the hour of 10:00, at the offices of
St. Charles County Counselor' Office, 100 North
Third Street, Suite 216, St. Charles, Missouri
63301, there appeared before me Sheriff Tom Neer
for the purpose of having his deposition taken:

**CERTIFIED QUESTIONS:**
Page 7 Line 25:
   **Q.** When I asked the question about
discipline, I include in that any suspensions?

Page 8 Line 21:
   **Q.** Was he the subject of an internal
affairs investigation?

Page 23 Line 19:
   **Q.** Now, did you order that an internal
affairs investigation be conducted with regard to
Deputy Hunt?
      IN WITNESS WHEREOF, I have hereunto
subscribed my name on this 2nd day of August, A.D.,
2013.

_____
Tina Marie Catlett, CCR

---

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

D.B., )
      )
      Plaintiff, )
      ) Cause #4:12-CV-00654-JAR
vs. )
      )
ST. CHARLES COUNTY, )
MISSOURI; and JASON )
KING, )
      )
      Defendants. )

DEPOSITION OF SHERIFF TOM NEER, produced,
sworn, and examined on the 23rd day of July, 2013,
between the hours of eight o'clock in the forenoon
of that day and six o'clock in the afternoon of
that day at the St. Charles County Counselor's
Office, 100 North Third Street, Suite 216, State of
Missouri, before TINA MARIE CATLETT, a Certified
Shorthand Reporter within and for the State of
Missouri, in a certain cause now pending in the
United States District Court, Eastern District of
Missouri, Eastern Division, taken on behalf of
Plaintiff D.B.

A P P E A R A N C E S

Mr. Steve Ryals
Ryals & Breed, P.C.
For the Plaintiff
3120 Locust Street
St. Louis, Missouri 63103
314-862-6262

Mr. Donald L. Hood
The Hood Law Office, LLC
For Defendant Jason King
PO Box 220366
Kirkwood, Missouri 63122

Ms. Beverly E. Temple
St. Charles County Counselor's Office
100 North Third Street, Suite 216
St. Charles, Missouri 63301

Tina Marie Catlett, Ccr
Catlett Reporting, Inc.
167 Lamp & Lantern Village, Suite 205
St. Louis, Missouri 63017
(314) 726-0800

1      SHERIFF TOM NEER,
2  of lawful age, being first duly sworn to tell the
3  truth, the whole truth, and nothing but the truth,
4  deposes and says in behalf of the Plaintiff as
5  follows:
6     DIRECT EXAMINATION
7  QUESTIONS BY MR. RYALS:
8    Q.    State your name, sir.
9    **A.    Thomas W. Neer.**
10    Q.    You're the sheriff of St. Charles
11  County?
12    **A.    Yes, I am.**
13    Q.    Elected by the people of St. Charles
14  County?
15    **A.    This time, yes.**
16    Q.    This time?
17    **A.    Yes. I've been appointed twice.**
18    Q.    Sheriff, do you have any convicted
19  felons on the payroll at St. Charles County?
20    **A.    Convicted felons?**
21    Q.    Yes.
22    **A.    I have one under appeal.**
23    Q.    Is that Christopher Hunt?
24    **A.    Yes, it is.**
25    Q.    He has been tried, correct?

1    **A.    Yes, he has.**
2    Q.    Jury returned a verdict?
3    **A.    Yes, they did.**
4    Q.    And he was sentenced, correct?
5    **A.    Yes, he was.**
6    Q.    What was the charge he was tried and
7  convicted of?
8    **A.    Burglary, assault, property damage, I**
9  **believe.**
10    Q.    When did that occur, the incident giving
11  rise to those charges?
12    **A.    February of '08, I believe, or '09.**
13    Q.    What is his job with the St. Charles
14  County Sheriff's Department now?
15    **A.    Right now he does administrative duties,**
16  **in-house officer.**
17    Q.    Is the result of him being charged or at
18  any point in the process after he was charged, did
19  he ever receive any discipline from St. Charles
20  County?
21    **A.    Since he was charged?**
22    Q.    From the time he was charged until
23  today.
24    **A.    No.**
25    Q.    When I asked the question about

1  discipline, I include in that any suspensions.
2    **A.    I'm not going to answer that, sir, you**
3  **are getting into the personnel issues of one of the**
4  **employees so I'm not going to answer that question.**
5    Q.    Well, we will certify that question.
6  Okay?
7    (QUESTION CERTIFIED)
8    MS. TEMPLE: I believe that the
9  objection is that it is protected information under
10  the Missouri Sunshine Law.
11    MR. RYALS: That would be a good
12  objection if the Sunshine Law applied to discovery
13  in a federal civil rights lawsuit and it doesn't.
14  QUESTIONS BY MR. RYALS:
15    Q.    So you are not going to answer the
16  question --
17    **A.    No, sir.**
18    Q.    -- Whether he was suspended?
19    **A.    No, sir.**
20    Q.    Was he the subject of an internal
21  affairs investigation?
22    **A.    Once again, that's information relevant**
23  **to the personnel file of an employee. I refuse to**
24  **answer that one.**
25    MS. TEMPLE: Same objection.

1       MR. RYALS:  We will certify that as
2  well.
3              (CERTIFIED QUESTION)
QUESTIONS BY MR. RYALS:
5       Q.    Does your department have an internal
6  affairs function?
7       A.    **Yes, we do.**
8       Q.    How long have you been the sheriff?
9       A.    **Eight-and-a-half years.**
10      Q.    This time?
11      A.    **This time.**
12      Q.    When were you the sheriff before?
13      A.    **1991, from September through November I**
14  **was appointed interim sheriff.**
15      Q.    By who?
16      A.    **By the, at that time, county commission.**
17      Q.    Was that between tenures of elected
18  sheriffs?
19      A.    **I don't understand your question, sir.**
20      Q.    The question is, what precipitated there
21  being an opening for the sheriff?
22      A.    **The elected sheriff vacated the office.**
23      Q.    Who was that?
24      A.    **Edward Uebinger.**
25      Q.    He resigned or --

1       A.    **He resigned to go to law school.**
2       Q.    And then you were appointed for a period
3  of three --
4       A.    **Until the next general election, yes.**
5       Q.    Who was elected in that next election?
6       A.    **Ray Runyon.**
7       Q.    Did you run in that election?
8       A.    **No, sir.**
9       Q.    What was your rank in the department?
10      A.    **At that time?**
11      Q.    Yes, sir.
12      A.    **Captain.**
13      Q.    Were there any personnel who had a rank
14  superior to captain at that time?
15      A.    **Sheriff.**
16      Q.    No major?
17      A.    **No.**
18      Q.    So you served under Uebinger and then
19  Runyon.  Were there other times when you were
20  appointed?
21      A.    **No, just this last one.**
22      Q.    And tell me about the event that
23  precipitated you were appointed to --
24      A.    **The elected sheriff vacated the office.**
25      Q.    Who was that?

1       A.    **Tim Swope.**
2       Q.    He resigned?
3       A.    **Yes.**
4       Q.    When was that?
5       A.    **He resigned early 2005.**
6       Q.    What was your rank when you were
7  appointed when Sheriff Swope resigned?
8       A.    **Captain.**
9       Q.    Did anybody have superior rank to you at
10  that time?
11      A.    **No.**
12      Q.    Were there any other captains in the
13  department?
14      A.    **Yes.**
15      Q.    Who were they?
16      A.    **'91, one of them was Glen Welker.  This**
17  **last time it was Dave Kaiser, Wes Simcox, Dave**
18  **Todd.**
19      Q.    Who appointed you this last time in
20  2005?
21      A.    **I went through a evaluation process and**
22  **was ultimately appointed by the executive, county**
23  **executive.**
24      Q.    Is that Steve Ehlmann?
25      A.    **No, Joe Ortwerth.**

1       Q.    Did you then stand for election after
2  you were appointed?
3       A.    **Yes, sir, I did.**
4       Q.    What year was that general election?
5       A.    **Election was 2006.**
6       Q.    And you won the election, correct?
7       A.    **Yes.**
8       Q.    And served ever since?
9       A.    **Yes.**
10      Q.    Since '06, have you had to stand for
11  reelection?
12      A.    **Once.**
13      Q.    Would that have been in '10?
14      A.    **Yes.**
15      Q.    When is the next general?
16      A.    **2014.**
17      Q.    Do you intend to run again?
18      A.    **I haven't decided.**
19      Q.    Is there a movement afoot to change the
20  county sheriff's department from a sheriff's
21  department to a police agency?
22      A.    **It's more than a movement.  It's going**
23  **to occur.**
24      Q.    Did you initiate that?
25      A.    **Yes, I did.**

1   Q.   Why?

2   A.   **In order to try to ensure that**
3   **St. Charles County would have a qualified law**
4   **enforcement manager in the future. Tried to**
5   **eliminate as much internal politics as possible**
6   **under the current system.**

7   Q.   When will that occur, sir?

8   A.   **January 1st, 2015.**

9   Q.   What do you mean by your statement that
10  you wanted to ensure that the law enforcement
11  agency had a, how did you put it, qualified?

12  A.   **Qualified law enforcement manager.**
13  **There are several reasons. In the past I worked**
14  **for six different sheriffs. Two of those six**
15  **sheriffs weren't qualified to command an outhouse,**
16  **and this is 2013. Law enforcement in this county**
17  **has changed and right now, up until this year, a**
18  **sheriff didn't have to have any qualifications at**
19  **all, didn't even have to be a licensed law**
20  **enforcement officer. Legislature just passed a law**
21  **to where now a sheriff will have to be a licensed**
22  **peace officer in the state of Missouri before he or**
23  **she can even file. That's one qualification. A**
24  **registered voter, no felonies, but there's no**
25  **requirement for any law enforcement experience,**

1   **management experience, management training,**
2   **administrative training. And the way the elections**
3   **go, we could wind up the same way it was a few**
4   **years back under those so-called managers who did**
5   **not have the qualifications to manage a**
6   **contemporary law enforcement agency.**

7   Q.   Which sheriffs did you serve under, sir?

8   A.   **Start with, do you want all of them?**

9   Q.   Well, you said you served under six was
10  it?

11  A.   **Yes, six sheriffs.**

12  Q.   Who was it?

13  A.   **Robert Koester.**

14  Q.   Koester?

15  A.   **Koester, yes.**

16  Q.   All right.

17  A.   **Guy Lee Koester.**

18  Q.   All right.

19  A.   **Edward Uebinger.**

20  Q.   All right.

21  A.   **Ray Runyon.**

22  Q.   All right.

23  A.   **Doug Salters and Tim Swope.**

24  Q.   Which of those two didn't have the
25  qualifications to manage an outhouse?

1   A.   **Swope and Koester too.**

2   Q.   You obviously have given this a great
3   deal of thought. What do you think are the minimum
4   qualifications to hold the office of sheriff of
5   St. Charles County?

6   A.   **I think they're abysmal.**

7   Q.   No. No. My question is unclear, I think.
8   What do you believe the minimal qualifications
9   should be or what qualifications should the sheriff
10  have at a minimum?

11  A.   **Oh, okay. At least 15 years law**
12  **enforcement experience with a minimum of at least**
13  **six of those in a command position or**
14  **administrative position. I believe should be,**
15  **should have completed a law enforcement**
16  **administrative nationally recognized law**
17  **enforcement administrative course such as**
18  **Northwestern Staff and Command, Southern Police**
19  **Institute, FBI National Academy, something of that**
20  **caliber that's nationally recognized.**

21  Q.   Anything else?

22  A.   **That's good starters.**

23  Q.   You attended the FBI National Academy,
24  correct?

25  A.   **Yes, I did.**

1   Q.   When was that?

2   A.   **1990.**

3   Q.   Did you attend those other courses you
4   mentioned?

5   A.   **No. I attended other law enforcement**
6   **administrative training and schools but not**
7   **Northwestern or Southern Police Institute.**

8   Q.   You're familiar with CALEA?

9   A.   **Yes.**

10  Q.   Acronym for Commission on Accreditation
11  of Law Enforcement Agencies?

12  A.   **Yes.**

13  Q.   Is the St. Charles County Sheriff's
14  Department CALEA certified?

15  A.   **We were.**

16  Q.   When was that?

17  A.   **'86 through '90, and when we went for**
18  **recertification the county refused to fund the**
19  **process so we didn't get back into it.**

20  Q.   Who was the sheriff when the CALEA
21  certification was earned?

22  A.   **Ed Uebinger**

23  Q.   Your mention of the county funding
24  prompts a question about the relationship between
25  the sheriff's department and St. Charles County.

1 How would you describe that relationship, and let
2 me preface it further. When there was a vacancy in
3 the sheriff's department for the sheriff, you went
4 through a process on two occasions where you were
5 appointed, correct?
6     A.    Yes.
7     Q.    Otherwise, a sheriff is elected; is that
8 correct?
9     A.    Yes.
10    Q.    What other interactions does the sheriff
11 have with county government?
12    A.    It really depends on the sheriff. We've
13 had some sheriffs who are of the opinion they are
14 the elected, they are elected by the people and
15 they answer only to the people and they are not
16 answerable to county government. I don't manage
17 the sheriff's department that way. I manage more
18 in lines of a police agency. Right now, my
19 relationship with county government is very good.
20 I wouldn't say excellent because we have our
21 differences of opinion. However, an elected
22 official still has to understand that the county
23 human resources department oversees the hiring and
24 firing of personnel. The budget director, finance
25 director is the one who pretty well designates how

1 much money you're going to get to spend on the
2 agency. Let me rephrase that. Human resources and
3 budget committee determines how many personnel you
4 are going to have. So it's a good idea to get
5 along with people who hold the money and hold the
6 personnel strings.
7     Q.    In terms of chain of command reporting,
8 does the sheriff have anyone above him in the chain
9 of command other than the voters?
10    A.    No.
11    Q.    Is it accurate then to say that the
12 sheriff is solely responsible for the policies of
13 the sheriff's department?
14    A.    Yes, sir, it is.
15    Q.    Does the county have any authority,
16 either legally set forth or in practice, to affect
17 any control of the policies of the sheriff's
18 department?
19    A.    There's a personnel administration
20 program that the county personnel department has.
21 So as far as our policies, we can't create a policy
22 that counters or exceeds the personnel
23 administration program that the county has for all
24 employees.
25    Q.    All right. And I take it the control of

1 the purse strings that you have described could
2 also affect the operation of the department?
3     A.    Oh, certainly.
4     Q.    But as far as what the policies call
5 for, use of force policy, internal affairs
6 organization, the various units within the
7 sheriff's department, that's the sheriff's
8 decision?
9     A.    Operational policies, yes.
10    Q.    With regard to Christopher Hunt's
11 continued employment, was that a decision that you
12 made?
13    A.    Yes, it was.
14    Q.    Did you have the ability to terminate
15 Deputy Hunt's employment?
16    A.    Yes, I do.
17    Q.    And you decided not to do that, correct?
18    A.    Correct.
19    Q.    Did you have the power to terminate
20 Jason King?
21    A.    Let me rephrase terminate. I can
22 recommend termination. I do not have the authority
23 to terminate, hire or terminate an individual.
24    Q.    Where do you recommend that to?
25    A.    That has to go to the director of

1 administration has to approve that through human
2 resources.
3     Q.    Did you recommend that Deputy Hunt be
4 terminated?
5     A.    No.
6     Q.    Did you recommend that Jason King be
7 terminated?
8     A.    Yes.
9     Q.    Was Jason King actually terminated?
10    A.    He resigned.
11    Q.    Have you read his deposition testimony?
12    A.    Some of it, yes.
13    Q.    Did you see where he described an event
14 where he was called into your office and had a
15 conversation with you around whether he would stay
16 employed or not?
17    A.    Yes.
18    Q.    And of course the record will speak for
19 itself, but I believe what he said was he was told
20 you can either resign or you'll be fired.
21    A.    That's a lie.
22    Q.    It's a lie?
23    A.    It is a lie, yes, sir.
24    Q.    What actually happened?
25    A.    The day he was scheduled for his meeting

1  to present the termination letter, he came in with
2  a box with his equipment and asked if he could
3  resign.
   Q.    I see. Just so I'm clear, you called
⌄  him in for a meeting, you and he?
6  A.    Well, the bureau commander handles those
7  issues, but he did come down the hall towards my
8  office with a box and he came into my office, asked
9  if he could resign, and I said yes, I need a
10 letter.
11 Q.    Your belief was that on that day, had he
12 not resigned, he was going to receive a letter
13 notifying him he was terminated?
14 A.    Yes.
15 Q.    Was there ever an internal investigation
16 conducted regarding Jason King?
17 A.    Yes.
18 Q.    What prompted that internal
19 investigation?
20 A.    Complainant coming to our office, filing
21 a complaint, and discussing the circumstances with
22 the supervisor who was on duty at that time. And
23 the supervisor took it to the bureau commander,
24 bureau of field operations. They brought it to my
⌄⌄ attention and I directed an internal affairs

1  investigation.
2  Q.    Did anyone else in the sheriff's
3  department at that time have the ability to direct
4  an internal affairs investigation?
5  A.    No.
6  Q.    When the sheriff initiates an internal
7  affairs investigation, is there an automatic
8  protocol that would be followed following that
9  directive?
10 A.    Yes.
11 (PLAINTIFF'S EXHIBIT NOs. 1 THROUGH 4 WERE
12 MARKED FOR IDENTIFICATION)
13 QUESTIONS BY MR. RYALS:
14 Q.    Sheriff, this is Exhibit 1.
15 A.    Do you want me to respond?
16 Q.    I'm just showing it to you. You have
17 had a chance to look at it?
18 A.    Yes.
19 Q.    And your counsel as well?
20 A.    Yes, sir.
   Q.    I represent to you that this was
22 provided to us in response to a request to produce
23 documents and it appears to me to be part of the
24 policy manual from the sheriff's department.
25 A.    Yes, sir.

1  Q.    And the heading on it is internal
2  affairs?
3  A.    Yes, sir.
4  Q.    And it's three pages, correct?
5  A.    Yes, sir.
6  Q.    Before I interrupted to mark this, I
7  think the question was to the effect of is there a
8  protocol that is followed in the sheriff's
9  department when an internal investigation is
10 conducted?
11 A.    Yes, sir.
12 Q.    Would Exhibit 1 reflect that protocol?
13 A.    Yes, sir, it does.
14 Q.    Are there any additional directives or
15 written matter that would tell someone interested
16 in the internal affairs protocol about how they are
17 conducted?
18 A.    No, sir, this is complete.
19 Q.    Now, did you order that an internal
20 affairs investigation be conducted with regard to
21 Deputy Hunt?
22 MS. TEMPLE: I think we've already
23 objected to that and it's irrelevant as to whether
24 or not Jason King in this case.
25 QUESTIONS BY MR. RYALS:

1  Q.    Do you understand the question, sir?
2  A.    I'm not going to answer that question,
3  sir.
4  MS. TEMPLE: His question was whether or
5  not you understood it.
6  THE WITNESS: I understand the question,
7  yes, sir.
8  QUESTIONS BY MR. RYALS:
9  Q.    And you're not going to tell me whether
10 you ordered an internal investigation into Deputy
11 Hunt?
12 A.    No.
13 Q.    The answer is yes, you're not going to?
14 A.    Yes, sir, I'm not going to answer it.
15 MR. RYALS: And that will be certified
16 as well.
17 (CERTIFIED QUESTION)
18 QUESTIONS BY MR. RYALS:
19 Q.    This is Exhibit 2.
20 A.    Yes, sir.
21 Q.    What is that?
22 A.    This is a record of our disciplinary
23 actions from January of 2006 until to date or close
24 to, which is May 19th of this year.
25 Q.    I think your answer is complete in this

1  respect, but is it accurate to say that if a
2  deputy -- strike that.
3       Is that the proper title to give to a
member of your agency or --
5    **A.    Patrol division, yes.**
6    Q.    Some of these may involve sergeants or
7  lieutenants?
8    **A.    Yes.**
9    Q.    And they wouldn't be referred to as
10 deputies, correct?
11   **A.    I would refer to -- well, a general**
12 **classification is deputy sheriff. They may be**
13 **referred to as sergeant or lieutenant in paperwork**
14 **throughout the agency.**
15   Q.    If I use the term sworn member,
16   **A.    Yes.**
17   Q.    -- would that refer to every law
18 enforcement officer in the sheriff's department?
19   **A.    Every commissioned officer, yes.**
20   Q.    Does Exhibit 2 reflect all of the
21 internal investigations that were initiated as to
22 any sworn member from the dates indicated in this
23 document?
24   **A.    The results on this document are not all**
25 **results of internal investigations.**

1    Q.    But are all internal investigations
2  reflected in this document?
3    **A.    Yes.**
4    Q.    In addition, the result -- or strike
5  that.
6        The incident or the charge of the
7  allegation is reflected?
8    **A.    Yes.**
9    Q.    And the result of the investigation?
10   **A.    Yes. Should be. That's not to say,**
11 **there may be an incident where personnel makes**
12 **these entries. They may have forgotten an entry or**
13 **something of that nature, but overall, that**
14 **document should reflect all of the disciplinary**
15 **action from 2006 to date of all personnel.**
16   Q.    All right. Would it reflect an
17 allegation against a sworn member where no
18 disciplinary action was taken?
19   **A.    No.**
20       MS. TEMPLE: This is blank.
         THE WITNESS: It's just an error on the
22 personnel department of an entry.
23       MS. TEMPLE: You need to tell him that.
24       THE WITNESS: Well, I indicated there
25 may from time to time be a clerical error.

1  QUESTIONS BY MR. RYALS:
2    Q.    Right. Does there exist a document that
3  would detail every instance where there was a
4  complaint and no discipline meted out?
5    **A.    No.**
6    Q.    Is this document, Exhibit 2, one that
7  was prepared in response to our request for
8  information or is it --
9    **A.    This is an ongoing document we've had**
10 **for years.**
11   Q.    I see. With regard to Exhibit 2, you
12 distinguish between internal affairs investigations
13 and other types of investigations; is that correct?
14 That is --
15   **A.    Not on the spreadsheet.**
16   Q.    Right.
17   **A.    It wouldn't indicate if it's an IA or if**
18 **it was a citizen's complaint or if it was a fellow**
19 **officer's complaint. It is just a complaint, and**
20 **the disciplinary actions taken as a result of that**
21 **complaint, that complaint was verified.**
22   Q.    What I understood you to testify to was
23 that the Exhibit 2 does -- not every single item
24 listed on Exhibit 2 was an internal affairs
25 complaint?

1    **A.    Correct.**
2    Q.    All right. That's what I wanted to get
3  to. If it's not an internal affairs complaint, how
4  would you otherwise characterize it?
5    **A.    From time to time there's complaints**
6  **from citizens or -- well, most of these are all**
7  **complaints from citizens over a period of time.**
8  **They could be either written complaints that come**
9  **or they can be phone complaints.**
10   Q.    Within Exhibit 2 though, there are
11 instances of internal affairs, complaints, and
12 investigations?
13   **A.    Yes, sir.**
14   Q.    And there's no way to tell by looking at
15 Exhibit 2 which are which?
16   **A.    No, sir.**
17   Q.    What determines when a, let's take a
18 citizen's complaint either by phone or in writing,
19 what determines when that is treated as an internal
20 affairs matter and when it's not?
21   **A.    It depends on the circumstances of the**
22 **complaint. They will normally be reviewed by the**
23 **supervisor, bureau commander. They may very well**
24 **be held at the supervisory level. It depends, like**
25 **I said, on the circumstances of the event. If**

1  someone complains because their son was talked to
2  roughly by the officer, a supervisor will generally
3  talk to that complainant, and nine times out of ten
4  those are resolved over the phone. If it's more
5  serious matters then we do what we call an inquiry
6  to determine as many facts as we can based on the
7  information we have at that time. They will bring
8  it to me. I will review the circumstances and then
9  I will determine if it goes to an IA, if I'm going
10 to direct that an IA be conducted.
11     Q.    Is an inquiry always a first step to an
12 IA?
13     A.    Yes.
14     Q.    Do I understand correctly that not all
15 citizen complaints result in an inquiry?
16     A.    That's true.
17     Q.    And the decision about whether a citizen
18 complaint results in an inquiry is made lower in
19 the chain of command, perhaps at the sergeant or
20 lieutenant's level?
21     A.    Yes, sir.
22     Q.    Is there a written protocol governing
23 when a citizen complaint will be treated as an
24 inquiry as opposed to not?
25     A.    No.

1      Q.    If a citizen complaint is not treated as
2  an inquiry, does the sheriff get informed of that
3  complaint?
4      A.    Generally not.
5      Q.    Is there a record made when there is a
6  inquiry?
7      A.    No.
8      Q.    When you said you do an inquiry, you
9  described some investigation?
10     A.    Yes.
11     Q.    Is that reduced to writing?
12     A.    Sometimes it may be, sometimes it may
13 not. There again, it depends on the circumstances.
14 Generally, a supervisor who inquires into a
15 circumstance may very well reduce that to writing
16 and submit that to the bureau commander who then
17 generally would discuss it with me.
18     Q.    But there's no requirement that it come
19 up the chain of command to the sheriff, correct?
20     A.    No.
21     Q.    That is correct or not correct?
22     A.    That is correct.
23     Q.    I take it then since there's no record
24 made of an inquiry routinely, if there is no
25 inquiry, is it accurate to say there's no record at

1  all of that?
2      A.    Not necessarily. Some of these
3  supervisors may reduce it to writing and some may
4  not. It depends on what the nature of the
5  complaint was and other circumstances involved. It
6  may or may not be in writing. It's not required
7  that an inquiry be reduced to writing.
8      Q.    This term, you said do an inquiry, is
9  that a specific term of art in your agency?
10     A.    Yes.
11     Q.    The definition of the term or the
12 protocol around doing the inquiry is not reduced to
13 writing anywhere, correct?
14     A.    That's true.
15     Q.    So that would be an example of something
16 that happened in your department based on a general
17 understanding or custom; is that accurate?
18     A.    Yes.
19     Q.    Does the general understanding or custom
20 around how inquiries are handled, is that with your
21 approval as the sheriff?
22     A.    Yes.
23     Q.    Is this a situation where you have
24 issued some sort of directive to those under your
25 command about how an inquiry will be handled or is

1  it a situation where inquiries have sort of been
2  handled this way and you approve of it after the
3  fact?
4      A.    That's the way it's been done
5  traditionally for several years, and I've discussed
6  it with our commanders. I have four bureau
7  commanders and yes, it is with my approval.
8      Q.    As opposed to with you initiating it?
9      A.    Yes.
10     Q.    The four bureau commanders, sir, who are
11 they?
12     A.    Captain Todd, Captain Kaiser, Captain
13 Hudson, Captain Simcox.
14     Q.    Have you been your bureau commanders
15 the entire time you have been the sheriff?
16     A.    Yes, sir.
17     Q.    I should say the last time you were the
18 sheriff.
19     A.    This time, yes.
20     Q.    Do you have a major?
21     A.    No, I don't.
22     Q.    Was Captain Todd a major at one time?
23     A.    At one time.
24     Q.    Why is he now a Captain?
25     A.    We changed sheriffs and we changed

1 procedures, and the previous sheriff deemed he
2 needed a major, as sheriff I deem I don't need a
3 major.
   Q.   Administrative decision?
   A.   **Yes, sir.**
6  Q.   As opposed to performance related or
7 disciplinary?
8  A.   **Yes.**
9  Q.   Would your change, the change you
10 described where you didn't want a major but you
11 wanted four captains,
12 A.   **Yes, sir.**
13 Q.   -- would that be an example of a policy
14 change that the sheriff has sole decision making
15 authority over?
16 A.   **No, sir.**
17 Q.   What -- why is that not accurate?
18 A.   **Any change in the personnel**
19 **administration has, in most cases has to be**
20 **approved by the county council. If you are going**
21 **to change your FTE, your full time equivalency, it**
22 **has to be approved by the county council. If I**
23 **wanted to eliminate a captain and create a major, I**
24 **can't do that. I don't have the authority to do**
25 **that. That has to be approved by the county**

1 council.
2  Q.   The approval by the council, is it
3 accurate to say that that is approval of the
4 budgetary aspect of that decision?
5  A.   **No.**
6  Q.   All right. What is it approval of?
7  A.   **The change of personnel and the movement**
8 **of personnel within the department. If I wanted to**
9 **eliminate three sergeants and make two lieutenants,**
10 **if the money is the same, I still have to get**
11 **approval from the county council to do that.**
12 Q.   Have you ever had an occasion where you
13 have asked for approval to make a change internally
14 in the department that you were denied?
15 A.   **No.**
16 Q.   We've talked around the chain of command
17 and other aspects of your job as the sheriff of
18 St. Charles County where you have had to interact
19 with the county and you just described one where
20 you said you need approval to make a particular
21 kind of change, correct?
22 A.   **Correct.**
23 Q.   Are there any others, sir? Any other
24 instances where you have to get county approval
25 before you can implement a change?

1  A.   **To hire and fire.**
2  Q.   Let's take a situation where you have an
3 authorized strength of a hundred deputies, a
4 hundred sworn personnel.
5  A.   **Yes, sir.**
6  Q.   And the hundredth individual retires or
7 quits.
8  A.   **Yes, sir.**
9  Q.   So now you've got a billet that is
10 vacant; is that accurate?
11 A.   **Yes.**
12 Q.   When you seek to fill that spot, are you
13 saying you have to get approval to hire a new
14 deputy?
15 A.   **Yes.**
16 Q.   And similarly, if you seek to terminate
17 the employment of a deputy, do you have to get
18 approval for that?
19 A.   **Yes.**
20 Q.   Have you ever been denied a request to
21 hire a deputy?
22 A.   **No.**
23 Q.   Have you ever been denied a request to
24 terminate the employment of a member of your
25 department?

1  A.   **Yes.**
2  Q.   How many times has that occurred?
3  A.   **Once.**
4  Q.   When did that occur?
5  A.   **Probably 2000-- well, I need to rephrase**
6 **that. I was not sheriff at that time.**
7  Q.   I see. You have some information, some
8 awareness of a request to terminate someone?
9  A.   **Yes.**
10 Q.   That was denied?
11 A.   **Yes.**
12 Q.   That would have been what year, sir?
13 A.   **Probably 2000 -- can I ask the counselor**
14 **a question?**
15 (OFF THE RECORD DISCUSSION)
16 QUESTIONS BY MR. RYALS:
17 A.   **My estimate, around 2002.**
18 Q.   At that time you were captain in the
19 department?
20 A.   **Yes, I was.**
21 Q.   Did you have a role in the decision
22 making to attempt to terminate this employee?
23 A.   **Yes.**
24 Q.   A recommending role?
25 A.   **Yes.**

1    Q.    Is this employee still a member of the
2 sheriff's department?
3    A.    No.
    Q.    Do you know why this employee is no
⌄ longer a member?
6    A.    He resigned.
7    Q.    Without telling me the name of the
8 individual, what were the circumstances around the
9 effort to terminate that individual's employment?
10    A.    There had been some disciplinary issues
11 with the individual and we had a complaint come in
12 in reference to another complaint come in, and
13 through progressive discipline, the department
14 realized that there wasn't going to be any
15 improvement in the individual, so there was some
16 allegations of misconduct on the part of the
17 officer, so the sheriff at that time decided to
18 terminate him and it went through the process.
19         MS. TEMPLE:  Tell him what process.
20    A.    It went through our disciplinary review
21 process and the recommendation to terminate was
22 upheld at our level, pre-disciplinary review.  It
23 went to the Merit Commission hearing and the Merit
24 Commission determined that the individual should be
⌄⌄ retained with a severe disciplinary action.

1    Q.    Is the Merit Commission a body of the
2 St. Charles County government?
3    A.    The Merit Commission is a body under
4 which all employees work based on the guidelines
5 established by the Merit Commission.
6    Q.    That is, the Merit Commission is not an
7 arm of the sheriff's department, correct?
8    A.    No, sir.
9    Q.    It's an arm of the county government?
10    A.    Yes, sir.
11    Q.    Is it accurate to say, as far as you
12 know, the Merit Commission exists to review
13 termination decisions for any county employee?
14    A.    Yes, in addition to establishing work
15 conditions, etc., etc.
16    Q.    Again, without -- I don't care about
17 great detail and I certainly don't want to know the
18 name of the individual, but what were the -- what
19 was the substance of the allegations against this
20 individual?
21    A.    Excessive force.
22    Q.    Do you know the circumstances of the
23 resignation of this individual?
24    A.    No, sir.
25    Q.    When did this individual resign?

1    A.    Two days after he was reinstated.
2    Q.    When a sworn member of law enforcement
3 community comes to work for an agency like St.
4 Charles County Sheriff's Department, the department
5 is required to report to POST; is that correct?
6    A.    Yes.
7    Q.    POST is an acronym for Peace Officer
8 Standards and Training?
9    A.    Yes.
10    Q.    That's a state agency that keeps track
11 of the employment at least of all peace officers in
12 the state of Missouri, correct?
13    A.    Yes, sir.
14    Q.    When a sworn member separates from a
15 department, the department is required to report
16 that to POST?
17    A.    Yes, sir.
18    Q.    Now with regard to the individual we've
19 been discussing who the Merit Commission decided
20 not to terminate,
21    A.    Yes.
22    Q.    -- did the department send any sort of
23 information to POST about that individual's
24 qualification to be a police officer?
25    A.    I have no idea, sir.

1    Q.    During your entire tenure this time,
2 have you always had four bureau commanders at the
3 captain level?
4    A.    Yes, sir.
5    Q.    That was the change you made when you
6 came in?
7    A.    Yes, sir.
8    Q.    Did you make it before or after you got
9 elected?
10    A.    After.
11    Q.    Briefly please describe the job
12 responsibilities of each of the bureau commanders.
13    A.    Bureau field operations commander is
14 responsible for the hours of the operations of the
15 field operations, deputies and communications or
16 the dispatchers.
17    Q.    May I interrupt you, sir?
18    A.    Sure.
19         MR. RYALS:  Why don't we mark this.
20         (PLAINTIFF'S EXHIBIT NO. 6 WAS MARKED
21         FOR IDENTIFICATION)
22 QUESTIONS BY MR. RYALS:
23    Q.    You have a copy of Exhibit 6 in front of
24 you, correct?
25    A.    Yes.

1     Q.    And I asked the responsibilities of the
2 four bureau commanders, and it appears this is a
3 table of organization for the sheriff's department?
4     A.    **Yes, sir, it is.**
5     Q.    Dated January 28th of '13, correct?
6     A.    **Yes, sir.**
7     Q.    Is this the table of organization that's
8 been in effect since you were the sheriff?
9     A.    **Yes, sir, it is.**
10     Q.    There's handwriting next to the boxes,
11 the four boxes immediately below the sheriff,
12 correct?
13     A.    **Yes, sir.**
14     Q.    And it says captain, captain, captain,
15 captain?
16     A.    **Yes, sir.**
17     Q.    So if we look at this table of
18 organization, we can see what responsibilities each
19 bureau commander has under them, correct?
20     A.    **Yes, sir.**
21     Q.    Which bureau does Captain Todd have
22 charge of?
23     A.    **Bureau of special enforcement.**
24     Q.    I don't want to -- without your
25 permission I don't want to mark on a marked

1 exhibit, but if I put the name Todd after that?
2     A.    **Sure.**
3     Q.    I'll have you review it to make sure
4 it's accurate. Bureau of special enforcement is
5 Todd. How about Captain Kaiser?
6     A.    **Captain Kaiser is bureau of field**
7 **operations.**
8     Q.    That's K-A-I-S-E-R?
9     A.    **Yes, sir.**
10     Q.    Hudson?
11     A.    **Bureau of administration.**
12     Q.    And Simcox is criminal investigation?
13     A.    **Yes, sir.**
14     Q.    Under the bureau of field operations, it
15 appears that you have a patrol division and
16 communication, correct?
17     A.    **Yes, sir.**
18     Q.    And it looks like your department is
19 organized in the patrol division around three
20 shifts?
21     A.    **Yes, sir.**
22     Q.    And how does the communications side of
23 bureau of field operations differ from the patrol
24 division?
25     A.    **I don't understand your question, sir.**

1     Q.    Well, under the communications
2 subheading, you have three shifts as well?
3     A.    **Yes, sir.**
4     Q.    Are those all dispatchers?
5     A.    **Yes, sir.**
6     Q.    Under the patrol division side, how many
7 deputies, that is patrol deputies, are assigned to
8 each shift?
9     A.    **It varies. Right now, under the current**
10 **shift assignments there is -- do you mind if I go**
11 **to my notes?**
12     Q.    No, No. Please.
13     A.    **Day shift has 23, evening shift has 28,**
14 **midnight shift has 23.**
15     Q.    Given those numbers, how many deputies
16 would be on duty at any given shift?
17     A.    **On days anywhere from 10 to 13, on**
18 **evenings anywhere from 12 to 15. The highest**
19 **number can vary. The low number is minimum**
20 **manpower, it wouldn't vary. Midnight shift**
21 **anywhere from 9 to 13, and on occasion they would**
22 **have as many as 23.**
23     Q.    Mr. King testified about a power shift,
24 are you familiar with that term?
25     A.    **Yes, sir. I noticed an error on the**

1 **organizational chart.**
2     Q.    All right. Please point it out.
3     A.    **Under communications there is no**
4 **sergeant on shift one and shift two and shift**
5 **three. Those are supervised by lead dispatchers.**
6     Q.    I see. Are the communications people
7 sworn members?
8     A.    **No, sir. The division commander only.**
9     Q.    That would be a lieutenant?
10     A.    **Yes, sir.**
11     Q.    And it appears that at the level
12 immediately below the bureau of commanders you have
13 the patrol division, but then you have other
14 functions that are not called divisions, correct?
15     A.    **Yes. They may be sections.**
16     Q.    Back to the question about the power
17 shift.
18     A.    **Okay. Power shift or fourth shift, that**
19 **is a shift that's been used periodically. We first**
20 **started using it in the middle '90s, I believe, and**
21 **we used it for four or five years, and then we**
22 **reinstated it probably around 2006, somewhere in**
23 **that area. It may have been before that, but then**
24 **we are back to three shifts now. The power shift**
25 **or fourth shift was just a shift that was**

1   designated to pick up the late evening and early
2   midnight manpower. You try to set up your
3   workforce where your workload is. Highest call
4   load between 7:00 in the evening and 2:00 to 3:00
5   in the morning. So with that fourth shift there
6   was additional layover personnel, shall we say,
7   between evening shift and midnight shift.
8       Q.    Were those on the power shift assigned
9   to a particular geographic patrol area?
10      A.    **Yes.**
11      Q.    So there would just be another car in
12   specific zones?
13      A.    **Just another shift.**
14      Q.    In addition to second and third shift?
15      A.    **Yes.**
16      Q.    Then you have specific officers who are
17   K-9 officers?
18      A.    **Yes, sir.**
19      Q.    What's the manpower there?
20      A.    **I've got five now. They are worked into**
21   **the regular shifts.**
22      Q.    They actually, even though they are set
23   -- the box on the organizational chart is that they
24   work regular shifts?
25      A.    **Yes.**

1      Q.    Is the bureau of criminal investigations
2   what would commonly be called detectives?
3      A.    **Yes.**
4      Q.    The bureau of administration has under
5   it civil process, correct?
6      A.    **Yes.**
7      Q.    And those are deputies who go out and
8   serve process for the courts?
9      A.    **Yes, sir.**
10      Q.    Are they sworn members?
11      A.    **Yes, they are.**
12      Q.    Do they do that work full time?
13      A.    **Yes, they do.**
14      Q.    And then what is records?
15      A.    **Records is just that. They maintain all**
16   **of the records, they issue the CCW permits, they**
17   **prepare the UCR report, they file all of the police**
18   **reports. I'm sure they do a lot more and I'm**
19   **embarrassed because they would hate me if I didn't**
20   **tell everything they did.**
21      Q.    Maybe you will remember something else,
22   you can add it later if you want. Is it accurate
23   that professional standards, is that referred to as
24   internal affairs?
25      A.    **Yes.**

1      Q.    Is there any other aspect of
2   professional standards other than internal affairs?
3      A.    **Yes. Mobile data terminal program comes**
4   **under professional standards.**
5      Q.    Mold data?
6      A.    **Mobile.**
7      Q.    Mobile. I beg your pardon.
8      A.    **Police car computers. Yes. IA mobile**
9   **data terminals, and to be quite honest, any other**
10   **issues that may come up that need attention that**
11   **isn't directly assigned to somebody else.**
12      Q.    For example?
13      A.    **Well, they also -- let me include in**
14   **that policy and procedures, background**
15   **investigations pretty well consists of professional**
16   **standards, IA, mobile data, backgrounds.**
17      Q.    The professional standard, would you
18   call that a division?
19      A.    **That's a section under administrative**
20   **services.**
21      Q.    Is commanded by a lieutenant; is that
22   right?
23      A.    **He is a lieutenant. He answers to the**
24   **captain.**
25      Q.    Who is the lieutenant in professional

1   standards?
2      A.    **Kevin Broom.**
3      Q.    Has he been the lieutenant in
4   professional standards the entire time you have
5   been the sheriff?
6      A.    **No.**
7      Q.    Who preceded him?
8      A.    **My wife.**
9      Q.    Her name?
10      A.    **Peggy.**
11      Q.    And before Peggy?
12      A.    **I'm trying to think if we had**
13   **professional standards before. I believe Sheriff**
14   **Swope created that position.**
15      Q.    The table -- I'm glad you said that.
16   The table of organization that's reflected by
17   Exhibit 6, was this in effect when you became the
18   sheriff the last time?
19      A.    **It's close. Prisoner transport -- I'm**
20   **sorry, fugitive unit, when I took over was under**
21   **criminal investigations. That was moved to bureau**
22   **of special enforcement. K-9 was under bureau of**
23   **special enforcement at the time I took office. I**
24   **moved that shortly after over to bureau of field**
25   **operations. But overall, this is the**

1 organizational chart.

2 Q. That existed when you took office?

3 A. **Yes.**

Q. Was your wife the head of professional

5 standards when you became the sheriff or after you

6 became the sheriff?

7 A. **When I became sheriff.**

8 Q. She already had that position?

9 A. **Yes.**

10 Q. Is it accurate to say you were in her

11 chain of command?

12 A. **I was in her chain of command?**

13 Q. Yes.

14 A. **Not at work.**

15 Q. Well, she would report to the bureau

16 chief, correct, Captain Hudson?

17 A. **Let me back up a little bit. When I was**

18 **appointed she was in professional standards.**

19 Q. Right.

20 A. **Okay. Once I was appointed, then she**

21 **answered to Captain Hudson who I appointed to the**

22 **bureau of administrative services.**

23 Q. Right.

24 A. **Yeah.**

Q. The chain of command goes above her

1 immediate report though, correct?

2 A. **Yes.**

3 Q. And you were above her in the chain of

4 command?

5 A. **Yes.**

6 Q. I'm sorry to refer to her as Peggy, was

7 she a lieutenant? I want to give her her rank.

8 A. **Yes.**

9 Q. Lieutenant Neer, is she still a member

10 of the department?

11 A. **No.**

12 Q. Did her separation have anything to do

13 with the fact that you were the sheriff?

14 A. **Personally or legally?**

15 Q. At any level.

16 A. **She chose to retire after 31 years with**

17 **the department shortly after I was appointed**

18 **sheriff.**

19 Q. Was her decision to retire something

20 that you communicated with her about at the

21 professional level?

22 A. **No, sir.**

23 Q. Did you perceive any problem with your

24 wife serving in the department that you ran?

25 A. **I was uncomfortable with it.**

1 Q. What's the total strength of the

2 St. Charles County Sheriff's Department, sworn

3 members?

4 A. **164 sworn.**

5 Q. Including you?

6 A. **Yes, sir.**

7 Q. Is that the full authorized strength or

8 is that your present census?

9 A. **That's full authorized strength.**

10 Q. Are you fully staffed?

11 A. **No.**

12 Q. What's your present --

13 A. **I'm short two dispatchers and one**

14 **records clerk and one bailiff, and those will be**

15 **filled prior to the end of August.**

16 Q. Is the bailiff a sworn member?

17 A. **Yes.**

18 Q. So aside from the bailiff, you are fully

19 staffed as far as sworn members?

20 A. **Yes.**

21 Q. Over your tenure as the sheriff, has

22 that generally been the case, you've been fully

23 staffed?

24 A. **No. Oh, as sheriff?**

25 Q. Yes.

1 A. **No. No.**

2 Q. What's the rate of turnover for sworn

3 members in your department?

4 A. **An average would be three percent or**

5 **less.**

6 Q. Annually?

7 A. **Yes.**

8 Q. That sounds pretty good.

9 A. **Some years there's none, some years**

10 **there's one to three percent.**

11 Q. Is that all separations, voluntary and

12 involuntary?

13 A. **Yes.**

14 Q. If one wanted to examine all of the

15 records of complaints -- strike that.

16 If one wanted to examine all of the

17 records of internal affairs complaints, how would

18 one access that information?

19 A. **Through the courts.**

20 Q. The courts have all internal affairs

21 complaints in their records?

22 A. **No. I'm sorry. I misunderstood your**

23 **question. Where do we house them?**

24 Q. Right.

25 A. **Our department, personnel section.**

1    **Q.**    And they keep track of all complaints?

2    **A.**    **Yes. I'm sorry, all internal affairs.**

3    **Q.**    How is that data kept? Are they individual files or do you keep some sort of record that perhaps is accessible by computer?

6    **A.**    **No, individual files.**

7    **Q.**    That would be all internal affairs

8 complaints sustained or not sustained, correct?

9    **A.**    **Yes.**

10    **Q.**    If an internal affairs complaint

11 resulted in -- if it was sustained, then we would

12 find it, at least for the time period here on

13 Exhibit 2?

14    **A.**    **Yes.**

15    **Q.**    And there is no accumulation of data for

16 not sustaining?

17    **A.**    **No. Let me rephrase that. On the IA,**

18 **the nonsustained would be on file. Did you mean**

19 **the IAs or all complaints?**

20    **Q.**    I'm just talking about IAs.

21    **A.**    **IAs, yes. If they're not sustained**

22 **they're still on file.**

23    **Q.**    Those are in individual files as opposed

24 to accumulated and created where you would create

25 statistics?

1    **A.**    **They're separate and apart from anything**

2 **else.**

3    **Q.**    Single files?

4    **A.**    **Yes.**

5    **Q.**    I'm familiar with, and perhaps you are

6 as well, another agency, St. Louis Metropolitan

7 Police Department. Every year they publish

8 statistics and you get a list of all complaints and

9 then their disposition, sustained, not sustained,

10 exonerated, unfounded. And the complaints are

11 broken down by categories that they've come up with

12 and those are published to the public.

13    **A.**    **Uh-huh.**

14    **Q.**    Does your department accumulate or

15 gather the statistics of complaints and their

16 dispositions?

17    **A.**    **On this spreadsheet.**

18    **Q.**    Exhibit 6?

19    **A.**    **Yes, sir.**

20    **Q.**    Now, the example I'm giving you from the

21 city, they will also include complaints that were

22 not sustained. Does your department gather that

23 data?

24    **A.**    **No. We don't gather that data**

25 **specifically. If we have formal complaints from**

1 citizens come in and they are unsustained, those

2 are on file. But as far as every single complaint

3 that comes into the department, do we publish and

4 categorize what those complaints are, no.

5    **Q.**    Do you publish and categorize what the

6 -- strike that.

7        The formal complaints of citizens are?

8    **A.**    **No, we don't publish those.**

9    **Q.**    Do you keep them though? Do you gather

10 them?

11    **A.**    **The formal complaints, yes.**

12    **Q.**    Would they be in a spreadsheet similar

13 to Exhibit 2?

14    **A.**    **If they were sustained.**

15    **Q.**    And if they're not?

16    **A.**    **They wouldn't be on this sheet.**

17    **Q.**    Not Exhibit 2, but like Exhibit 2, in

18 this format?

19    **A.**    **They would not be in that format, no.**

20    **Q.**    What format would they be in?

21    **A.**    **They would be in the individual**

22 **officer's file.**

23    **Q.**    Is there a separate file kept for formal

24 complaints regarding each officer?

25    **A.**    **If there's a formal complaint against a**

1 specific officer, that complaint would go, unless

2 it's an IA, would go in his or her personnel file.

3    **Q.**    And the example of an IA complaint

4 against an officer, are all IA complaints against a

5 given officer kept in a single file?

6    **A.**    **Yes.**

7        MR. RYALS: You're looking at your

8 watch, is it time for a break?

9        MS. TEMPLE: No, I'm just looking.

10 QUESTIONS BY MR. RYALS:

11    **Q.**    Would you like a break?

12    **A.**    **(Witness indicated no).**

13    **Q.**    As a manager or administrator of a

14 police agency, do you, either yourself or at your

15 direction utilize the information that would be

16 contained in an officer's complaint file in any

17 respect relative to that officer?

18    **A.**    **I think I understand your question. If**

19 **there's information about an officer's behavior and**

20 **that officer applies for a promotion or specialized**

21 **unit or something like this, that information would**

22 **be used along with several other categories with**

23 **that officer.**

24    **Q.**    Take a hypothetical, officer applying to

25 become a member of the fugitive squad or something,

1 that officer has four not-sustained internal
2 affairs complaints, your testimony is that those
3 four not-sustained complaints would be considered
4 in the context of whether that officer might get
5 that assignment?
6 **A.    That would not be the determining**
7 **factor.  That would be weighed in with the other**
8 **criteria for that promotion assignment or -- and**
9 **these issues would also be considered for the**
10 **officer's individual evaluations.**
11     Q.    All right.  So not-sustained complaints
12 do have some value going forward relative to that
13 particular officer?
14 **A.    They have some value.  They are not**
15 **ignored.**
16     Q.    How about if an officer, let's focus on
17 the specific context of a subsequent complaint,
18 same hypothetical officer has four not-sustained
19 complaints in their file and receives a fifth, does
20 the four not-sustained complaints have any bearing
21 on what happens in the fifth?
22 **A.    If they are not sustained, no, but you**
23 **certainly have to take them into consideration.**
24     Q.    How would you take them into
25 consideration?  I mean, if you said they are not

1 sustained, no, how would you take them into
2 consideration?
3 **A.    Just the fact that they are there.  Yes,**
4 **they are sustained so as far as any official**
5 **action, you have to consider they weren't**
6 **sustained.  In other words, well, unsustained or**
7 **exonerated, you would have to take that into**
8 **consideration.  You may have a situation where**
9 **there's a complaint against the officer, it's not**
10 **sustained because you could have several things**
11 **like lack of cooperation by the complainant.  If**
12 **you can't obtain the information that you need to**
13 **make a decision, to sustain what this complaint is,**
14 **then it's unsustained.  It doesn't mean it's**
15 **unfounded.  It doesn't mean they're exonerated.  It**
16 **means you were unable to sustain it.  So if you've**
17 **got four unsustains, a light bulb is going to go**
18 **off.**
19     Q.    What does that mean, a light bulb is
20 going to go off?
21 **A.    It means you will be considering those**
22 **issues when you are dealing with the issue at hand.**
23 **Would you base a decision on it, not necessarily,**
24 **but you can't totally ignore it.**
25     Q.    I take it you have had some

1 indoctrination, training, exposure to the
2 importance of the internal affairs function in the
3 police agency?
4 **A.    Yes, sir.**
5     Q.    You went to the national academy, the
6 FBI National Academy?
7 **A.    I've taken three courses in internal**
8 **affairs investigations myself.**
9     Q.    Right.  And as a commander and chief of
10 a 150 plus person law enforcement agency, would you
11 agree with the proposition that an effective
12 internal affairs function is important for that
13 organization?
14 **A.    Oh, certainly.**
15     Q.    Are you able to articulate why it's
16 important?
17 **A.    Well, there's several reasons.  Number**
18 **one, that guides the integrity of the agency to**
19 **begin with.  Number two, it is directly involved**
20 **with the operations of the department, the**
21 **responsibilities to the public, and the**
22 **responsibilities to either the county or the city**
23 **depending on what kind of entity it is.  The**
24 **internal affairs function pretty well is the**
25 **internal court for any law enforcement agency.**

1     Q.    What is the risk to the agency -- strike
2 that.
3         What is the risk in general if the
4 internal affairs function does not operate
5 effectively?
6 **A.    Lack of trust, not only among the**
7 **employees but lack of trust from the general**
8 **public, lack of trust from those you are**
9 **responsible to.  In case of a city police**
10 **department or be it the city council or mayor or**
11 **the city administrator, whomever.  In our**
12 **particular situation, the trust of the people that**
13 **we serve.**
14     Q.    I've seen verbiage to the effect that
15 lax discipline, L-A-X discipline, fosters
16 misconduct.  Do you agree with that?
17 **A.    Yes, I agree with that.**
18     Q.    Is it important for your sworn members
19 to understand that if they engage in misconduct
20 they will be held accountable by the command staff?
21 **A.    Yes.**
22     Q.    Is it important for the members to
23 understand that if they engage in discipline --
24 strike that, that entire question.
25         Is it important for the members to

1 understand that the disciplinary system is
2 administered fairly and equally among all the
3 members?

  A. **As much as possible, yes.**

4  Q. I take it that that's a morale issue as
6 well, correct?

7  A. **It can be, yes.**

8  Q. Now, did you read any part of Mr. King's
9 testimony where he described a difference in how
10 some members were treated as opposed to others?

11  A. **Yes, I did.**

12  Q. Is that -- is his account an accurate
13 account of the way the disciplinary system has
14 worked in your department?

15  A. **No, it's not.**

16  Q. If you take as true his accounts, and I
17 understand you are not, you disagree with the way
18 he's described the way the disciplinary system
19 operates, right?

20  A. **I totally object to it, yes.**

21  Q. I want to be clear. I am not trying to
22 suggest that you agree with it, but if you take his
23 account as true, would you agree that that is an
24 inappropriate way for the disciplinary system to
25 operate in your department, if you accept as true

1 what he has said?

2  A. **If I accepted what he said, it would not
3 be proper.**

4  Q. Would you characterize his description
5 as unequal applications of the rules?

6  A. **I would describe his description as not
7 knowing a whole heck of a lot about what he was
8 talking about in those individual incidents that he
9 describes.**

10  Q. I understand. But again, if he's
11 accurate, if he's telling the truth and it's
12 accurate, would you agree that he's described
13 unequal application of the rules?

14  A. **That's what he described, but as stated
15 before, it is totally false.**

16  Q. You can say that as many times as you
17 want.

18  A. **You can ask me that as many times as you
19 want.**

20  Q. I'm not trying to trick you into saying
21 it's true. If you take his accounts as true, would
22 you agree that he has described, at least for part
23 of the department, lax discipline?

24  A. **Once again, if I assumed what he said
25 was true, yes.**

1  Q. Now, with your permission, I'd like to
2 take a break, is that acceptable?

3  A. **Sure.**

4  (OFF THE RECORD DISCUSSION)
5 QUESTIONS BY MR. RYALS:

6  Q. Did you have any role in helping
7 Christopher Hunt post an appeal bond?

8  MS. TEMPLE: I object. It's irrelevant
9 to this preceding. Subject to that, you can answer
10 if you want to.

11  THE WITNESS: I don't understand the
12 question.
13 QUESTIONS BY MR. RYALS:

14  Q. Did you post an appeal bond for
15 Christopher Hunt?

16  A. **No, I did not.**

17  Q. Did you assist him in arranging for the
18 appeal bond?

19  A. **No.**

20  Q. Had no role in it whatsoever?

21  A. **I loaned his family some money.**

22  Q. The total amount of the bond, sir?

23  A. **I believe it was 10,000.**

24  Q. I take it that there's no part of that
25 event that would violate your department's

1 policies, correct?

2  A. **No, absolutely not.**

3  Q. Is there any guidance for the sheriff,
4 sir, as to when an internal affairs investigation
5 is ordered versus not being ordered, or is that the
6 sheriff's --

7  A. **That's the sheriff's discretion by
8 policy.**

9  Q. If you look at Exhibit 2, do you have a
10 copy of that?

11  A. **I did somewhere.**

12  MS. TEMPLE: Here you go.
13 QUESTIONS BY MR. RYALS:

14  Q. After the name of the individual in the
15 horizontal column, there is a vertical column
16 labeled type?

17  A. **Yes.**

18  Q. What I see are entries that are either a
19 C, an R, or a blank. Do you know what the C means?

20  A. **C is a counseling form.**

21  Q. And R?

22  A. **Reprimand.**

23  Q. So when you see these various -- or
24 these designated C or R, what does that tell you
25 about what occurred in a given instance?

1    A.    **Very little, other than the fact that**
2 **the individual was issued a supervisory incident**
3 **form, and depending on what the violation was, the**
4 **discipline was determined to be either counseling**
5 **or reprimand.**
6    Q.    Maybe we can --
7    A.    **And --**
8    Q.    I'm sorry?
9    A.    **I'm trying to remember the question you**
10 **asked. How would I know by what the designation**
11 **is?**
12    Q.    What does it tell you, if anything?
13    A.    **Well, if it's counseling form, it's, I**
14 **don't want to say a minor nature, but not a serious**
15 **nature violation. If it's a reprimand, the chances**
16 **are most likely that individual has had**
17 **counseling forms in the past, so the reprimand is**
18 **our form of progressive discipline. And when you**
19 **get down into the terminations, although there are**
20 **a few single acts that result in termination,**
21 **approval means that that individual has had several**
22 **disciplinary incidents.**
23    Q.    Now what I'm going to hand you is what
24 I've marked as Exhibit 5. And if you will quickly
25 identify this as a number of different documents,

1 and it appears to me that these all pertain to
2 Jason King. Take a look.
3    A.    **Are these in date order by any chance?**
4    Q.    I'm not going to represent to you they
5 are or aren't. I'm sorry. You can take the
6 paperclip off if it's easier.
7    So is Exhibit 5 a series of documents
8 pertaining to Jason King?
9    A.    **Yes, sir.**
10    Q.    Is each stapled document within
11 Exhibit 5 the same form over and over again?
12    A.    **Yes, sir.**
13    Q.    And what would you call this form?
14    A.    **Supervisory incident form.**
15    Q.    Tell me when one of these is prepared.
16    A.    **When there is -- an incident occurs and**
17 **disciplinary action is determined, then generally**
18 **the shift supervisor will complete the supervisory**
19 **incident form and then submit it up the chain,**
20 **providing the information to the next senior**
21 **officer, and then eventually it gets to me.**
22    Q.    When it comes to you, the sheriff, is
23 that because there's been a recommendation for some
24 discipline?
25    A.    **Yes, sir.**

1    Q.    If there's a recommendation for no
2 discipline, would this form ever be prepared?
3    A.    **No.**
4    Q.    When you receive supervisor incident
5 forms, is one of the determinations that you are
6 going to make whether discipline should be meted
7 out or not?
8    A.    **Yes. If the recommended discipline**
9 **meets the violations.**
10    Q.    Is another decision that you have to
11 make or could make, is a better way to ask it, to
12 commence an internal affairs investigation?
13    A.    **The information of anything of a serious**
14 **enough nature that would require an internal**
15 **affairs investigation comes generally before that.**
16    Q.    On the inquiry form?
17    A.    **Yes.**
18    Q.    All right. So is it accurate to say
19 that the supervisor incident form is utilized for,
20 not to minimize the gravity of any given event in
21 this exhibit, but more minor types of
22 transgressions?
23    A.    **For the most part, yes. The counseling**
24 **where it's indicated, the counseling or reprimand,**
25 **it's to inform the individual that we are aware of**

1 **the circumstance, the situation, the corrective**
2 **action that we are trying to gain from the employee**
3 **by documenting certain events that have happened.**
4    Q.    And in Exhibit 2, there are a large
5 number of counselings reflected in that exhibit.
6    A.    **Yes.**
7    Q.    What exactly is a counseling in your
8 department?
9    A.    **The written counseling is a formal**
10 **record or document that the negative behavior or**
11 **actions of the employee have been discussed with**
12 **the employee by the supervisor and that it is going**
13 **to be a part of the record.**
14    Q.    Is that the same as a written reprimand?
15    A.    **Written reprimand is the next**
16 **progressive step in addressing the violations of**
17 **the employees.**
18    Q.    Does Exhibit 5 reflect written
19 counseling?
20    A.    **Some of it, yes. I believe there is**
21 **some written counseling and some reprimand.**
22    Q.    But in any event if there was a
23 non-written reprimand, I guess by definition you
24 wouldn't have a record that that occurred?
25    A.    **No. If there was a conversation between**

1 a supervisor and a subordinate about he needs to
2 pick it up a little bit or, you know, your car
3 looks like you have been sleeping it in for the
4 last three days or something like that, that would
5 not be documented on a supervisor incident form.
6     Q.    Would it be documented anywhere?
7     A.    **No. Third time you had to tell him it**
8 **would be.**
9     Q.    Exhibit 3, sir?
10     A.    **Yes, sir.**
11     Q.    I'm going to take a guess, but is
12 Exhibit 3 just a record of the individual documents
13 in Exhibit 5?
14     A.    **Yes, sir. A synopsis of the supervisor**
15 **incident form.**
16     Q.    In Exhibit 2, if you look at the fifth
17 page in, quarter of the way up, 1/11/08, Jason
18 King, do you see that?
19     A.    **Page five, oh, from the bottom up. Yes.**
20     Q.    This reflects, first of all, under type
21 the box is blank, would you expect the box to be
22 blank given the circumstances --
23     A.    **Yes.**
24     Q.    -- of this record?
25     A.    **Yes.**

1     Q.    In this case, Deputy King received
2 neither a counseling or a reprimand, correct?
3     A.    **I believe his supervisor incident form**
4 **indicates reprimand with recommended disciplinary**
5 **termination. You won't find that in there.**
6     Q.    I just picked up Exhibit 5, you said I
7 won't find that in Exhibit 5, right?
8     A.    **On the supervisor incident form?**
9     Q.    Yes.
10     A.    **For this incident?**
11     Q.    Yes.
12     A.    **No.**
13     Q.    Where is it?
14     A.    **In the internal affairs file.**
15     Q.    Do we have that?
16     A.    **No.**
17     Q.    Why not?
18     A.    **It's an internal affairs file, and by**
19 **department policy and our county personnel policy,**
20 **IA files are not available to the general public,**
21 **or to anyone other than the sheriff and IA and the**
22 **investigator.**
23     Q.    So what we have here is under incident
24 disciplinary action, correct?
25     A.    **Yes.**

1     Q.    What does that mean?
2     A.    **That means he was terminated because of**
3 **disciplinary action. Or he resigned -- he was**
4 **under disciplinary -- he was under investigation**
5 **and his fate was to be determined when he resigned.**
6     Q.    You don't mean after he resigned. At
7 the time he resigned his fate was to be determined?
8     A.    **This is a clerical error. That should**
9 **have been entered as resigned.**
10     Q.    Whose handwriting is that?
11     A.    **That's mine.**
12     Q.    If you look up at the top, maybe a
13 quarter of the way down, right below Eric Schruder.
14     A.    **Yes.**
15     Q.    There appears to be a redaction, do you
16 agree?
17     A.    **Yes.**
18     Q.    Did you direct that redaction?
19     A.    **No, I did not.**
20     Q.    Do you know what information was
21 contained in that line?
22     A.    **I have no idea what was in that line.**
23 **This is the first I've seen it.**
24     Q.    Was Jason King's matter that's reflected
25 on Exhibit 2 -- strike that.

1     From your testimony I take it that Jason
2 King's matter reflected on Exhibit 2, this entry
3 reflects the result of an internal affairs action,
4 correct?
5     A.    **Yes.**
6     Q.    So you have provided information about
7 an internal affairs action, but you decline to
8 provide the actual internal affairs file?
9     A.    **That's correct.**
10     Q.    If we go through Exhibit 2, we can't
11 tell which of these were internal affairs actions
12 and which were something else, correct?
13     A.    **That is correct.**
14     Q.    If you went through each line, could you
15 tell me which are internal affairs and which
16 aren't?
17     A.    **No.**
18     Q.    Go to the second to the last page.
19 Again, a little more, maybe a quarter of the way
20 up, Richard Walker from 2/22/13.
21     A.    **Yes.**
22     Q.    Do you know Mr. Walker?
23     A.    **Yes.**
24     Q.    He was terminated, correct?
25     A.    **Yes, he was.**

1    Q.    For what?

2    A.    **Several violations, lying to a**
3    **supervisor, lying, entering false information on**
4    **the mobile data terminal, sitting at home when he**
5    **was supposed be in his zone, a myriad of issues.**
6    **And this was progressive discipline based on prior**
7    **issues with Mr. Walker.**

8    Q.    Preceding the event on 2/22 of '13, was
9    there an internal affairs investigation?

10    A.    **No.**

11    Q.    Or did that proceed, that proceeded in a
12    different route?

13    A.    **Yes, it did.**

14    Q.    With the inquiry?

15    A.    **Yes, it was pretty well cut and dried.**

16    Q.    Sir?

17    A.    **It was pretty well cut and dried.**

18    Q.    Now, when I look at Exhibit 2, I see a
19    number of vehicular issues?

20    A.    **Yes.**

21    Q.    Is that a pretty common issue in your
22    department?

23    A.    **Yes, sir, it is.**

24    Q.    Is it accurate to say when a deputy
25    dings a county sheriff's department vehicle, they

1    are probably going to get some form of disciplinary
2    action?

3    A.    **Yes.**

4    Q.    Is it accurate to say that's almost
5    automatic?

6    A.    **Yes.**

7    Q.    I'm just looking at the range of
8    descriptors, and if you look at page two, fourth
9    down, James Naughton.

10    A.    **Yes.**

11    Q.    He received a counseling for wearing
12    unauthorized head gear?

13    A.    **Yes.**

14    Q.    Do you know what that head gear was?

15    A.    **It was a sock hat with some kind of**
16    **goofy insignia on the front that he had been warned**
17    **previously, verbally, not to wear it.**

18    Q.    Okay.

19    A.    **I believe it was Tasmanian devil or**
20    **something of that nature. It was detracting from**
**the professional uniform.**

22    Q.    Not to minimize the offense, but that's
23    a relatively minor transgression, would you agree?

24    A.    **First one maybe, not the second one.**

25    Q.    Got you. But if you look at the top

1    entry on the second page, Keller, Brian?

2    A.    **Yes.**

3    Q.    Conduct unbecoming of a deputy, pointed
4    taser at estranged wife. Would you characterize
5    that as a little more serious?

6    A.    **Yes. Therefore, that was a reprimand as**
7    **opposed to counseling form.**

8    Q.    All right. And the reprimand does not
9    reflect any suspension or loss of pay, correct?

10    A.    **It doesn't reflect it here, so I can**
11    **only assume there was no loss of pay or suspension**
12    **on that particular incident.**

13    Q.    Well, if you look --

14    A.    **However -- Excuse me. Go ahead.**

15    Q.    I don't want to interrupt your train of
16    thought.

17    A.    **No, I was done.**

18    Q.    If you scroll down on 4/27/07, Warner,
19    Jeff.

20    A.    **Yes.**

21    Q.    He's charged with leaving work without
22    advice. I think it must be a typo. Must be
23    without advising supervisor and lied about his
24    reason.

25    A.    **Yes.**

1    Q.    And Warner comma Jeff got a reprimand
2    and a two-day suspension?

3    A.    **Yes.**

4    Q.    So if we see reprimand but no suspension
5    noted, is it fair to conclude that no suspension
6    followed the reprimand?

7    A.    **It should be if all these entries are**
8    **indeed correct.**

9    Q.    As you look at Exhibit 2, do you have
10    any reason to doubt the veracity or the accuracy of
11    the entries?

12    A.    **Overall, no. I just -- there are a**
13    **couple entries on here where action taken is not**
14    **noted, for which I will determine why not, but**
15    **overall the accuracy of the document as a whole I**
16    **see is correct, yes.**

17    Q.    I'm sorry, you are not hiding it, but I
18    see you have highlighted the copy you have in front
19    of you in certain places, Exhibit 2?

20    A.    **Yes.**

21    Q.    Did you highlight those items for
22    errors?

23    A.    **No.**

24    Q.    Why did you highlight them?

25    A.    **They noted the terminations.**

1   Q.   Let's talk about that, the terminations.
2 On the second page, Wheelan, John dated 10/20/06?
3   A.   **Yes.**
    Q.   Failed to successfully complete
5 probation period, termination?
6   A.   **Yes, sir.**
7   Q.   Now, how long is a sworn member under
8 probation when they come to your department?
9   A.   **One year.**
10   Q.   And during that year, they are purely an
11 at-will employee; is that correct?
12   A.   **Yes.**
13   Q.   Can be terminated for any reason, no
14 reason, great reasons, bad reasons, correct?
15   A.   **In theory, yes.**
16   Q.   All right. The one-year probation is
17 designed, and I'm going to move this along. The
18 one year probation is designed to permit
19 supervisors and commanders to evaluate the
20 performance of that probationary deputy, correct?
21   A.   **Yes, sir.**
22   Q.   And ultimately to decide whether that
23 person performs up to the competence level expected
24 of your officers, correct?
25   A.   **Yes.**

1   Q.   So the termination after failing to
2 successfully complete probation, does not
3 necessarily reflect misconduct; is that accurate?
4   A.   **No, sir. That's correct.**
5   Q.   It could just be there's some deficiency
6 and the decision is made, he's not for us?
7   A.   **Yes. And sometimes it's on their own**
8 **volition to tell us before the end of the year.**
9   Q.   I see. Would that still reflect
10 termination?
11   A.   **Yes. It's kind of harsh for those**
12 **circumstances where they leave on their own**
13 **volition, but we have to have a category, and**
14 **that's what that category is.**
15   Q.   So as to those terminations for failing
16 to complete probationary period, we really have no
17 detail about whether the person resigned, whether
18 they engaged in misconduct, whether they simply
19 didn't measure up in some respects?
20   A.   **No, sir.**
    Q.   If we could please, as to the
22 terminations following disciplinary action, take a
23 look at those. And the first one is Kerry Kamp,
24 that's the one you already testified about,
25 correct, or did you?

1   A.   **No.**
2   Q.   Do you know the circumstances of Kerry
3 Camp's termination?
4   A.   **Yes.**
5   Q.   Please describe them.
6   A.   **He assaulted a young man in the back**
7 **seat of his patrol car while the young man was**
8 **handcuffed.**
9   Q.   First offense?
10   A.   **No.**
11   Q.   Do you recall --
12   A.   **First offense of that nature.**
13   Q.   Excessive force?
14   A.   **Yes.**
15   Q.   Was this a situation with Deputy Camp or
16 Mr. Camp where he was disciplined on this occasion
17 because it was -- he had worked his way up the
18 ladder of progressive discipline, or would he have
19 been terminated if this was the first time he did
20 it, or can you say?
21   A.   **I can't say, that would be speculating.**
22 **But he did have several prior incidents, recorded**
23 **incidents, and this was the determination of the**
24 **command staff.**
25   Q.   The prior incidents, were they

1 inquiries, counselings or internal affairs?
2   A.   **Off the top of my head, I don't recall**
3 **an internal affairs prior to this. I would have to**
4 **go back and look at the personnel file. There had**
5 **been several incidents with Mr. Camp prior to this.**
6   Q.   Okay. How long was he on the force
7 before he was terminated?
8   A.   **Probably four or five years, maybe**
9 **longer. That was a long time ago.**
10   Q.   Correct me if I misstate, but the next
11 termination for disciplinary action I see is
12 12/23/09, Lindsey comma Matthew?
13   A.   **Matt Lindsey, yes.**
14   Q.   Is that the next one after?
15   A.   **Yes.**
16   Q.   And what caused Lindsey comma Matthew to
17 get terminated?
18   A.   **He had had some prior incidents. This**
19 **particular one through the progressive disciplinary**
20 **action. His vehicle, during vehicle inspection,**
21 **narcotics were found in the vehicle as well as**
22 **alcohol.**
23   Q.   That was the event that resulted in him
24 getting terminated?
25   A.   **Terminated, yes, sir.**

1     Q.    Do you recall his prior problems?

2     A.    **Not specifically. I believe he had some**

3 **report issues, abuse of sick leave, and I don't**

4 **know. I've got 70 patrol officers, I can't recall**

5 **each incident on each one.**

6     Q.    I know.

7     A.    **But I do know the reason for his**

8 **termination was drugs and alcohol in the patrol**

9 **car.**

10     Q.    Was there an indication that either the

11 drugs or the alcohol were personal use or were

12 they, on the other hand, evidence?

13     A.    **The alcohol was in a flask in his**

14 **console, and the drugs were in a vial under a**

15 **different person's name, also in his console under**

16 **partial concealment.**

17     Q.    In other words, they did not appear to

18 be evidence that he had seized --

19     A.    **No.**

20     Q.    -- and just carried around?

21     A.    **No.**

22     Q.    On the next page there's an entry on

23 4/13 of '10 for Mallett comma Chance?

24     A.    **That's the one with a blank entry on**

25 **action taken, isn't it?**

1     Q.    Yes, sir.

2     A.    **I recall seeing it before.**

3     Q.    And the incident just says deputy.

4     A.    **Yeah. I have no explanation for that at**

5 **all. I wouldn't even want to speculate on that**

6 **one.**

7     Q.    Of course. I see it appears the next

8 disciplinary action termination involves Walters

9 comma Sarah on 11/2 of '10?

10     A.    **Sarah Walters, she was a dispatcher.**

11     Q.    Not a sworn officer?

12     A.    **No.**

13     Q.    I don't need to ask any more about her.

14 She didn't use excessive force, did she?

15     A.    **No.**

16     Q.    Third from the last page, Sheriff.

17 Third line down, Roberts comma Patrick?

18     A.    **Yes.**

19     Q.    Uniform appearance?

20     A.    **Yes.**

    Q.    And there's no action taken?

22     A.    **No. I would speculate that's a**

23 **counseling form. However, once again, clerical**

24 **error why it's not entered in the first place.**

25     Q.    Of course. I just noticed another mark

1 on some of these entries and, for example, the

2 first entry on the third from the last page is Clay

3 comma Brian, correct?

4     A.    **Yes.**

5     Q.    If you go over to the last column,

6 there's an X.

7     A.    **Yes.**

8     Q.    Do you know what the X indicates?

9     A.    **I have no idea.**

10     Q.    Who would know the answer to that

11 question?

12     A.    **The personnel clerk who does all these**

13 **entries.**

14     Q.    That person's name?

15     A.    **Phyllis Boyle.**

16      MS. TEMPLE: B-O-Y-L-E.

17 QUESTIONS BY MR. RYALS:

18     Q.    I think you testified that clerk

19 maintains this record on an ongoing basis?

20     A.    **Yes.**

21     Q.    Then if we could take a look at from

22 6/8/12, Williams comma Rob?

23     A.    **Yes.**

24     Q.    He was terminated?

25     A.    **Yes.**

1     Q.    Why?

2     A.    **He was on his way back from training**

3 **session in St. Louis city in his marked patrol car**

4 **and he was driving extremely intoxicated down I-70,**

5 **which we received reports on, and had him**

6 **intercepted at his residence and was terminated for**

7 **those actions.**

8     Q.    His name appears the second line above

9 as well, code of ethics conduct unbecoming, same

10 incident?

11     A.    **Yes.**

12     Q.    Second to the last page from 2/22/13?

13     A.    **Yes.**

14     Q.    Walker comma Richard?

15     A.    **Yes.**

16     Q.    Why did Richard Walker get terminated?

17     A.    **He's the one that lied to the**

18 **supervisor, and was trying to conduct his law**

19 **business from his residence when he was supposed to**

20 **be on patrol, made false entries into the mobile**

21 **data terminal into the computer system.**

22     Q.    The false entries were designed to make

23 it look --

24     A.    **Make everybody think he was working.**

25     Q.    Right below him is James Logsdon?

1    A.    Yes.

2    Q.    Showed poor judgment using another

3 department's computer. Do you know what that is

about?

5    A.    **I believe he is assigned the Darden**

6 **Prairie contract frequently, and I believe he was**

7 **using one of the computers in the city hall there**

8 **and one of the clerks or Darden Prairie employees**

9 **issued a complaint.**

10    Q.    Sorry to jump around there, third from

11 the last page, Sheriff. On 4/27 of '12 Cochran

12 comma Jerry?

13    A.    **Yes.**

14    Q.    Your department has patrol rifles,

15 correct?

16    A.    **No.**

17    Q.    Do you know what happened in this

18 incident?

19    A.    **Well, the patrol personnel don't have**

20 **rifles assigned. The regional SWAT team members do**

21 **have rifles assigned. I don't remember this**

22 **specific incident. Any accidental discharge of a**

23 **weapon is taken seriously and like I say, I recall**

24 **this specific incident.**

25    Q.    Was Jerry Cochran a SWAT team member?

1    A.    **At that time, yes.**

2    Q.    The date range for Exhibit 2 is from

3 1/11/06 to almost current, May of this year.

4    A.    **Uh-huh.**

5    Q.    If we looked at a similar document going

6 back to the beginning of your tenure, would it

7 reflect basically the same information that

8 Exhibit 2 has? What I mean to say, what I mean to

9 ask you is, when you came on as the sheriff, were

10 there more terminations than starting in January of

11 '06?

12    A.    **To my recollection, probably not.**

13    Q.    You would, of course, recall if your

14 mindset was, I'm going to crack the whip or

15 whatever?

16    A.    **Most certainly.**

17    Q.    Had you sort of cleaned house or taken a

18 different approach than maybe your predecessor that

19 may have resulted in a different record of

20 disciplinary actions? So that's the purpose of my

21 question because we don't have a record beyond '06.

22 Do you think if we looked at the record going back

23 to when you became the sheriff, it looked roughly

24 the same as this?

25    A.    **My management style is I believe I hold**

1 **officers, supervisors more accountable than my**

2 **predecessors. And those supervisors are**

3 **instructed, and I meet with them periodically to**

4 **ensure that their subordinates are accountable. I**

5 **think I require more accountability than my**

6 **predecessors did, but within reason for sure.**

7    Q.    That response prompts two additional

8 questions. Separate questions.

9    Do you think there would be, given the

10 change from your predecessor, there would be

11 greater frequency of disciplinary actions when you

12 first came on as the sheriff?

13    A.    **It's been pretty steady since I was**

14 **appointed.**

15    Q.    Second question. Do you think when you

16 first came on, you would find more disciplinary

17 actions directed to supervisors than Exhibit 2

18 might reflect?

19    A.    **No, not necessarily.**

20    Q.    So in terms of the numbers and the types

21 of disciplinary matters, if we looked at the record

22 back to when you started as the sheriff, it would

23 look the same as Exhibit 2?

24    A.    **Pretty consistent, yes, sir.**

25    Q.    Now, this is Exhibit 4. Do you have a

1 copy of that before you, sir?

2    A.    **Yes, I do.**

3    Q.    Now, the title of this document is

4 internal affairs investigations, correct?

5    A.    **Yes, sir.**

6    Q.    Is this a document that's prepared as

7 part of the routine of the department or was it

8 prepared in response to a question we asked?

9    A.    **It was prepared in response to your**

10 **request, your inquiry.**

11    Q.    Do you know what information this is

12 responsive to or what question this was responsive

13 to?

14    A.    **A list of all internal affairs**

15 **investigations over the last six years, seven**

16 **years, something like that.**

17    Q.    It also has the disposition for each

18 internal affairs incident?

19    A.    **Yes, sir.**

20    Q.    Am I correct that if we took all of the

21 sustained incidents from Exhibit 4, we should be

22 able to match them with an entry in Exhibit 2?

23    A.    **One would assume so.**

24    Q.    Let's test it. I looked at the July, I

25 think this must be July 20, '11 as opposed to July

1    11, it says, improper computer usage, sustained,
2    correct? And I'm looking at Exhibit 4.
3         A.    **Yes. Which form? You're on internal**
     **affairs investigation form?**
5         Q.    Yes, sir.
6         A.    **May 11th?**
7         Q.    July.
8         A.    **July 11th, okay.**
9         Q.    Improper computer usage, sustained?
10        A.    **Uh-huh.**
11        Q.    So if I look at Exhibit 2 I see two
12   entries from July of 2011, and they are found on
13   the fourth page from the back.
14        A.    **Uh-huh.**
15        Q.    Do you find those two entries, sir?
16        A.    **I don't find them on the disciplinary**
17   **records.**
18        Q.    No. Let's take it a step at a time. On
19   Exhibit 2, you find there are apparently only two
20   entries from July of '11, correct, 2011?
21        A.    **Yes.**
22        Q.    And neither of those entries reflect or
23   are consistent with the record in Exhibit 4,
24   improper computer usage?
25        A.    **Yes.**

1         Q.    You agree with that?
2         A.    **I agree with that.**
3         Q.    Is it possible that the entry from
4    Exhibit 4 was put someplace else maybe at a later
5    date or an earlier date on Exhibit 2?
6         A.    **That's possible, yes. Obviously it's**
7    **not on this one.**
8         Q.    Well, it's not on that date, but it
9    could have been -- the discipline could have
10   happened or been reflected on a different date, do
11   you think, or should it be reflected as of July of
12   2011?
13        A.    **It should be reflected there. However,**
14   **there are other clerical errors on there so that**
15   **could very well be a clerical error.**
16        Q.    All right.
17        A.    **But I do not have an explanation as to**
18   **why disposition from my report does not reflect on**
19   **the spreadsheet for disciplinary action.**
20        Q.    All right. When we look at Exhibit 4,
21   is this meant to be a complete list of all internal
22   affairs investigation from January '06 to today's
23   date?
24        A.    **Yes, it is.**
25        Q.    And you think that's accurate?

1         A.    **That's the information I requested. I**
2    **have faith in the people who prepared it so, yes, I**
3    **would say it's accurate.**
4         Q.    Okay.
5         A.    **To my knowledge it's accurate.**
6         Q.    Okay. All right. To make the record
7    clearer, there are four categories, maybe five in
8    your department for disposition of an internal
9    affairs investigation. Sustained, correct?
10        A.    **Yes.**
11        Q.    And that means that you found the
12   allegations true, both factually and in terms of
13   there being a violation?
14        A.    **Yes.**
15        Q.    Exonerated means there's factual truth,
16   but it wasn't a violation of policy or law,
17   correct?
18        A.    **Basically, yes.**
19        Q.    Unfounded means no factual basis for the
20   conclusion?
21        A.    **That is correct.**
22        Q.    Not sustained means the scales aren't
23   tipped, correct?
24        A.    **Correct.**
25        Q.    You can't say it happened or you can't

1    say it didn't happen, there's not enough evidence
2    to make that determination?
3         A.    **Correct.**
4         Q.    What is the standard of proof to tip the
5    scales between sustained and not sustained?
6         A.    **The standard of proof, it's not beyond a**
7    **reasonable doubt, but it's not only a preponderance**
8    **of evidence, it's in between.**
9         Q.    Would we find that standard set forth
10   somewhere in your policies?
11        A.    **No.**
12        Q.    Is that standard one that you have
13   communicated to people under your charge?
14        A.    **Yes.**
15        Q.    Given the dates of the incident
16   involving Jason King, and given the record you have
17   before you in Exhibit 4, can you tell which of
18   these entries reflect Jason King's investigation?
19        A.    **I'm guessing, this is a guess on my**
20   **part, I'm guessing corruption.**
21        Q.    November of '07?
22        A.    **Yes, sir.**
23        Q.    Would you agree with me that sexual
24   assault is an act of violence?
25        A.    **I most certainly would.**

1    Q.    Would it be proper and accurate or
2  improper or in anyway inaccurate to characterize
3  sexual assault by a police officer as excessive
   force?
6    A.    **You're asking me a legal question I**
7  **don't have a response to. If you could rephrase**
   **the question I would like to respond to it.**
8    Q.    Of course. And I certainly do not mean
9  it in the legal sense. I mean it in the sense I'm
10 talking to a police administrator. So, would it
11 be, from your standpoint as commander and chief of
12 a police agency, would it be appropriate to
13 characterize a sexual assault by a police officer
14 as excessive force?
15         MS. TEMPLE: Answer it if you can.
16         THE WITNESS: Did you say a sexual
17 assault?
18 QUESTIONS BY MR. RYALS:
19   Q.    Yes, sir.
20   A.    **A sexual assault by use of force, yes.**
21   Q.    I want to ask a similar question to that
22 which I asked about Plaintiff's Exhibit 2. I asked
23 you if we went back before the date where this
24 exhibit starts, would the record look about the
25 same? Any significant differences? So I want to

1  ask the same question with regard to Plaintiff's
2  Exhibit 4. If we had records going back to when
3  you became the sheriff, do you believe the record
4  would look different than what it looks now?
5    A.    **In numbers, probably. In nature of the**
6  **incidents, probably not.**
7    Q.    How would the numbers be different, sir?
8    A.    **I believe there would be fewer prior.**
9    Q.    Do you have an explanation for why there
10 would be fewer prior to March of '06?
11   A.    **You would have to ask previous sheriffs,**
12 **sir. I wouldn't have an explanation as to why he**
13 **managed the agency differently from me.**
14   Q.    I'm going to -- and I owe you a big
15 apology. When did you become the sheriff, I'm
16 sorry?
17   A.    **March 2005.**
18   Q.    So I appreciate your answer. Prior to
19 March of '05, you can't speak to what the other
20 sheriffs did?
21   A.    **No, sir.**
22   Q.    But if we go back to March of '06 to
23 March '05 when you became the sheriff, would the
24 record appear to be about the same?
25   A.    **Yes, sir.**

1    Q.    In terms of the numbers and the
2  substance of the allegations?
3    A.    **Yes.**
4    Q.    And the results?
5    A.    **Yes.**
6    Q.    Now, Exhibit 4 reveals, and by the way,
7  I suppose there's a fifth category that I alluded
8  to before, and that would be the complaint was
9  withdrawn. Is that a category in your --
10   A.    **No.**
11   Q.    Once the complaint is made, you are not
12 going to permit a withdrawal of the complaint to
13 stop the process?
14   A.    **No.**
15   Q.    That's accurate, yes?
16   A.    **Yes, that is accurate.**
17   Q.    The determination that we see for the
18 dispositions on Exhibit 4, please talk to me about
19 the process by which that determination is finally
20 arrived at. What I mean to ask is, where does it
21 begin, does somebody make a recommendation, and
22 where does the buck stop?
23   A.    **It begins with the internal affairs**
24 **investigator who obtains all facts and evidence and**
25 **circumstances that he can. And then he will, over**

1  **a period of time, every once in a while he may, if**
2  **it's going to be a long drawn-out investigation, he**
3  **will make periodic reports, but most generally at**
4  **the end of his investigation he will submit a**
5  **summary of his findings.**
6    Q.    May I interrupt you?
7    A.    **Sure.**
8    Q.    To whom are the periodic reports made?
9    A.    **Me.**
10   Q.    Directly to you?
11   A.    **Yes.**
12   Q.    Not up the chain?
13   A.    **I am the chain.**
14   Q.    No. No. But not steps before you?
15   A.    **No. Directly from the IA investigator**
16 **to me.**
17   Q.    I see.
18   A.    **When that is complete, I generally meet**
19 **with my four bureau commanders, and at that point**
20 **it's pretty well determined what the recommended**
21 **disciplinary action is, if the violations are**
22 **sustained or if the complaint is sustained.**
23   Q.    Who makes the determination whether it's
24 sustained or not?
25   A.    **Ultimately, I do.**

1    Q.    But you would receive a recommendation
2  about that, correct?
3    A.    **I meet with my four bureau commanders.**
       Q.    Does a recommendation come out of that
5  meeting?
6    A.    **Yes.**
7    Q.    All right.
8    A.    **But I still have final say.**
9    Q.    So there's an investigation.  It really
10  starts with you become aware of a complaint,
11  correct?
12   A.    **Yes.**
13   Q.    And let me take a little side road.  Are
14  the complaints always from citizens or can they be
15  from someone else?
16   A.    **They can be from other government**
17  **officials, they can be from other employees.**
18   Q.    Other members?
19   A.    **They can come from anywhere.**
20   Q.    Sworn members?
21   A.    **Sure.**
22   Q.    Have you had occasion to review
23  complaints lodged by other members?
24   A.    **Not to date that I recall.**
       Q.    Is it accurate to say that most

1  complaints that result in internal investigations
2  in your department emanate from a citizens
3  complaint?
4    A.    **Yes.**
5    Q.    So the process is you receive a
6  complaint, you determine in your discretion that it
7  warrants a full-blown internal affairs
8  investigation?
9    A.    **Yes, sir.**
10   Q.    You have a choice at that point to treat
11  it else-wise, correct?
12   A.    **Yes.**
13   Q.    Once you determine that it warrants a
14  full-blown investigation, you direct that occur?
15   A.    **Yes.**
16   Q.    Do you direct that to a lieutenant, the
17  head of the professional standards?
18   A.    **Yes.**
19   Q.    And I take it he has the power to
20  delegate the investigation to someone else?
       A.    **No.**
22   Q.    He conducts it himself or she?
23   A.    **Yes.**
24   Q.    If it's a long drawn-out investigation,
25  you will receive periodic updates?

1    A.    **Yes.**
2    Q.    And of course, you can always inquire,
3  if you want?
4    A.    **Sure.**
5    Q.    And the chain from that lieutenant to
6  you bypasses the commander of that bureau?
7    A.    **Yes, it does.**
8    Q.    The lieutenant completes the
9  investigation and submits to you, the sheriff, a
10  final report?
11   A.    **The findings, yes.**
12   Q.    Along with the findings, does he make a
13  formal recommendation or is it sort of implicit in
14  the findings?
15   A.    **Generally it's implicit in the findings.**
16  **Different IA formal training teaches two different**
17  **ways.  Some teach the IA investigator does make the**
18  **recommendation.  Some teach no, that's not the**
19  **function of IA.  I try to dissuade our IA personnel**
20  **from making that recommendation, that to me is a**
21  **command staff function.**
22   Q.    You have obviously given this some
23  thought?
24   A.    **Yes.**
25   Q.    The report comes to you and then you

1  assemble your bureau commanders, the four captains?
2    A.    **Yes.**
3    Q.    And you have a meeting specific to that
4  particular IA file?
5    A.    **Yes.**
6    Q.    At that point everybody reviews the
7  record and there's a discussion?
8    A.    **Yes.**
9    Q.    How do those meetings run?  Do you call,
10  for lack of a better term, a vote?  How does
11  everybody feel?
12   A.    **Opinion.**
13   Q.    Opinion.  Ultimately, at the end of that
14  meeting, it's your charge to make a decision,
15  sustained or not sustained?
16   A.    **Yes.**
17   Q.    Or any of the other categories?
18   A.    **Yes.**
19   Q.    Do you require unanimity among your
20  commanders before you will sustain a complaint?
21   A.    **I don't require it, but as I think back,**
22  **I cannot recall not having it.**
23   Q.    Is your role in the meeting to absorb
24  the opinions of your command staff or are you more
25  active in terms of expressing your views?

1    A.    My role is to listen.
2    Q.    You're now in the vignette here, we've
3    reached a point where the discussion is over, you
4    have received input, opinions from your command
5    staff and now the decision is yours to make?
6    A.    Yes, sir.
7    Q.    When you make the decision, is it in the
8    moment or do you withdraw and think about it?
9    A.    I think about it.
10    Q.    After you make the decision, are you the
11    one who then prescribes the discipline?
12    A.    Yes.
13    Q.    Because a decision wasn't made when
14    you --
15    A.    Because the recommendation comes from
16    the command staff.
17    Q.    When does that come, during that
18    meeting?
19    A.    Yes.
20    Q.    So they will not only tell you, we think
21    it should be sustained, but we think the member
22    should be fired?
23    A.    Yes.
24    Q.    Or whatever it might be?
25    A.    Suspended or whatever.

1    Q.    When you look at Exhibit 4, Sheriff, and
2    thank you for giving me that account.  I appreciate
3    it.  When you look at Exhibit 4, can you say
4    whether any of the sustained complaints did not
5    result in termination?
6    A.    I would have to look at these reports.
7    Dates and allegations.
8    Q.    Not jogging the memory?
9    A.    No.
10    Q.    Fair enough.  Let me ask a different
11    question and even if you can't recall them all.
12    A.    No, I can't.
13    Q.    If you recall that one or more was
14    sustained, but you know the person wasn't
15    terminated, that would be good information.  But I
16    understand you don't recall.  Maybe it will come to
17    you before we go off the record today and you can
18    share that if you would, please.
19    A.    It may, but the way it's looking now
20    it's not likely, but we'll try.
21    Q.    Different question.  As to the --
22    anything but sustained, whether exonerated, not
23    sustained or unfounded, is it possible that the
24    member could still receive some form of discipline?
25    A.    If it's exonerated, no.  If it's not

1    sustained, no.  If it's unfounded, no.
2    Q.    When you evaluate an internal affairs
3    allegation, are you evaluating only violations of
4    department policy or are you evaluating violations
5    of law, both of those things, something else?  Is
6    it purely policy, purely law, a combination?
7    A.    Both of those and code of ethics.
8    Q.    And the code of ethics would be found
9    where, sir?
10    A.    It's a part of our policy.
11    Q.    I thought that would be your response.
12    That's why I asked the question whether exonerated,
13    not sustained or unfounded could result in
14    discipline.  And I have in my mind that somebody
15    could be accused of say stealing and you find it's
16    unfounded, you didn't steal, but in the course of
17    the investigation you may discover they did
18    something that would be a less egregious offense,
19    failing to report or something, where because of
20    the investigation, even though the internal affairs
21    allegations are not sustained, there was something
22    else that would have resulted in discipline?
23    A.    Sure.
24    Q.    Is that possible?
25    A.    If during the course of the

1    investigation some other violations were noted that
2    aren't a part of IA, yes, they could be disciplined
3    on that.
4    Q.    Do you recall that ever happening?
5    A.    No.
6    Q.    The limit of, the temporal limit of
7    Exhibit 4 is March '06 to July of 2012?
8    A.    Yes.
9    Q.    Does that mean that there are no --
10    strike that.
11          There have been no concluded internal
12    affairs investigations after July 2012?
13    A.    That is correct.
14    Q.    Are there any active pending
15    investigations?
16    A.    No, sir.
17    Q.    Based on the raw number of disciplinary
18    actions we see in Exhibit 2, compared to the raw
19    number of disciplinary internal affairs matters in
20    Exhibit 4, it appears to me that you are, for lack
21    of a better term and you will correct me if I
22    mischaracterize it, your management style is to be
23    less punitive on the whole because you don't
24    initiate a large number of internal affairs
25    matters.  And what I see in Exhibit 2 are a large

number of counselings and reprimands with
relatively minor punishment.  Do these documents
and the raw numbers reflect something about your
management style?

A.     **I don't believe necessarily because the
nature of the violation is going to determine
whether it's an IA, not what my personal feelings
are about the individual involved or was it alleged
on purpose or whatever.  Regardless of the
management style, the severity of the complaints or
the alleged violation is what determines whether
it's an IA file or not.  The reason you see so many
entries on Exhibit 2 is the fact that my philosophy
is if it's not documented, it didn't happen.  So if
you have someone who has -- perpetually violates
policy, no matter how minor it may be, a continuous
violation warrants correction.  So you go from a
verbal, don't do that anymore a couple times, and
then written down.  Okay, now we've got a record of
this, so it's not in your best interest to continue
to do it, so to document and to correct negative
behavior.**

Q.     Before you became the sheriff we talked
about you were a captain, correct?

A.     **Yes, sir.**

Q.     Did you come up through the ranks in the
St. Charles County sheriff's department?

A.     **Yes, sir, I did.**

Q.     Was the first law enforcement job you
had as a deputy at the department?

A.     **Yes.**

Q.     When did you start?

A.     **September 1st, 1974.**

Q.     Promoted to sergeant at some point?

A.     **Promoted to sergeant at some point, and
then to lieutenant at some point, and to captain,
appointed sheriff.**

Q.     I take from your previous testimony it's
accurate to say that the St. Charles County
Sheriff's Department has changed significantly over
the years since you first came on?

A.     **Very significantly, yes, sir.**

Q.     Due in part I'm assuming to the growth
and population here?

A.     **Growth and population, and the change in
contemporary law enforcement throughout the
country.**

Q.     You would characterize that change as
positive?  That is at least in your watch, you have
tried to make it more professional?

A.     **Yes, sir.**

Q.     To and including moving from the
sheriff's department model to the police department
model?

A.     **Yes, sir, the ultimate move.**

Q.     When we first started your examination
about three days ago, at least that's what it feels
like, you made some reference to politics.  And the
record, of course, will stand on its own.  Did you
say something about when you became the sheriff,
one of the things you were concerned with
addressing was the politics of the department?

A.     **Internal, yes.**

Q.     Internal politics.  What do you mean by
that?

A.     **Every four years, the sheriff is up for
election, and traditionally there have been several
employees within the sheriff's department that
decide they want the sheriff's job.  During the
course of a year, because the filing is in February
and you have got almost a year of campaigning, then
faction will form within the agency where you got
one group supporting one individual, another group
supporting another individual.  And even though
people have the right to enjoin themselves in the**

**electoral process, when you get patrol officers
arguing among themselves and competing among
themselves for votes or support for their
particular candidate, it becomes totally disruptive
just to try to conduct the daily operations of the
sheriff's department.  You have several detectives
and employees and different individuals that sit
next to each other, supposed to be working cases
together.  Well, if there's a fundraiser one night
or rally another night for one of the candidates
and different one for the other one, they are not
going to get along.  And there's just -- politics
is the biggest detriment to law enforcement in our
society today.  So the more you can do to reduce
that, the better off the agency is going to be.
And every four years they don't have to worry about
oh, if I don't support this person and he or she is
elected sheriff, I'm screwed.  Or I want to help
this one but I'm afraid that one will win and then
what do we do.  So that was one of the reasons I
stayed out of every single electoral process from
the time I was deputy sheriff.  And there's some
times I suffered for it because of failure to
support the sheriff who was elected.  I didn't
support anybody, but since I didn't support that**

1 individual I suffered repercussions for it.
2    Q.    Can you give me an example? Like a bad
3 assignment?
    A.    **I was reduced in rank from captain to**
5 **lieutenant in 1995 because I didn't engage in**
6 **politics.**
7    Q.    Who did that?
8    A.    **Salters. But then I was promoted again**
9 **two years later.**
10    Q.    By Salters?
11    A.    **Yes, sir.**
12    Q.    Was that culture of the political, I
13 call it turmoil, but maybe you call it something
14 else?
15    A.    **It is turmoil.**
16    Q.    Was that something you experienced in
17 the department from the time you became a deputy
18 until --
19    A.    **Yes, sir, every four years.**
20    Q.    When you became the sheriff, did you try
21 to take steps to stop that from happening?
22    A.    **Yes.**
23    Q.    Aside from the movement to go to a
24 police department, did you take other steps?
25    A.    **The steps I took were primarily not**

1 **taking any steps. Prior to my being appointed or**
2 **elected, every sheriff that would come in would**
3 **have people who worked their campaigns or were**
4 **buddy buddy up to them, whatever. When that**
5 **sheriff took office they would move that person**
6 **over to another assignment, a more enjoyable**
7 **assignment, or would move a person out of a**
8 **particular position because the folks that**
9 **supported him didn't particularly care for him, a**
10 **supervisor or something like that or folks that**
11 **supported him. Detective jobs are considered, you**
12 **know, that's what everybody aspires to, supposedly,**
13 **from the patrol division. They would come in and**
14 **make wholesale changes in the detective's**
15 **department, even though some of these people have,**
16 **you know, three or four years experience and**
17 **thousands of dollars worth of training and**
18 **experience, but at the snap of a finger they would**
19 **go back to patrol and someone in patrol who**
20 **couldn't spell detective would go into the**
    **detective bureau.**
22     **When I went in March 5th, 2005, I left**
23 **everybody exactly where they were. I didn't move a**
24 **single person. And everybody was sitting on pins**
25 **and needles, who's going to move, who's going to be**

1 **moved. And I put out the information, anybody in a**
2 **position now that is doing a job will remain in**
3 **that job. Those are who are not doing a good job**
4 **will be moved to a job that is better suited for**
5 **them. I have not moved one person. That's the**
6 **difference.**
7    Q.    In Mr. King's testimony, did you read
8 his description of sort of the in-group and out-
9 group, the good ol' boys and people who weren't the
10 good ol' boys?
11    A.    **Yes.**
12    Q.    And his description of how, for example,
13 if you're on the SWAT team you could get away with
14 things that other people couldn't get away with,
15 you read that?
16    A.    **I read that.**
17    Q.    What's your comment about that
18 description?
19    A.    **It's just the opposite. If you are**
20 **assigned to the SWAT team and you make any little**
21 **violation, someone else would probably get talked**
22 **to, you'll be removed from the SWAT team. Their**
23 **standards are higher than the patrol office. As**
24 **far as good ol' boys, that's a term that came from**
25 **years ago and it will last forever in law**

1 **enforcement.**
2    Q.    Right.
3    A.    **Every law enforcement agency has -- it**
4 **used to be what we had cliques, even in our agency.**
5 **Those have pretty well gone by the wayside, but you**
6 **still have a handful of patrol personnel, we'll**
7 **keep it at patrol personnel right now, who are**
8 **constantly trying to, I don't want to say disrupt**
9 **the organization, but they want to make others feel**
10 **they know more than they really do. And they want**
11 **a following, and they will particularly try to find**
12 **the newer officers coming in, you know, the strong**
13 **body with the weak mind at the time they come in,**
14 **and try to get them in that clique or group,**
15 **whatever you want to call it. And every agency has**
16 **it. Most of those are the low performers. Most of**
17 **them, not all of them, most of them are the low**
18 **performers who have for some reason or another**
19 **tried for advancement and failed or tried for**
20 **assignment to specialized units and failed for lack**
21 **of performance or they just weren't suited for that**
22 **position. So naturally it's human nature that they**
23 **are going to talk down the organization as a whole.**
24 **If you have an opening for a sergeant and you have**
25 **15 applicants, you can only appoint one, promote**

1    one, so you are going to have one glad employee and
2    14 mad ones. Most of the mad ones will get over it
3    within a day or so, so you have that environment in
     any law enforcement agency.
          Q.    Was Jason King a low performer, an
6    average performer, a good performer?
7         A.    Jason King always stayed busy. He was
8    always looking for something.
9         Q.    Looking for something in the law
10   enforcement context?
11        A.    Yes. Looking for something in law
12   enforcement. He was hunting for the drugs, he was
13   hunting for the bad guys. The problem is Jason
14   wanted to do things that he wanted to do. The
15   things that come along with doing your job in law
16   enforcement he didn't want anything to do with,
17   they were troublesome, reports, maybe assignments
18   to a particular zone or something like that. He
19   always stayed busy, but he did best those things
20   only that he wanted to do. The rest of it was
21   average.
22        Q.    He gave an account of how he worked in
23   the drug unit and then was removed from the drug
24   unit, you read that?
25        A.    Yes.

1         Q.    He related a conversation he had with
2    you in which you told him he didn't do anything
3    wrong, I'm paraphrasing, but you're going to be
4    removed from the drug unit and you can pick
5    whatever shift you want, and you're not in trouble,
6    but you're going back on patrol. Did he describe
7    that conversation accurately?
8         A.    That conversation never took place.
9         Q.    So that would be a no?
10        A.    That's a lie.
11        Q.    Do you know the circumstances of his
12   separation from the drug unit?
13        A.    Yes. The commander of the drug unit
14   called me and asked me to remove him.
15        Q.    Do you know why?
16        A.    He had been involved in a couple
17   incidents while he was a member of the drug unit
18   that just didn't go well with the commander, and
19   the commander didn't trust him and he just called
20   and asked he be removed. And the way the drug unit
21   is set up, if the commander asks a participating
22   chief or sheriff to remove somebody, you do it, you
23   don't question it. Because that's such a small
24   group of individuals that have to be a cohesively
25   working organization. So he called and asked for

1    him to be removed and I removed him.
2         Q.    Was he assigned to the power shift after
3    that?
4         A.    He may have been. He would have
5    reported to the bureau commander who would have
6    checked the schedule to see what shift to put him
7    on at that time, wherever there was an opening.
8    And he may well have told him, what shift do you
9    want. It may have been the middle of the cycle or
10   something like that to where one person wouldn't
11   make a lot of difference on whichever shift it was.
12        Q.    Was the power shift in any way a special
13   assignment or was it just normal patrol?
14        A.    That's just another shift. You sign up
15   when the signup sheet goes out for whatever shift
16   preference you have. It goes out every four
17   months. When we had the fourth shift you had four
18   choices. You put down your first choice, second
19   choice, third choice, and fourth choice. And then
20   assignments were made from that. Depending on how
21   many requested midnights, how many requested
22   evenings, how many requested days, and how many
23   requested fourth shift, but it was just another
24   shift, yes.
25        Q.    Do you in any way track when a member

1    has been sued and particularly sued for a violation
2    of constitutional rights?
3         A.    I don't.
4         Q.    Any way that's tracked in your
5    department?
6         A.    Not in the department, county
7    counselor's office.
8         Q.    I take it from that response that the
9    filing of a lawsuit does not prompt any internal
10   investigation?
11        A.    No.
12        Q.    That's accurate?
13        A.    That's accurate.
14        Q.    Why is that?
15        A.    It may lead to it, but it doesn't prompt
16   it.
17        Q.    I see. What's the difference?
18        A.    You're talking about a filing of a
19   lawsuit?
20        Q.    Yes.
21        A.    We don't have any information to begin
22   with. If I get a lawsuit sent to my desk, it
23   automatically goes to the county counselor's
24   office.
25        Q.    But you have the ability to read the

1 allegations?

2    A.    Sure.

3    Q.    And I guess that's what I'm thinking of.
You read allegations that a member did something
and that does not cause you to investigate whether
6 it happened or not?

7    A.    **Not automatically.**

8    Q.    Under what circumstances would it
9 happen?

10    A.    **Well, obviously if the allegations are
11 egregious enough, and most of the time by the time
12 the lawsuit is filed it's something that occurred
13 months prior. So we would do an inquiry.**

14    Q.    Is that every case you do an inquiry?
15 I'm not talking --

16    A.    **Every case is discussed. As far as a
17 formal investigation, I'm trying to think of any --
18 yeah, because there's a lot of times the first we
19 have any knowledge at all that there's an issue or
20 problem is when we get the lawsuit filed. There
21 would not have been a citizen's complaint or
22 anything. And like I said, a lot of times this is
23 stuff that occurred months before, so that doesn't
24 automatically initiate an internal affairs
25 investigation. And you're asking what would. I**

1 **can't give you any specifics other than the fact
2 that if it is obviously serious enough allegations,
3 that we would do the inquiry. And many times the
4 inquiry would lead to an internal affairs
5 investigation.**

6    Q.    Can you think of any occasion where that
7 occurred?

8    A.    **Where we initiated an IA relevant to a
9 suit filed? At this point, I can't.**

10    Q.    Can you think of any instance where you
11 initiated an inquiry as a result of a suit being
12 filed?

13    A.    **Not right here, no, sir.**

14    Q.    Would there be a record of that
15 somewhere?

16    A.    **The only record would be if you compare
17 the IAs with the lawsuits filed or vice versa.**

18    Q.    I'm just talking inquiries, not IAs at
19 this point.

20    A.    **Okay.**

21    Q.    Would there be a record of inquiries
22 that came as a result of lawsuits being filed?

23    A.    **No.**

24    Q.    From those answers, is it accurate to
25 say that the filing of a lawsuit doesn't go in the

1 officer's file the same way? For example, a not
2 sustained internal affairs complaint would go in
3 the officers's file?

4    A.    **No, the lawsuit doesn't go in the
5 officer's file.**

6    Q.    How about if the lawsuit results in a
7 verdict against the officer, does that prompt any
8 internal action?

9    A.    **If the officer is found guilty of
10 whatever the allegations or charges are, yes.**

11    Q.    Has that ever happened?

12    A.    **Not that I recall at this moment.**

13    Q.    How about if the case is settled, does
14 that affect the officer or your records in any
15 respect?

16    A.    **No.**

17    Q.    When the allegations about Jason King
18 came to light, that is, his encounter with my
19 client, did that surprise you that that occurred?

20    A.    **Nothing surprises me.**

21    Q.    Specific to Jason King and what you knew
22 with his history and all, does it surprise you?

23    A.    **No, sir.**

24    Q.    Can you think of anything in his past
25 that, looking back on it, you think you know that

1 could have been a predictor that this would occur?

2    A.    **No. The only issues prior to that were
3 of car crashes, reports, nothing even anywhere
4 close to what those allegations were.**

5    Q.    As a result of what Mr. King is alleged
6 to have done, was there any change in policy in
7 your department?

8    A.    **No, sir, no direct changes.**

9    Q.    Indirect change?

10    A.    **Indirect changes, no. Conversations,
11 certainly. As far as specific changes, no.**

12    Q.    If not in the policy, did you take any
13 action to, for example, emphasis a particular
14 policy that was already in existence? I could ask
15 this in a broader sense. Did you do anything in
16 response to these allegations? But I have a focus
17 purpose for it obviously.

18    A.    **All I did was let my feelings pretty
19 well be known that as I had preached and talked
20 before, any actions you take as a police officer
21 could be on a camera or on a recorder and it may
22 not, that doesn't mean that you can do something
23 and think it isn't recorded and -- well, I will
24 leave it at that.**

25    Q.    Well, one of the factual matters that

1  has arisen is the fact that he did not call out on
2  the traffic stop, you're aware of that?
3  **A.   Yes.**
   **Q.   Without looking at it, I'm going to**
5  assume your policies require anytime a police
6  officer makes a traffic stop, they are to call out?
7  **A.   Yes, sir.  It's reenforced periodically.**
8  **Q.   I see.  And I suppose that rule has a**
9  number of different purposes, one is officer safety
10 obviously, correct?
11 **A.   Yes.**
12 **Q.   But also it provides a measure of**
13 monitoring and accountability, right?
14 **A.   Yes.  It's an indicator of what the**
15 **officer is doing or not doing.**
16 **Q.   Were you aware that Officer King had**
17 been sued along with Deputy Cantillion, Ginnever,
18 and Sherrill arising from an incident involving the
19 attempted apprehension of a fugitive and entry into
20 a home where excessive force was alleged?
21 **A.   I knew of the suit.  I didn't know the**
22 **particulars.**
23 **Q.   And consistent with what you said**
24 before, your knowledge of this suit did not result
25 in any either change in policy or investigation in

1  your department, correct?
2  **A.   No.**
3  **Q.   And nothing about Jason King's alleged**
4  conduct, and that is alleged in that suit, would
5  have been part of his record at the time of the
6  incident with my client, correct?
7  **A.   Could you repeat that, please?**
8  **Q.   Yes, sir.  Nothing about the allegations**
9  in the lawsuit, and it's Sean Johnson against
10 Cantillion, King, Ginnever and Sherrill?
11      MS. TEMPLE:  What's the date on that,
12 please?
13      MR. RYALS:  Date on what?
14      MS. TEMPLE:  Of the lawsuit of those
15 alleged individuals.
16      MR. RYALS:  2003.
17      MS. TEMPLE:  Sheriff wasn't sheriff.
18      THE WITNESS:  No wonder I don't recall.
19 QUESTIONS BY MR. RYALS:
20 **Q.   Nonetheless, as far as you know, nothing**
21 about the allegations in that incident became part
22 of Deputy King's record?
23 **A.   To my knowledge, you are correct, yes.**
24 **Q.   That was the case under the sheriff in**
25 2003?

1  **A.   Yes.**
2  **Q.   And the case under your tenure, under**
3  your watch, correct?  That is, had it occurred on
4  your watch, it still would not have become part of
5  his record?
6  **A.   No, sir it, would not.**
7       MS. TEMPLE:  How much longer do you
8  have, approximately?
9       (OFF THE RECORD DISCUSSION)
10 QUESTIONS BY MR. RYALS:
11 **Q.   Sheriff, we talked before about the**
12 aspects of running the department that involved the
13 county and that the sheriff is free to make
14 decisions on his own, and I just wanted to make
15 sure that one of those types of policies or
16 practices where you don't require the county's
17 blessing or permission is the decision about how to
18 handle complaints about members?
19 **A.   Correct.**
20 **Q.   And similarly, how to handle, what to**
21 make of or what to do with allegations that might
22 be raised in a civil rights lawsuit?
23 **A.   That's correct.**
24 **Q.   You described political turmoil and, my**
25 word, and I was wondering if when former Sheriff

1  Swope was running, was there a lot of that
2  political, is turmoil a good word?
3  **A.   Yes.**
4  **Q.   Was there a lot of political turmoil**
5  over his campaign?
6  **A.   Worst in the history of the sheriff's**
7  **department since I had been there.**
8  **Q.   And I understand former Sheriff Swope**
9  was a sergeant at the time he ran for sheriff?
10 **A.   Yes.**
11 **Q.   Had no command experience above being a**
12 line supervisor?
13 **A.   Correct.**
14 **Q.   And I also had a perception that the**
15 rank and file deputies aligned with him, is that
16 more or less accurate?
17 **A.   More or less, yes, sir.**
18 **Q.   And then I suppose there were others in**
19 the department that didn't align with him, correct?
20 **A.   I'm sure, yes.**
21 **Q.   What was it about that election that**
22 made it the worst in the history of the department?
23 **A.   Probably the fact that so many of the**
24 **line personnel aligned with Tim Swope because of**
25 **the promises he made that he wouldn't have been**

1 empowered to keep, but he didn't know that at the
2 time. Promises made, the buddy system, and he was
3 closer to the age of the average patrol officer,
4 and the sheriff at that time had pretty well
5 angered the rank and file personnel over a few of
6 his decisions.
7    Q.    What were the decisions that angered
8 them?
9    A.    Well, more than anything else, as it got
10 closer to the election time, he would put people in
11 charge so he could go out and politic, but he
12 didn't go out and politic. He just assumed he was
13 a two-term sheriff and nothing was going to, you
14 know, pop up that would take him out of office.
15 But he underestimated the power of money and the
16 campaign signs and not staying attuned to what was
17 going on within the agency.
18    Q.    Remind me, you've run twice; is that
19 correct?
20    A.    Yes.
21    Q.    Did you have an opponent the first time?
22    A.    Yes, I had six of them.
23    Q.    All from the same department?
24    A.    All but one.
25    Q.    The second time did you have any

1 opponents?
2    A.    Yes.
3    Q.    How many?
4    A.    One.
5    Q.    From within?
6    A.    Yes.
7    Q.    Who was the opponent the second time?
8    A.    Pat Riley.
9    Q.    And the opponent the first time?
10    A.    Oh, boy. Doug Salters, Dennis Davis,
11 Greg Cross, Riley was on that one also. It was
12 either a total of six -- oh, Ed Copeland. There
13 might be a couple more in there I forgot about.
14    Q.    The first time you ran, was there -- I
15 know what you testified to about your reaction
16 after you were elected, which was different than
17 your predecessors, but the first time you ran, did
18 you perceive that there was any form of political
19 turmoil in the department over that election?
20    A.    There was some, but not at the magnitude
21 that there had been in the past.
22    Q.    How about during the second election?
23    A.    Very little.
24    Q.    Do you have an explanation as to why
25 there was very little when you ran for reelection?

1    A.    I'm probably the hardest working sheriff
2 that's been there in the last 50 years. And I try
3 to be honest. I try to communicate with the
4 officers and pretty well have an open-door policy.
5 And I believe they were comfortable with me.
6    Q.    No real ground swell of opposition that
7 would disrupt the operation of the agency?
8    A.    No.
9    Q.    Your department has several sources of
10 authority that guide the day-to-day operations.
11 That's not a question, it's a statement. U.S.
12 Constitution, would you agree?
13    A.    Yes.
14    Q.    The laws of the state of Missouri?
15    A.    Yes.
16    Q.    Department policy?
17    A.    Yes.
18    Q.    And you have a policy manual?
19    A.    Yes.
20    Q.    Are there additional directives or
21 guidance internally besides the department manual?
22    A.    County ordinances.
23    Q.    Sure.
24    A.    From time to time there are directives
25 that may address a specific issue that's focused on

1 a particular time.
2    Q.    Do you call those special orders?
3    A.    Directives.
4    Q.    How are those promulgated?
5    A.    If they come from my level, they will be
6 posted on the bulletin board throughout. They will
7 be put on what we call desk book. It's a portion
8 of the mobile data terminal where every single
9 officer reads that desk book. They get the
10 information, and it will be read at roll call.
11    Q.    Aside from the mobile data terminal, do
12 you send e-mails or voice mail blasts?
13    A.    The division commander for patrol does
14 from time to time, bureau commander does from time
15 to time. If it's, I don't want to say a real
16 serious nature, but if it's something I want them
17 to know comes from me, the sheriff, I will have one
18 put out, voice mail.
19    Q.    Voice mail. All right.
20    A.    And I have a department wide e-mail that
21 I think I have used twice.
22    Q.    Does every officer have a mobile data
23 terminal in their car?
24    A.    Yes, every patrol officer, yes.
25    Q.    Does every member have access to a

1  mobile data terminal in the department?
2      A.    **Yes.**
3      Q.    It sounds like that's the most efficient
way to communicate --
5      A.    **Yes.**
6      Q.    -- through the MDTs.  How about in-car
7  cameras, does your department have them?
8      A.    **About 30 percent at this time.**
9      Q.    Is this a budgetary issue?
10      A.    **Yes.  We increase from year to year.**
11      Q.    You would like to have them in all of
12  them?
13      A.    **Well, once again, technology is**
14  **changing.  Available on the market now are the**
15  **lapel cameras and lapel recorders.**
16      Q.    Right.
17      A.    **And I'm looking seriously at them to**
18  **possibly replace the camcorders, the in-dash**
19  **camcorders, because of the field of view of the**
20  **camera, it's pointed the same way the officer is.**
21  **You may have an incident occur that might not**
22  **necessarily be in front of the car, but a camera**
23  **will catch it.  But our program has been, for the**
24  **last several years, and with the end result the**
25  **goal to have every car equipped.  Now about a third**

1  **of the way through we are looking at another**
2  **avenue.**
3      Q.    Do you prohibit individual officers from
4  carrying any kind of recording device?
5      A.    **No.**
6      Q.    Do you encourage it?
7      A.    **Sure.**
8      Q.    Sheriff, during your tenure on the St.
9  Charles County sheriff's department, have you ever
10  reported another officer for misconduct?
11          MS. TEMPLE:  To whom, POST?
12  QUESTIONS BY MR. RYALS:
13      Q.    Anyone.
14      A.    **Have I personally?**
15      Q.    Yes, sir.
16      A.    **Yes, once.**
17      Q.    How long ago?
18      A.    **Seven years, eight.**
19      Q.    Without the gory details, what was the
20  misconduct you reported?
21      A.    **I fired him and I wanted POST to make**
22  **sure he didn't go to work for another law**
23  **enforcement agency.**
24      Q.    You reported misconduct to POST?
25      A.    **POST, yes.**

1      Q.    Is that the only time you reported a
2  terminated employee to POST?
3      A.    **So far.**
4      Q.    Was that Jason King?
5      A.    **No.**
6      Q.    That prompts my next question.  What
7  about the conduct of the officer reported to POST
8  was different from any other person who's been
9  terminated?
10      A.    **Most likely he was approached through**
11  **the whole situation and his attitude, and my**
12  **thoughts that he would probably do the same thing**
13  **somewhere else.**
14      Q.    Was it excessive force?
15      A.    **Yes.**
16      Q.    Was this one of the individuals that
17  Jason King testified about?  There was, I think, a
18  Jeremy Thom who hit a prisoner in the jail?
19      A.    **Yeah.  No, it wasn't him.**
20      Q.    There was a, well, the names I have are
21  James Gaddy.
22      A.    **No.**
23      Q.    Ryan Streck?
24      A.    **No.**
25      Q.    Lieutenant Cook obviously not, right?

1      A.    **Correct.**
2      Q.    Not Lieutenant Cook?
3      A.    **No, you are correct, it's not Lieutenant**
4  **Cook.**
5      Q.    Adam Kaup, K-A-U-P?
6      A.    **No.**
7      Q.    Would the individual appear on Exhibit 4
8  in this case?
9      A.    **Yes.**
10      Q.    Would that be May '07?
11      A.    **Most likely, yes.**
12      Q.    Would you tell me who it is if I ask
13  you?
14      A.    **Sure.**
15      Q.    Who was it?
16      A.    **Kerry Kamp.**
17      Q.    What did Kerry Kamp do to --
18          MS. TEMPLE:  He already told you, but
19  you can repeat it.
20          THE WITNESS:  Handcuffed a minor and
21  beat the -- assaulted him.
22  QUESTIONS BY MR. RYALS:
23      Q.    In the back of the car?
24      A.    **Right.**
25      Q.    That's the one?

1    A.    Yes.

2    Q.    I asked you if you ever reported

3  misconduct and I meant from the beginning of the

4  police career until now, and I heard your answer is

5  to be one time and that would be a report to POST?

6    A.    Yes.

7    Q.    Did you ever see any misconduct that you

8  didn't report, and what I'm thinking about is saw

9  another officer use excessive force or make a

10  questionable search or any violation that you

11  didn't report to a supervisor or someone else?

12    A.    Sure.

13    Q.    What's the reason that you didn't report

14  that violation?

15    A.    The violations that I observed weren't

16  so egregious that I felt it necessary to take it to

17  a supervisor.

18    Q.    There's a phenomenon that I'm sure you

19  are familiar with, it's called different names, the

20  blue wall of silence or the code of silence, and a

21  rough definition of the code of silence is that

22  officers do not report misconduct of other

23  officers.

24    A.    All the time.

25    Q.    Okay.  And I think I asked you before,

1  you are not aware of any instance when another

2  officer in your department reported an officer for

3  excessive force or a bad search or anything like

4  that?

5    A.    Not that I recall, no, sir.

6    Q.    Having worked in the department for?

7    A.    39 years, 11 months.

8    Q.    And counting?

9    A.    Yes.

10    Q.    Do you believe that that occurs, that

11  officers may witness other officers stepping over

12  the line?

13    A.    Sure they do.

14    Q.    And not report it?

15    A.    Sure they do.

16    Q.    Have you ever done anything to try to

17  change that?

18    A.    Well, yeah, we have in our policy that

19  an officer who observes another officer, policy

20  violations etc., etc., are required to report that

21  to a supervisor.  Failure to do so is a violation.

22  There is one case within the last eight years since

23  I've been sheriff that we did charge an officer

24  with failure to notify a supervisor.  I can't put

25  my finger on it right now, but I do recall, and he

1  was disciplined for having knowledge that an

2  officer violated -- it was a pretty serious

3  violation obviously, and failed to report it to the

4  supervisor.  And that person was disciplined, but

5  right now I don't remember the specific case, but I

6  do recall the incident.

7    Q.    One time is your recollection?

8    A.    One time is all I recall at this time,

9  yes, sir.

10    Q.    Aside from having it in your policy that

11  it's a violation not to report misconduct, have you

12  done anything to emphasis that or try to prompt a

13  change in that behavior?

14    A.    Not directly, no, you know, I haven't

15  addressed the troops or anything like that.  But

16  once again, it is in the policy and there are -- in

17  some aspects law enforcement is common sense, that

18  may be the problem.  But I would say any law

19  enforcement officer working for a legitimate law

20  enforcement agency knows that if you witness

21  something of a serious nature, your incumbent to

22  notify the supervisor, and it's been done in the

23  St. Louis area on many occasions.

24    Q.    One time in your experience in your

25  department?

1    A.    One time that I recall at this time,

2  yes, sir.

3    Q.    When you said, made the remark about

4  common sense, do you mean to say it's common sense

5  that if you are an officer on the street and you

6  are running to the supervisor every time somebody

7  crosses a line, even if it's a minor or that you're

8  not going to survive very long as a police officer

9  on the street?

10    A.    It would be extremely difficult to have

11  a positive working relationship with your fellow

12  officers under those circumstances, yes, sir.

13    Q.    Because you've read the testimony of

14  Mr. King, I want to ask you about some specific

15  allegations he's made.  The first one had to do

16  with Sergeant McCarver being out of the county.

17  Are you familiar with that?

18    A.    Oh, yes.

19    Q.    Was that on your watch?

20    A.    Yes, I believe it was.

21    Q.    What is your familiarity with it?

22    A.    When it was reported to me, I was

23  extremely frustrated to begin with, in addition to

24  angry.  And there was a supervisor incident form

25  submitted by a bureau commander, and my

1 recommendation was termination. He challenged it
2 and took it to the pre-disciplinary review board
3 and they came back with termination is a little
4 stringent under these circumstances considering the
5 officer's record etc., etc., and they recommended
6 suspension and I think there was extensive loss of
7 pay or something like that. So I didn't override
8 the board on that, but he was not terminated, but
9 he was severely disciplined.
10    Q.    Could you have overridden the board?
11    A.    Yes.
12    Q.    Did he lose his stripes?
13    A.    No.
14    Q.    Is he still a member of your department?
15    A.    Yes.
16    Q.    Just in the briefest way, what were the
17 allegations? He left the county?
18    A.    He left the county. He was the only
19 supervisor on shift and left the county without
20 notifying communications. He was in communication
21 with all of the officers and dispatch center at all
22 times. However, the fact remains he was physically
23 out of the county.
24    Q.    Wasn't there something about his purpose
25 for leaving the county was a personal mission?

1    A.    It was something personal with one of
2 his kids or maybe it was a girlfriend or wife or
3 something but, yes, he left for personal nature.
4    Q.    Sergeant Knox ran code from Jeff City.
5 That was another thing that Mr. King testified
6 about. Are you familiar with that complaint about
7 him?
8    A.    He didn't run code from Jeff City. If I
9 remember correctly, he and another officer were on
10 the way back to the county having been at training
11 and I believe it was Salem, and he was somewhere
12 around Warren County, Wright City area on I-70 and
13 there was a vehicle in front of them that they
14 followed for about two, three miles impeding the
15 flow of traffic. They couldn't pass on the right
16 because it was in the late evening, or early
17 evening, I guess. So Sergeant Knox hit the
18 overheads and beeped the sirens, the car moved
19 over, and they went on, turned the overheads and
20 the siren off and drove home. Next morning they
21 were in the field commander's office.
22    Q.    Did he get any discipline for that?
23    A.    I don't recall if he got any paper on
24 it. You had to know the field commander, he got a
25 very serious tongue lashing at the very least. I

1 don't recall if there was any paperwork.
2    Q.    Were you the sheriff at that time?
3    A.    Yes, I was.
4    Q.    Who was the bureau commander?
5    A.    Captain Kaiser.
6    Q.    Captain Kaiser is no-nonsense when it
7 comes to a verbal reprimand, is that your
8 perception?
9    A.    Yes. That's a kind way of putting it.
10    Q.    There was also an allegation that
11 Sergeant Knox was promoted even though he failed
12 the test repeatedly and there was some sort of
13 favoritism in his promotion, do you recall reading
14 that?
15    A.    I recall reading that. At the time
16 Sergeant Knox was promoted he was the most
17 qualified applicant at that time, and yes, he had
18 tested before, he had also been with the department
19 about ten years.
20    Q.    All right. That promotion was on your
21 watch?
22    A.    Yes.
23    Q.    There was an incident described at a bar
24 in O'Fallon involving some Hispanic men, and I
25 think there was an assault or altercation involving

1 Adam Kaup?
2    A.    Kaup, yes.
3    Q.    Are familiar with that?
4    A.    Yes.
5    Q.    Was that while you were the sheriff?
6    A.    Yes.
7    Q.    Mr. King testified that you offered
8 assistance to Deputy Kaup by calling Joe
9 McCullough, a lawyer?
10    A.    Deputy Kaup came into my office. I
11 believe it was the morning after the incident and
12 explained what had happened. It was not a
13 duty-related incident. It was off-duty and he was
14 visibly upset. Not to say down the road it
15 couldn't be, but at the time it was not a
16 department issue and I knew Mr. McCullough had
17 worked with law enforcement officers in the past,
18 and I asked if he would give Adam a call and check
19 to see what his status is, and basically that was
20 it, and that was it.
21    Q.    You called Mr. McCullough or you had
22 Mr. --
23    A.    Yes.
24    Q.    Oh, okay. Did the incident giving rise
25 to that conversation between you and Deputy Kaup

1 ever result in any discipline of Deputy Kaup?
2     A.    **Nope.**
3     Q.    Did you have any involvement in that
4 matter after that conversation with him?
5     A.    **None whatsoever.**
6     Q.    Was there ever an inquiry?
7     A.    **No.**
8     Q.    And I take it no internal affairs
9 investigation?
10     A.    **No.**
11     Q.    What information, Sheriff, did you have
12 about what had occurred?
13     A.    **The information provided to me was that**
14 **the officers were at a local club. There was a**
15 **St. Peters officer, I believe, retiring. I believe**
16 **it was a retirement party for him and they were**
17 **outside in the parking lot leaving, and there were**
18 **two or three Hispanics, one of them approached**
19 **Deputy Kaup and he got in his face or shoved him or**
20 **something. Well, Deputy Kaup then shoved him and**
21 **he fell back. If I remember correctly, I don't**
22 **believe Deputy Kaup had anything to drink that**
23 **night. And the police were called, and all of the**
24 **information was provided and, well, I did hear**
25 **later on there was no prosecution on the part of**

1 the subjects that had been jailed.
2     Q.    You said the subject didn't want to
3 prosecute?
4     A.    **That's what was reported to me by**
5 **O'Fallon police, yes.**
6     Q.    Another individual, Jeremy Thom,
7 T-H-O-M, I think.
8     A.    **Thom.**
9     Q.    Thom, thank you. There was a fall,
10 alleged fall in jail.
11     A.    **He backhanded a prisoner in the holdover**
12 **cell and went directly from there to the captains**
13 **office and reported what had happened.**
14     Q.    He did?
15     A.    **Yes.**
16     Q.    Did that result in an inquiry?
17     A.    **That resulted in a suspension, I**
18 **believe.**
19     Q.    Did that have to come through you, sir,
20 the suspension decision?
21     A.    **I have to approve every suspension, yes,**
22 **sir.**
23     Q.    Was that the recommendation or was that
24 your decision?
25     A.    **That was the recommendation that came to**

1 me and I approved it.
2     Q.    James Gaddy, use of a taser or
3 something, does that ring a bell?
4     A.    **I have no knowledge of that whatsoever.**
5     Q.    Ryan Streck fired a shotgun into the
6 engine compartment of his car?
7     A.    **Yes, he did.**
8     Q.    And apparently there was some
9 allegations about him holding himself out to be an
10 FBI agent and maybe stalking a woman. That was the
11 testimony. Do you know anything about that?
12     A.    **I don't know anything about that.**
13     Q.    Did Deputy Streck get disciplined for
14 the shotgun incident?
15     A.    **Yes, he did.**
16     Q.    Another bit of testimony was --
17     A.    **That was done -- back up a little bit.**
18     Q.    Yes, sir.
19     A.    **That incident with the shotgun, that**
20 **vehicle was not moving. That vehicle was roadside.**
21 **He was placing the shotgun back into the carrier**
22 **and he caught the trigger.**
23     Q.    I see. That bit of testimony raises an
24 interesting point. Mr. King testified that there
25 was a very active rumor mill in your agency,

1 probably no different than any other police agency.
2 Would you agree with that?
3     A.    **I would agree with that, yes.**
4     Q.    Let's take Deputy Streck's incident.
5 The way Deputy King describes it, Deputy Streck was
6 messing with the trigger and discharged it, right?
7     A.    **Uh-huh.**
8     Q.    And the way you describe it, it was an
9 accident because he was actually putting the weapon
10 back into its holder?
11     A.    **Yes.**
12     Q.    So that's an example, at least, of some
13 of the facts being true and circulating about and
14 at least some of the facts being disputed, correct?
15     A.    **Who's disputing the facts? You have to**
16 **know the facts before you can dispute them.**
17     Q.    Yes. Yes. Maybe that's a poor way to
18 phrase the question. The information that was
19 disseminated was contrary to your conclusion?
20     A.    **Yes, sir.**
21     Q.    There was testimony about Lieutenant
22 Cook and troubles with his wife, maybe assaultive
23 behavior, did you see that?
24     A.    **Oh, yes, yeah.**
25     Q.    Did those events or anything like that

1  occur on your watch?

2     **A.**    **No.**

3     **Q.**    And then apparently Lieutenant Cook was

4  also in a motorcycle collision?

5     **A.**    **Yes, he was.**

6     **Q.**    Single vehicle?

7     **A.**    **Yes.**

8     **Q.**    Severely injured apparently?

9     **A.**    **Yes.**

10     **Q.**    Deputy King testified that, I think he

11  said I have it on good authority that his BAC was

12  over the legal limit when he got to the hospital,

13  do you have any knowledge of that?

14     **A.**    **None other than the BAC, or any**

15  **conversation relevant to that at all, was never**

16  **brought to Lieutenant Cook's attention by either**

17  **the Wentzville Police Department that handled the**

18  **incident or the hospital staff.**

19     **Q.**    Was the collision, the wreck, motorcycle

20  wreck, on your watch?

21     **A.**    **Yes.**

22     **Q.**    Was there any investigation about the

23  circumstances?

24     **A.**    **No. It was off duty.**

25     **Q.**    Now, you certainly have, and I think the

1  record will reflect there are things that have

2  happened off duty that are within your purview,

3  correct? If an officer --

4     **A.**    **Oh, yes, yes. There are some that are**

5  **and some that aren't.**

6     **Q.**    If someone was driving while intoxicated

7  and had a collision, that would be a matter that

8  you would be interested in investigating

9  internally, correct?

10     **A.**    **Yes.**

11     **Q.**    Mr. King also testified that he was

12  asked by someone who should have no knowledge of an

13  internal investigation involving Mr. King, about

14  the investigation, suggesting that what should have

15  been secret was out and being disseminated in the

16  rumor mill, I guess, first of all, are you aware of

17  whether that occurred?

18     **A.**    **I'm aware of the conversation or the**

19  **comments that Mr. King made. I do know that the**

20  **only person in that room at the time of that IA was**

21  **Mr. King and the IA investigator. And I know the**

22  **IA investigator, and there's no way on earth he**

23  **would say anything to anybody. Now, if that**

24  **information came back as he was saying, it did not**

25  **come from my mouth, my office or the IA**

1  **investigator. To say that someone wasn't outside**

2  **listening, you know, walls are thin, some walls are**

3  **thin, or Mr. King could possibly have told someone**

4  **else about it and the rumor mill gets going and it**

5  **got back to him the way it went out, but as far as**

6  **the IA officer or my office, that information never**

7  **came from there.**

8     **Q.**    What was the first you knew about the

9  allegations that resulted in Mr. King resigning?

10     **A.**    **The shift supervisor on duty that**

11  **evening came and informed me of what the lady had**

12  **come into our office to report.**

13     **Q.**    Based on your almost 40 years of

14  experience in the department, when that information

15  first was brought into the department, is that the

16  sort of information that would typically spread

17  through the rumor mill or is that sort of

18  information that would typically have a lid put on

19  it? And here's what I'm getting at. If you assume

20  Mr. King didn't say anything to anyone, and maybe

21  that's a wrong assumption, but would you expect,

22  based on your experience with how the rumor mill

23  operates in your department, when Mr. King had that

24  incident and it became more than just a traffic

25  stop, would you expect that that information would

1  have traveled through the department?

2     **A.**    **Most likely it would travel through the**

3  **department, but it would not be from the command or**

4  **supervisory level. It would be from the rumor**

5  **mill, from the ground troops. They talk to each**

6  **other all the time.**

7     **Q.**    Okay. My perception, especially where

8  there's an active rumor mill, is if an officer gets

9  in a pursuit or uses force against someone that

10  morning, by third shift everybody knows it

11  happened. It's not officially disseminated, right?

12     **A.**    **Right.**

13     **Q.**    But when you say rumor mill, we're

14  really talking about a rumor mill on steroids?

15     **A.**    **Exactly.**

16     **Q.**    It's a small, close-knit community where

17  there are no secrets?

18     **A.**    **And very few facts.**

19     **Q.**    As rumor mills are, right?

20     **A.**    **Yes.**

21     **Q.**    The last bit of testimony I want to ask

22  you about is when Mr. King said he came off the

23  drug unit, he said he was told by someone to steer

24  clear of the drug unit members?

25     **A.**    **Yes.**

1    Q.    He said he attempted to contact you,
2  have a meeting with you through Captain Kaiser, was
3  denied by Captain Kaiser, and Captain Kaiser later
4  came to him and said the sheriff will talk to you,
5  then he had a discussion with you about it, did
6  that happen?
7    A.    Yes.
8    Q.    Do you believe he was told to steer
9  clear of the drug unit members?
10   A.    Yes, he was.
11   Q.    Did that come from you?
12   A.    Yes, it did.
13   Q.    Can you explain why?
14   A.    Because the commander of the regional
15  drug task force called me and informed me that
16  Deputy King was interfering with their operations,
17  continuing to contact the operators left in the
18  unit about cases they were working and cases he was
19  working, and he was told they wanted him to stay
20  away.
21   Q.    And then you had a meeting with him and
22  is that what you communicated to him?
23   A.    Yes.
24   Q.    So his account of why he was told to
25  steer clear was not accurate?

1    A.    Totally inaccurate.
2    Q.    I've asked you a lot about specifics and
3  I know this feels like an oral examination, it's
4  not meant to be.  But there may have been other
5  things that he said that come to mind that I
6  haven't asked you about, so the question I pose to
7  you now is, is there anything else from his
8  testimony that you haven't already talked about
9  that you believe is inaccurate or less than
10  accurate?
11   A.    How much time do you have?
12   Q.    Well, until you have to be in Jeff City.
13   A.    Okay.  Some of the more notable ones,
14  one incident on Forest Drive where Deputy King
15  alleged that one of the SWAT officers shot an armed
16  subject who had a pistol to his head and that when
17  a nonlethal round hit the arm it made the pistol go
18  off and shot himself in the head.  For one thing he
19  got the wrong officer involved.  That was not
20  Sergeant Knox.  That was an officer named Tom
21  Jones.  Tom Jones deployed the nonlethal round that
22  took the arm away from the subject, and he brought
23  it back and pulled the trigger and committed
24  suicide.  What Deputy King probably didn't know is
25  I was there that night myself.

1    Q.    You witnessed it?
2    A.    Yes.  So that's one.  I wish I had my
3  list.  Give me a couple seconds here.
4    Q.    Take your time, Sheriff.
5    A.    Believe it or not, we've covered several
6  of these.  There was one particular incident that
7  he recalls.  He refers several times to other
8  officers, like all cops do.  You know, other
9  officers get by with this and the others were
10  disciplined for this.
11   Q.    Yes.
12   A.    And he referred to one of his favorite
13  supervisors was Lieutenant Martchink, and that he
14  thought he was treated fairly, more fairly by him
15  than anybody else.  And that, I forget exactly what
16  the relationship is there, but he indicated
17  Marchand was not on the good list, so to say, so he
18  got in trouble and he was busted, demoted, and
19  moved out of the bureau.  What had happened was the
20  other shift members, Lieutenant Marchand's shift
21  members reported him staying at home, said the same
22  thing, used the walkie and the MDT that you can
23  take into the house to make it appear he was out on
24  the street.  So he had a couple other supervisors
25  on his shift that every once in a while he would

1  give them a S.A.D. day.  He would say don't come to
2  work, supervisory appreciation day.  Well, the
3  reason he was doing this was because he was staying
4  home when he was supposed to be out working a
5  shift, supposed to be supervising his personnel.
6  So one of the other officers finally got tired of
7  it, he knew it too, so he reported to the division
8  commander.  And, of course, this can't be
9  happening, so over a period of a couple weeks,
10  through our own surveillance, for lack of a better
11  term, it was determined that he was indeed, number
12  one, lying on the radio and was staying home.  And
13  we found out the extent of the sad days was more
14  than what had been anticipated.  So the officer,
15  the supervisors who were taking off, putting in
16  time sheets as if they had worked, but the
17  lieutenant said this is a S.A.D. day, I will take
18  care of it.  So the end result was Lieutenant
19  Marchand was demoted to a deputy, moved to prison
20  transport, and all the supervisors he had given
21  S.A.D. days were required to pay all of those hours
22  back to the county.  But Deputy King didn't think
23  that that was right, he thought it was just done
24  because Lieutenant Marchand wasn't one of the good
25  ol' boys.

1  Q.  May I interrupt you?

2  A.  **Sure, go ahead.**

3  Q.  That event with sworn personnel staying
home or --

     A.  **Given the shift off.**

6  Q.  That seems to have popped up at a number

7  of different times during your testimony.  Was that

8  a common problem in your department where deputies

9  who report from home are not being truthful about

10  when they are on duty or when they are not?

11  A.  **Well, we demoted that one.  We suspended**

12  **three or four of them, terminated another one, so**

13  **when it's known, it's addressed.  Because of the**

14  **take-home car program, we respond to the office two**

15  **days a week.  I'm not so naive as to not think that**

16  **one of those officers who goes 10-41, signing on,**

17  **may still be putting on his boots or his shoes.**

18  **But as a routine practice, extensive time reporting**

19  **someplace where they're not, no.  I think he made**

20  **some reference to guys being in sandals and**

21  **underwear, something like that.  Well, like the**

22  **rest of his story, how would he know if the**

23  **person's in sandals or if he's at home or not**

24  **unless he did it several times himself.  But no,**

25  **once it's determined, then it is addressed.**

1  Q.  Without editorializing, it seems to me

2  that the number of times that you caught people

3  doing that, it seems rather high.  And I don't mean

4  to accuse, but did you ever identify this program

5  that permits deputies to go on duty from their home

6  as opposed to reporting to the station as any kind

7  of supervisory problem?

8  A.  **Well, I don't know if it's a major**

9  **problem.  Most of the time the supervisor is at the**

10  **office, at the station at the beginning of the**

11  **shift doing paperwork or other supervisory**

12  **functions anyway.  As far as, there again, once the**

13  **supervisor determines that or suspects this person**

14  **is reporting on the radio at a location where he**

15  **really isn't, we have had them report on a radio**

16  **where they are and pass a supervisor in an unmarked**

17  **car and had lied about their location.  I hate to**

18  **admit it, cops do stuff like this every once in a**

19  **while.  And once it's determined, once it's**

20  **discovered, then it's dealt with and it's very**

21  **serious.**

22  Q.  The question was poor.  What I should

23  have said, in your mind is it a supervisory issue,

24  an issue for you or your command staff to address,

25  closer supervision of when the deputies actually

1  report in?

2  A.  **With the demographics of the county,**

3  **that would be virtually impossible.  Like I said,**

4  **90 percent of them report in and they are where**

5  **they are when they say they are there.  And they**

6  **are required to be in their zone 15 minutes prior**

7  **to the beginning of the shift.  That pretty well**

8  **bars anyone reporting from home.**

9  Q.  I see.  I interrupted your thought.

10  A.  **No, that's fine.  One other one, like I**

11  **said, from all the accounts from Jason King in**

12  **there, there isn't a single one that is factual,**

13  **not a single one.  The last one that I will address**

14  **is there was allegations in there that I provided**

15  **-- or I intervened with DWI arrests by telling**

16  **supervisors to go to this officer and say, you**

17  **know, make this go away.  I don't want that to go**

18  **away.  I will sit right here before you and swear**

19  **on my mother's life and she's still alive.  I've**

20  **been in law enforcement 40 years and not once in**

21  **that 40-year career have I ever intervened in a DWI**

22  **case.  That includes the two that my niece got.**

23  **That's all I have to say about that.**

24  Q.  All right.  And your testimony is

25  complete as far as anything else you want to

1  comment about?

2  A.  **Yes.**

3  MR. RYALS:  Let's mark these two because

4  they were provided.

5  (PLAINTIFF'S EXHIBIT NOs. 7 AND 8 WERE

6  MARKED FOR IDENTIFICATION)

7  QUESTIONS BY MR. RYALS:

8  Q.  Sheriff, I'll represent to you

9  Exhibits 7 and 8 were provided to us in response to

10  our request for production, and I would like you to

11  identify what each of those exhibits are, please.

12  A.  **Exhibit 7 is in reference to changes we**

13  **made in our policies relevant to IA investigations**

14  **or other policy violations.**

15  Q.  So Exhibit 7 reflects a memo to you from

16  someone who you directed to research that question?

17  A.  **Yes.**

18  Q.  As far as you know, that's complete and

19  accurate?

20  A.  **Yes, it is.**

21  Q.  Exhibit 8, documents signed by Jason

22  King accepting receipt of St. Charles County

23  personnel administration program and policy manual

24  and updates of sheriff's department policies and

25  procedures.  Each of those pages sort of speaks for

1 itself, would you agree?

2     **A.**   **Yes, sir.**

3     **Q.**   I mean, there is nothing -- they are
responsive to requests for personnel file or
something like that?

6     **A.**   **Yes, sir.**

7     **Q.**   I take it from the fact that Exhibit 7
8 exists that you were provided with a copy of our
9 request for production?

10     **A.**   **Yes, sir.**

11     **Q.**   Did you attempt to gather all of the
12 information that we asked for?

13     **A.**   **No, sir.**

14     **Q.**   Because you weren't going to give us the
15 internal affairs records?

16     **A.**   **Correct.**

17     **Q.**   Anything else?

18     **A.**   **No, sir. I believe that was it. Or a**
19 **DB number or something. I believe that was all.**
20 **Everything else I produced for you.**

21     **Q.**   And the last thing I want to talk to you
22 about is I have a number of reports of statements
23 that you made to the media over Chris Hunt's
24 situation. And they are in quotation marks, so I
25 just want to read them to you and see if you said

1 them.

2     **A.**   **Okay.**

3     **Q.**   "If he was a rogue cop, he wouldn't be
4 with the St. Charles County Sheriff's department".
5 Did you say that?

6     **A.**   **In relation to what?**

7     **Q.**   Well, I will show it to you. I think
8 it's from KSDK.

9     **A.**   **If it's in the media I must have said**
10 **it, or something close to it.**

11     **Q.**   And then the next one, Sheriff Neer was
12 shocked. "There are no words to really describe
13 it. Very angry. Frustrated in the judicial system
14 that we are sworn to uphold. And it's turned and
15 used against us." Now I will place that before you
16 so you can see if I read it correctly.

17     MS. TEMPLE: If you recall the context
18 in which it was said.

19     THE WITNESS: I don't recall the
20 context. I would have to read the whole interview.
QUESTIONS BY MR. RYALS:

22     **Q.**   It's a good point. My question is, do
23 you admit saying it or do you not deny it? If you
24 want to add, I said it in this context, feel free.

25     **A.**   **I don't recall the context of the**

1 conversation, but like I said, it's there in black
2 and white. Media says I said it.

3     **Q.**   Do you have a recollection of saying it
4 or words to that effect?

5     **A.**   **No. Which interview was this? I don't**
6 **recall saying it. I won't deny saying it. I**
7 **remember having the interview, but as far as the --**

8     **Q.**   And the last one I want to ask you
9 about, I'm going to read it. "We will not provide
10 law enforcement to Montgomery County or Warren
11 County under the circumstances because I'm not
12 going to take a chance of one of my personnel being
13 charged with a crime while they're on duty, doing
14 their jobs in either one of these counties".

15     **A.**   **That's not what I said.**

16     **Q.**   Do you recall what you said?

17     **A.**   **I don't remember exact words other than**
18 **there was -- emergency circumstances was included**
19 **in that comment, life threatening situations to the**
20 **citizens or officers of Warren County would be the**
21 **exception. This dealt with the routine daily**
22 **services that we provided to them in the past, such**
23 **as bomb disposal, SWAT, crime scene processing,**
24 **things like that. But as far as life threatening**
25 **situations, I made the statement in there, that was**

1 exempt, that's not in there.

2     **Q.**   So let me make sure I understand. The
3 quote is misleading in that it's accurate in terms
4 of day-to-day operations, correct?

5     **A.**   **Yes.**

6     **Q.**   You will no longer send members of your
7 department to those counties for like SWAT or bomb
8 disposal, whatever?

9     **A.**   **Right.**

10     **Q.**   But were there to be an emergency?

11     **A.**   **Life threatening situation.**

12     **Q.**   You would not withhold your people?

13     **A.**   **No.**

14     **Q.**   Thank you, Sheriff. I'm going to pass
15 the examination to Mr. Hood and I think I will be
16 finished finally, but while he's examining you I
17 will take a look at my notes. Do you want to
18 change spots for the court reporter's benefit?

19     CROSS EXAMINATION
20 QUESTIONS BY MR. HOOD:

21     **Q.**   All right. Sheriff, this won't take
22 very long. I don't have very many questions for
23 you. Mr. Ryals covered most of what I was going to
24 cover so that saved us quite a bit of time. Just a
25 quick review of some of the documents here, if you

1    would. Exhibit 4, if you would bring that up,
2    please. Exhibit 4 is the internal investigation
3    summary over the past several years with the
4    disposition of each one of those. I just have some
5    questions about the allegations and nature of
6    complaints of those that were sustained, not those
7    that were exonerated, not those that were not
8    sustained or unfounded. Were all of these
9    potentially termination of employment events?
10    **A.**    **No.**
11    Q.    So which one of the sustained events
12    would you say was obviously not necessarily a
13    termination event?
14    **A.**    **Once again, I don't recall what each one**
15    **of these investigations involved. The one**
16    **July 11th would not -- that's a sustained, would**
17    **not have -- improper computer usage, I'm sorry,**
18    **would not result in termination unless there was**
19    **some long history of violations prior to that.**
20    **Well, the November 7th one would have resulted in**
21    **termination. The other one, sir, I don't recall**
22    **the nature of those investigations.**
23    Q.    Okay. That's fair enough. But under
24    most circumstances you would normally consider
25    stealing by a police officer to probably warrant at

1    least consideration of termination?
2    **A.**    **Stealing most likely would result in**
3    **termination.**
4    Q.    Yes, sir. Falsification of police
5    records, that would likely be consideration for
6    termination?
7    **A.**    **That's pretty close, yes.**
8    Q.    So other than the improper computer
9    usage, depending upon the circumstances, most of
10    those would at least involve consideration of
11    termination, depending upon the individual facts of
12    each of them?
13    **A.**    **Yes. There would be serious**
14    **disciplinary action up to and including**
15    **termination.**
16    Q.    Thank you. Are criminal convictions
17    normally termination events in your department?
18    **A.**    **Normally. Well, classify what you're**
19    **talking about as criminal conviction. If someone's**
20    **convicted of trespassing or peace disturbance,**
21    **that's not a terminable offense. Traffic**
22    **violation, once again, depends on the**
23    **circumstances.**
24    Q.    How about a DWI?
25    **A.**    **Not automatically.**

1    Q.    Off duty?
2    **A.**    **Not automatically. Oh, on duty, yes.**
3    **On duty is automatic.**
4    Q.    Now a DWI on duty would be a --
5    **A.**    **Yes.**
6    Q.    Would stealing time in the department's
7    allegations or nature of complaints be considered
8    the same as stealing property? When I say stealing
9    time I mean --
10    **A.**    **Yes.**
11    Q.    -- multiple occasions when you are
12    actually in your area or when you are on duty or
13    when you are doing the job you are supposed to do?
14    **A.**    **By stealing time you are referring to**
15    **saying you are working when you're not working?**
16    Q.    Yes, sir.
17    **A.**    **That's stealing.**
18    Q.    That is stealing, and that is a
19    consideration for termination?
20    **A.**    **Yes.**
21    Q.    Do you recall how many, or if any, of
22    these internal affairs investigations on Exhibit 4
23    were passed on to the prosecuting attorney of St.
24    Charles County?
25    **A.**    **One.**

1    Q.    And that would be the November 7th,
2    Jason King?
3    **A.**    **Yes, sir.**
4    Q.    None of the others?
5    THE WITNESS: I didn't have issues --
6    MS. TEMPLE: Right. But he didn't ask
7    that, he asked --
8    THE WITNESS: Oh, were any of them
9    referred to --
10    QUESTIONS BY MR. HOOD:
11    Q.    Right.
12    **A.**    **Oh, two of them were referred.**
13    Q.    And the other one would be?
14    **A.**    **March 6th.**
15    Q.    On Exhibit 2, we don't have to refer to
16    any specific one, but I'm going to ask you a
17    question about terminology on an exhibit. There
18    are several times incidents are described as
19    conduct unbecoming a deputy. Would you give me a
20    brief description of what that might entail?
21    **A.**    **Conduct unbecoming a deputy can be**
22    **subjective, cursing at a citizen. One incident, I**
23    **can't say it, you are writing this all down. Being**
24    **disrespectful towards a supervisor or speeding in**
25    **the city of St. Charles, exceeding the speed limit.**

1  Q.  While on duty?

2  A.  **While on duty, yes. Those things that**
3  **would draw attention to the officer in his official**
4  **capacity that makes a department look bad.**

5  Q.  So these unbecoming conducts are usually
6  considered fairly serious?

7  A.  **Yes.**

8  Q.  Okay.

9  A.  **Well, they can be, yes.**

10  Q.  You referred several times to your
11  progressive discipline policy?

12  A.  **Yes, sir.**

13  Q.  Has a copy of that been provided?

14  MS. TEMPLE:  We will be happy to.

15  A.  **That comes from our county's personnel**
16  **administration program, and I just duplicate it in**
17  **the sheriff's department policies and procedures.**

18  QUESTIONS BY MR. HOOD:

19  Q.  Thank you. And if you would, Exhibit 1,
20  I'm going to ask you some specific questions off of
21  that, sir. And particularly paragraph two where it
22  says the sheriff shall be notified of any -- as
23  soon as practical, of any complaint against the
24  office or it's employees that may require an
25  internal investigation.

1  A.  **Yes.**

2  Q.  Just to be clear, I know that you spoke
3  about this with Mr. Ryals earlier, but I wasn't
4  quite sure. So you are really the first responder
5  or decider of whether or not there will be an
6  internal investigation?

7  A.  **I am the only decider, yes, sir.**

8  Q.  And you are the one who assigns the
9  personnel from internal affairs or professional
10  standards division?

11  A.  **Yes, sir.**

12  Q.  No one else has that ability?

13  A.  **On a rare occasion, if necessary, I may**
14  **have to assign a criminal investigator who has the**
15  **background and training in internal affairs**
16  **investigations.**

17  Q.  Okay.

18  A.  **In case Lieutenant Tiefenbrun is out of**
19  **town or unavailable.**

20  Q.  And paragraph 11 in bold, however, no
21  statements of culpability from the suspect officer
22  shall be given to the prosecuting attorney where
23  that statement was obtained absent of a Miranda
24  warning?

25  A.  **Yes.**

1  Q.  Is it the usual custom or practice of an
2  internal affairs investigating officer to give a
3  Miranda warning or to not give a Miranda warning?

4  A.  **No. We won't do both. The internal**
5  **affairs investigator does the internal**
6  **investigation and a separate officer would do a**
7  **criminal investigation. And nothing that is said**
8  **in the internal affairs interview, obviously, can**
9  **be provided to --**

10  Q.  How about during an inquiry where you
11  talk to the officer about the incident in question?

12  A.  **Well, if someone is doing an inquiry and**
13  **he comes up, he or she comes up with an**
14  **incriminating statement, all hands go up, you know,**
15  **it stops right here.**

16  MR. HOOD:  All right. I believe I'm
17  finished. That was much easier, wasn't it?

18  THE WITNESS:  Thank you, sir.

19  REDIRECT EXAMINATION

20  QUESTIONS BY MR. RYALS:

21  Q.  Just briefly. The practice of not
22  calling out on stops, does that occur in your
23  department?

24  A.  **I'm sure it does from time to time.**

25  Q.  Have you identified it as a problem?

1  A.  **No.**

2  Q.  You are satisfied that most of the time
3  officers call out?

4  A.  **Most of the time I'm satisfied they do**
5  **because most of the officers are aware of the fact**
6  **that it's a safety issue to begin with, and being,**
7  **you know, part of the policy. Once again, if radio**
8  **traffic's heavy there may be a rare occasion. We**
9  **encourage them, if radio traffic is heavy, you are**
10  **going to make a vehicle stop, just go ahead and**
11  **stay with that vehicle until the radio is clear,**
12  **then do your license number and location, go ahead**
13  **and make the stop.**

14  Q.  Can an officer call out, so to speak, on
15  the MDT?

16  A.  **Yes.**

17  Q.  And that wouldn't be dependent on radio
18  traffic, correct?

19  A.  **No.**

20  Q.  You don't have GPSs in the car, correct?

21  A.  **No.**

22  Q.  That is, you have no way of tracking
23  where your patrol vehicles are at by GPS?

24  A.  **Not yet.**

25  Q.  After the incident involving Mr. King

1  and my client, you determined that he didn't call
2  out, correct?
3      A.    Yes.
4      Q.    Did that prompt you to reemphasize your
5  policies about you shall call out?
6      A.    Yes. It was brought up again at roll
7  call shortly after that as a reminder. Like I
8  said, we put reminders out frequently. Use the
9  radio or be sure to give your location when the
10  dispatcher calls you. So many people just say go
11  ahead. Well, we want you to tell us, where are
12  you.
13      Q.    Last thing. Mr. King testified that his
14  perception was that the St. Charles County
15  Sheriff's Department deputies were, my word,
16  respected, also my word, perhaps a little bit
17  feared by the public. He described pulling up, you
18  know, where maybe officers from a different agency
19  were encountering a subject and then when a deputy
20  shows up the subject's attitude changes. And that
21  prompted the question I was trying to get at. Do
22  you know the reputation in the law enforcement
23  community of the St. Charles County Sheriff's
24  Department?
25      A.    Yes, I do.

1      Q.    What is it?
2      A.    It's a professional organization, well
3  equipped, well trained, and for the most part, well
4  respected by the community and other law
5  enforcement agencies within the county. I have
6  never heard that we are feared by anybody.
7      Q.    All right. And the reputation in the
8  community outside of law enforcement, have you
9  answered that question as well?
10      A.    What do you mean outside law, the
11  general populus?
12      Q.    Yes.
13      A.    The majority of the responses we get
14  from the general populus are positive in nature.
15  We get those complaints as does everyone. But I'm
16  very pleased with the complimentary e-mails that
17  come through from time to time. And we have a
18  reputation, once again, of being a professional
19  organization.
20      Q.    Mr. King also described two styles of
21  patrol policing, and again I'm characterizing. You
22  may disagree with how I characterize the testimony,
23  but essentially sort of an aggressive style,
24  proactive, self initiated activity, compared to an
25  officer who is not proactive, not aggressive, sort

1  of answers calls for service and goes home at the
2  end of the day. Is that generally a fair
3  characterization?
4      A.    That's a pretty good characterization of
5  just about any law enforcement agency in our area,
6  not just in our area, but in the country. You have
7  those that just wait for the phone to ring and go
8  to the call. You have others that will work a
9  burglary and they will follow up, they'll do an
10  area canvas if there's not a big call load waiting,
11  and the supervisors encourage that, follow up on
12  their own cases, and make those cases, if they can,
13  and that's that many less or fewer that detectives
14  are burdened with. But yeah, in answer to the
15  original question, every agency has both kinds.
16      Q.    Which model do you try to foster in your
17  department?
18      A.    I try to foster follow up those
19  investigations that you work, the stealing. I
20  mean, if you have an armed robbery or something
21  like that, chances are you're not going to get the
22  opportunity to work it. You're going to follow up,
23  given the opportunity, car spottings, things of
24  this nature. Areas in the county where we are
25  having problems or what Sam Dotson now is calling

1  hot spots, we've been doing hot spot policing for
2  years on this side of the river. And those
3  officers while not on call will go to those areas
4  where they know we have problems and observe, make
5  vehicle stops on traffic violations, probable
6  cause, and are active in trying to find something.
7  And you have those that, like I said, will wait
8  till they get a call, they handle that call, they
9  do the report and then they patrol, waiting for the
10  phone to ring again. But every agency has all
11  kinds. I promote follow up on the calls that
12  you're assigned. If you have a little old lady
13  whose heat goes out in the middle of winter and the
14  neighbors are wanting to do an area check for her,
15  or a check for wellbeing. I had a couple officers
16  that there was a lady that needed heat in her
17  trailer. They got a hold of the social service
18  agency where they very well could have -- another
19  officer may have just said -- call the people back,
20  said she's okay. Yes, I promote staying busy
21  because when you stay busy, you stay out of
22  trouble.
23      Q.    Well, I've got to follow up with how do
24  you -- is that idle hands are the devil's tools?
25      A.    Something like that.

Q. With regard to person-to-person
encounters with citizens, subjects, would you say
your officers are encouraged to be assertive and
firm or something else? I don't know what the
something else would be.

A. They're encouraged, if they are writing
a traffic violation, to write the violation and
inform the violator and then leave. Don't sit
there and try to argue with somebody over a traffic
violation roadside. Number one, you get run over
by a tractor-trailer, and you're not going to win
the argument anyway. I encourage firmness but
fairness. Don't talk to those people in a way you
wouldn't want to be talked to. Everyone you stop
is not a bad guy or a bad gal. And you don't call
them by a name that is not on their driver's
license.

Q. Well, there's got to be an example, off
the record.

(OFF THE RECORD DISCUSSION)

QUESTIONS BY MR. RYALS:

Q. Thank you, Sheriff, that's all the
questions I have.

CROSS EXAMINATION

QUESTIONS BY MS. TEMPLE:

Q. I have a few questions. Sheriff, the
power shift Mr. Ryals talked to you about, and you
read Mr. King's characterization of it, is that a
fair characterization where they just get to go
wherever they want and have free rein in the
county?

A. No. Power shift or fourth shift is just
another shift. Officers who are assigned to the
fourth shift are assigned zones just like any other
officer on first, second, or third shift. If
manpower allows, from time to time they will be
assigned -- someone in power for the fourth shift
will be assigned to what we call roles, there will
be an R next to the names, and that means that
during that shift they can go into the pockets of
problem areas, where they know the problems are and
do proactive patrols in there. However, they are
still responsible for handling calls for service.
If that zone car is tied up, they are still
responsible for backing up other officers.

Q. Do they have, those people on the fourth
shift, the power shift, do they have supervisors?

A. Yes.

Q. On Plaintiff's Exhibit Number 4,
November '07, has corruption listed as the

allegation slash nature of complaint, do you have
any idea why it's listed as corruption as opposed
to a sexual assault as Mr. Ryals suggested?

A. I believe that's probably because that's
what the prosecutor classified it.

Q. Is that what Mr. King was charged with,
corruption?

A. Yes.

Q. When you were having the internal
affairs investigations, were each person given
polygraph tests, both the plaintiff and Mr. King?

A. Yes.

Q. Did each of them pass?

A. Yes.

MS. TEMPLE: Thank you. I don't have
anything further.

MR. RYALS: Only that we respectfully
disagree with the decision to withhold documents
that were to be produced. And I reserve the right
to recall the sheriff when we get a ruling on
either our motion to compel or your objections. So
other than that, do you want to tell him about
reading or not?

MS. TEMPLE: You have the right to read
your deposition transcript, or you can waive and

assume she took down accurately what was said.
It's up to you.

THE WITNESS: At this time?

MS. TEMPLE: Yes.

THE WITNESS: I will waive that reading
and trust the reporter.

(SIGNATURE WAS WAIVED)

1          CERTIFICATE

2

3    STATE OF MISSOURI        )
                              ) SS
4    COUNTY OF ST. LOUIS      )

6         I, TINA MARIE CATLETT, a Certified Shorthand
     Reporter before the County of St. Louis, State of
     Missouri, do hereby certify that pursuant to Notice
7    came before me at the St. Charles County
     Counselor's Office, 100 North Third Street, Suite
8    216, St. Charles, Missouri,

9         SHERIFF TOM NEER,

10   who was by me first duly sworn to testify to the
     truth and nothing but the truth of all knowledge
11   touching and concerning the matters in controversy
     aforesaid in this cause; that the witness was
12   thereupon carefully examined under oath and said
     examination was reduced to writing by me; that the
13   witness agreed to waive signature by agreement of
     all counsel; and that this deposition is a true and
14   correct record of the testimony given by the
     witness, and that this deposition is now returned
15   to the Court.
          I further certify that I am neither attorney
16   nor counsel for nor related nor employed by any of
     the parties to the action in which this deposition
17   is taken; further, that I am not a relative or
     Plaintiff of any attorney or counsel employed by
18   the parties hereto or financially interested in
     this action.

19

20        IN WITNESS WHEREOF, I have hereunto subscribed
     my name on this 2nd day of August, A.D., 2013.

21

22        _____
          Tina Marie Catlett, CCR
23
24

# #

**#946** - 1:23

**'**

**'05** - 94:19, 94:23
**'06** - 12:10, 86:11, 86:21, 90:22, 94:10, 94:22, 104:7
**'07** - 92:21, 132:10, 174:25
**'08** - 7:12
**'09** - 7:12
**'10** - 12:13, 81:23, 82:9
**'11** - 88:25, 89:20
**'12** - 85:11
**'13** - 41:5, 73:8
**'86** - 16:17
**'90** - 16:17
**'90s** - 44:20
**'91** - 11:16

# 1

**1** - 2:9, 22:11, 22:14, 23:12, 165:19
**1/11/06** - 86:3
**1/11/08** - 69:17
**10** - 43:17
**10,000** - 63:23
**10-41** - 153:16
**10/20/06** - 77:2
**100** - 3:12, 4:16, 5:11, 177:7
**10:00** - 3:12
**11** - 89:1, 134:7, 166:20
**11/2** - 82:9
**11th** - 89:6, 89:8, 161:16
**12** - 43:18
**12/23/09** - 80:12
**13** - 43:17, 43:21
**14** - 113:2
**15** - 15:11, 43:18, 112:25, 155:6
**150** - 59:10
**164** - 51:4
**167** - 5:15
**19** - 3:20
**1974** - 106:8
**1990** - 16:2
**1991** - 9:13
**1995** - 109:5
**19th** - 24:24
**1st** - 13:8, 106:8

# 2

**2** - 2:3, 2:10, 24:19, 25:20, 27:6, 27:11, 27:23, 27:24, 28:10, 28:15, 53:13, 55:13, 55:17, 64:9, 68:4, 69:16, 71:25, 72:2, 72:10, 73:18, 76:9, 76:19, 86:2, 86:8, 87:17, 87:23, 88:22, 89:11, 89:19, 90:5, 93:22, 104:18, 104:25, 105:13, 164:15
**2/22** - 73:8
**2/22/13** - 72:20, 84:12
**20** - 88:25
**2000** - 36:5, 36:13

**2002** - 36:17
**2003** - 122:16, 122:25
**2005** - 11:5, 11:20, 94:17, 110:22
**2006** - 12:5, 24:23, 26:15, 44:22
**2011** - 89:12, 89:20, 90:12
**2012** - 104:7, 104:12
**2013** - 1:18, 3:11, 3:23, 4:12, 13:16, 177:20
**2014** - 12:16
**2015** - 13:8
**205** - 5:15
**21** - 3:18
**216** - 3:13, 4:16, 5:11, 177:8
**220366** - 5:8
**23** - 1:18, 2:8, 3:20, 43:13, 43:14, 43:22
**23rd** - 3:11, 4:12
**25** - 3:15
**28** - 43:13
**28th** - 41:5
**2:00** - 45:4
**2nd** - 3:23, 177:20

# 3

**3** - 2:11, 69:9, 69:12
**30** - 129:8
**31** - 50:16
**3120** - 5:3
**314** - 5:16
**314-862-6262** - 5:4
**39** - 134:7
**3:00** - 45:4

# 4

**4** - 2:4, 2:12, 22:11, 87:25, 88:21, 89:2, 89:23, 90:4, 90:20, 92:17, 94:2, 95:6, 95:18, 102:1, 102:3, 104:7, 104:20, 132:7, 161:1, 161:2, 163:22, 174:24
**4/13** - 81:23
**4/27** - 85:11
**4/27/07** - 75:18
**40** - 147:13, 155:20
**40-year** - 155:21
**4:12-cv-00654-jar** - 1:10, 3:5, 4:5

# 5

**5** - 2:4, 2:13, 65:24, 66:7, 66:11, 68:18, 69:13, 70:6, 70:7
**50** - 127:2
**5th** - 110:22

# 6

**6** - 2:14, 40:20, 40:23, 48:17, 54:18
**6/8/12** - 83:22
**63** - 2:8
**63017** - 5:15
**63103** - 5:4
**63122** - 5:8
**63301** - 3:13, 5:12
**6th** - 164:14

# 7

**7** - 2:15, 3:15, 156:5, 156:9, 156:12, 156:15, 157:7
**70** - 81:4
**726-0800** - 5:16
**7:00** - 45:4
**7th** - 161:20, 164:1

# 8

**8** - 2:16, 3:18, 156:5, 156:9, 156:21

# 9

**9** - 43:21
**90** - 155:4

# A

**ability** - 19:14, 22:3, 116:25, 166:12
**able** - 59:15, 88:22
**absent** - 166:23
**absolutely** - 64:2
**absorb** - 100:23
**abuse** - 81:3
**abysmal** - 15:6
**academy** - 59:5
**Academy** - 15:19, 15:23, 59:6
**accept** - 61:25
**acceptable** - 63:2
**accepted** - 62:2
**accepting** - 2:17, 156:22
**access** - 52:18, 128:25
**accessible** - 53:5
**accident** - 144:9
**accidental** - 85:22
**account** - 61:12, 61:13, 61:23, 102:2, 113:22, 149:24
**accountability** - 87:5, 121:13
**accountable** - 60:20, 87:1, 87:4
**accounts** - 61:16, 62:21, 155:11
**Accreditation** - 16:10
**accumulate** - 54:14
**accumulated** - 53:24
**accumulation** - 53:15
**accuracy** - 76:10, 76:15
**accurate** - 18:11, 25:1, 30:25, 31:17, 33:17, 34:3, 35:10, 38:11, 42:4, 46:22, 49:10, 61:12, 62:11, 62:12, 67:18, 73:24, 74:4, 78:3, 90:25, 91:3, 91:5, 93:1, 95:15, 95:16, 97:25, 106:14, 116:12, 116:13, 118:24, 124:16, 149:25, 150:10, 156:19, 160:3
**accurately** - 114:7, 176:1
**accuse** - 154:4
**accused** - 103:15
**Acronym** - 16:10
**acronym** - 39:7
**act** - 92:24
**action** - 2:10, 26:15,

26:18, 37:25, 58:5, 66:17, 68:2, 70:24, 71:3, 72:3, 72:7, 74:2, 76:13, 78:22, 80:11, 80:20, 81:25, 82:8, 82:21, 90:19, 96:21, 119:8, 120:13, 162:14, 177:16, 177:18
**actions** - 24:23, 27:20, 68:11, 72:11, 84:7, 86:20, 87:11, 87:17, 104:18, 120:20
**active** - 100:25, 104:14, 143:25, 148:8, 172:6
**activity** - 170:24
**acts** - 65:20
**actual** - 72:8
**Ad** - 3:23, 177:20
**Adam** - 132:5, 140:1, 140:18
**add** - 46:22, 158:24
**addition** - 26:4, 38:14, 45:14, 136:23
**additional** - 23:14, 45:6, 87:7, 127:20
**address** - 127:25, 154:24, 155:13
**addressed** - 135:15, 153:13, 153:25
**addressing** - 68:16, 107:12
**administered** - 61:2
**administration** - 2:18, 18:19, 18:23, 20:1, 33:19, 42:11, 46:4, 156:23, 165:16
**administrative** - 7:15, 14:2, 15:14, 15:16, 15:17, 16:6, 47:19, 49:22
**Administrative** - 33:4
**administrator** - 56:13, 60:11, 93:10
**admit** - 154:18, 158:23
**advancement** - 112:19
**advice** - 75:22
**advising** - 75:23
**affairs** - 2:12, 3:19, 3:21, 8:21, 9:6, 19:5, 21:25, 22:4, 22:7, 23:2, 23:16, 23:20, 27:12, 27:24, 28:3, 28:11, 28:20, 46:24, 47:2, 52:17, 52:20, 53:2, 53:7, 53:10, 57:2, 59:2, 59:8, 59:12, 59:24, 60:4, 64:4, 67:12, 67:15, 70:14, 70:18, 72:3, 72:7, 72:8, 72:11, 72:15, 73:9, 80:1, 80:3, 88:4, 88:14, 88:18, 89:4, 90:22, 91:9, 95:23, 98:7, 103:2, 103:20, 104:12, 104:19, 104:24, 117:24, 118:4, 119:2, 141:8, 157:15, 163:22, 166:9, 166:15, 167:2, 167:5, 167:8, 175:10
**affect** - 18:16, 19:2, 119:14
**afoot** - 12:19
**aforesaid** - 177:11

**afraid** - 108:19
**afternoon** - 4:14
**age** - 6:2, 125:3
**agencies** - 170:5
**Agencies** - 16:11
**agency** - 12:21, 13:11, 14:16, 17:18, 18:2, 25:4, 25:14, 31:9, 39:3, 39:10, 54:6, 56:14, 59:3, 59:10, 59:18, 59:25, 60:1, 93:12, 94:13, 107:22, 108:15, 112:3, 112:4, 112:15, 113:4, 125:17, 127:7, 130:23, 135:20, 143:25, 144:1, 169:18, 171:5, 171:15, 172:10, 172:18
**agent** - 143:10
**aggressive** - 170:23, 170:25
**ago** - 80:9, 107:7, 111:25, 130:17
**agree** - 59:11, 60:16, 60:17, 61:22, 61:23, 62:12, 62:22, 71:16, 74:23, 90:1, 90:2, 92:23, 127:12, 144:2, 144:3, 157:1
**agreed** - 177:13
**agreement** - 177:13
**ahead** - 75:14, 153:2, 168:10, 168:12, 169:11
**alcohol** - 80:22, 81:8, 81:11, 81:13
**align** - 124:19
**aligned** - 124:15, 124:24
**alive** - 155:19
**allegation** - 26:7, 26:17, 103:3, 139:10, 175:1
**allegations** - 37:16, 38:19, 91:12, 95:2, 102:7, 103:21, 117:1, 117:4, 117:10, 118:2, 119:10, 119:17, 120:4, 120:16, 122:8, 122:21, 123:21, 136:15, 137:17, 143:9, 147:9, 155:14, 161:5, 163:7
**alleged** - 105:8, 105:11, 120:5, 121:20, 120:3, 122:4, 122:15, 142:10, 150:15
**allows** - 174:11
**alluded** - 95:7
**almost** - 74:4, 86:3, 107:21, 147:13
**altercation** - 139:25
**amount** - 63:22
**angered** - 125:5, 125:7
**angry** - 136:24, 158:13
**Annually** - 52:6
**Answer** - 93:15
**answer** - 8:2, 8:4, 8:15, 8:24, 17:15, 24:2, 24:13, 24:14, 24:25, 63:9, 83:10, 94:18, 133:4, 171:14
**answerable** - 47:16
**answered** - 49:21, 170:9

**answers** - 47:23, 118:24, 171:1
**anticipated** - 152:14
**anytime** - 121:5
**anyway** - 93:2, 154:12, 173:12
**apart** - 54:1
**apology** - 94:15
**appeal** - 6:22, 63:7, 63:14, 63:18
**appear** - 81:17, 94:24, 132:7, 151:23
**appearance** - 82:19
**Appearances** - 2:4
**appeared** - 3:13
**applicant** - 139:17
**applicants** - 112:25
**application** - 62:13
**applications** - 62:5
**applied** - 8:12
**applies** - 56:20
**applying** - 56:24
**appoint** - 112:25
**appointed** - 6:17, 9:14, 10:2, 10:20, 10:23, 11:7, 11:19, 11:22, 12:2, 17:5, 49:18, 49:20, 49:21, 50:17, 87:14, 106:12, 110:1
**appreciate** - 94:18, 102:2
**appreciation** - 152:2
**apprehension** - 121:19
**approach** - 86:18
**approached** - 131:10, 141:18
**appropriate** - 93:12
**approval** - 31:21, 32:7, 34:2, 34:3, 34:6, 34:11, 34:13, 34:20, 34:24, 35:13, 35:18, 65:21
**approve** - 20:1, 32:2, 142:21
**approved** - 33:20, 33:22, 33:25, 143:1
**area** - 44:23, 45:9, 135:23, 138:12, 163:12, 171:5, 171:6, 171:10, 172:14
**Areas** - 171:24
**areas** - 172:3, 174:16
**argue** - 173:9
**arguing** - 108:2
**argument** - 173:12
**arisen** - 121:1
**arising** - 121:18
**arm** - 38:7, 38:9, 150:17, 150:22
**armed** - 150:15, 171:20
**arranging** - 63:17
**arrests** - 155:15
**arrived** - 95:20
**art** - 31:9
**articulate** - 59:15
**aside** - 51:18
**Aside** - 109:23, 128:11, 135:10
**aspect** - 34:4, 47:1
**aspects** - 34:17, 123:12, 135:17
**aspires** - 110:12
**assault** - 7:8, 92:24, 93:3, 93:13, 93:17, 93:20, 139:25, 175:3

**assaulted** - 79:6, 132:21
**assaultive** - 144:22
**assemble** - 100:1
**assertive** - 173:3
**assign** - 166:14
**assigned** - 43:7, 45:8, 47:11, 85:5, 85:20, 85:21, 111:20, 115:2, 172:12, 174:8, 174:9, 174:12, 174:13
**assignment** - 57:5, 57:8, 109:3, 110:6, 110:7, 112:20, 115:13
**assignments** - 43:10, 113:17, 115:20
**assigns** - 166:8
**assist** - 63:17
**assistance** - 140:8
**assume** - 75:11, 88:23, 121:5, 147:19, 176:1
**assumed** - 62:24, 125:12
**assuming** - 106:18
**assumption** - 147:21
**at-will** - 77:11
**attempt** - 36:22, 157:11
**attempted** - 121:19, 149:1
**attend** - 16:3
**attended** - 15:23, 16:5
**attention** - 21:25, 47:10, 145:16, 165:3
**attitude** - 131:11, 169:20
**attorney** - 163:23, 166:22, 177:15, 177:17
**attorneys** - 2:8
**attuned** - 125:16
**August** - 3:23, 51:15, 177:20
**authority** - 18:15, 19:22, 33:15, 33:24, 127:10, 145:11
**authorized** - 35:3, 51:7, 51:9
**automatic** - 22:7, 74:5, 163:3
**automatically** - 116:23, 117:7, 117:24, 162:25, 163:2
**available** - 70:20
**Available** - 129:14
**avenue** - 130:2
**average** - 52:4, 113:6, 113:21, 125:3
**aware** - 67:25, 97:10, 121:2, 121:16, 134:1, 146:16, 146:18, 168:5
**awareness** - 36:8

### B

**Bac** - 145:11, 145:14
**background** - 47:14, 166:15
**backgrounds** - 47:16
**backhanded** - 142:11
**backing** - 174:20
**bad** - 77:14, 109:2, 113:13, 134:3, 165:4,

173:15
**bailiff** - 51:14, 51:16, 51:18
**bar** - 139:23
**bars** - 155:8
**base** - 58:23
**Based** - 104:17, 147:13
**based** - 29:6, 31:16, 38:4, 73:6, 147:22
**basis** - 83:19, 91:19
**bearing** - 57:20
**beat** - 132:21
**became** - 48:17, 49:5, 49:6, 49:7, 86:23, 94:3, 94:23, 105:23, 107:10, 109:17, 109:20, 122:21, 147:24
**become** - 56:25, 94:15, 97:10, 123:4
**becomes** - 108:4
**beeped** - 138:18
**beg** - 47:7
**begin** - 59:19, 95:21, 116:21, 136:23, 168:6
**beginning** - 3:12, 86:6, 133:3, 154:10, 155:7
**begins** - 95:23
**Behalf** - 1:17
**behalf** - 4:21, 6:4
**behavior** - 56:19, 68:10, 105:22, 135:13, 144:23
**belief** - 21:11
**bell** - 143:3
**below** - 44:11, 44:12, 71:13, 84:25
**benefit** - 160:18
**best** - 105:20, 113:19
**better** - 67:11, 100:10, 104:21, 108:15, 111:4, 152:10
**between** - 4:13, 9:17, 16:24, 27:12, 45:4, 45:7, 68:25, 92:5, 92:8, 140:25
**Beverly** - 5:10
**beyond** - 86:21, 92:6
**big** - 94:14, 171:10
**biggest** - 108:13
**billet** - 35:9
**bit** - 49:17, 69:2, 143:16, 143:17, 143:23, 148:21, 160:24, 169:16
**black** - 159:1
**blank** - 26:20, 64:19, 69:21, 69:22, 81:24
**blasts** - 128:5
**blessing** - 123:17
**blown** - 98:7, 98:14
**blue** - 133:20
**board** - 128:6, 137:2, 137:8, 137:10, 112:13
**bold** - 166:20
**bomb** - 159:23, 160:7
**bond** - 63:7, 63:14, 63:18, 63:22
**book** - 128:7, 128:9
**boots** - 153:17
**born** - 69:19

**Box** - 5:8
**box** - 21:2, 21:8, 45:23, 69:21
**boxes** - 41:10, 41:11
**boy** - 126:10
**Boyle** - 83:15, 83:16
**boys** - 111:9, 111:10, 111:24, 152:25
**break** - 56:8, 56:11, 63:2
**Breed** - 5:2
**Brian** - 75:1, 83:3
**brief** - 164:20
**briefest** - 137:16
**Briefly** - 40:11
**briefly** - 167:21
**bring** - 29:7, 161:1
**broader** - 120:15
**broken** - 54:11
**Broom** - 48:2
**brought** - 21:24, 145:16, 147:15, 150:22, 169:6
**buck** - 95:22
**buddy** - 110:4, 125:2
**budget** - 17:24, 18:3
**budgetary** - 34:4, 129:9
**bulb** - 58:17, 58:19
**bulletin** - 128:6
**burdened** - 171:14
**Bureau** - 40:13, 41:23, 42:4, 42:11
**bureau** - 21:6, 21:23, 21:24, 28:23, 30:16, 32:6, 32:10, 32:14, 40:2, 40:12, 41:2, 41:19, 41:21, 42:6, 42:14, 42:23, 44:12, 46:1, 46:4, 48:21, 48:22, 48:24, 49:15, 49:22, 96:19, 97:3, 99:6, 100:1, 110:21, 115:5, 128:14, 136:25, 139:4, 151:19
**Burglary** - 7:8
**burglary** - 171:9
**business** - 84:19
**busted** - 151:18
**busy** - 113:7, 113:19, 172:20, 172:21
**bypasses** - 99:6

### C

**Calea** - 16:8, 16:14, 16:20
**caliber** - 15:20
**camcorders** - 129:18, 129:19
**camera** - 120:21, 129:20, 129:22
**cameras** - 129:7, 129:15
**Camp** - 79:15, 79:16, 80:5
**Camp's** - 79:3
**campaign** - 124:5, 125:16
**campaigning** - 107:21
**campaigns** - 110:3
**candidate** - 108:4
**candidates** - 108:10

**cannot** - 100:22
**Cantillion** - 121:17, 122:10
**canvas** - 171:10
**capacity** - 165:4
**Captain** - 10:12, 11:8, 32:12, 32:13, 32:22, 32:24, 41:21, 42:5, 42:6, 49:16, 49:21, 139:5, 139:6, 149:2, 149:3
**captain** - 10:14, 33:23, 36:18, 40:3, 41:14, 41:15, 47:24, 105:24, 106:11, 109:4
**captains** - 11:12, 33:11, 100:1, 142:12
**car** - 45:11, 47:8, 69:2, 79:7, 81:9, 84:3, 120:3, 128:23, 129:6, 129:22, 129:25, 132:23, 138:18, 143:6, 153:14, 154:17, 168:20, 171:23, 174:19
**care** - 38:16, 110:9, 152:18
**career** - 133:4, 155:21
**carefully** - 177:12
**carried** - 81:20
**carrier** - 143:21
**carrying** - 130:4
**case** - 23:24, 51:22, 60:9, 70:1, 117:14, 117:16, 119:13, 122:24, 123:2, 132:3, 134:22, 135:5, 155:22, 166:18
**cases** - 33:19, 108:8, 149:18, 171:12
**catch** - 129:23
**categories** - 54:11, 56:22, 91:7, 100:17
**categorize** - 55:4, 55:5
**category** - 78:13, 78:14, 95:7, 95:9
**Catlett** - 1:22, 3:10, 3:24, 4:17, 5:14, 177:5, 177:22
**caught** - 143:22, 154:2
**caused** - 80:16
**Ccr** - 3:24, 5:14, 177:22
**Ccw** - 46:16
**cell** - 142:12
**census** - 51:8
**center** - 137:21
**certain** - 4:19, 68:3, 76:19
**certainly** - 19:3, 38:17, 57:23, 59:14, 86:16, 92:25, 93:8, 120:11, 145:25
**Certificate** - 177:1
**Certification** - 2:19
**certification** - 16:21
**Certified** - 1:23, 2:3, 3:10, 3:15, 4:17, 8:7, 9:3, 24:17, 177:5
**certified** - 16:14, 24:15
**certify** - 3:11, 8:5, 9:1, 177:6, 177:15
**chain** - 18:7, 18:8, 29:19, 30:19, 34:16, 49:11, 49:12, 49:25, 50:3, 66:19, 96:12,

96:13, 99:5
**challenged** - 137:1
**chance** - 22:17, 66:3, 159:12
**Chance** - 81:23
**chances** - 65:15, 171:21
**change** - 12:19, 33:9, 33:14, 33:18, 33:21, 34:7, 34:13, 34:21, 34:25, 40:5, 87:10, 106:20, 106:23, 120:6, 120:9, 121:25, 134:17, 135:13, 160:18
**changed** - 13:17, 32:25, 106:15
**changes** - 110:14, 120:8, 120:10, 120:11, 156:12, 169:20
**Changes** - 2:15
**changing** - 129:14
**characterization** - 171:3, 171:4, 174:3, 174:4
**characterize** - 28:4, 62:4, 75:4, 93:2, 93:13, 106:23, 170:22
**characterizing** - 170:21
**charge** - 7:6, 26:6, 41:22, 92:13, 100:14, 125:11, 134:23
**charged** - 7:17, 7:18, 7:21, 7:22, 75:21, 159:13, 175:6
**charges** - 7:11, 119:10
**Charles** - 1:12, 2:17, 3:7, 3:12, 3:13, 4:7, 4:15, 5:11, 5:12, 6:10, 6:13, 6:19, 7:13, 7:19, 13:3, 15:5, 16:13, 16:25, 34:18, 38:2, 39:4, 51:2, 106:2, 106:14, 130:9, 156:22, 158:4, 163:24, 164:25, 169:14, 169:23, 177:7, 177:8
**chart** - 44:1, 45:23, 49:1
**check** - 140:18, 172:14, 172:15
**checked** - 115:6
**chief** - 16:19, 59:9, 93:11, 114:22
**choice** - 98:10, 115:18, 115:19
**choices** - 115:18
**chose** - 50:16
**Chris** - 157:23
**Christopher** - 6:23, 19:10, 63:7, 63:15
**circulating** - 144:13
**circumstance** - 30:15, 68:1
**circumstances** - 21:21, 28:21, 28:25, 29:8, 30:13, 31:5, 37:8, 38:22, 69:22, 78:12, 79:2, 95:25, 114:11, 117:8, 136:12, 137:4, 145:23, 159:11, 159:18, 161:24, 162:9, 162:23
**citizen** - 29:15, 29:17, 29:23, 30:1,

164:22
**citizen's** - 27:18, 28:18, 117:21
**citizens** - 28:6, 28:7, 55:1, 55:7, 97:14, 98:2, 159:20, 173:2
**City** - 138:4, 138:8, 138:12, 150:12
**city** - 54:21, 59:22, 60:9, 60:10, 60:11, 84:3, 85:7, 164:25
**civil** - 8:13, 46:5, 123:22
**classification** - 25:12
**classified** - 175:5
**classify** - 162:18
**Clay** - 83:2
**cleaned** - 86:17
**clear** - 21:4, 61:21, 148:24, 149:9, 149:25, 166:2, 168:11
**clearer** - 91:7
**clerical** - 26:25, 71:8, 82:23, 90:14, 90:15
**clerk** - 51:14, 83:12, 83:18
**clerks** - 85:8
**client** - 119:19, 122:6, 169:1
**clique** - 112:14
**cliques** - 112:4
**close** - 24:23, 48:19, 120:4, 148:16, 158:10, 162:7
**close-knit** - 148:16
**closer** - 125:3, 125:10, 154:25
**club** - 141:14
**Cochran** - 85:11, 85:25
**code** - 84:9, 103:7, 103:8, 133:20, 133:21, 138:4, 138:8
**cohesively** - 114:24
**collision** - 145:4, 145:19, 146:7
**column** - 64:15, 83:5
**combination** - 103:6
**comfortable** - 127:5
**coming** - 21:20, 112:12
**comma** - 76:1, 80:12, 80:16, 81:23, 82:9, 82:17, 83:3, 83:22, 84:14, 85:12
**command** - 13:15, 15:13, 18:7, 18:9, 29:19, 30:19, 31:25, 34:16, 49:11, 49:12, 49:25, 50:4, 60:20, 79:24, 99:21, 100:24, 101:4, 101:16, 124:11, 148:3, 154:24
**Command** - 15:18
**commanded** - 47:21
**commander** - 21:6, 21:23, 28:23, 30:16, 40:13, 41:19, 44:8, 59:9, 93:11, 99:6, 114:3, 114:18, 114:19, 114:21, 115:5, 128:13, 128:14, 136:25, 138:24, 139:4,

149:14, 152:8
**commander's** - 138:21
**commanders** - 32:6, 32:7, 32:10, 32:14, 40:2, 40:12, 41:2, 44:12, 77:19, 96:19, 97:3, 100:1, 100:20
**commence** - 67:12
**comment** - 111:17, 156:1, 159:19
**comments** - 146:19
**Commission** - 16:10, 37:23, 37:24, 38:1, 38:3, 38:5, 38:6, 38:12, 39:19
**commission** - 9:16
**commissioned** - 25:19
**committed** - 150:23
**committee** - 18:3
**common** - 73:21, 135:17, 136:4, 153:8
**commonly** - 46:2
**communicate** - 127:3, 129:4
**communicated** - 50:20, 92:13, 149:22
**communication** - 42:16, 137:20
**communications** - 40:15, 42:22, 43:1, 44:3, 44:6, 137:20
**community** - 39:3, 148:16, 169:23, 170:4, 170:8
**compare** - 118:16
**compared** - 104:18, 170:24
**compartment** - 143:6
**compel** - 175:21
**competence** - 77:23
**competing** - 108:2
**Complainant-** 21:20
**complainant** - 29:3, 58:11
**complains** - 29:1
**complaint** - 21:21, 27:4, 27:18, 27:19, 27:21, 27:25, 28:3, 28:18, 28:22, 29:18, 29:23, 30:1, 30:3, 31:5, 37:11, 37:12, 53:10, 55:2, 55:25, 56:1, 56:3, 56:16, 57:17, 58:9, 58:13, 85:9, 95:8, 95:11, 95:12, 96:22, 97:10, 98:3, 98:6, 100:20, 117:21, 119:2, 138:6, 165:23, 175:1
**complaints** - 28:5, 28:7, 28:8, 28:9, 28:11, 29:15, 52:15, 52:17, 52:21, 53:1, 53:8, 53:19, 54:8, 54:10, 54:15, 54:21, 54:25, 55:4, 55:7, 55:11, 55:24, 56:4, 57:2, 57:3, 57:11, 57:19, 57:20, 97:14, 97:23, 98:1, 102:4, 105:10, 123:18, 161:6, 163:7, 170:15
**complete** - 23:18, 24:25, 66:18, 77:4, 78:2, 78:16, 90:21,

96:18, 155:25, 156:18
**completed** - 15:15
**completes** - 99:8
**complimentary** - 170:16
**computer** - 53:5, 84:21, 85:3, 89:1, 89:9, 89:24, 161:17, 162:8
**computers** - 47:8, 85:7
**concealment** - 81:16
**concerned** - 107:11
**concerning** - 177:11
**conclude** - 76:5
**concluded** - 104:11
**conclusion** - 91:20, 144:19
**conditions** - 38:15
**Conduct** - 75:3, 164:21
**conduct** - 84:9, 84:18, 108:5, 122:4, 131:7, 164:19
**conducted** - 3:21, 21:16, 23:10, 23:17, 23:20, 29:10
**conducts** - 98:22, 165:5
**consider** - 58:5, 161:24
**consideration** - 57:23, 57:25, 58:2, 58:8, 162:1, 162:5, 162:10, 163:19
**considered** - 57:3, 57:9, 110:11, 163:7, 165:6
**considering** - 58:21, 137:4
**consistent** - 87:24, 89:23, 121:23
**consists** - 47:15
**console** - 81:14, 81:15
**constantly** - 112:8
**Constitution** - 127:12
**constitutional** - 116:2
**contact** - 149:1, 149:17
**contained** - 56:16, 71:21
**contemporary** - 14:6, 106:21
**context** - 57:4, 57:17, 113:10, 158:17, 158:20, 158:24, 158:25
**continue** - 105:20
**continued** - 19:11
**continuing** - 149:17
**continuous** - 105:16
**contract** - 85:6
**contrary** - 144:19
**control** - 18:17, 18:25
**controversy** - 177:11
**conversation** - 20:15, 68:25, 114:1, 114:7, 114:8, 140:25, 141:4, 145:15, 146:18, 159:1
**Conversations** - 120:10

**convicted** - 6:18, 7:7, 162:20
**Convicted** - 6:20
**conviction** - 162:19
**convictions** - 162:16
**Cook** - 131:25, 132:2, 132:4, 144:22, 145:3
**Cook's** - 145:16
**cooperation** - 58:11
**cop** - 158:3
**Copeland** - 126:12
**cops** - 151:8, 154:18
**copy** - 40:23, 64:10, 76:18, 88:1, 157:8, 165:13
**Correct** - 19:18, 28:1, 34:22, 80:10, 91:24, 92:3, 123:19, 124:13, 132:1, 157:16
**correct** - 6:25, 7:4, 12:6, 15:24, 17:5, 17:8, 19:17, 23:4, 25:10, 27:13, 30:19, 30:21, 30:22, 31:13, 34:21, 38:7, 39:5, 39:12, 40:24, 41:5, 41:12, 41:19, 42:16, 44:14, 46:5, 49:16, 50:1, 53:8, 61:6, 64:1, 70:2, 70:24, 72:4, 72:9, 72:12, 72:13, 72:24, 75:9, 76:8, 76:16, 77:11, 77:14, 77:20, 77:24, 78:4, 78:25, 83:3, 85:15, 88:4, 88:20, 89:2, 89:20, 91:9, 91:17, 91:21, 91:23, 97:2, 97:11, 98:11, 104:13, 104:21, 105:21, 105:24, 121:10, 122:1, 122:6, 122:23, 123:3, 123:23, 124:19, 125:19, 132:3, 144:14, 146:3, 146:9, 160:4, 168:18, 168:20, 169:2, 177:14
**correction** - 105:17
**corrective** - 68:1
**correctly** - 29:14, 138:9, 141:21, 158:16
**corruption** - 92:20, 174:25, 175:2, 175:7
**council** - 33:20, 33:22, 34:1, 34:2, 34:11, 60:10
**counsel** - 22:19, 177:13, 177:16, 177:17
**counseling** - 64:20, 65:4, 65:13, 65:17, 67:23, 67:24, 68:7, 68:9, 68:19, 68:21, 70:2, 74:11, 75:7, 82:23
**counselings** - 68:5, 80:1, 105:1
**counselor** - 36:13
**Counselor'** - 3:12
**Counselor's** - 4:15, 5:11, 177:7
**counselor's** - 116:7, 116:23
**counters** - 18:22
**counties** - 159:14, 160:7
**counting** - 134:8

country - 106:22, 171:6

County - 1:12, 2:17, 3:7, 3:11, 3:12, 4:7, 4:15, 5:11, 6:11, 6:14, 6:19, 7:14, 7:20, 13:3, 15:5, 16:13, 16:25, 34:18, 38:2, 39:4, 51:2, 106:2, 106:14, 127:22, 130:9, 138:12, 156:22, 158:4, 159:10, 159:11, 159:20, 163:24, 169:14, 169:23, 177:4, 177:6, 177:7

county - 9:16, 11:22, 12:20, 13:16, 16:18, 16:23, 17:11, 17:16, 17:19, 17:22, 18:15, 18:20, 18:23, 33:20, 33:22, 33:25, 34:11, 34:19, 34:24, 38:9, 38:13, 59:22, 70:19, 73:25, 116:6, 116:23, 123:13, 136:16, 137:17, 137:18, 137:19, 137:23, 137:25, 138:10, 152:22, 155:2, 170:5, 171:24, 174:6

county's - 123:16, 165:15

couple - 76:13, 105:18, 114:16, 126:13, 151:3, 151:24, 152:9, 172:15

course - 15:17, 20:18, 82:7, 82:25, 86:13, 93:8, 99:2, 103:16, 103:25, 107:9, 107:20, 152:8

courses - 16:3, 59:7

court - 3:10, 59:25, 160:18

Court- 1:5, 1:23, 3:1, 4:1, 4:20, 177:15

courts - 46:8, 52:19, 52:20

cover - 160:24

covered - 151:5, 160:23

crack - 86:14

crashes - 120:3

create - 18:21, 33:23, 53:24

created - 48:14, 53:24

crime - 159:13, 159:23

criminal - 42:12, 46:1, 48:21, 162:16, 162:19, 166:14, 167:7

criteria - 57:8

Cross - 2:6, 2:7, 126:11, 160:19, 173:24

crosses - 136:7

culpability - 166:21

culture - 109:12

current - 13:6, 43:9, 86:3

cursing - 164:22

custom - 31:17, 31:19, 167:1

cut - 73:15, 73:17

cycle - 115:9

## D

daily - 108:5, 159:21

damage - 7:8

Darden - 85:5, 85:8

dash - 129:18

data - 47:3, 47:5, 47:9, 47:16, 53:3, 53:15, 54:23, 54:24, 73:4, 84:21, 128:8, 128:11, 128:22, 129:1

date - 24:23, 26:15, 66:3, 86:2, 90:5, 90:8, 90:10, 90:23, 93:23, 97:24, 122:11

Date - 122:13

Dated - 41:5

dated - 77:2

Dates - 102:7

dates - 25:22, 92:15

Dave - 11:17

Davis - 126:10

day-to-day - 127:10, 160:4

days - 39:1, 43:17, 69:4, 107:7, 115:22, 152:13, 152:21, 153:15

Db - 1:9, 3:4, 4:4, 4:22, 157:19

deal - 15:3

dealing - 58:22

dealt - 154:20, 159:21

decide - 77:22, 107:19

decided - 12:18, 19:17, 37:17, 39:19

decider - 166:5, 166:7

decision - 19:8, 19:11, 29:17, 33:4, 33:14, 34:4, 36:21, 50:19, 58:13, 58:23, 67:10, 78:6, 100:14, 101:5, 101:7, 101:10, 101:13, 123:17, 142:20, 142:24, 175:18

decisions - 38:13, 123:14, 125:6, 125:7

decline - 72:7

deem - 33:2

deemed - 33:1

Defendant - 5:7

Defendants - 1:14, 3:9, 4:9

deficiency - 78:5

definition - 31:11, 68:23, 133:21

delegate - 98:20

demographics - 155:2

demoted - 151:18, 152:19, 153:11

denied - 34:14, 35:20, 35:23, 36:10, 149:3

Dennis - 126:10

deny - 158:23, 159:6

Department - 2:14, 7:14, 16:14, 39:4, 51:2, 54:7, 106:15, 127:16, 145:17, 169:15, 169:24

department - 2:18, 9:5, 10:9, 11:13,

12:20, 12:21, 16:25, 17:3, 17:17, 17:23, 18:13, 18:18, 18:20, 19:2, 19:7, 22:3, 22:24, 23:9, 25:18, 26:22, 31:16, 34:8, 34:14, 35:25, 36:19, 37:2, 37:13, 38:7, 39:4, 39:15, 39:22, 41:3, 42:18, 50:10, 50:17, 50:24, 52:3, 52:25, 54:14, 54:22, 55:3, 59:20, 60:10, 61:14, 61:25, 62:23, 68:8, 70:19, 73:22, 73:25, 77:8, 85:14, 88:7, 91:8, 98:2, 103:4, 106:2, 106:5, 107:3, 107:12, 107:18, 108:6, 109:17, 109:24, 110:15, 116:5, 116:6, 120:7, 122:1, 123:12, 124:7, 124:19, 124:22, 125:23, 126:19, 127:9, 127:21, 128:20, 129:1, 129:7, 130:9, 134:2, 134:6, 135:25, 137:14, 139:18, 140:16, 147:14, 147:15, 147:23, 148:1, 148:3, 153:8, 156:24, 158:4, 160:7, 162:17, 165:4, 165:17, 167:23, 171:17

department's - 63:25, 85:3, 163:6

dependent - 168:17

deployed - 150:21

deposes - 6:4

deposition - 3:14, 20:11, 175:25, 177:13, 177:14, 177:16

Deposition - 1:17, 2:4, 4:11

deputies - 25:10, 35:3, 40:15, 43:7, 43:15, 46:7, 124:15, 153:8, 154:5, 154:25, 169:15

Deputy - 3:22, 19:15, 20:3, 23:21, 24:10, 70:1, 79:15, 121:17, 122:22, 140:8, 140:10, 140:25, 141:1, 141:19, 141:20, 141:22, 143:13, 144:4, 144:5, 145:10, 149:16, 150:14, 150:24, 152:22

deputy - 25:2, 25:12, 35:14, 35:17, 35:21, 73:24, 75:3, 77:20, 82:3, 106:5, 108:22, 109:17, 152:19, 164:19, 164:21, 169:19

describe - 17:1, 40:11, 62:6, 79:5, 114:6, 144:8, 158:12

described - 19:1, 20:13, 30:9, 33:10, 34:19, 61:9, 61:18, 62:12, 62:14, 62:22, 123:24, 139:23, 164:18, 169:17,

170:20

describes - 62:9, 144:5

description - 62:4, 62:6, 111:8, 111:12, 111:18, 164:20

descriptors - 74:8

designated - 45:1, 64:24

designates - 17:25

designation - 65:10

designed - 77:17, 77:18, 84:22

desk - 116:22, 128:7, 128:9

detail - 27:3, 38:17, 78:17

details - 130:19

Detective - 110:11

detective - 110:20, 110:21

detective's - 110:14

detectives - 46:2, 108:6, 171:13

determination - 79:23, 92:2, 95:17, 95:19, 96:23

determinations - 67:5

determine - 29:6, 29:9, 76:14, 98:6, 98:13, 105:6

determined - 37:24, 65:4, 66:17, 71:5, 71:7, 96:20, 152:11, 153:25, 154:19, 169:1

determines - 18:3, 28:17, 28:19, 105:11, 154:13

determining - 57:6

detracting - 74:20

detriment - 108:13

device - 130:4

devil - 74:19

devil's - 172:24

differ - 42:23

difference - 61:9, 111:6, 115:11, 116:17

differences - 17:21, 93:25

Different - 99:16, 102:21

different - 13:14, 65:25, 73:12, 81:15, 86:18, 86:19, 90:10, 94:4, 94:7, 99:16, 102:10, 108:7, 108:11, 121:9, 126:16, 131:8, 133:19, 144:1, 153:7, 169:18

differently - 94:13

difficult - 136:10

dings - 73:25

direct - 22:3, 29:10, 71:18, 98:14, 98:16, 120:8

Direct - 2:5, 6:6

directed - 21:25, 87:17, 156:16

direction - 56:15

directive - 22:9, 31:24

Directives - 128:3

directives - 23:14, 127:20, 127:24

directly - 47:11, 59:19, 135:14, 142:12

Directly - 96:10, 96:15

170:20

director - 17:24, 17:25, 19:25

disagree - 61:17, 170:22, 175:18

discharge - 85:22

discharged - 144:6

disciplinary - 2:10, 24:22, 26:14, 26:18, 27:20, 33:7, 37:10, 37:20, 37:22, 37:25, 61:1, 61:13, 61:18, 61:24, 65:22, 66:17, 70:4, 70:24, 71:3, 71:4, 74:1, 78:22, 80:11, 80:19, 82:8, 86:20, 87:11, 87:16, 87:21, 89:16, 90:19, 96:21, 104:17, 104:19, 137:2, 162:14

discipline - 3:16, 7:19, 8:1, 27:4, 37:13, 60:15, 60:23, 62:23, 65:4, 65:18, 66:24, 67:2, 67:6, 67:8, 73:6, 79:18, 90:9, 101:11, 102:24, 103:14, 103:22, 138:22, 141:1, 165:11

disciplined - 79:16, 104:2, 135:1, 135:4, 137:9, 143:13, 151:10

discover - 103:17

discovered - 154:20

discovery - 8:12

discretion - 64:7, 98:6

discuss - 30:17

discussed - 32:5, 68:11, 117:16

discussing - 21:21, 39:19

discussion - 100:7, 101:3, 149:5

Discussion - 36:15, 63:4, 123:9, 173:25

dispatch - 137:21

dispatcher - 82:10, 169:10

dispatchers - 40:16, 43:4, 44:5, 51:13

disposal - 159:23, 160:8

disposition - 54:9, 88:17, 90:18, 91:8, 161:4

dispositions - 54:16, 95:18

dispute - 144:16

disputed - 144:14

disputing - 144:15

disrespectful - 164:24

disrupt - 112:8, 127:7

disruptive - 108:4

disseminated - 144:19, 146:15, 148:11

dissuade - 99:19

distinguish - 27:12

District - 1:5, 1:6, 3:1, 4:1, 4:20

disturbance - 162:20

division - 25:5, 42:15, 42:19, 42:24, 43:6, 44:8, 44:13, 47:18, 110:13, 128:13, 152:7, 166:10

**Division** - 1:6, 3:2, 4:2, 4:21

**divisions** - 44:14

**document** - 25:23, 25:24, 26:2, 26:14, 27:2, 27:6, 27:9, 66:10, 68:10, 76:15, 86:5, 88:3, 88:6, 105:21

**documented** - 69:5, 69:6, 105:14

**documenting** - 68:3

**Documents** - 2:13, 2:17

**documents** - 22:23, 65:25, 66:7, 69:12, 105:2, 156:21, 160:25, 175:18

**dollars** - 110:17

**Donald** - 5:6

**done** - 32:4, 75:17, 120:6, 134:16, 135:12, 135:22, 143:17, 152:23

**door** - 127:4

**Dotson** - 171:25

**doubt** - 76:10, 92:7

**Doug** - 14:23, 126:10

**down** - 21:7, 54:11, 65:19, 71:13, 74:9, 75:18, 82:17, 84:4, 105:19, 112:23, 115:18, 140:14, 164:23, 176:1

**draw** - 165:3

**drawn** - 96:2, 98:24

**drawn-out** - 96:2, 98:24

**dried** - 73:15, 73:17

**drink** - 141:22

**Drive** - 150:14

**driver's** - 173:16

**driving** - 84:4, 146:6

**drove** - 138:20

**drug** - 113:23, 114:4, 114:12, 114:13, 114:17, 114:20, 148:23, 148:24, 149:9, 149:15

**drugs** - 81:8, 81:11, 81:14, 113:12

**Due** - 106:18

**duly** - 6:2, 177:10

**duplicate** - 165:16

**During** - 40:1, 107:19

**during** - 77:10, 80:20, 101:17, 103:25, 126:22, 130:8, 153:7, 167:10, 174:15

**duties** - 7:15

**duty** - 21:22, 43:16, 140:13, 145:24, 146:2, 147:10, 153:10, 154:5, 159:13, 163:1, 163:2, 163:3, 163:4, 163:12, 165:1, 165:2

**duty-related** - 140:13

**Dwi** - 155:15, 155:21, 162:24, 163:4

---

**E**

**e-mail** - 128:20

**e-mails** - 128:12, 170:16

**early** - 11:5, 45:1, 138:16

**earned** - 16:21

**earth** - 146:22

**easier** - 66:6, 167:17

**Eastern** - 1:6, 3:1, 3:2, 4:1, 4:2, 4:20, 4:21

**Ed** - 16:22, 126:12

**editorializing** - 154:1

**Edward** - 9:24, 14:19

**effect** - 23:7, 41:8, 48:17, 60:14, 159:4

**effective** - 59:11

**effectively** - 60:5

**efficient** - 129:3

**effort** - 37:9

**egregious** - 103:18, 117:11, 133:16

**Ehlmann** - 11:24

**eight** - 4:13, 130:18, 134:22

**Eight** - 9:9

**Eight-and-a-half** - 9:9

**either** - 18:16, 20:20, 28:8, 28:18, 56:14, 59:22, 64:18, 65:4, 81:10, 121:25, 126:12, 145:16, 159:14, 175:21

**Elected** - 6:13

**elected** - 9:17, 9:22, 10:5, 10:24, 17:7, 17:14, 17:21, 40:9, 108:18, 108:24, 110:2, 126:16

**Election** - 12:5

**election** - 10:4, 10:5, 10:7, 12:1, 12:4, 12:6, 107:17, 124:21, 125:10, 126:19, 126:22

**elections** - 14:2

**electoral** - 108:1, 108:21

**eliminate** - 13:5, 33:23, 34:9

**else-wise** - 98:11

**emanate** - 98:2

**embarrassed** - 46:19

**emergency** - 159:18, 160:10

**emphasis** - 120:13, 135:12

**employed** - 20:16, 177:16, 177:17

**employee** - 8:23, 36:22, 37:1, 37:4, 38:13, 68:2, 68:11, 68:12, 77:11, 113:1, 131:2

**employees** - 8:4, 18:24, 38:4, 60:7, 68:17, 85:8, 97:17, 107:18, 108:7, 165:24

**employment** - 19:11, 19:15, 35:17, 35:24, 37:9, 39:11, 161:9

**empowered** - 125:1

**encounter** - 119:18

**encountering** - 169:19

**encounters** - 173:2

**encourage** - 130:6,

**168:9, 171:11, 173:12

**encouraged** - 173:3, 173:6

**end** - 51:15, 78:8, 96:4, 100:13, 129:24, 152:18, 171:2

**enforcement** - 13:4, 13:10, 13:12, 13:16, 13:20, 13:25, 14:6, 15:12, 15:15, 15:17, 16:5, 25:18, 39:2, 41:23, 42:4, 48:22, 48:23, 59:10, 59:25, 106:4, 106:21, 108:13, 112:1, 112:3, 113:4, 113:10, 113:12, 113:16, 130:23, 135:17, 135:19, 135:20, 140:17, 155:20, 159:10, 169:22, 170:5, 170:8, 171:5

**Enforcement** - 16:11

**engage** - 60:19, 60:23, 109:5

**engaged** - 78:18

**engine** - 143:6

**enjoin** - 107:25

**enjoyable** - 110:6

**ensure** - 13:2, 13:10, 87:4

**entail** - 164:20

**entered** - 71:9, 82:24

**entering** - 73:3

**entire** - 32:15, 40:1, 48:4, 60:24

**entity** - 59:23

**entries** - 26:12, 64:18, 76:7, 76:11, 76:13, 83:1, 83:13, 84:20, 84:22, 89:12, 89:15, 89:20, 89:22, 92:18, 105:13

**entry** - 26:12, 26:22, 72:2, 75:1, 81:22, 81:24, 83:2, 88:22, 90:3, 121:19

**environment** - 113:3

**equally** - 61:2

**equipment** - 21:2

**equipped** - 129:25, 170:3

**equivalency** - 33:21

**Eric** - 71:13

**error** - 26:21, 26:25, 43:25, 71:8, 82:24, 90:15

**errors** - 76:22, 90:14

**especially** - 148:7

**essentially** - 170:23

**established** - 38:5

**establishing** - 38:14

**estimate** - 36:17

**estranged** - 75:4

**etc** - 38:15, 134:20, 137:5

**ethics** - 84:9, 103:7, 103:8

**evaluate** - 77:19, 103:2

**evaluating** - 103:3, 103:4

**evaluation** - 11:21

**evaluations** - 57:10

**evening** - 115:25,

**45:1, 45:4, 45:7, 138:16, 138:17, 147:11

**evenings** - 43:18, 115:22

**event** - 10:22, 20:13, 28:25, 63:25, 67:20, 68:22, 73:8, 80:23, 153:3, 161:13

**events** - 68:3, 144:25, 161:9, 161:11, 162:17

**eventually** - 66:21

**evidence** - 81:12, 81:18, 92:1, 92:8, 95:24

**exact** - 159:17

**Exactly** - 148:15

**exactly** - 68:7, 110:23, 151:15

**examination** - 107:6, 150:3, 160:15, 177:12

**Examination** - 2:5, 2:6, 2:7, 6:6, 160:19, 167:19, 173:24

**Examinations** - 2:5

**examine** - 52:14, 52:16

**examined** - 4:12, 177:12

**examining** - 156:14

**example** - 31:15, 33:13, 47:12, 54:20, 56:3, 83:1, 109:2, 111:12, 119:1, 120:13, 144:12, 173:18

**exceeding** - 164:25

**exceeds** - 18:22

**excellent** - 17:20

**exception** - 159:21

**Excessive** - 38:21, 79:13

**excessive** - 82:14, 93:3, 93:14, 121:20, 131:14, 133:9, 134:3

**Excuse** - 75:14

**executive** - 11:22, 11:23

**exempt** - 160:1

**exhibit** - 42:1, 67:21, 68:5, 93:24, 164:17

**Exhibit** - 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 2:15, 2:16, 22:11, 22:14, 23:12, 24:19, 25:20, 27:6, 27:11, 27:23, 27:24, 28:10, 28:15, 40:20, 40:23, 48:17, 53:13, 54:18, 55:13, 55:17, 64:9, 65:24, 66:7, 66:11, 68:4, 68:18, 69:9, 69:12, 69:13, 69:16, 70:6, 70:7, 71:25, 72:2, 72:10, 73:18, 76:9, 76:19, 86:2, 86:8, 87:17, 87:23, 87:25, 88:21, 88:22, 89:2, 89:11, 89:19, 89:23, 90:4, 90:5, 90:20, 92:17, 93:22, 94:2, 95:6, 95:18, 102:1, 102:3, 104:7, 104:18, 104:20, 104:25, 105:13, 132:7, 156:5, 156:12, 156:15, 156:21,

**157:7, 161:1, 161:2, 163:22, 164:15, 165:19, 174:24

**exhibits** - 156:11

**Exhibits** - 2:8, 156:9

**exist** - 27:2

**existed** - 49:2

**existence** - 120:14

**exists** - 38:12, 157:8

**exonerated** - 54:10, 58:7, 58:15, 102:22, 102:25, 103:12, 161:7

**Exonerated** - 91:15

**expect** - 69:21, 147:21, 147:25

**expected** - 77:23

**experience** - 13:25, 14:1, 15:12, 110:16, 110:18, 124:11, 135:24, 147:14, 147:22

**experienced** - 109:16

**explain** - 149:13

**explained** - 140:12

**explanation** - 82:4, 90:17, 94:9, 94:12, 126:24

**exposure** - 59:1

**expressing** - 100:25

**extensive** - 137:6, 153:18

**extent** - 152:13

**extremely** - 84:4, 136:10, 136:23

---

**F**

**face** - 141:19

**fact** - 32:3, 50:13, 58:3, 65:1, 105:13, 118:1, 121:1, 124:23, 137:22, 157:7, 168:5

**faction** - 107:22

**factor** - 57:7

**facts** - 29:6, 95:24, 144:13, 144:14, 144:15, 144:16, 148:18, 162:11

**factual** - 91:15, 91:19, 120:25, 155:12

**factually** - 91:12

**Failed** - 77:4

**failed** - 112:19, 112:20, 135:3, 139:11

**failing** - 78:1, 78:15, 103:19

**Failure** - 134:21

**failure** - 108:23, 134:24

**fair** - 76:5, 161:23, 171:2, 174:4

**Fair** - 102:10

**fairly** - 61:2, 151:14, 165:6

**fairness** - 173:13

**faith** - 91:2

**fall** - 142:9, 142:10

**false** - 62:15, 73:3, 84:20, 84:22

**Falsification** - 162:4

**familiar** - 16:8, 43:24, 54:5, 133:19, 136:17, 138:6, 140:3

**familiarity** - 136:21

**family** - 63:21

**far** - 18:21, 19:4, 38:11, 51:19, 55:2, 58:4, 111:24, 117:16,

120:11, 122:20,
131:3, 147:5, 154:12,
155:25, 156:18,
159:7, 159:24
 **fate** - 71:5, 71:7
 **favorite** - 151:12
 **favoritism** - 139:13
 **Fbi-** 15:19, 15:23,
59:6, 143:10
 **feared** - 169:17,
170:6
 **February-** 7:12,
107:20
 **federal** - 8:13
 **feelings** - 105:7,
120:18
 **fell** - 141:21
 **fellow** - 27:18,
136:11
 **felonies** - 13:24
 **felons** - 6:19, 6:20
 **felt** - 133:16
 **few** - 14:3, 65:20,
125:5, 148:18, 174:1
 **fewer** - 94:8, 94:10,
171:13
 **field** - 21:24, 40:13,
40:15, 42:6, 42:14,
42:23, 48:24, 129:19,
138:21, 138:24
 **fifth** - 57:19, 57:21,
69:16, 95:7
 **file** - 8:23, 13:23,
46:17, 53:18, 53:22,
55:2, 55:22, 55:23,
56:2, 56:5, 56:16,
57:19, 70:14, 70:18,
72:8, 80:4, 100:4,
105:12, 119:1, 119:3,
119:5, 124:15, 125:5,
157:4
 **filed** - 117:12,
117:20, 118:9,
118:12, 118:17,
118:22
 **files** - 53:4, 53:6,
53:23, 54:3, 70:20
 **filing** - 21:20,
107:20, 116:9,
116:18, 118:25
 **fill** - 35:12
 **filled** - 51:15
 **final** - 97:8, 99:10
 **finally** - 95:19,
152:6, 160:16
 **finance** - 17:24
 **financially** - 177:18
 **findings** - 96:5,
99:11, 99:12, 99:14,
99:15
 **fine** - 155:10
 **finger** - 110:18,
134:25
 **finished** - 160:16,
167:17
 **fire** - 35:1
 **fired** - 20:20,
101:22, 130:21, 143:5
 **firing** - 17:24
 **firm** - 173:4
 **firmness** - 173:12
 **First-** 74:24, 79:9,
79:12
 **first** - 6:2, 29:11,
44:19, 69:20, 71:23,
78:23, 79:19, 82:24,
83:2, 87:12, 87:16,
106:4, 106:16, 107:6,
115:18, 117:18,
125:21, 126:9,

126:14, 126:17,
136:15, 146:16,
147:8, 147:15, 166:4,
174:10, 177:10
 **five** - 44:21, 45:20,
69:19, 80:8, 91:7
 **flask** - 81:13
 **flow** - 138:15
 **focus** - 57:16,
120:16
 **focused** - 127:25
 **folks** - 110:8,
110:10
 **follow** - 171:9,
171:11, 171:18,
171:22, 172:11,
172:23
 **followed** - 22:8,
23:8, 76:6, 138:14
 **following** - 22:8,
78:22, 112:11
 **follows** - 6:5
 **force** - 19:5, 38:21,
79:13, 80:6, 82:14,
93:4, 93:14, 93:20,
121:20, 131:14,
133:9, 134:3, 148:9,
149:15
 **forenoon** - 4:13
 **Forest-** 150:14
 **forever** - 111:25
 **forget** - 151:15
 **forgot** - 126:13
 **forgotten** - 26:12
 **form** - 2:11, 64:20,
65:3, 65:13, 65:18,
66:11, 66:13, 66:14,
66:19, 67:2, 67:16,
67:19, 69:5, 69:15,
70:3, 70:8, 74:1, 75:7,
82:23, 89:3, 89:4,
102:24, 107:22,
126:18, 136:24
 **formal** - 54:25, 55:7,
55:11, 55:23, 55:25,
68:9, 93:13, 99:16,
117:17
 **format** - 55:18,
55:19, 55:20
 **former** - 123:25,
124:8
 **forms** - 65:17, 67:5
 **forth** - 18:16, 92:9
 **forward** - 57:12
 **foster** - 171:16,
171:18
 **fosters** - 60:15
 **four** - 32:6, 32:10,
33:11, 40:2, 41:2,
41:11, 44:21, 57:1,
57:3, 57:18, 57:20,
58:17, 80:8, 91:7,
96:19, 97:3, 100:1,
107:16, 108:16,
109:19, 110:16,
115:16, 115:17,
153:12
 **fourth** - 44:18,
44:25, 45:5, 74:8,
89:13, 115:17,
115:19, 115:23,
174:7, 174:9, 174:12,
174:21
 **free** - 123:13,
158:24, 174:5
 **frequency** - 87:11
 **frequently** - 85:6,
169:8
 **front** - 40:23, 74:16,
76:18, 129:22, 138:13

 **frustrated** - 136:23
 **Frustrated-** 158:13
 **Fte-** 33:21
 **fugitive** - 48:20,
56:25, 121:19
 **full** - 33:21, 46:12,
51:7, 51:9, 98:7,
98:14
 **full-blown** - 98:7,
98:14
 **fully** - 51:10, 51:18,
51:22
 **function** - 9:6, 59:2,
59:12, 59:24, 60:4,
99:19, 99:21
 **functions** - 44:14,
154:12
 **fund** - 16:18
 **funding** - 16:23
 **fundraiser** - 108:9
 **future** - 13:4

## G

 **Gaddy** - 131:21,
143:2
 **gain** - 68:2
 **gal** - 173:15
 **gather** - 54:15,
54:22, 54:24, 55:9,
157:11
 **gear** - 74:12, 74:14
 **general** - 10:4, 12:4,
12:15, 25:11, 31:16,
31:19, 60:3, 60:7,
70:20, 170:11, 170:14
 **generally** - 29:2,
30:17, 51:22, 66:17,
67:15, 96:3, 96:18,
171:2
 **Generally** - 30:4,
30:14, 99:15
 **geographic** - 45:9
 **Ginnever** - 121:17,
122:10
 **girlfriend** - 138:2
 **Given-** 43:15,
92:15, 153:5
 **given** - 15:2, 43:16,
56:5, 64:25, 67:20,
69:22, 87:9, 92:16,
99:22, 152:20,
166:22, 171:23,
175:10, 177:14
 **glad** - 48:15, 113:1
 **Glen** - 11:16
 **goal** - 129:25
 **goofy** - 74:16
 **gory** - 130:19
 **governing** - 29:22
 **government** -
17:11, 17:16, 17:19,
38:2, 38:9, 97:16
 **Gps-** 168:23
 **Gpss-** 168:20
 **gravity** - 67:20
 **great** - 15:2, 38:17,
77:14
 **greater** - 87:11
 **Greg** - 126:11
 **ground** - 127:6,
148:5
 **group** - 107:23,
111:8, 111:9, 112:14,
114:24
 **growth** - 106:18
 **Growth** - 106:20
 **guess** - 68:23,
69:11, 92:19, 117:3,
138:17, 146:16

 **guessing** - 92:19,
92:20
 **guidance** - 64:3,
127:21
 **guide** - 127:10
 **guidelines** - 38:4
 **guides** - 59:18
 **guilty** - 119:9
 **guy** - 173:15
 **Guy-** 14:17
 **guys** - 113:13,
153:20

## H

 **half** - 9:9
 **hall** - 21:7, 85:7
 **hand** - 58:22, 65:23,
81:12
 **handcuffed** - 79:8
 **Handcuffed-**
132:20
 **handful** - 112:6
 **handle** - 123:18,
123:20, 172:8
 **handled** - 31:20,
31:25, 32:2, 145:17
 **handles** - 21:6
 **handling** - 174:18
 **hands** - 167:14,
172:24
 **handwriting** -
41:10, 71:10
 **happy** - 165:14
 **hardest** - 127:1
 **harsh** - 78:11
 **hat** - 74:15
 **hate** - 46:19, 154:17
 **head** - 49:4, 74:12,
74:14, 80:2, 98:17,
150:16, 150:18
 **heading** - 23:1
 **hear** - 141:24
 **heard** - 133:4, 170:6
 **hearing** - 37:23
 **heat** - 172:13,
172:16
 **heavy** - 168:8,
168:9
 **heck** - 62:7
 **held** - 28:24, 60:20
 **help** - 108:18
 **helping** - 63:6
 **hereby** - 3:11, 177:6
 **hereto** - 177:18
 **hereunto** - 3:22,
177:19
 **hiding** - 76:17
 **high** - 154:3
 **higher** - 111:23
 **highest** - 43:18
 **Highest-** 45:3
 **highlight** - 76:21,
76:24
 **highlighted** - 76:18
 **himself** - 98:22,
143:9, 150:18, 153:24
 **hire** - 19:23, 35:1,
35:13, 35:21
 **hiring** - 17:24
 **Hispanic** - 139:24
 **Hispanics** - 18:17
 **history** - 119:22,
124:6, 124:22, 161:19
 **hit** - 131:18, 138:17,
150:17
 **hold** - 15:4, 18:5,
86:25, 172:17
 **holder** - 144:10
 **holding** - 143:9

 **holdover** - 142:11
 **home** - 73:4,
121:20, 138:20,
151:21, 152:4,
152:12, 153:4, 153:9,
153:14, 153:23,
154:5, 155:8, 171:1
 **honest** - 47:9, 127:3
 **Hood** - 5:6, 5:7,
160:15, 160:20,
164:10, 165:18,
167:16
 **Hood.............160** -
2:6
 **horizontal** - 64:15
 **hospital** - 145:12,
145:18
 **hot** - 172:1
 **hour** - 3:12
 **hours** - 4:13, 40:14,
152:21
 **house** - 7:16, 52:23,
86:17, 151:23
 **Hudson** - 32:13,
42:10, 49:16, 49:21
 **human** - 17:23,
20:1, 112:22
 **Human-** 18:2
 **hundred** - 35:3,
35:4
 **hundredth** - 35:6
 **Hunt** - 3:22, 6:23,
20:3, 23:21, 24:11,
63:7, 63:15
 **Hunt's** - 19:10,
19:15, 157:23
 **hunting** - 113:12,
113:13
 **hypothetical** -
56:24, 57:18

## I

 **I-70** - 84:4, 138:12
 **Ia** - 2:15, 27:17,
29:9, 29:10, 29:12,
47:8, 47:16, 53:17,
56:2, 56:3, 56:4,
70:20, 70:21, 96:15,
99:16, 99:17, 99:19,
100:4, 104:2, 105:7,
105:12, 118:8,
146:20, 146:21,
146:22, 146:25,
147:6, 156:13
 **Ias** - 53:19, 53:20,
53:21, 118:17, 118:18
 **idea** - 18:4, 39:25,
71:22, 83:9, 175:2
 **Identification** -
22:12, 40:21, 156:6
 **identified** - 167:25
 **identify** - 65:25,
154:4, 156:11
 **idle** - 172:24
 **ignore** - 58:24
 **ignored** - 57:15
 **immediate** - 50:1
 **immediately** -
41:11, 44:12
 **impeding** - 138:14
 **implement** - 34:25
 **implicit** - 99:13,
99:15
 **importance** - 59:2
 **important** - 59:12,
59:16, 60:18, 60:22,
60:25
 **impossible** - 155:3
 **improper** - 89:1,

89:24, 93:2, 161:17, 162:8
**Improper** - 89:9
**improvement** - 37:15
**in-car** - 129:6
**in-dash** - 129:18
**in-group** - 111:8
**in-house** - 7:16
**inaccurate** - 93:2, 150:1, 150:9
**inappropriate** - 61:24
**Inc** - 5:14
**incident** - 2:11, 7:10, 26:6, 26:11, 65:2, 66:14, 66:16, 66:19, 67:4, 67:19, 69:5, 69:15, 70:3, 70:8, 70:10, 70:23, 75:12, 81:5, 82:3, 84:10, 85:18, 85:22, 85:24, 88:18, 92:15, 121:18, 122:6, 122:21, 129:21, 135:6, 136:24, 139:23, 140:11, 140:13, 140:24, 143:14, 143:19, 144:4, 145:18, 147:24, 150:14, 151:6, 164:22, 167:11, 168:25
**incidents** - 62:8, 65:22, 79:22, 79:23, 79:25, 80:5, 80:18, 88:21, 94:6, 114:17, 164:18
**include** - 3:16, 8:1, 47:13, 54:21
**included** - 159:18
**includes** - 155:22
**Including** - 51:5
**including** - 107:2, 162:14
**increase** - 129:10
**incriminating** - 167:14
**incumbent** - 135:21
**indeed** - 76:8, 152:11
**Index** - 2:1, 2:3
**indicate** - 27:17
**indicated** - 25:22, 26:24, 56:12, 67:24, 151:16
**indicates** - 70:4, 83:8
**indication** - 81:10
**indicator** - 121:14
**Indirect** - 120:9, 120:10
**individual** - 19:23, 35:6, 37:8, 37:11, 37:15, 37:24, 38:18, 38:20, 38:23, 38:25, 39:18, 53:4, 53:6, 53:23, 55:21, 57:10, 62:8, 64:14, 65:2, 65:16, 65:21, 67:25, 69:12, 105:8, 107:23, 107:24, 109:1, 130:3, 132:7, 142:6, 162:11
**individual's** - 37:9, 39:23
**individuals** - 108:7, 114:24, 122:15, 131:16
**indoctrination** - 59:1

**inform** - 67:25, 173:8
**information** - 8:9, 8:22, 27:8, 29:7, 36:7, 39:23, 52:18, 56:15, 56:19, 56:21, 58:12, 66:20, 67:13, 71:20, 72:6, 73:3, 86:7, 88:11, 91:1, 102:15, 111:1, 116:21, 128:10, 141:11, 141:13, 141:24, 144:18, 146:24, 147:6, 147:14, 147:16, 147:18, 147:25, 157:12
**Information** - 2:4
**informed** - 30:2, 147:11, 149:15
**initiate** - 12:24, 104:24, 117:24
**initiated** - 25:21, 118:8, 118:11, 170:24
**initiates** - 22:6
**initiating** - 32:8
**injured** - 145:8
**input** - 101:4
**inquire** - 99:2
**inquires** - 30:14
**inquiries** - 31:20, 32:1, 80:1, 118:18, 118:21
**inquiry** - 29:5, 29:11, 29:15, 29:18, 29:24, 30:2, 30:6, 30:8, 30:24, 30:25, 31:7, 31:8, 31:12, 31:25, 67:16, 73:14, 88:10, 117:13, 117:14, 118:3, 118:4, 118:11, 141:6, 142:16, 167:10, 167:12
**insignia** - 74:16
**inspection** - 80:20
**instance** - 27:3, 64:25, 118:10, 134:1
**instances** - 28:11, 34:24
**Institute** - 15:19, 16:7
**instructed** - 87:3
**integrity** - 59:18
**intend** - 12:17
**interact** - 34:18
**interactions** - 17:10
**intercepted** - 84:6
**interest** - 105:20
**interested** - 23:15, 146:8, 177:18
**interesting** - 143:24
**interfering** - 149:16
**interim** - 9:14
**internal** - 2:12, 3:18, 3:21, 8:20, 9:5, 13:5, 19:5, 21:15, 21:18, 21:25, 22:4, 22:6, 23:1, 23:9, 23:16, 23:19, 24:10, 25:21, 25:25, 26:1, 27:12, 27:24, 28:3, 28:11, 28:19, 46:24, 47:2, 52:17, 52:20, 53:2, 53:7, 53:10, 57:1, 59:2, 59:7, 59:12, 59:24, 59:25, 60:4, 64:4, 67:12, 67:14, 70:14, 70:18, 72:3, 72:7, 72:8, 72:11, 72:15, 73:9,

80:1, 80:3, 88:4, 88:14, 88:18, 89:3, 90:21, 91:8, 95:23, 98:1, 98:7, 103:2, 103:20, 104:11, 104:19, 104:24, 116:9, 117:24, 118:4, 119:2, 119:8, 141:8, 146:13, 157:15, 161:2, 163:22, 165:25, 166:6, 166:9, 166:15, 167:2, 167:4, 167:5, 167:8, 175:9
**Internal** - 107:13, 107:14
**internally** - 34:13, 127:21, 146:9
**interrupt** - 40:17, 75:15, 96:6, 153:1
**interrupted** - 23:6, 155:9
**intervened** - 155:15, 155:21
**interview** - 158:20, 159:5, 159:7, 167:8
**intoxicated** - 84:4, 146:6
**investigate** - 117:5
**investigating** - 146:8, 167:2
**investigation** - 2:12, 3:19, 3:21, 8:21, 21:15, 21:19, 22:1, 22:4, 22:7, 23:9, 23:20, 24:10, 26:9, 30:9, 42:12, 64:4, 67:12, 67:15, 71:4, 73:9, 89:4, 90:22, 91:9, 92:18, 96:2, 96:4, 97:9, 98:8, 98:14, 98:20, 98:24, 99:9, 103:17, 103:20, 104:1, 116:10, 117:17, 117:25, 118:5, 121:25, 141:9, 145:22, 146:13, 146:14, 161:2, 165:25, 166:6, 167:6, 167:7
**investigations** - 25:21, 25:25, 26:1, 27:12, 27:13, 28:12, 46:1, 47:15, 48:21, 59:8, 88:4, 88:15, 98:1, 104:12, 104:15, 156:13, 161:15, 161:22, 163:22, 166:16, 171:19, 175:10
**Investigations** - 2:16
**investigator** - 70:22, 95:24, 96:15, 99:17, 146:21, 146:22, 147:1, 166:14, 167:5
**involuntary** - 52:12
**involve** - 25:6, 162:10
**involved** - 31:5, 59:19, 105:8, 114:16, 123:12, 150:19, 161:15
**involvement** - 141:3
**involves** - 82:8
**involving** - 92:16, 121:18, 139:24, 139:25, 146:13, 168:25
**irrelevant** - 23:23,

63:8
**issue** - 46:16, 58:22, 61:5, 73:21, 117:19, 127:25, 129:9, 140:16, 154:23, 154:24, 168:6
**issued** - 31:24, 65:2, 85:9
**issues** - 8:3, 21:7, 37:10, 47:10, 57:9, 58:22, 73:5, 73:7, 73:19, 81:3, 120:2, 164:5
**item** - 27:23
**items** - 76:21
**itself** - 20:19, 157:1

## J

**jail** - 131:18, 142:10
**jailed** - 142:1
**James** - 74:9, 84:25, 131:21, 143:2
**January** - 13:8, 24:23, 41:5, 86:10, 90:22
**Jason** - 1:12, 2:13, 2:17, 3:7, 4:7, 5:7, 19:20, 20:6, 20:9, 21:16, 23:24, 66:2, 66:8, 69:17, 71:24, 72:1, 92:16, 92:18, 113:5, 113:7, 113:13, 119:17, 119:21, 122:3, 131:4, 131:17, 155:11, 156:21, 164:2
**Jeff** - 75:19, 76:1, 138:4, 138:8, 150:12
**Jeremy** - 131:18, 142:6
**Jerry** - 85:12, 85:25
**job** - 7:13, 34:17, 40:11, 106:4, 107:19, 111:2, 111:3, 111:4, 113:15, 163:13
**jobs** - 110:11, 159:14
**Joe** - 11:25, 140:8
**jogging** - 102:8
**John** - 77:2
**Johnson** - 122:9
**Jones** - 150:21
**judgment** - 85:2
**judicial** - 158:13
**July** - 1:18, 3:11, 4:12, 88:24, 88:25, 89:7, 89:8, 89:12, 89:20, 90:11, 104:7, 104:12, 161:16
**jump** - 85:10
**Jury** - 7:2

## K

**K-9** - 45:17, 48:22
**Kaiser** - 11:17, 32:12, 42:5, 42:6, 42:8, 139:5, 139:6, 149:2, 149:3
**Kamp** - 78:23, 132:16, 132:17
**Kaup** - 132:5, 140:1, 140:2, 140:8, 140:10, 140:25, 141:1, 141:19, 141:20, 141:22
**keep** - 53:1, 53:4, 55:9, 112:7, 125:1
**keeps** - 39:10
**Keller** - 75:1

**kept** - 53:3, 55:23, 56:5
**Kerry** - 78:23, 79:2, 132:16, 132:17
**Kevin** - 48:2
**kids** - 138:2
**kind** - 34:21, 59:23, 74:15, 78:11, 130:4, 139:9, 154:6
**kinds** - 171:15, 172:11
**King** - 1:13, 2:13, 2:17, 3:8, 4:8, 5:7, 19:20, 20:6, 20:9, 21:16, 23:24, 43:23, 66:2, 66:8, 69:18, 70:1, 92:16, 113:5, 113:7, 119:17, 119:21, 120:5, 121:16, 122:10, 131:4, 131:17, 136:14, 138:5, 140:7, 143:24, 144:5, 145:10, 146:11, 146:13, 146:19, 146:21, 147:3, 147:9, 147:20, 147:23, 148:22, 149:16, 150:14, 150:24, 152:22, 155:11, 156:22, 164:2, 168:25, 169:13, 170:20, 175:6, 175:11
**King's** - 61:8, 71:24, 72:2, 92:18, 111:7, 122:3, 122:22, 174:3
**Kirkwood** - 5:8
**knit** - 148:16
**knowing** - 62:7
**knowledge** - 91:5, 117:19, 121:24, 122:23, 135:1, 143:4, 145:13, 146:12, 177:10
**known** - 120:19, 153:13
**knows** - 135:20, 148:10
**Knox** - 138:4, 138:17, 139:11, 139:16, 150:20
**Koester** - 14:13, 14:14, 14:15, 14:17, 15:1
**Ksdk** - 158:8

## L

**labeled** - 64:16
**lack** - 58:11, 60:7, 60:8, 100:10, 104:20, 112:20, 152:10
**Lack** - 60:6
**ladder** - 79:18
**lady** - 147:11, 172:12, 172:16
**Lamp** - 5:15
**Lantern** - 5:15
**lapel** - 129:15
**large** - 68:4, 104:24, 104:25
**lashing** - 138:25
**last** - 10:21, 11:17, 11:19, 32:17, 48:18, 69:4, 72:18, 82:16, 83:2, 83:5, 84:12, 85:11, 88:15, 111:25, 127:2, 129:24, 134:22, 148:21, 155:13, 157:21, 159:8

Last- 169:13
late - 45:1, 138:16
Law- 5:7, 8:10, 8:12, 13:16, 16:11
law - 10:1, 13:3, 13:10, 13:12, 13:19, 13:20, 13:25, 14:6, 15:11, 15:15, 15:16, 16:5, 25:17, 39:2, 59:10, 59:25, 84:18, 91:16, 103:5, 103:6, 106:4, 106:21, 108:13, 111:25, 112:3, 113:4, 113:9, 113:11, 113:15, 130:22, 135:17, 135:18, 135:19, 140:17, 155:20, 159:10, 169:22, 170:4, 170:8, 170:10, 171:5
lawful - 6:2
laws - 127:14
lawsuit - 8:13, 116:9, 116:19, 116:22, 117:12, 117:20, 118:25, 119:4, 119:6, 122:9, 122:14, 123:22
lawsuits - 118:17, 118:22
lawyer - 140:9
lax - 60:15, 62:23
Lax- 60:15
layover - 45:6
lead - 44:5, 116:15, 118:4
least - 15:11, 15:12, 39:11, 53:12, 62:22, 106:24, 107:7, 138:25, 144:12, 144:14, 162:1, 162:10
leave - 78:12, 81:3, 120:24, 173:8
leaving - 75:21, 137:25, 141:17
Lee- 14:17
left - 110:22, 137:17, 137:18, 137:19, 138:3, 149:17
legal - 93:5, 93:9, 145:12
legally - 18:16, 50:14
Legislature- 13:20
legitimate - 135:19
less - 52:5, 103:18, 104:23, 124:16, 124:17, 150:9, 171:13
letter - 21:1, 21:10, 21:12
level - 28:24, 29:20, 37:22, 40:3, 44:11, 50:15, 50:21, 77:23, 128:5, 148:4
license - 168:12, 173:17
licensed - 13:19, 13:21
lid - 147:18
lie - 20:21, 20:22, 20:23, 114:10
lied - 75:23, 84:17, 154:17
lieutenant - 25:13, 44:9, 47:21, 47:23, 47:25, 48:3, 50:7, 98:16, 99:5, 99:8, 106:11, 109:5, 152:17
Lieutenant- 50:9,

131:25, 132:2, 132:3, 144:21, 145:3, 145:16, 151:13, 151:20, 152:18, 152:24, 166:18
lieutenant's - 29:20
lieutenants - 25:7, 34:9
Life- 160:11
life - 155:19, 159:19, 159:24
light - 58:17, 58:19, 119:18
likely - 65:16, 102:20, 131:10, 132:11, 148:2, 162:2, 162:5
limit - 104:6, 145:12, 164:25
Lindsey- 80:12, 80:13, 80:16
Line- 3:15, 3:18, 3:20
line - 71:21, 71:22, 72:14, 82:17, 84:8, 124:12, 124:24, 134:12, 136:7
lines - 17:18
list - 54:8, 88:14, 90:21, 151:3, 151:17
List- 2:12
listed - 27:24, 174:25, 175:2
listen - 101:1
listening - 147:2
Llc- 5:7
load - 45:4, 171:10
loaned - 63:21
local - 141:14
location - 154:14, 154:17, 168:12, 169:9
Locust- 5:3
lodged - 97:23
Logsdon- 84:25
look - 22:17, 41:17, 64:9, 66:2, 69:16, 71:12, 73:18, 74:8, 74:25, 75:13, 76:9, 78:23, 80:4, 83:21, 84:23, 87:23, 89:11, 90:20, 93:24, 94:4, 102:1, 102:3, 102:6, 160:17, 165:4
looked - 86:5, 86:22, 86:23, 87:21, 88:24
Looking- 113:9, 113:11
looking - 28:14, 56:7, 56:9, 74:7, 89:2, 102:19, 113:8, 119:25, 121:4, 129:17, 130:1
looks - 42:18, 69:3, 94:4
lose - 137:12
loss - 75:9, 75:11, 137:6
Louis- 3:11, 5:4, 5:15, 54:6, 84:3, 135:23, 177:4, 177:6
low - 43:19, 112:16, 112:17, 113:5
lower - 29:18
lying - 73:2, 73:3, 152:12

M

mad - 113:2

magnitude - 126:20
mail - 128:12, 128:18, 128:19, 128:20
mails - 128:12, 170:16
maintain - 46:15
maintains - 83:19
major - 10:16, 32:20, 32:22, 33:2, 33:3, 33:10, 33:23, 154:8
majority - 170:13
Mallett - 81:23
man - 79:6, 79:7
manage - 14:5, 14:25, 17:16, 17:17
managed - 94:13
management - 14:1, 86:25, 104:22, 105:4, 105:10
manager - 13:4, 13:12, 56:13
managers - 14:4
manpower - 43:20, 45:2, 45:19, 174:11
manual - 2:9, 2:18, 22:24, 127:18, 127:21, 156:23
March - 94:10, 94:17, 94:19, 94:22, 94:23, 104:7, 110:22, 164:14
Marchand - 151:17, 152:19, 152:24
Marchand's - 151:20
Marie - 1:22, 3:10, 3:24, 4:17, 5:14, 177:5, 177:22
mark - 23:6, 40:19, 41:25, 82:25, 156:3
marked - 41:25, 65:24, 84:3
Marked - 22:12, 40:20, 156:6
market - 129:14
marks - 157:24
Martchink - 151:13
match - 88:22
Matt - 80:13
matter - 23:15, 28:20, 71:24, 72:2, 105:16, 141:4, 146:7
matters - 29:5, 87:21, 104:19, 104:25, 120:25, 177:11
Matthew - 80:12, 80:16
mayor - 60:10
Mccarver - 136:16
Mccullough - 140:9, 140:16, 140:21
Mdt - 151:22, 168:15
Mdts - 129:6
mean - 19:9, 53:18, 57:25, 58:14, 58:15, 58:19, 71:1, 71:6, 86:8, 93:8, 93:9, 95:20, 104:9, 107:14, 120:22, 136:4, 154:3, 157:3, 163:9, 170:10, 171:20
means - 58:16, 58:21, 64:19, 65:21, 71:2, 91:11, 91:15, 91:19, 91:22, 174:14
meant - 90:21,

133:3, 150:4
measure - 78:19, 121:12
media - 157:23, 158:9
Media - 159:2
meet - 87:3, 96:18, 97:3
meeting - 20:25, 21:5, 97:5, 100:3, 100:14, 100:23, 101:18, 149:2, 149:21
meetings - 100:9
meets - 67:9
member - 25:4, 25:15, 25:22, 26:17, 35:24, 37:1, 37:5, 39:2, 39:14, 50:9, 51:16, 56:25, 77:7, 85:25, 101:21, 102:24, 114:17, 115:25, 117:4, 128:25, 137:14
members - 44:7, 46:10, 51:3, 51:19, 52:3, 60:18, 60:22, 60:25, 61:3, 61:10, 85:20, 97:18, 97:20, 97:23, 123:18, 148:24, 149:9, 151:20, 151:21, 160:6
memo - 156:15
memory - 102:8
men - 139:24
mention - 16:23
mentioned - 16:4
Merit - 37:23, 38:1, 38:3, 38:5, 38:6, 38:12, 39:19
messing - 144:6
meted - 27:4, 67:6
Metropolitan - 54:6
middle - 44:20, 115:9, 172:13
midnight - 43:14, 45:2, 45:7
Midnight - 43:20
midnights - 115:21
might - 57:4, 87:18, 101:24, 123:21, 126:13, 129:21, 164:20
miles - 138:14
mill - 143:25, 146:16, 147:4, 147:17, 147:22, 148:5, 148:8, 148:13, 148:14
mills - 148:19
mind - 43:10, 103:14, 112:13, 150:5, 154:23
mindset - 86:14
mine - 71:11
minimal - 15:8
minimize - 67:20, 74:22
minimum - 15:3, 15:10, 15:12, 43:19
minor - 65:14, 67:21, 74:23, 105:2, 105:16, 132:20, 136:7
minutes - 155:6
Miranda - 166:23, 167:3
mischaracterize - 104:22
misconduct - 37:16, 60:16, 60:19, 78:3, 78:18, 130:10,

130:20, 130:24, 133:3, 133:7, 133:22, 135:11
misleading - 160:3
mission - 137:25
Missouri - 1:6, 1:12, 3:1, 3:7, 3:11, 3:13, 4:1, 4:7, 4:17, 4:19, 4:21, 5:4, 5:8, 5:12, 5:15, 8:10, 13:22, 39:12, 127:14, 177:3, 177:6, 177:8
misstate - 80:10
misunderstood - 52:22
Mobile - 47:3, 47:6, 47:7
mobile - 47:8, 47:16, 73:4, 84:20, 128:8, 128:11, 128:22, 129:1
model - 107:3, 107:4, 171:16
Mold - 47:5
moment - 101:8, 119:12
money - 18:1, 18:5, 34:10, 63:21, 125:15
monitoring - 121:13
Montgomery - 159:10
months - 115:17, 117:13, 117:23, 134:7
morale - 61:5
morning - 45:5, 138:20, 140:11, 148:10
most - 28:6, 33:19, 65:16, 67:23, 92:25, 96:3, 97:25, 112:17, 117:11, 129:3, 139:16, 160:23, 161:24, 162:2, 162:9, 168:2, 168:5, 170:3
Most - 86:16, 112:16, 113:2, 131:10, 132:11, 148:2, 154:9, 168:4
mother's - 155:19
motion - 175:21
motorcycle - 145:4, 145:19
mouth - 146:25
move - 77:17, 107:5, 110:5, 110:7, 110:23, 110:25
moved - 48:21, 48:24, 111:1, 111:4, 111:5, 138:18, 151:19, 152:19
movement - 12:19, 12:22, 34:7, 109:23
moving - 107:2, 143:20
multiple - 163:11
must - 75:22, 88:25, 158:9
Must - 75:22
myriad - 73:5

N

naive - 153:15
name - 3:23, 6:8, 37:7, 38:18, 42:1, 48:9, 64:14, 81:15, 83:14, 84:8, 173:16, 177:20
named - 150:20
names - 131:20,

133:19, 174:14
**narcotics** - 80:21
**national** - 59:5
**National** - 15:19, 15:23, 59:6
**nationally** - 15:16, 15:20
**naturally** - 112:22
**nature** - 26:13, 31:4, 65:14, 65:15, 67:14, 74:20, 79:12, 94:5, 105:6, 112:22, 128:16, 135:21, 138:3, 161:5, 161:22, 163:7, 170:14, 171:24, 175:1
**Naughton** - 74:9
**necessarily** - 31:2, 58:23, 78:3, 87:19, 105:5, 129:22, 161:12
**necessary** - 133:16, 166:13
**need** - 21:9, 26:23, 33:2, 34:20, 36:5, 47:10, 58:12, 82:13
**needed** - 33:2, 172:16
**needles** - 110:25
**needs** - 69:1
**Neer** - 1:17, 3:13, 4:11, 6:1, 6:9, 50:9, 158:11, 177:9
**negative** - 68:10, 105:21
**neighbors** - 172:14
**never** - 114:8, 145:15, 147:6, 170:6
**new** - 35:13
**newer** - 112:11, 142:12
**Next** - 138:20
**next** - 10:4, 10:5, 12:15, 41:10, 66:20, 68:15, 80:10, 80:14, 81:22, 82:7, 108:8, 131:6, 158:11, 174:14
**niece** - 155:22
**night** - 108:9, 108:10, 141:23, 150:25
**nine** - 29:3
**no-nonsense** - 139:6
**non** - 68:23
**non-written** - 68:23
**none** - 52:9
**None** - 141:5, 145:14, 164:4
**Nonetheless** - 122:20
**nonlethal** - 150:17, 150:21
**nonsense** - 139:6
**nonsustained** - 53:18
**normal** - 115:13
**Normally** - 162:18
**normally** - 28:22, 161:24, 162:17
**North** - 3:12, 4:16, 5:11, 177:7
**Northwestern** - 15:18, 16:7
**Nos** - 22:11, 156:5
**not-sustained** - 57:1, 57:3, 57:11, 57:18, 57:20
**notable** - 150:13
**noted** - 76:5, 76:14, 76:25, 104:1
**notes** - 43:11,

160:17
**nothing** - 6:3, 120:3, 122:3, 122:20, 125:13, 157:3, 167:7, 177:10
**Nothing** - 119:20, 122:8
**Notice** - 177:6
**noticed** - 43:25, 82:25
**notified** - 165:22
**notify** - 134:24, 135:22
**notifying** - 21:13, 137:20
**November** - 9:13, 92:21, 161:20, 164:1, 174:25
**Number** - 59:17, 59:19, 173:10, 174:24
**number** - 43:19, 65:25, 68:5, 73:19, 104:17, 104:19, 104:24, 105:1, 121:9, 152:11, 153:6, 154:2, 157:19, 157:22, 168:12
**numbers** - 43:15, 87:20, 94:5, 94:7, 95:1, 105:3

## O

**o'clock** - 4:13, 4:14
**O'fallon** - 139:24, 142:5
**oath** - 177:12
**object** - 61:20, 63:8
**objected** - 23:23
**objection** - 8:9, 8:12, 8:25
**Objections** - 2:7
**objections** - 175:21
**observe** - 172:4
**observed** - 133:15
**observes** - 134:19
**obtain** - 58:12
**obtained** - 166:23
**obtains** - 95:24
**obviously** - 15:2, 99:22, 117:10, 118:2, 120:17, 121:10, 131:25, 135:3, 161:12, 167:8
**Obviously** - 90:6
**occasion** - 34:12, 43:21, 79:16, 97:22, 118:6, 166:13, 168:8
**occasions** - 17:4, 135:23, 163:11
**occur** - 7:10, 12:23, 13:7, 36:4, 98:14, 120:1, 129:21, 145:1, 167:22
**occurred** - 36:2, 64:25, 68:24, 117:12, 117:23, 118:7, 119:19, 123:3, 141:12, 146:17
**occurs** - 66:16, 134:10
**off-duty** - 140:13
**offense** - 74:22, 79:9, 79:12, 103:18, 162:21
**offered** - 140:17
**office** - 9:22, 10:24, 15:4, 20:14, 21:8, 21:20, 48:23, 49:2, 110:5, 111:23, 116:7,

116:24, 125:14, 138:21, 140:10, 142:13, 146:25, 147:6, 147:12, 153:14, 154:10, 165:24
**Office** - 3:12, 4:16, 5:7, 5:11, 177:7
**officer** - 7:16, 13:20, 13:22, 25:18, 25:19, 29:2, 37:17, 39:24, 55:24, 56:1, 56:4, 56:5, 56:17, 56:20, 56:23, 56:24, 57:1, 57:4, 57:13, 57:16, 57:18, 58:9, 66:21, 82:11, 93:3, 93:13, 119:7, 119:9, 119:14, 120:20, 121:6, 121:9, 121:15, 125:3, 128:9, 128:22, 128:24, 129:20, 130:10, 131:7, 133:9, 134:2, 134:19, 134:23, 135:2, 135:19, 136:5, 136:8, 138:9, 141:15, 146:3, 147:6, 148:8, 150:19, 150:20, 152:14, 155:16, 161:25, 165:3, 166:21, 167:2, 167:6, 167:11, 168:14, 170:25, 172:19, 174:10
**Officer** - 39:7, 121:16
**officer's** - 27:19, 55:22, 56:16, 56:19, 57:10, 119:1, 119:5, 137:5
**Officers** - 174:8
**officers** - 39:11, 45:16, 45:17, 77:24, 81:4, 87:1, 108:1, 112:12, 127:4, 130:3, 133:22, 133:23, 134:11, 136:12, 137:21, 140:17, 141:14, 150:15, 151:8, 151:9, 152:6, 153:16, 159:20, 168:3, 168:5, 169:18, 172:3, 172:15, 173:3, 174:20
**officers's** - 119:3
**offices** - 3:12
**official** - 17:22, 58:4, 165:3
**officially** - 148:11
**officials** - 97:17
**ol'** - 111:9, 111:10, 111:24, 152:25
**old** - 172:12
**once** - 82:23, 96:1, 129:13, 130:16, 135:16, 151:25, 153:25, 154:12, 154:18, 154:19, 155:20, 162:22, 170:18
**Once** - 8:22, 12:12, 36:3, 49:20, 62:24, 95:11, 98:13, 161:14, 168:7
**One** - 77:9, 88:23, 126:4, 135:7, 135:8, 135:24, 136:1, 150:10, 163:25, 164:22
**one** - 6:22, 8:3,

8:24, 10:21, 11:16, 13:23, 17:25, 27:6, 32:22, 32:23, 34:19, 44:4, 51:13, 51:14, 52:10, 52:14, 52:16, 52:18, 59:18, 66:15, 67:5, 74:24, 77:16, 77:18, 78:23, 78:24, 80:14, 80:19, 81:5, 81:24, 82:6, 84:17, 85:7, 85:8, 90:7, 92:12, 101:11, 102:13, 107:11, 107:23, 108:9, 108:10, 108:11, 108:19, 108:20, 111:5, 112:25, 113:1, 115:10, 120:25, 121:9, 123:15, 125:24, 126:11, 128:17, 131:16, 132:25, 133:5, 134:22, 136:15, 138:1, 141:18, 150:14, 150:15, 150:18, 151:2, 151:6, 151:12, 152:6, 152:12, 152:24, 153:11, 153:12, 153:16, 155:10, 155:12, 155:13, 158:11, 159:8, 159:12, 159:14, 161:4, 161:11, 161:14, 161:15, 161:20, 161:21, 164:13, 164:16, 166:8, 166:12, 173:10
**one-year** - 77:16
**ones** - 113:2, 150:13
**ongoing** - 27:9, 83:19
**open** - 127:4
**open-door** - 127:4
**opening** - 9:21, 112:24, 115:7
**operate** - 60:4, 61:25
**operates** - 61:19, 147:23
**operation** - 19:2, 127:7
**Operational** - 19:9
**operations** - 21:24, 40:13, 40:14, 40:15, 42:7, 42:14, 42:23, 48:25, 59:20, 108:5, 127:10, 149:16, 160:4
**operators** - 149:17
**Opinion** - 100:12, 100:13
**opinion** - 17:13, 17:21
**opinions** - 100:24, 101:4
**opponent** - 125:21, 126:7, 126:9
**opponents** - 126:1
**opportunity** - 171:22, 171:23
**opposed** - 29:24, 32:8, 33:6, 53:23, 61:10, 75:7, 88:25, 154:6, 175:2
**opposite** - 111:19
**opposition** - 127:6
**oral** - 150:3
**order** - 3:21, 13:2, 23:19, 66:3

**ordered** - 24:10, 64:5
**orders** - 128:2
**ordinances** - 127:22
**organization** - 19:6, 41:3, 41:7, 41:18, 48:16, 59:13, 112:9, 112:23, 114:25, 170:2, 170:19
**organization/ sheriff's** - 2:14
**organizational** - 44:1, 45:23, 49:1
**organized** - 42:19
**original** - 171:15
**Orterwerth** - 11:25
**Otherwise** - 17:7
**otherwise** - 28:4
**outhouse** - 13:15, 14:25
**outside** - 141:17, 147:1, 170:8, 170:10
**Overall** - 76:12
**overall** - 26:13, 48:25, 76:15
**overheads** - 138:18, 138:19
**overridden** - 137:10
**override** - 137:7
**oversees** - 17:23
**owe** - 94:14
**own** - 78:7, 78:12, 107:9, 123:14, 152:10, 171:12

## P

**page** - 69:17, 72:18, 74:8, 75:1, 77:2, 81:22, 82:16, 83:2, 84:12, 85:11, 89:13
**Page** - 2:2, 3:15, 3:18, 3:20, 69:19
**pages** - 23:4, 156:25
**paper** - 138:23
**paperclip** - 66:6
**paperwork** - 25:13, 139:1, 154:11
**paragraph** - 165:21, 166:20
**paraphrasing** - 114:3
**pardon** - 47:7
**parking** - 141:17
**part** - 22:23, 37:16, 61:8, 62:22, 63:24, 67:23, 68:13, 88:7, 92:20, 103:10, 104:2, 106:18, 122:5, 122:21, 123:4, 141:25, 168:7, 170:3
**partial** - 81:16
**participating** - 114:21
**particular** - 34:20, 45:9, 57:13, 60:12, 75:12, 80:19, 100:4, 108:4, 110:8, 113:18, 120:13, 128:1, 151:6
**particularly** - 110:9, 112:11, 116:1, 165:21
**particulars** - 121:22
**parties** - 177:16, 177:18
**party** - 141:16
**pass** - 138:15, 154:16, 160:14, 175:13

passed - 13:20, 163:23
past - 13:13, 65:17, 119:24, 126:21, 140:17, 159:22, 161:3
Pat - 126:8
Patrick - 82:17
patrol - 42:15, 42:19, 42:23, 43:6, 43:7, 44:13, 45:9, 79:7, 81:4, 81:8, 84:3, 84:20, 85:14, 85:19, 108:1, 110:13, 110:19, 111:23, 112:6, 112:7, 114:6, 115:13, 125:3, 128:13, 128:24, 168:23, 170:21, 172:9
Patrol - 25:5
patrols - 174:17
pay - 75:9, 75:11, 137:7, 152:21
payroll - 6:19
Pc - 5:2
Peace - 39:7
peace - 13:22, 39:11, 162:20
Peggy - 48:10, 48:11, 50:6
pending - 4:19, 104:14
people - 6:13, 17:14, 17:15, 18:5, 44:6, 60:12, 91:2, 92:13, 107:25, 110:3, 110:15, 111:9, 111:14, 125:10, 154:2, 160:12, 169:10, 172:19, 173:13, 174:21
perceive - 50:23, 126:18
percent - 52:4, 52:10, 129:8, 155:4
perception - 124:14, 139:8, 148:7, 169:14
performance - 33:6, 77:20, 112:21
performer - 113:5, 113:6
performers - 112:16, 112:18
performs - 77:23
perhaps - 29:19, 53:5, 54:5, 169:16
period - 10:2, 28:7, 53:12, 77:5, 78:16, 96:1, 152:9
periodic - 96:3, 96:8, 98:25
periodically - 44:19, 87:3, 121:7
permission - 41:25, 63:1, 123:17
permit - 77:18, 95:12
permits - 46:16, 154:5
perpetually - 105:15
person - 59:10, 77:23, 78:17, 102:14, 108:17, 110:5, 110:7, 110:24, 111:5, 115:10, 131:8, 135:4, 146:20, 154:13, 173:1, 175:10
person's - 81:15, 83:14, 153:23

person-to-person - 173:1
personal - 81:11, 105:7, 137:25, 138:1, 138:3
personally - 130:14
Personally - 50:14
personnel - 2:17, 8:3, 8:23, 10:13, 17:24, 18:3, 18:6, 18:19, 18:20, 18:22, 26:11, 26:15, 26:22, 33:18, 34:7, 34:8, 35:4, 45:6, 52:25, 56:2, 70:19, 80:4, 83:12, 85:19, 99:19, 112:6, 112:7, 124:24, 125:5, 152:5, 153:3, 156:23, 157:4, 159:12, 165:15, 166:9
pertain - 66:1
pertaining - 2:13, 66:8
Peters - 141:15
phenomenon - 133:18
philosophy - 105:13
phone - 28:9, 28:18, 29:4, 171:7, 172:10
phrase - 144:18
Phyllis - 83:15
physically - 137:22
pick - 45:1, 69:2, 114:4
picked - 70:6
pins - 110:24
pistol - 150:16, 150:17
place - 82:24, 114:8, 158:15
places - 76:19
placing - 143:21
plaintiff - 175:11
Plaintiff - 1:10, 1:17, 3:5, 4:5, 4:22, 5:3, 6:4, 177:17
Plaintiff's - 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 2:15, 2:16, 22:11, 40:20, 93:22, 94:1, 156:5, 174:24
pleased - 170:16
plus - 59:10
Po - 5:8
pockets - 174:15
point - 7:18, 44:2, 96:19, 98:10, 100:6, 101:3, 106:9, 106:10, 106:11, 118:9, 118:19, 143:24, 158:22
pointed - 75:3, 129:20
police - 12:21, 17:18, 39:24, 46:17, 56:14, 59:3, 60:9, 93:3, 93:10, 93:12, 93:13, 107:3, 109:24, 120:20, 121:5, 133:4, 136:8, 141:23, 142:5, 144:1, 161:25, 162:4
Police - 15:18, 16:7, 47:8, 54:7, 145:17
policies - 2:15, 2:18, 18:12, 18:17, 18:21, 19:4, 19:9, 64:1, 92:10, 121:5, 123:15, 156:13, 156:24, 165:17, 169:5

policing - 170:21, 172:1
policy - 2:9, 2:16, 2:18, 18:21, 19:5, 22:24, 33:13, 47:14, 64:8, 70:19, 91:16, 103:4, 103:6, 103:10, 105:16, 120:6, 120:12, 120:14, 121:25, 127:4, 127:16, 127:18, 134:18, 134:19, 135:10, 135:16, 156:14, 156:23, 165:11, 168:7
politic - 125:11, 125:12
political - 109:12, 123:24, 124:2, 124:4, 126:18
politics - 13:5, 107:8, 107:12, 107:14, 108:12, 109:6
polygraph - 175:11
poor - 85:2, 144:17, 154:22
pop - 125:14
popped - 153:6
population - 106:19, 106:20
populus - 170:11, 170:14
Portion - 2:9
portion - 128:7
pose - 150:6
position - 15:13, 15:14, 48:14, 49:8, 110:8, 111:2, 112:22
positive - 106:24, 136:11, 170:14
possible - 13:5, 61:4, 90:3, 90:6, 102:23, 103:24
possibly - 129:18, 147:3
Post - 39:5, 39:7, 39:16, 39:23, 130:11, 130:21, 130:24, 130:25, 131:2, 131:7, 133:5
post - 63:7, 63:14
posted - 128:6
potentially - 161:9
power - 19:19, 43:23, 44:16, 44:24, 45:8, 98:19, 115:2, 115:12, 125:15, 174:2, 174:12, 174:22
Power - 44:18, 174:7
practical - 165:23
practice - 18:16, 153:18, 167:1, 167:21
practices - 123:16
Prairie - 85:6, 85:8
pre - 37:22, 137:2
pre-disciplinary - 37:22, 137:2
preached - 120:19
preceded - 48:7
preceding - 63:9
Preceding - 73:8
precipitated - 9:20, 10:23
predecessor - 86:18, 87:10
predecessors - 87:2, 87:6, 126:17
predictor - 120:1
preface - 17:2

preference - 115:16
prepare - 46:17
prepared - 27:7, 66:15, 67:2, 88:6, 88:8, 88:9, 91:2
preponderance - 92:7
prescribes - 101:11
present - 21:1, 51:8, 51:12
pretty - 17:25, 47:15, 52:8, 59:24, 73:15, 73:17, 73:21, 87:13, 96:20, 112:5, 120:18, 125:4, 127:4, 135:2, 155:7, 162:7, 171:4
Pretty - 87:24
previous - 33:1, 94:11, 106:13
previously - 74:17
primarily - 109:25
prison - 152:19
prisoner - 131:18, 142:11
Prisoner - 48:19
proactive - 170:24, 170:25, 174:17
probable - 172:5
probation - 77:5, 77:8, 77:16, 77:18, 78:2
probationary - 77:20, 78:16
problem - 50:23, 113:13, 117:20, 135:18, 153:8, 154:7, 154:9, 167:25, 174:16
problems - 81:1, 171:25, 172:4, 174:16
procedures - 2:19, 33:1, 47:14, 156:25, 165:17
proceed - 73:11
proceeded - 73:11
process - 7:18, 11:21, 16:19, 17:4, 37:18, 37:19, 37:21, 46:5, 46:8, 95:13, 95:19, 98:5, 108:1, 108:21
processing - 159:23
produce - 22:22
produced - 4:11, 157:20, 175:19
production - 156:10, 157:9
professional - 46:23, 47:2, 47:4, 47:15, 47:17, 47:25, 48:4, 48:13, 49:4, 49:18, 50:21, 74:21, 98:17, 106:25, 166:9, 170:2, 170:18
program - 2:18, 18:20, 18:23, 47:3, 129:23, 153:14, 154:4, 156:23, 165:16
progressive - 37:13, 65:18, 68:16, 73:6, 79:18, 80:19, 165:11
prohibit - 102:11
promises - 124:25
Promises - 125:2
promote - 112:25, 172:11, 172:20
Promoted - 106:9, 106:10

promoted - 109:8, 139:11, 139:16
promotion - 56:20, 57:8, 139:13, 139:20
prompt - 116:9, 116:15, 119:7, 135:12, 169:4
prompted - 21:18, 169:21
prompts - 16:24, 87:7, 131:6
promulgated - 128:4
proof - 92:4, 92:6
proper - 25:3, 62:3, 93:1
property - 7:8, 163:8
proposition - 59:11
prosecute - 142:3
prosecuting - 163:23, 166:22
prosecution - 141:25
prosecutor - 175:5
protected - 8:9
protocol - 22:8, 23:8, 23:12, 23:16, 29:22, 31:12
provide - 72:8, 159:9
provided - 22:22, 72:6, 141:13, 141:24, 155:14, 156:4, 156:9, 157:8, 159:22, 165:13, 167:9
provides - 121:12
providing - 66:20
public - 54:12, 59:21, 60:8, 70:20, 169:17
publish - 54:7, 55:3, 55:5, 55:8
published - 54:12
pulled - 150:23
pulling - 169:17
punishment - 105:2
punitive - 104:23
purely - 77:10, 103:6
purpose - 3:14, 86:20, 105:9, 120:17, 137:24
purposes - 121:9
purse - 19:1
pursuant - 177:6
pursuit - 148:9
purview - 146:2
put - 13:11, 42:1, 90:4, 111:1, 115:6, 115:18, 125:10, 128:7, 128:18, 134:24, 147:18, 169:8
putting - 139:9, 144:9, 152:15, 153:17

## Q

qualification - 13:23, 39:24
qualifications - 13:18, 14:5, 14:25, 15:4, 15:8, 15:9
qualified - 13:3, 13:11, 13:15, 139:17
Qualified - 13:12
quarter - 69:17, 71:13, 72:19
questionable - 133:10

**Questions** - 3:15, 6:7, 8:14, 9:4, 22:13, 23:25, 24:8, 24:18, 27:1, 36:16, 40:22, 56:10, 63:5, 63:13, 64:13, 83:17, 93:18, 122:19, 123:10, 130:12, 132:22, 156:7, 158:21, 160:20, 164:10, 165:18, 167:20, 173:21, 173:25

**questions** - 87:8, 160:22, 161:5, 165:20, 173:23, 174:1

**Questions...............
..............3** - 2:3

**quick** - 160:25

**quickly** - 65:24

**quite** - 47:9, 160:24, 166:4

**quits** - 35:7

**quotation** - 157:24

**quote** - 160:3

# R

**radio** - 152:12, 154:14, 154:15, 168:7, 168:9, 168:11, 168:17, 169:9

**raised** - 123:22

**raises** - 143:23

**rally** - 108:10

**ran** - 50:24, 124:9, 126:14, 126:17, 126:25, 138:4

**range** - 74:7, 86:2

**rank** - 10:9, 10:13, 11:6, 11:9, 50:7, 109:4, 124:15, 125:5

**ranks** - 106:1

**rare** - 166:13, 168:8

**rate** - 52:2

**rather** - 154:3

**raw** - 104:17, 104:18, 105:3

**Ray**- 10:6, 14:21

**reached** - 101:3

**reaction** - 126:15

**read** - 20:11, 61:8, 111:7, 111:15, 111:16, 113:24, 116:25, 117:4, 128:10, 136:13, 157:25, 158:16, 158:20, 159:9, 174:3, 175:24

**reading** - 139:13, 139:15, 175:23, 176:5

**reads** - 128:9

**real** - 127:6, 128:15

**realized** - 37:14

**really** - 17:12, 78:16, 97:9, 112:10, 148:14, 154:15, 158:12, 166:4

**reason** - 75:24, 76:10, 77:13, 77:14, 81:7, 87:6, 105:12, 112:18, 133:13, 152:3

**reasonable** - 92:7

**reasons** - 13:13, 59:17, 77:14, 108:20

**receipt** - 2:17, 156:22

**receive** - 7:19, 21:12, 67:4, 97:1, 98:5, 98:25, 102:24

**received** - 70:1,

**74:11, 84:5, 101:4**

**receives** - 57:19

**recertification** - 16:18

**recognized** - 15:16, 15:20

**recollection** - 86:12, 135:7, 159:3

**recommend** - 19:22, 19:24, 20:3, 20:6

**recommendation** - 37:21, 66:23, 67:1, 95:21, 97:1, 97:4, 99:13, 99:18, 99:20, 101:15, 137:1, 142:23, 142:25

**recommended** - 67:8, 70:4, 96:20, 137:5

**recommending** - 36:24

**Record**- 2:10, 36:15, 63:4, 123:9, 173:20

**record** - 20:18, 24:22, 30:5, 30:23, 30:25, 53:4, 68:10, 68:13, 68:24, 69:12, 69:24, 83:19, 86:19, 86:21, 86:22, 87:21, 89:23, 91:6, 92:16, 93:24, 94:3, 94:24, 100:7, 102:17, 105:19, 107:9, 118:14, 118:16, 118:21, 122:5, 122:22, 123:5, 137:5, 146:1, 173:19, 177:14

**recorded** - 79:22, 120:23

**recorder** - 120:21

**recorders** - 129:15

**recording** - 130:4

**records** - 46:14, 46:16, 51:14, 52:15, 52:17, 52:21, 89:17, 94:2, 119:14, 157:15, 162:5

**Records**- 46:15

**redaction** - 71:15, 71:18

**Redirect**- 2:6, 167:19

**reduce** - 30:15, 31:3, 108:14

**reduced** - 30:11, 31:7, 31:12, 109:4, 177:12

**reelection** - 12:11, 126:25

**reemphasize** - 169:4

**reenforced** - 121:7

**refer** - 25:11, 25:17, 50:6, 164:15

**reference** - 37:12, 107:8, 153:20, 156:12

**referred** - 25:9, 25:13, 46:23, 151:12, 164:9, 164:12, 165:10

**referring** - 163:14

**refers** - 151:7

**reflect** - 23:12, 25:20, 26:14, 26:16, 68:18, 75:9, 75:10, 78:3, 78:9, 86:7, 87:18, 89:22, 90:18, 92:18, 105:3, 146:1

**reflected** - 26:2,

**26:7, 48:16, 68:5, 71:24, 72:2, 90:10, 90:11, 90:13**

**reflects** - 69:20, 72:3, 156:15

**refuse** - 8:23

**refused** - 16:18

**regard** - 3:21, 19:10, 23:20, 27:11, 39:18, 94:1, 173:1

**regarding** - 21:16, 55:24

**Regardless**- 105:9

**regional** - 85:20, 149:14

**registered** - 13:24

**regular** - 45:21, 45:24

**rein** - 174:5

**reinstated** - 39:1, 44:22

**related** - 33:6, 114:1, 140:13, 177:16

**relation** - 158:6

**relationship** - 16:24, 17:1, 17:19, 136:11, 151:16

**relative** - 56:17, 57:12, 177:17

**relatively** - 74:23, 105:2

**relevant** - 2:15, 8:22, 118:8, 145:15, 156:13

**remain** - 111:2

**remains** - 137:22

**remark** - 136:3

**remember** - 46:21, 65:9, 85:21, 135:5, 138:9, 141:21, 159:7, 159:17

**Remind**- 125:18

**reminder** - 169:7

**reminders** - 169:8

**remove** - 114:14, 114:22

**removed** - 111:22, 113:23, 114:4, 114:20, 115:1

**repeat** - 122:7, 132:19

**repeatedly** - 139:12

**repercussions** - 109:1

**rephrase** - 18:2, 19:21, 36:5, 53:17, 93:6

**replace** - 129:18

**report** - 39:5, 39:15, 46:17, 49:15, 50:1, 81:3, 90:18, 99:10, 99:25, 103:19, 133:5, 133:8, 133:11, 133:13, 133:22, 134:14, 134:20, 135:3, 135:11, 147:12, 153:9, 154:15, 155:1, 155:4, 172:9

**Reported**- 1:22

**reported** - 115:5, 130:10, 130:20, 130:24, 131:1, 131:7, 133:2, 134:2, 136:22, 142:4, 142:13, 151:21, 152:7

**reporter** - 3:10, 176:6

**Reporter**- 1:23, 4:18, 177:6

**reporter's** - 160:18

**reporting** - 18:7, 153:18, 154:6, 154:14, 155:8

**Reporting**- 5:14

**reports** - 46:18, 84:5, 96:3, 96:8, 102:6, 113:17, 120:3, 157:22

**represent** - 22:21, 66:4, 156:8

**Reprimand**- 64:22

**reprimand** - 65:5, 65:15, 65:17, 67:24, 68:14, 68:15, 68:21, 68:23, 70:2, 70:4, 75:6, 75:8, 76:1, 76:4, 76:6, 139:7

**reprimands** - 105:1

**reputation** - 169:22, 170:7, 170:18

**request** - 22:22, 27:7, 35:20, 35:23, 36:8, 88:10, 156:10, 157:9

**requested** - 91:1, 115:21, 115:22, 115:23

**requests** - 157:4

**require** - 67:14, 87:5, 100:19, 100:21, 121:5, 123:16, 165:24

**required** - 31:6, 39:5, 39:15, 134:20, 152:21, 155:6

**requirement** - 13:25, 30:18

**research** - 156:16

**reserve** - 175:19

**residence** - 84:6, 84:19

**resign** - 20:20, 21:3, 21:9, 38:25

**resignation** - 38:23

**resigned** - 9:25, 10:1, 11:2, 11:5, 11:7, 20:10, 21:12, 37:6, 71:3, 71:5, 71:6, 71:7, 71:9, 78:17

**resigning** - 147:9

**resolved** - 29:4

**resources** - 17:23, 18:2, 20:2

**respect** - 25:1, 56:17, 119:15

**respected** - 169:16, 170:4

**respectfully** - 175:17

**respects** - 78:19

**respond** - 22:15, 93:7, 153:14

**responder** - 146:4

**response** - 22:22, 27:7, 87:7, 88:8, 88:9, 93:6, 103:11, 116:8, 120:16, 156:9

**responses** - 170:13

**responsibilities** - 40:12, 41:1, 41:18, 59:21, 59:22

**responsible** - 18:12, 40:14, 60:9, 174:18, 174:20

**responsive** - 88:12, 157:4

**rest** - 113:20, 153:22

**result** - 7:17, 26:4, 26:9, 27:20, 29:15,

**65:20, 72:3, 98:1, 102:5, 103:13, 118:11, 118:22, 120:5, 121:24, 129:24, 141:1, 142:16, 152:18, 161:18, 162:2**

**resulted** - 53:11, 80:23, 86:19, 103:22, 142:17, 147:9, 161:20

**results** - 25:24, 25:25, 29:18, 95:4, 119:6

**retained** - 2:8, 37:25

**retire** - 50:16, 50:19

**retirement** - 141:16

**retires** - 35:6

**retiring** - 141:15

**returned** - 7:2, 177:14

**reveals** - 95:6

**review** - 29:8, 37:20, 37:22, 38:12, 42:3, 97:22, 137:2, 160:25

**reviewed** - 28:22

**reviews** - 100:6

**Richard**- 72:20, 84:14, 84:16

**rifles** - 85:14, 85:20, 85:21

**rights** - 8:13, 116:2, 123:22

**Riley**- 126:8, 126:11

**ring** - 143:3, 171:7, 172:10

**rise** - 7:11, 140:24

**risk** - 60:1, 60:3

**river** - 172:2

**road** - 97:13, 140:14

**roadside** - 143:20, 173:10

**Rob**- 83:22

**robbery** - 171:20

**Robert**- 14:13

**Roberts**- 82:17

**rogue** - 158:3

**role** - 36:21, 36:24, 63:6, 63:20, 100:23, 101:1

**roles** - 174:13

**roll** - 128:10, 169:6

**room** - 146:20

**rough** - 133:21

**roughly** - 29:2, 86:23

**round** - 150:17, 150:21

**route** - 73:12

**routine** - 88:7, 153:18, 159:21

**routinely** - 30:24

**rule** - 121:8

**rules** - 62:5, 62:13

**ruling** - 175:20

**rumor** - 143:25, 146:16, 147:4, 147:17, 147:22, 148:4, 148:8, 148:13, 148:14, 148:19

**run** - 10:7, 12:17, 100:9, 125:18, 138:8, 173:10

**running** - 123:12, 124:1, 136:6

**Runyon**- 10:6, 10:19, 14:21

**Ryals**- 5:2, 6:7, 8:11, 8:14, 9:1, 9:4, 22:13, 23:25, 24:8,

24:15, 24:18, 27:1, 36:16, 40:19, 40:22, 56:7, 56:10, 63:5, 63:13, 64:13, 83:17, 93:18, 122:13, 122:16, 122:19, 123:10, 130:12, 132:22, 156:3, 156:7, 158:21, 160:23, 166:3, 167:20, 173:21, 174:2, 175:3, 175:17
**Ryals**..............6- 2:5
**Ryals**......**167**- 2:6
**Ryan**- 131:23, 143:5

# S

**Sad** - 152:1, 152:17, 152:21
**sad** - 152:13
**safety** - 121:9, 168:6
**Salem** - 138:11
**Salters** - 14:23, 109:8, 109:10, 126:10
**Sam** - 171:25
**sandals** - 153:20, 153:23
**Sarah** - 82:9, 82:10
**satisfied** - 168:2, 168:4
**saved** - 160:24
**saw** - 133:8
**scales** - 91:22, 92:5
**scene** - 159:23
**schedule** - 115:6
**scheduled** - 20:25
**school** - 10:1
**schools** - 16:6
**Schruder** - 71:13
**screwed** - 108:18
**scroll** - 75:18
**Sean** - 122:9
**search** - 133:10, 134:3
**seat** - 79:7
**Second** - 84:12, 87:15
**second** - 45:14, 72:18, 74:24, 75:1, 77:2, 84:8, 115:18, 125:25, 126:7, 126:22, 174:10
**seconds** - 151:3
**secret** - 146:15
**secrets** - 148:17
**section** - 47:19, 52:25
**sections** - 44:15
**see** - 20:13, 21:4, 27:11, 36:7, 41:18, 44:6, 64:18, 64:23, 69:18, 73:18, 76:4, 76:16, 76:18, 78:9, 80:11, 82:7, 89:11, 95:17, 96:17, 104:18, 104:25, 105:12, 115:6, 116:17, 121:8, 133:7, 140:19, 143:23, 144:23, 155:9, 157:25, 158:16
**seeing** - 82:2
**seek** - 35:12, 35:16
**seized** - 81:18
**self** - 170:24
**send** - 39:22, 128:12, 160:6
**senior** - 66:20
**sense** - 93:9,

120:15, 135:17, 136:4
**sent** - 116:22
**sentenced** - 7:4
**separate** - 54:1, 55:23, 167:6
**Separate** - 87:8
**separates** - 39:14
**separation** - 50:12, 114:12
**separations** - 52:11
**September** - 9:13, 106:8
**sergeant** - 25:13, 29:19, 44:4, 106:9, 106:10, 112:24, 124:9
**Sergeant** - 136:16, 138:4, 138:17, 139:11, 139:16, 150:20
**sergeants** - 25:6, 34:9
**series** - 66:7
**serious** - 29:5, 65:14, 67:13, 75:5, 118:2, 128:16, 135:2, 135:21, 138:25, 154:21, 162:13, 165:6
**seriously** - 85:23, 129:17
**serve** - 14:7, 46:8, 60:13
**served** - 10:18, 12:8, 14:9
**service** - 171:1, 172:17, 174:18
**services** - 47:20, 49:22, 159:22
**serving** - 50:24
**session** - 84:3
**set** - 18:16, 45:2, 45:22, 92:9, 114:21
**settled** - 119:13
**Seven** - 130:18
**seven** - 88:15
**several** - 13:13, 32:5, 56:22, 58:10, 59:17, 65:21, 79:22, 80:5, 107:17, 108:6, 127:9, 129:24, 151:5, 151:7, 153:24, 161:3, 164:18, 165:10
**Several** - 73:2
**severe** - 37:25
**severely** - 137:9
**Severely** - 145:8
**severity** - 105:10
**sexual** - 92:23, 93:3, 93:13, 93:16, 93:20, 175:3
**shall** - 45:6, 165:22, 166:22, 169:5
**share** - 102:18
**sheet** - 55:16, 115:15
**sheets** - 152:16
**Sheriff** - 1:17, 3:13, 4:11, 6:1, 6:18, 10:15, 11:7, 22:14, 48:13, 82:16, 85:11, 102:1, 122:17, 123:11, 123:25, 124:8, 130:8, 141:11, 151:4, 156:8, 158:11, 160:14, 160:21, 173:22, 174:1, 177:9
**sheriff** - 6:10, 9:8, 9:12, 9:14, 9:21, 9:22, 10:24, 13:18, 13:21, 15:4, 15:9, 16:20, 17:3, 17:7, 17:10,

17:12, 18:8, 18:12, 22:6, 25:12, 30:2, 30:19, 31:21, 32:15, 32:18, 33:1, 33:2, 33:14, 34:17, 36:6, 37:17, 41:8, 41:11, 48:5, 48:18, 49:5, 49:6, 49:7, 50:13, 50:18, 51:21, 51:24, 64:3, 66:22, 70:21, 86:9, 86:23, 87:12, 87:22, 94:3, 94:15, 94:23, 99:9, 105:23, 106:12, 107:10, 107:16, 108:18, 108:22, 108:24, 109:20, 110:2, 110:5, 114:22, 122:17, 122:24, 123:13, 124:9, 125:4, 125:13, 127:1, 128:17, 134:23, 139:2, 140:5, 149:4, 165:22, 175:20
**sheriff's** - 2:18, 12:20, 16:25, 17:3, 17:17, 18:13, 18:17, 19:7, 22:2, 22:24, 23:8, 25:18, 37:2, 38:7, 41:3, 64:6, 64:7, 73:25, 106:2, 107:3, 107:18, 107:19, 108:6, 124:6, 130:9, 156:24, 165:17
**Sheriff's** - 7:14, 16:13, 39:4, 51:2, 106:15, 158:4, 169:15, 169:23
**sheriffs** - 9:18, 13:14, 13:15, 14:7, 14:11, 17:13, 32:25, 94:11, 94:20
**Sherrill** - 121:18, 122:10
**shift** - 43:8, 43:10, 43:13, 43:14, 43:16, 43:20, 43:23, 44:4, 44:17, 44:18, 44:19, 44:24, 44:25, 45:5, 45:7, 45:8, 45:13, 45:14, 66:18, 114:5, 115:2, 115:6, 115:8, 115:11, 115:12, 115:14, 115:15, 115:17, 115:23, 115:24, 137:19, 147:10, 148:10, 151:20, 151:25, 152:5, 153:5, 154:11, 155:7, 174:2, 174:7, 174:8, 174:9, 174:10, 174:12, 174:15, 174:22
**shifts** - 42:20, 43:2, 44:24, 45:21, 45:24
**shocked** - 158:12
**shoes** - 153:17
**short** - 51:13
**Shorthand** - 4:18, 177:5
**shortly** - 48:24, 50:17, 169:7
**shot** - 150:15, 150:18
**shotgun** - 143:5, 143:14, 143:19, 143:21
**shoved** - 141:19, 141:20
**show** - 158:7
**Showed** - 85:2

**showing** - 22:16
**shows** - 169:20
**sick** - 81:3
**side** - 42:22, 43:6, 97:13, 172:2
**sign** - 115:14
**Signature** - 176:7
**signature** - 177:13
**signed** - 2:17, 156:21
**significant** - 93:25
**significantly** - 106:15, 106:17
**signing** - 153:16
**signs** - 125:16
**signup** - 115:15
**silence** - 133:20, 133:21
**Simcox** - 11:17, 32:13, 42:12
**similar** - 55:12, 86:5, 93:21
**similarly** - 35:16, 123:20
**simply** - 78:18
**Single** - 54:3, 145:6
**single** - 27:23, 55:2, 56:5, 65:20, 108:21, 110:24, 128:8, 155:12, 155:13
**siren** - 138:20
**sirens** - 138:18
**sit** - 108:7, 155:18, 173:8
**sitting** - 73:4, 110:24
**situation** - 31:23, 32:1, 35:2, 58:8, 60:12, 68:1, 79:15, 131:11, 157:24, 160:11
**situations** - 159:19, 159:25
**six** - 4:14, 13:14, 14:9, 14:11, 15:13, 88:15, 125:22, 126:12
**slash** - 175:1
**sleeping** - 69:3
**small** - 114:23, 148:16
**snap** - 110:18
**so-called** - 14:4
**social** - 172:17
**society** - 108:14
**sock** - 74:15
**sole** - 33:14
**solely** - 18:12
**someone** - 23:15, 29:1, 36:8, 97:15, 98:20, 105:15, 110:19, 111:21, 133:11, 146:6, 146:12, 147:1, 147:3, 148:9, 148:23, 156:16, 167:12, 174:12
**someplace** - 90:4, 153:19
**Sometimes** - 30:12
**sometimes** - 30:12, 78:7
**somewhere** - 44:22, 64:11, 92:10, 118:15, 131:13, 138:11
**son** - 29:1
**soon** - 165:23
**Sorry** - 85:10
**sorry** - 48:20, 50:6, 52:22, 53:2, 65:8, 66:5, 76:17, 94:16,

161:17
**sort** - 31:24, 32:1, 39:22, 53:4, 86:17, 99:13, 111:8, 139:12, 147:16, 147:17, 156:25, 170:23, 170:25
**sounds** - 52:8, 129:3
**sources** - 127:9
**Southern** - 15:18, 16:7
**speaks** - 156:25
**special** - 41:23, 42:4, 48:22, 48:23, 115:12, 128:2
**specialized** - 56:20, 112:20
**Specific** - 119:21
**specific** - 31:9, 45:12, 45:16, 56:1, 57:17, 85:22, 85:24, 100:3, 120:11, 127:25, 135:5, 136:14, 164:16, 165:20
**specifically** - 54:25, 81:2
**specifics** - 118:1, 150:2
**speculate** - 82:5, 82:22
**speculating** - 79:21
**speed** - 164:25
**speeding** - 164:24
**spell** - 110:20
**spend** - 18:1
**spot** - 35:12, 172:1
**spots** - 160:18, 172:1
**spottings** - 171:23
**spread** - 147:16
**spreadsheet** - 27:15, 54:17, 55:12, 90:19
**squad** - 56:25
**Ss** - 177:3
**St** - 1:12, 2:17, 3:7, 3:11, 3:12, 3:13, 4:7, 4:15, 5:4, 5:11, 5:12, 5:15, 6:10, 6:13, 6:19, 7:13, 7:19, 13:3, 15:5, 16:13, 16:25, 34:18, 38:2, 39:3, 51:2, 54:6, 84:3, 106:2, 106:14, 130:8, 135:23, 141:15, 156:22, 158:4, 163:23, 164:25, 169:14, 169:23, 177:4, 177:6, 177:7, 177:8
**staff** - 60:20, 79:24, 99:21, 100:24, 101:5, 101:16, 145:18, 154:24
**Staff** - 15:18
**staffed** - 51:10, 51:19, 51:23
**stalking** - 143:10
**stand** - 12:1, 12:10, 107:9
**standard** - 47:17, 92:4, 92:6, 92:9, 92:12
**Standards** - 39:8
**standards** - 46:23, 47:2, 47:4, 47:16, 48:1, 48:4, 48:13, 49:5, 49:18, 98:17, 111:23, 166:10

**standpoint** - 93:11
**stapled** - 66:10
**Start** - 14:8
**start** - 106:7
**started** - 44:20, 87:22, 107:6
**starters** - 15:22
**starting** - 86:10
**starts** - 93:24, 97:10
**state** - 13:22, 39:10, 39:12, 127:14
**State** - 3:11, 4:16, 4:18, 6:8, 177:3, 177:6
**statement** - 13:9, 127:11, 159:25, 166:23, 167:14
**statements** - 157:22, 166:21
**States** - 1:5, 3:1, 4:1, 4:20
**station** - 154:6, 154:10
**statistics** - 53:25, 54:8, 54:15
**status** - 140:19
**stay** - 20:15, 149:19, 168:11, 172:21
**stayed** - 108:21, 113:7, 113:19
**staying** - 125:16, 151:21, 152:3, 152:12, 153:3, 172:20
**steady** - 87:13
**steal** - 103:16
**Stealing** - 162:2
**stealing** - 103:15, 161:25, 163:6, 163:8, 163:14, 163:17, 163:18, 171:19
**steer** - 148:23, 149:8, 149:25
**step** - 29:11, 68:16, 89:18
**stepping** - 134:11
**steps** - 96:14, 109:21, 109:24, 109:25, 110:1
**steroids** - 148:14
**Steve** - 5:2, 11:24
**still** - 17:22, 34:10, 37:1, 50:9, 53:22, 78:9, 97:8, 102:24, 112:6, 123:4, 137:14, 153:17, 155:19, 174:18, 174:19
**stop** - 95:13, 95:22, 109:21, 121:2, 121:6, 147:25, 168:10, 168:13, 173:14
**stops** - 167:15, 167:22, 172:5
**story** - 153:22
**Streck** - 131:23, 143:5, 143:13, 144:5
**Streck's** - 144:4
**Street** - 3:13, 4:16, 5:3, 5:11, 177:7
**street** - 136:5, 136:9, 151:24
**strength** - 35:3, 51:1, 51:7, 51:9
**strike** - 25:2, 26:4, 52:15, 55:6, 60:1, 60:24, 71:25, 104:10
**stringent** - 137:4
**strings** - 18:6, 19:1
**stripes** - 137:12
**strong** - 112:12

**stuff** - 117:23, 154:18
**style** - 86:25, 104:22, 105:4, 105:10, 170:23
**styles** - 170:20
**subheading** - 43:2
**subject** - 3:18, 8:20, 142:2, 150:16, 150:22, 169:19
**Subject** - 63:9
**subject's** - 169:20
**subjective** - 164:22
**subjects** - 142:1, 173:2
**submit** - 30:16, 66:19, 96:4
**submits** - 99:9
**submitted** - 136:25
**subordinate** - 69:1
**subordinates** - 87:4
**subscribed** - 3:23, 177:19
**subsequent** - 57:17
**substance** - 38:19, 95:2
**successfully** - 77:4, 78:2
**sued** - 116:1, 121:17
**suffered** - 108:23, 109:1
**suggest** - 61:22
**suggested** - 175:3
**suggesting** - 146:14
**suicide** - 150:24
**suit** - 118:9, 118:11, 121:21, 121:24, 122:4
**Suite** - 3:13, 4:16, 5:11, 5:15, 177:7
**suited** - 111:4, 112:21
**summary** - 96:5, 161:3
**Sunshine** - 8:10, 8:12
**superior** - 10:14, 11:9
**supervised** - 44:5
**supervising** - 152:5
**supervision** - 154:25
**supervisor** - 2:11, 21:22, 21:23, 28:23, 29:2, 30:14, 66:18, 67:4, 67:19, 68:12, 69:1, 69:5, 69:14, 70:3, 70:8, 73:3, 75:23, 84:18, 110:10, 124:12, 133:11, 133:17, 134:21, 134:24, 135:4, 135:22, 136:6, 136:24, 137:19, 147:10, 154:9, 154:13, 154:16, 164:24
**supervisors** - 31:3, 77:19, 87:1, 87:2, 87:17, 151:13, 151:24, 152:15, 152:20, 152:16, 171:11, 174:22
**supervisory** - 28:24, 65:2, 66:18, 148:4, 152:2, 154:7, 154:11, 154:23
**Supervisory** - 66:14
**support** - 108:3,

108:17, 108:24, 108:25
**supported** - 110:9, 110:11
**supporting** - 107:23, 107:24
**suppose** - 95:7, 121:8, 124:18
**supposed** - 73:5, 84:19, 108:8, 152:4, 152:5, 163:13
**supposedly** - 110:12
**surprise** - 119:19, 119:22
**surprises** - 119:20
**surveillance** - 152:10
**survive** - 136:8
**suspect** - 166:21
**suspects** - 154:13
**suspended** - 8:18, 153:11
**Suspended** - 101:25
**suspension** - 75:9, 75:11, 76:2, 76:4, 76:5, 137:6, 142:17, 142:20, 142:21
**suspensions** - 3:16, 8:1
**sustain** - 58:13, 58:16, 100:20
**Sustained** - 91:9
**sustained** - 53:8, 53:11, 53:21, 54:9, 54:22, 55:14, 57:1, 57:3, 57:11, 57:18, 57:20, 57:22, 58:1, 58:4, 58:6, 58:10, 88:21, 89:1, 89:9, 91:22, 92:5, 96:22, 96:24, 100:15, 101:21, 102:4, 102:14, 102:22, 102:23, 103:1, 103:13, 103:21, 119:2, 161:6, 161:8, 161:11, 161:16
**sustaining** - 53:16
**Swat** - 85:20, 85:25, 111:13, 111:20, 111:22, 150:15, 159:23, 160:7
**swear** - 155:18
**swell** - 127:6
**Swope** - 11:1, 11:7, 14:23, 15:1, 48:14, 124:1, 124:8, 124:24
**Sworn** - 97:20
**sworn** - 4:12, 6:2, 25:15, 25:22, 26:17, 35:4, 39:2, 39:14, 44:7, 46:10, 51:2, 51:4, 51:16, 51:19, 52:2, 60:18, 77:7, 82:11, 153:3, 158:14, 177:10
**Synopsis** - 2:11
**synopsis** - 69:14
**system** - 13:6, 61:1, 61:13, 61:18, 61:24, 84:21, 125:2, 158:13

## T

**table** - 41:3, 41:7, 41:17, 48:15, 48:16
**Table-** 2:14
**take-home** - 153:14
**taser** - 75:4, 143:2

**task** - 149:15
**Tasmanian** - 74:19
**teach** - 99:17, 99:18
**teaches** - 99:16
**team** - 85:20, 85:25, 111:13, 111:20, 111:22
**technology** - 129:13
**Temple** - 5:10, 8:8, 8:25, 23:22, 24:4, 26:20, 26:23, 37:19, 56:9, 63:8, 64:12, 83:16, 93:15, 122:11, 122:14, 122:17, 123:7, 130:11, 132:18, 158:17, 164:6, 165:14, 173:25, 175:15, 175:24, 176:4
**Temple............173-** 2:7
**Temple......8-** 2:8
**temporal** - 104:6
**ten** - 29:3, 139:19
**tenure** - 40:1, 51:21, 86:6, 123:2, 130:8
**tenures** - 9:17
**term** - 25:15, 31:8, 31:9, 31:11, 43:24, 100:10, 104:21, 111:24, 125:13, 152:11
**terminable** - 162:21
**terminal** - 47:3, 73:4, 84:21, 128:8, 128:11, 128:23, 129:1
**terminals** - 47:9
**terminate** - 19:14, 19:19, 19:21, 19:23, 35:16, 35:24, 36:8, 36:22, 37:9, 37:18, 37:21, 39:20
**Terminated-** 80:25
**terminated** - 20:4, 20:7, 20:9, 21:13, 71:2, 72:24, 77:13, 79:19, 80:7, 80:17, 80:24, 83:24, 84:6, 84:16, 102:15, 131:2, 131:9, 137:8, 153:12
**termination** - 19:22, 21:1, 38:13, 65:20, 70:5, 77:5, 78:1, 78:10, 79:3, 80:11, 81:8, 82:8, 102:5, 137:1, 137:3, 161:9, 161:13, 161:18, 161:21, 162:1, 162:3, 162:6, 162:11, 162:15, 162:17, 163:19
**terminations** - 65:19, 76:25, 77:1, 78:15, 78:22, 86:10
**terminology** - 164:17
**terms** - 18:7, 87:20, 91:12, 95:1, 100:25, 160:3
**test** - 88:24, 139:12
**tested** - 139:18
**testified** - 43:23, 78:24, 83:18, 126:15, 131:17, 138:5, 140:7, 143:24, 145:10, 146:11, 169:13
**testify** - 27:22, 177:10
**testimony** - 20:11,

57:2, 61:9, 72:1, 106:13, 111:7, 136:13, 143:11, 143:16, 143:23, 144:21, 148:21, 150:8, 153:7, 155:24, 170:22, 177:14
**tests** - 175:11
**themselves** - 107:25, 108:2, 108:3
**theory** - 77:15
**Therefore-** 75:6
**thereupon** - 177:12
**they've** - 54:11
**thin** - 147:2, 147:3
**thinking** - 117:3, 133:8
**Third-** 3:13, 4:16, 5:11, 69:7, 82:16, 82:17, 177:7
**third** - 45:14, 83:2, 85:10, 115:19, 129:25, 148:10, 174:10
**Thom-** 131:18, 142:6, 142:7, 142:8, 142:9
**Thomas-** 6:9
**thoughts** - 131:12
**thousands** - 110:17
**threatening** - 159:19, 159:24, 160:11
**three** - 10:3, 23:4, 34:9, 42:19, 43:2, 44:5, 44:24, 52:4, 52:10, 59:7, 69:4, 107:7, 110:16, 138:14, 141:18, 153:12
**throughout** - 25:14, 106:21, 128:6
**tied** - 174:19
**Tiefenbrun-** 166:18
**Tim-** 11:1, 14:23, 124:24
**Tina-** 1:22, 3:10, 3:24, 4:17, 5:14, 177:5, 177:22
**tip** - 92:4
**tipped** - 91:23
**tired** - 152:6
**title** - 25:3, 88:3
**today** - 7:23, 102:17, 108:14
**today's** - 90:22
**Todd-** 11:18, 32:12, 32:22, 41:21, 42:1, 42:5
**together** - 108:9
**Tom-** 1:17, 3:13, 4:11, 6:1, 150:20, 150:21, 177:9
**tongue** - 138:25
**took** - 21:23, 48:20, 48:23, 49:2, 88:20, 109:25, 110:5, 114:8, 137:2, 150:22, 176:1
**tools** - 172:24
**top** - 71:12, 74:25, 80:2
**total** - 51:1, 63:22, 126:12
**totally** - 58:24, 61:20, 62:15, 108:4
**Totally-** 150:1
**touching** - 177:11
**towards** - 21:7, 164:24
**town** - 166:19

track - 39:10, 53:1, 115:25
tracked - 116:4
tracking - 168:22
tractor - 173:11
tractor-trailer - 173:11
traditionally - 32:5, 107:17
traffic - 121:2, 121:6, 138:15, 147:24, 168:9, 168:18, 172:5, 173:7, 173:9
Traffic- 162:21
traffic's - 168:8
trailer - 172:17, 173:11
train - 75:15
trained - 170:3
Training- 39:8
training - 14:1, 14:2, 16:6, 59:1, 84:2, 99:16, 110:17, 138:10, 166:15
transcript - 175:25
Transcript................
.....177 - 2:19
transgression - 74:23
transgressions - 67:22
transport - 48:19, 152:20
travel - 148:2
traveled - 148:1
treat - 98:10
treated - 28:19, 29:23, 30:1, 61:10, 151:14
trespassing - 162:20
trick - 62:20
tried - 6:25, 7:6, 106:25, 112:19
Tried- 13:4
trigger - 143:22, 144:6, 150:23
troops - 135:15, 148:5
trouble - 114:5, 151:18, 172:22
troubles - 144:22
troublesome - 113:17
true - 29:16, 31:14, 61:16, 61:23, 61:25, 62:21, 62:25, 91:12, 144:13, 177:13
trust - 60:6, 60:7, 60:8, 60:12, 114:19, 176:6
truth - 6:3, 62:11, 91:15, 177:10
truthful - 153:9
try - 13:2, 45:2, 99:19, 102:20, 108:5, 109:20, 112:11, 112:14, 127:2, 127:3, 134:16, 135:12, 171:16, 171:18, 173:9
trying - 48:12, 61:21, 62:20, 65:9, 68:2, 84:18, 112:8, 117:17, 169:21, 172:6
turmoil - 109:13, 109:15, 123:24, 124:2, 124:4, 126:19
turned - 138:19, 158:14

turnover - 52:2
twice - 6:17, 125:18, 128:21
two - 14:24, 17:4, 34:9, 44:4, 51:13, 59:19, 74:8, 76:2, 87:7, 89:11, 89:15, 89:19, 99:16, 109:9, 125:13, 138:14, 141:18, 153:14, 155:22, 156:3, 164:12, 165:21, 170:20
Two- 13:14, 39:1
two-day - 76:2
two-term - 125:13
type - 64:16, 69:20
types - 27:13, 67:21, 87:20, 123:15
typically - 147:16, 147:18
typo - 75:22

## U

Ucr - 46:17
Uebinger - 9:24, 10:18, 14:19, 16:22
ultimate - 107:5
Ultimately - 96:25, 100:13
ultimately - 11:22, 77:22
unable - 58:16
unanimity - 100:19
unauthorized - 74:12
unavailable - 166:19
unbecoming - 75:3, 84:9, 164:19, 164:21, 165:5
unclear - 15:7
uncomfortable - 50:25
under - 6:22, 8:9, 10:18, 13:6, 14:4, 14:7, 14:9, 31:24, 38:3, 41:19, 43:1, 43:9, 46:4, 47:4, 47:19, 48:20, 48:22, 69:20, 70:23, 71:4, 77:7, 81:14, 81:15, 92:13, 122:24, 123:2, 136:12, 137:4, 159:11, 161:23, 177:12
Under - 42:14, 43:6, 44:3, 117:8
underestimated - 125:15
understood - 24:5, 27:22
underwear - 153:21
unequal - 62:5, 62:13
unfounded - 54:10, 58:15, 102:23, 103:1, 103:13, 103:16, 161:8
Unfounded - 91:19
Uniform - 82:19
uniform - 74:21
unit - 48:20, 56:21, 113:23, 113:24, 114:4, 114:12, 114:13, 114:17, 114:20, 148:23, 148:24, 149:9, 149:18
United - 1:5, 3:1, 4:1, 4:20

units - 19:6, 112:20
unless - 56:1, 153:24, 161:18
unmarked - 154:16
unsustained - 55:1, 58:6, 58:14
unsustains - 58:17
up - 13:17, 14:3, 30:19, 45:1, 45:2, 47:10, 49:17, 54:11, 66:19, 69:2, 69:17, 69:19, 70:6, 71:12, 72:20, 77:23, 78:19, 79:17, 96:12, 106:1, 107:16, 110:4, 114:21, 115:14, 125:14, 143:17, 153:6, 161:1, 162:14, 167:13, 167:14, 169:6, 169:17, 169:20, 171:9, 171:11, 171:18, 171:22, 172:11, 172:23, 174:19, 174:20, 176:2
updates - 2:18, 98:25, 156:24
upheld - 37:22
uphold - 158:14
upset - 140:14
usage - 89:1, 89:9, 89:24, 161:17, 162:9
uses - 148:9
usual - 167:1
utilize - 56:15
utilized - 67:19

## V

vacancy - 17:2
vacant - 35:10
vacated - 9:22, 10:24
value - 57:12, 57:14
varies - 43:9
various - 19:6, 64:23
vary - 43:19, 43:20
vehicle - 73:25, 80:20, 80:21, 138:13, 143:20, 145:6, 168:10, 168:11, 172:5
vehicles - 168:23
vehicular - 73:19
veracity - 76:10
verbal - 105:18, 139:7
verbally - 74:17
verbiage - 60:14
verdict - 7:2, 119:7
verified - 27:21
versa - 118:17
versus - 64:5
vertical - 64:15
vial - 81:14
vice - 118:17
view - 129:19
views - 100:25
vignette - 101:2
Village - 5:15
violate - 63:25
violated - 135:2
violates - 105:15
violation - 65:3, 65:15, 91:13, 91:16, 105:6, 105:11, 105:17, 111:21, 116:1, 133:10, 133:14, 134:21, 135:3, 135:11,

162:22, 173:7, 173:10
violations - 2:16, 67:9, 68:16, 73:2, 96:21, 103:3, 103:4, 104:1, 133:15, 134:20, 156:14, 161:19, 172:5
violator - 173:8
violence - 92:24
virtually - 155:3
visibly - 140:14
voice - 128:12, 128:18
Voice - 128:19
volition - 78:8, 78:13
voluntary - 52:11
vote - 100:10
voter - 13:24
voters - 18:9
votes - 108:3
vs - 1:11, 3:6, 4:6

## W

wait - 171:7, 172:7
waiting - 171:10, 172:9
waive - 175:25, 176:5, 177:13
Waived - 176:7
Walker - 72:20, 72:22, 73:7, 84:14, 84:16
walkie - 151:22
wall - 133:20
walls - 147:2
Walters - 82:8, 82:10
warned - 74:16
Warner - 75:18, 76:1
warning - 166:24, 167:3
warrant - 161:25
warrants - 98:7, 98:13, 105:17
Warren - 138:12, 159:10, 159:20
watch - 56:8, 106:24, 123:3, 123:4, 136:19, 139:21, 145:1, 145:20
ways - 99:17
wayside - 112:5
weak - 112:13
weapon - 85:23, 144:9
wear - 74:17
wearing - 74:11
week - 153:15
weeks - 152:9
weighed - 57:7
Welker- 11:16
wellbeing - 172:15
Wentzville- 145:17
Wes- 11:17
whatsoever - 63:20, 141:5, 143:4
Wheelan- 77:2
Whereof- 3:22, 177:19
whichever - 115:11
whip - 86:14
white - 159:2
whole - 6:3, 62:7, 76:15, 104:23, 112:23, 131:11, 158:20
wholesale - 110:14
wide - 128:20

wife - 48:8, 49:4, 50:24, 75:4, 138:2, 144:22
Williams - 83:22
win - 108:19, 173:11
wind - 14:3
winter - 172:13
wise - 98:11
wish - 151:2
withdraw - 101:8
withdrawal - 95:12
withdrawn - 95:9
withhold - 160:12, 175:18
Witness - 3:22, 24:6, 26:21, 26:24, 56:12, 63:11, 93:16, 122:18, 132:20, 158:19, 164:5, 164:8, 167:18, 176:3, 176:5, 177:19
witness - 134:11, 135:20, 177:11, 177:13, 177:14
witnessed - 151:1
woman - 143:10
won - 12:6
wonder - 122:18
wondering - 123:25
word - 123:25, 124:2, 169:15, 169:16
words - 58:6, 81:17, 158:12, 159:4, 159:17
workforce - 45:3
workload - 45:3
worry - 108:16
Worst- 124:6
worst - 124:22
worth - 110:17
wreck - 145:19, 145:20
Wright - 138:12
write - 173:7
writing - 28:18, 30:11, 30:15, 31:3, 31:6, 31:7, 31:13, 164:23, 173:6, 177:12
Written - 68:15
written - 23:15, 28:8, 29:22, 68:9, 68:14, 68:18, 68:21, 68:23, 105:19

## Y

year - 12:4, 13:17, 24:24, 36:12, 54:7, 77:9, 77:10, 77:16, 77:18, 78:8, 86:3, 107:20, 107:21, 129:10
years - 9:9, 14:4, 15:11, 27:10, 32:5, 44:21, 50:16, 52:9, 80:8, 88:15, 88:16, 106:16, 107:16, 108:16, 109:6, 109:19, 110:16, 111:25, 127:2, 129:24, 130:18, 134:7, 134:22, 139:19, 147:13, 155:20, 161:3, 172:2
young - 79:6, 79:7
yourself - 56:14

## Z

zone - 73:5, 113:18,

155:6, 174:19
  **zones** - 45:12,
174:9