1
                IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF MISSOURI
2                        EASTERN DIVISION

3

4   D.B.,                          )
                                   )
5           Plaintiff,             )
                                   )
6   vs.                            )   No. 4:12-CV-00654-JAR
                                   )
7   ST. CHARLES COUNTY,            )
    MISSOURI; and, JASON KING,     )
8                                  )
            Defendants.            )
9

10

11

12

13                          **VOLUME II**

14                  Deposition of JASON KING
                 Taken on behalf of the Plaintiff
15                       May 29, 2013

16

17              Reporter:  Debra L. Burris
        IL License No. 084-004545 * MO License No. 789

18

19

20

21

22

23                     **CATLETT REPORTING**
                167 Lamp and Lantern Village, #205
24                     Chesterfield, MO 63017
                (314) 726-0800 * (314) 726-0849 fax

25

                                                        1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF MISSOURI
 2                        EASTERN DIVISION

 3
      D.B.,                        )
 4                                 )
              Plaintiff,           )
 5                                 )
      vs.                          )  No. 4:12-CV-00654-JAR
 6                                 )
      ST. CHARLES COUNTY,          )
 7    MISSOURI; and, JASON KING,   )
                                   )
 8            Defendants.          )

 9

10         It is hereby stipulated and agreed that the

11    continuation of the deposition of JASON KING was

12    taken on the 29th day of May, A.D., 2013, between

13    the hours of eight o'clock in the forenoon and

14    eight o'clock in the afternoon at the office of

15    The Ryals Law Firm, P.C., 3120 Locust Street, St.

16    Louis, Missouri 63103, before Debra L. Burris,

17    Certified Shorthand Reporter, in a certain cause

18    now pending in the United States District Court

19    for the Eastern District of Missouri, Eastern

20    Division, wherein D.B. is Plaintiff and St.

21    Charles County, Missouri, and Jason King are

22    Defendants.

23

24

25
```

```
                        *  *  *  *  *  *

                        APPEARANCES

FOR PLAINTIFF:     The Ryals Law Firm, P.C.

                   3120 Locust Street

                   St. Louis, Missouri 63103

                   By:  Stephen M. Ryals, Esq.


FOR KING:          The Hood Law Office, LLC

                   P.O. Box 220366

                   Kirkwood, Missouri 63301

                   By:  Donald L. Hood, Esq.


FOR ST. CHARLES:   County Counselor's Office

                   100 North Third Street

                   Suite 216

                   St. Charles, Missouri 63301

                   By:  Beverly Temple, Esq.


                        *  *  *  *  *  *

                        INDEX

Questions by Mr. Ryals:  Page 5

Questions by Ms. Temple:  Page 89

Questions by Mr. Hood:  Page 117

Questions by Ms. Temple:  Page 118
```

```
 1                    CERTIFIED QUESTIONS

 2   Page 89:

 3          Q.   Who offered you tickets for taking care

 4   of a DWI?

 5

 6   Page 89:

 7          Q.   What supervisor came and asked you if

 8   you cared that the DWI disappeared?

 9

10                       EXHIBITS

11                 (No exhibits marked.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                          *  *  *  *  *  *

              IT IS HEREBY STIPULATED AND AGREED by and
between Counsel for the Plaintiff and Counsel for
Defendants this deposition may be taken in
shorthand by Debra L. Burris, a Certified
Shorthand Reporter and a Notary Public, and
afterwards transcribed into typewriting.


                          o-O-o


                       JASON KING,
of lawful age, being produced, sworn and examined
on the part of the Plaintiff deposes and says:
                      EXAMINATION
QUESTIONS BY MR. RYALS:
         Q.   Mr. King, thanks for coming back.  As I
told you in the last depo I'm going to try to move
this thing along and get done as quickly as
possible.  One of the areas I wanted to visit with
you about today was you were previously assigned
to the drug task force, is that correct?
         A.   Yes.
         Q.   And help me remember, when was that?
         A.   I'm thinking 2004 to maybe 2006,
roughly.
```

1       Q.   Now, in my mind's eye that means you

2  were undercover, plain clothes, long hair, beard,

3  you know --

4       A.   Correct.

5       Q.   -- so you would blend in with the people

6  you encounter in the drug trade?

7       A.   Correct.  Correct.

8       Q.   And that was one of those we talked

9  about specialized units like SWAT and interdiction

10 and fugitive.  Was the drug task force a

11 specialized unit as well?

12      A.   Yes, it was.

13      Q.   How did you apply for or get selected

14 for that?

15      A.   Well, the opening came up and I just,

16 you know, put a written memo in saying that I

17 would like to be considered.  My track record up

18 until that time showed that I was specializing in

19 drugs.  Right as I got -- I got the Deputy of the

20 Year -- American Legion, St. Charles American

21 Legion Deputy of Year.  I got nominated before I

22 got in the drug unit.  When I was in the drug unit

23 was when I actually received that award.  So I

24 just basically had shown that I had a knack for

25 finding drugs and dealing with drugs.  So I got

the job.

Q. So you'd been on the St. Charles County for how long at that point?

A. I think roughly three years maybe.

Q. Yeah. All patrol before that?

A. Correct.

Q. And even though you were a parole officer you were active in making your own case, so to speak, self-initiated activity and it was focusing on the drug trade?

A. Correct.

Q. When you applied I take it there was some sort of posting that let people know that there was a job opening there?

A. Yes.

Q. When you applied do you recall to whom you gave your application?

A. I don't. I don't recall.

Q. That unit had a chain of command, is that correct?

A. Yes.

Q. Where were you in the pecking order; were you a -- what was your title, investigator or were you a supervisor or what?

A. When I initially went in, there was the

drug unit commander, the drug unit secondary or
sergeant or supervisor.  The way they ran it was
that it was a rotating commander spot; and if the
St. Charles County drug commander was in charge,
then one of the other departments would have a
sergeant, a supervisor in there.  If then it
rotated where they were the drug unit commander,
then County always had a supervisor in there.  So
then the sergeant would be County at that point.

     Q.   Okay.

     A.   There were seven of us, I think seven
detectives that were in there.  I was actually on
a MoSMART grant, Missouri Sheriff Methamphetamine
Relief Team, which actually was a grant that I was
on to combat methamphetamine.  As far as pecking
order, I was pretty much the only person in the
drug unit designated to combatting
methamphetamine.

     Q.   But had the title detective?

     A.   Detective, correct.

     Q.   The drug unit commander, when that
person was a St. Charles County employee, did that
person always have the same rank as every other
person who had that --

     A.   When I initially got -- when I got in

there I believe it was there were lieutenants that were actually the drug unit commander; but when I first got in the unit there was, I think it was Sergeant Growich from O'Fallon who was the commander. He is now a lieutenant. Typically they want a lieutenant being commander, but it doesn't always have to be a lieutenant.

Q. But when you were St. Charles County people they were always lieutenants or above?

A. Correct. Lieutenant Melton, then I had Lieutenant Tiefenbrunn.

Q. Now, as you described this task force work, it strikes me as being different, your account, than when you were on the power squad in that when you were on the drug task force you weren't answering calls for service, you were just working drug cases?

A. Correct.

Q. Probably had your own protocol as far as reporting and roll call and all of that?

A. Correct.

Q. And when you became a drug task force detective did you have to get -- strike that -- did you receive any specialized training to do that job?

1    A.   Yes.

2    Q.   Was that particular to your work in

3    faring out meth labs?

4    A.   Some of the training was just consistent

5    with just being a detective in the drug unit, but

6    obviously I received additional training that was

7    not methamphetamine specific.

8    Q.   All right.  Now, at any other time

9    during your tenure with the St. Charles County

10   Sheriff's Department did you, as part of an

11   assignment did you receive any kind of specialized

12   training similar to the fact that you got

13   specialized training to be in the drug unit?

14   A.   Other than the continuing ed. like

15   interdepartmental training that we received, it

16   was, you know, Mace oriented, firearms.  Any other

17   training that I got was some that I requested to

18   get through St. Louis County, St. Charles County

19   Academy's, you know, sexual assault

20   investigations, missing persons investigations.

21   Those are all things though that I sought out.

22   How to become a supervisor.  Instructor

23   development so I could be an instructor at the

24   police academy.  I never did actually instruct,

25   but I had the certification to do that.  But those

are the things I sought out to do.

     Q.   Okay.  I don't think we covered this.
When you're a law enforcement police officer in
Missouri post police officer standards of training
requires X number of hours every three years,
correct?

     A.   Correct.

     Q.   Continuing ed. training?

     A.   Correct.

     Q.   And those are broken down into blocks?

     A.   Correct.

     Q.   So every police officer in Missouri is
supposed to get X number of hours of firearms
training every three years?

     A.   Correct.

     Q.   And training on the law every three
years?

     A.   Correct.

     Q.   Okay.  You received all of that
training, you were current as far as you know?

     A.   Correct, yes.

     Q.   But then what I hear you tell me was
that you also sought training that wasn't required
by post?

     A.   Correct.

1       Q.   And by saying that you sought it, you
2    were not either invited to or required to attend
3    that training, it was not required by post,
4    correct?
5       A.   Correct.
6       Q.   Did you ever ask for any training that
7    the sheriff's department did not provide for you?
8       A.   I believe maybe there was some courses
9    that I put in for that I did not receive, but I
10   can't recall exactly what those might have been or
11   would have been.
12      Q.   All right.
13      A.   Whether they declined them for whatever
14   reason, manpower issues, where the location of the
15   training may have been; I can't recall.
16      Q.   They weren't sending you to Hawaii for
17   --
18      A.   Yeah, Arizona, whatever.  So --
19      Q.   Okay.  You of course completed your,
20   back when you went through the academy, what was
21   it, 800 hours?
22      A.   800 and, what was it, 840 -- 840 hours.
23      Q.   Yeah.  You completed that, passed all
24   the examinations to become certified as a police
25   officer?

1          A.    Yes.

2          Q.    And then we talked about the continuing

3    ed. that you completed while you were a police

4    officer.  And I take it that applied throughout

5    your career at other agencies?

6          A.    Correct.  Correct.

7          Q.    With regard to your tenure at

8    St. Charles County, was there ever any training

9    that you felt you needed to perform your duties as

10   a police officer that you didn't get while you

11   were at St. Charles County?

12         A.    And that's a good question.  I'm just

13   kind of -- I don't know if I can think of anything

14   at this particular moment that I can think of

15   that, you know.  Certainly things like I said I

16   would have liked to have expanded out on, but as

17   far as being able to do my job, I don't know.  I

18   mean pretty much the basics is what you're taught,

19   the firearms, you know, the Mace, the -- you know.

20         Q.    Yeah.  You know, of course, a police

21   officer has to have a broad range of knowledge and

22   a lot of different -- I mean, from not only

23   martial skills, firearms, Mace, expandable baton,

24   shotgun, empty-handed control; but you also have

25   to understand the limits of the law, right?

A.   Correct.

          Q.   You have to understand techniques for
investigation, right?

          A.   Correct.

          Q.   And that's just to name a few of the
things, skills that you have to have?

          A.   Correct.

          Q.   The thought in my mind when I asked that
question was going more to as an example perhaps
you made an arrest, okay -- and this is purely
hypothetical, okay?

          A.   Okay.

          Q.   But you make an arrest and later it
turns out that for some reason the arrest was
unlawful, it was without cause or the search was
bad or something.  That's what's in my mind when I
ask you if you thought that you could or should
have received better training but you didn't.  It
may have arisen from a situation like that where,
you know, you did what you thought was right, but
if you had been better trained you would have
understood I shouldn't have done that.  Am I being
clear?

          A.   You are.  And I thought about that when
you just initially asked me the question, is, you

know, knowing the law inside and out, once again
of all the things of the totality of everything we
had to know in making a split-second decision,
certainly, yes, there was times when we did things
when we would, you know, have after-actions report
what we would call them and basically get together
and say hey, what happened here, what did you do,
you know, should you have done that, should you
have done that; or, you know, hey, there was even
times as deputies we would say hey, can we --
what's -- can I do this or this or can I write
this person a ticket for this incident, you know,
whether it was motor scooters or just little
things that would come that we, you know, like I
said, we were unaware or, you know, the deputy
working the street would say hey, I forget what's
going on with that, is that just a county thing or
can we write it under a state order.  So certainly
I would say as laws go probably the primary thing
is like you said what can I do, what can I not do.
As far as guns and the Mace and all those types of
things, like I said, those were hammered home.
Those were just, you know, things that just were
routine, whatever.  But when it came to the law
and applying each situation differently, those

were the ones where, like you said, making that
split decision of searching a car or towing a car
or whatever the case may be where it was kind of
touch and go maybe.

Q.   Yeah, sure.  As you talk through it can
you think of any incidents like that?

A.   Well, I mean only the one that you were
part of before which I was involved with where,
you know, like I said the deputy at the front of
the house, deputy at the back of the house, you
know, deputies at the front made entry.  You know,
whether that was -- you know, once again, I forget
the whole ramification behind that; but they made
entry, so we were going on the premise that they
made the entry, so, you know, as deputies we're
going to follow in behind under good faith that
they had something, they're doing the right thing.
We had a subject come out the back window, go back
in the house.  So obviously we had some sort of
visual on a possible suspect coming in the house
and then back into the house.  So something like
that I would say that was -- I mean that would
come to mind obviously because it turned into
something and became an incident.

Q.   Yeah.  And of course it became a

lawsuit?

A.   Correct.

Q.   But what I'm interested in knowing about that particular, now that you've mentioned that specific incident, internally how was that handled?  And I'm going to presume that any privilege between you and your counsel would still attach, okay?  So I'm not asking for discussions you had with your lawyers.  But back to when you talked about the after-action report, can you tell me what, if anything, occurred internally as a result of that incident?

A.   There was times when let's say somebody might do something that may have not, maybe on the cuffs of violating policy or just something they didn't like or whatever and there would be a memo put out or a memorandum saying, you know, a reminder that we will not do this, this, and this. Or in our shift meetings, our 15-minute meetings we would have twice a week, obviously it might be discussed, hey, this is, you know, just a reminder we're not going to do this, we're not going to do that.  Pretty much just that.

Q.   And do you specifically recall after the incident it was -- I'm trying to think of my

```
 1    client's name.
 2          A.    Yeah, I don't recall it either.
 3          Q.    It'll come to me.  Following that
 4    incident do you recall any memos or meetings or
 5    discussions?
 6          A.    I mean, I don't know if we talked about
 7    it the last time.  The only thing with that
 8    incident was because it was multiple deputies
 9    involved, once again we turned our reports in and
10    mine was the only report that wasn't given back to
11    let's say readjust so to speak.
12          Q.    And I want to make sure that the record
13    is clear on this point.  You had multiple
14    deputies, therefore multiple deputies writing an
15    account?
16          A.    Correct.
17          Q.    And your belief is that everyone but you
18    was given their report -- their report was
19    returned to them with some sort of direction or
20    suggestion about changes to the report?
21          A.    Possibly, yeah.
22          Q.    And are you saying that the reason that
23    those reports were given back to the other
24    deputies had to do with the way they wrote the
25    justification or they wrote --
```

1      A.   Once again --

2           MS. TEMPLE:  Objection, calls for

3      speculation.

4           MR. RYALS:  I know it does.  Go ahead.

5      A.   Once again I wasn't, you know, not privy

6      to -- you know, once again I just know that, you

7      know, your reports are not written as an exact

8      account, they're just, they're meant to be a

9      refresher for the events that took place for you

10     to recall those at a later time.  You try to write

11     them as accurate as possible; but once again,

12     that's why, you know, you use times at

13     approximately whatever because you just can't

14     exactly put the time.  So, you know, that was it,

15     I just know that some of the deputies were maybe

16     given suggestions to make them be a little bit

17     better as far as how they sounded moving forward.

18          Q.   (By Mr. Ryals)  And where would that

19     have come from, the sergeant or lieutenant or

20     above; do you know?

21          A.   I have no idea.

22          Q.   Anything else from that incident, memos,

23     discussions, anything that we haven't talked

24     about?

25          A.   Huh-uh.

```
 1          Q.   No?

 2          A.   No.  Sorry, no.

 3          Q.   Sean Johnson.

 4          A.   Yeah, sounds like that's it.

 5          Q.   All right.  We were taking before about

 6  your time on the drug task force, and you -- at

 7  one point you were separated from that job,

 8  correct?

 9          A.   Yes, correct.

10          Q.   And when that happened did you go back

11  on the road?

12          A.   Yes.

13          Q.   When you went back on the road did you

14  go back working the power shift?

15          A.   I believe so.  The sheriff basically

16  said you're going back to the road, pick whatever

17  shift you want, whatever.  So I believe I picked

18  the power -- I believe I picked the power shift

19  when I came back.

20          Q.   All right.  The sheriff being?

21          A.   Sheriff Neer.

22          Q.   You had a conversation with him?

23          A.   Correct.

24          Q.   Was there some event that preceded you

25  separating from the drug task force?
```

A.   Yeah.   In the same week that I was removed, Paul West at the time, he was a St. Charles City lieutenant, was running the drug unit.  Paul West called me into the office and asked me -- I was getting ready to finish -- typically your time with the drug unit lasted two years and they could extend you beyond that. Well, he called me and asked me if I would like a third year, he'd like me to stay.  So I obviously said yes, I would like to stay.  While at home on my own time I was mowing the grass.  Our drug unit cars, our vehicles were basically our personal vehicles that we could use to drive wherever.  I got in my issued drug unit truck to go get gas for my mower.  I was leaving my neighborhood and a car like nearly almost hit me going through the stop sign.  I kind of got behind him, was honking, you know, in kind of a semi police mode honking at him, like, you know, whatever.  They stopped on the side of the road and stopped.  I didn't -- I pulled over also because I didn't want to go around him and have this person get in behind me and have some, you know, pursuit with him behind me or whatever.  So I kind of pulled over to see what they were going to do.  The driver jumped out

of the vehicle and immediately started hurriedly
walking back towards my truck. I reached for my
badge. I didn't have my badge in the truck. I
did have my issued hand gun from the St. Charles
County Sheriff's Department. I picked my gun up
holding it in a downward position and said I'm a
police officer, do not come back here. The
subject said okay. I said what are you driving
like a nut case for? He said, well, I almost ran
out of gas or whatever. So needless to say I dove
on, left the scene. I didn't call anybody. I
didn't tell anybody because to me it was a non
issue. I was then called in. I don't remember
who called me in, Paul West or the sheriff, I
don't remember which one, and basically St.
Charles City had written a report. In the report
the subject even said, the subject stated himself,
you know, stated that he was police officer,
identified himself as a police officer, did not
point any weapon at me or whatever. And at that
point I was pulled out of the drug unit.

     Q.   Did the sheriff inform you you were
being pulled out?

     A.   The sheriff even said I can -- his exact
words were I could fight the other chiefs on this

to keep you in, but it's not worth it, you know,
it's not, I don't want to do that battle right
now.  So go ahead and come back to the department,
you're not in trouble, you're not getting written
up, you didn't do anything wrong, you can pick
whatever shift you want.  And at that point I had
no other option except for to, you know, come back
to the department.

Q.   Was that before or after the incident
with Mr. Johnson?

A.   I don't recall.  Probably would have
been after, but I don't know what year.  I mean it
would have obviously been 2006 that that would
have taken place.  I don't know when the Sean
Johnson incident took place.

Q.   This is the first time you have
testified that you actually spoke to the sheriff
about some official matter, I mean to exclude
passing him in the hall and saying hello.

A.   Okay.

Q.   Were there any other occasions during
your tenure with the sheriff's department when you
had an interaction with the sheriff in a, for lack
of a better word, an official discussion?

A.   Yeah.  After I had gotten out of the

drug unit there was some goings on.  Obviously I had some very good friends that were still in the drug unit and we were very close.  And Lieutenant Koch called me into the office one day and said -- once again not quoting him verbatim -- but there's some stuff going on in the drug unit and the sheriff said you need to steer clear, and just left it open-ended, left it at that.  So I don't know how much time went by.  It bothered me.  So I called, through the chain of command I called Captain Kaiser and said I would like to speak with the sheriff.  Captain Kaiser wouldn't let me.  He said, well, you need to tell me what it's about. I said, Captain Kaiser, no offense, I think it's probably information you're not privy to, I don't feel comfortable talking to you about it, I would like to talk to the sheriff.  He said no.  I said forget it.  We hung up.  I don't know if it was the next day, two days later, Captain Kaiser called me very angrily and said you can go talk to the sheriff.  So I went to the sheriff and I just said hey, Lieutenant Koch called me in and said there's something going on, you need to steer clear.  He just said I know you're good friends with those guys, there's some stuff going on,

you're not involved, you weren't a part of it, you
weren't nothing, I just don't want you to get -- I
don't want you to get involved in it.

Q.   Of course the natural next question is
what is it?

A.   There may have been -- there you -- when
I got out of the drug -- this is going to turn
into a big, long story.  Sergeant -- we were on a
-- I forget her name now.  It was a female officer
from O'Fallon who was going to marry a sergeant in
O'Fallon.  We were on a stakeout in Wentzville.  I
saw her pull up, meet a different officer from
O'Fallon and leave the area together.  She was
going to get married within a couple of days.
Sergeant Koester who was there with us, he was a
drug county sergeant, he was in the drug unit with
me, he had an incident many years ago where
Sergeant Bush who's no longer at the department,
he's with the secret service I believe, he was
Koester's sergeant at the time.  And while he
would -- he would purposely put Sergeant Koester
at the other end of the county away from his
house, and he was going to Koester's house and
having sex with his wife.  So -- and basically he
got on with the secret service.  The county

protected him because his dad is Sergeant Bush who

is --

MS. TEMPLE: Objection, that calls for

speculation.

A. Sergeant Bush who's at the range, he's

-- his half brother, Lieutenant Wilson, used to be

there. He was a big SWAT team member. He's no

longer there. He went to run some private

security company or whatever. But they had

basically a connection, a high connection there.

So they covered him. He ended up getting on with

the secret service. They said good things about

him, and the secret service called, whatever. So

because of this, Sergeant Koester had been through

this before. He's like what do you think I should

do? And I'm like you need to call -- you know, I

would make a phone call. You've been through this

before, so whatever. So needless to say he made

that phone call. That stirred up a little drama.

When I got in the drug unit, that female then got

in the drug unit. There was another county female

that got in the drug unit. Basically there was

some perjury in the grand jury where they lied

about drug use prior to becoming a police officer.

Another drug task force officer got on the stand

and basically refuted them saying they hadn't used
drugs prior to becoming a police officer.
Basically the grand jury had to be disbanded.
Numerous people were pulled out of the drug unit.
I think Becky Shaffar was reprimanded at the
prosecutor's office for even bringing it up and
moved to a lower position. And I don't know if
that was the incident which the sheriff was
talking about. I know that happened. There was a
couple other incidences, but I don't really have
the particulars on them what happened there, but
basically there was a bunch of stuff going on
right about that time.

    Q.    (By Mr. Ryals)  If you don't have
particulars, what did you hear?

    A.    I don't recall.  Involving non
St. Charles County deputies is what I believe.

    Q.    I want to make sure I understand the
Koester/Bush incident.  Koester was having sex
with Bush's wife?

    A.    No, Koester was just a deputy at the
time, and Sergeant Bush was his sergeant, and he
was purposely putting him at the other end of the
county.  Koester lived in St. Charles City, so I
think he was putting him out in New Melle,

1  Augusta.

2       Q.   And then Bush would go to Koester's --

3       A.   To his house, correct, on duty; correct.

4       Q.   And who became a secret service man?

5       A.   Sergeant Bush, correct.

6       Q.   And the incident that you observed on

7  the stakeout, was that a similar --

8       A.   Like I said, it was an O'Fallon -- it

9  was an O'Fallon female officer.  It involved

10 O'Fallon police officers, but the problem was,

11 like I said, after we had ended up basically

12 calling the sergeant she was supposed to marry in

13 a couple days, and basically that whole

14 relationship dissolved.  She ended up getting in

15 the drug unit.  And I remember having a

16 conversation with Paul West, you know this is

17 probably going to cause some issues bringing her

18 in the drug unit when we're the ones that

19 basically informed, you know, on her that she was

20 whatever.  So --

21      Q.   The whatever being she was seeing --

22      A.   Possibly seeing somebody, yeah, seeing

23 this other officer, or whatever, from O'Fallon.

24 And I think they ended up getting -- they ended up

25 getting married.  Like I said, I knew that would

cause problems. And I remember, like I said, having a personal conversation with Paul West, you know this is going to cause problems. Once again, then I was pulled out, and like I said, apparently there just started becoming some issues in the drug unit.

Q.    The other things that you heard about involving non St. Charles County deputies --

A.    Right.

Q.    -- whatever those things might have been, those deputies -- strike that -- those officers would have been supervised by at least one St. Charles County supervisor?

A.    Correct. I believe it would have been Sergeant Koester.

Q.    Kestor or Kesterer?

A.    K-o-e-s-t-e-r, Koester.

Q.    After you had the conversation with Sheriff Neer about the stuff going on in the drug unit that you needed to steer clear of, are you aware of any changes that happened in the drug unit?

A.    Well, like I said, the thing happened with the grand jury.

Q.    That stuff?

A.    Yeah.    People were pulled out.    Grand jury was disbanded.    Becky Shaffar to my knowledge was reprimanded to some degree, put in a lower position.    I think at the time she was the head assistant prosecutor at St. Charles County and then was put into a different position or whatever.

Q.    Does the drug unit still exist or did it when you left?

A.    Yes.

Q.    So it didn't get disbanded, it's just there was a shake-up?

A.    Shake-up of, right, personnel.

Q.    The chain of command in the drug unit beyond the lieutenant, whether it's St. Charles County or an outside agency, did that go up through the St. Charles County Sheriff's Department?

A.    No.    Actually in most big counties it works like that, but in St. Charles County the chiefs and the sheriff and Jack Banas or whoever the prosecutor is sit on a panel that oversees, or a board that oversees the drug unit.    And so basically the drug unit commander basically reports directly to the board.    They have a, I

don't know if it's a monthly meeting.  I think
they have a board monthly meeting where the drug
unit commander will go and meet with all the
chiefs and the sheriff and the prosecutor.  That's
how it operated when I got out.

    Q.    I want to talk to you about the incident
that gave rise to this suit now.

    A.    Okay.

    Q.    And the event occurred November 14th of
2007, does that sound right?

    A.    Sounds correct.

    Q.    The plaintiff is identified by her
initials D.B.  You know who that refers to,
correct?

    A.    Correct.

    Q.    And I take it at some point you read the
complaint, the pleading that was filed, correct?

    A.    Correct.

    Q.    Were you on duty on that day?

    A.    Yes.

    Q.    You were a patrol officer on duty?

    A.    Yes.

    Q.    And you had an encounter with the person
identified in the pleading as D.B.?

    A.    Yes.

1      Q.   And did the encounter occur as a result
2  of a, or as part of a traffic stop?
3      A.   Yes.
4      Q.   Where did the traffic stop occur?
5      A.   It actually happened, I actually stopped
6  her on Highway 40 eastbound east of Highway 94.
7  The infraction happened on the overpass of Highway
8  94 getting onto 40 eastbound.
9      Q.   What infraction occurred?
10     A.   Multiple lane change from one side all
11 the way over to the other without using a turn
12 signal, rapid.
13     Q.   So that would have in your estimation
14 been a violation of the traffic law?
15     A.   Correct.
16     Q.   Did it occur within St. Charles County?
17     A.   As far as unincorporated or -- I mean it
18 happened in St. Charles County.
19     Q.   That's a good point.  The better
20 question is did it happen within the jurisdiction
21 of your authority, that is within your law
22 enforcement jurisdiction?
23     A.   Correct.  That was, I believe, Weldon
24 Spring I think is what that is.  So, yes, that's
25 our area that we cover.

1      Q.    It raises another question.  As a
2   St. Charles County deputy what, if any, authority
3   did you have to enforce law within municipal
4   corporations that had their own police
5   departments?
6      A.    I basically being a first-class county
7   deputy could write state tickets within anywhere
8   within the St. Charles County and the state
9   really.
10     Q.    All right.  So you had state law
11  enforcement powers everyplace in St. Charles
12  County?
13     A.    Correct.
14     Q.    So when you initiated the traffic stop,
15  is it accurate to say that her conduct may have
16  violated state law?
17     A.    Yes.
18     Q.    Is it accurate to say her conduct may
19  have violated the county ordinance as well?
20     A.    Yes.
21     Q.    And the county ordinance would have been
22  a source of law in the area where the offense
23  occurred?
24     A.    Yes.
25     Q.    What time of day or night did the event

1  occur?

2          A.    Without reading the exact whatever, I

3  believe it was around 2:00, 2:30 in the morning.

4          Q.    At 2:00 or 2:30 in the morning -- and

5  I'm not going to hold you to the precise moment --

6  but were you in the middle of a shift, beginning

7  of the shift, at the end of the shift?

8          A.    End of shift.

9          Q.    End of?

10          A.    End of shift.

11          Q.    Before you observed what you testified

12  you observed of the driver D.B., where were you

13  going?

14          A.    Well, I had went to the bar.  I believe

15  there was fight call or whatever, so we were

16  having numerous problems at the bar.  I think I

17  talked about it last time, within the weeks prior

18  preceding this incident, Chris Hunt and I were

19  tasked to being in an undercover vehicle to go to

20  the bar to try to drum up leads, make cases,

21  whatever the case may be, because of the numerous

22  complaints we had at the bar, drug cases.

23          Q.    That testimony before was about the same

24  bar that D.B. came from?

25          A.    Yes.

1    Q.   Okay.   What's that place called, Monkey
2    Bar?
3         A.   It's closed down now.   Because of all
4    the numerous problems it's since been closed.
5         Q.   It was called --
6         A.   I believe the Monkey Bar, correct.
7         Q.   Did you say that was a week before?
8         A.   Within the weeks prior to that, like I
9    said in a week.   And also some time prior to that
10   I also took place where I went down with the
11   detectives from the St. Charles County Sheriff's
12   Department to do a search warrant on the Monkey
13   Bar to try to retrieve video evidence of a
14   possible sexual assault, rape within the bar.
15        Q.   Yeah.   And I did not appreciate it was
16   the same bar.   What were you and Deputy Hunt
17   tasked with doing?
18        A.   Just -- once again just trying to see if
19   we could make cases.   There was a lot of reports
20   that drug sales came from the bar.   I believe the
21   Monkey Bar initially prior to coming out to
22   St. Charles County had been a bar down here in
23   St. Louis.   There was complaints and kind of
24   similar type complaints as far as drug sales.
25   They were not -- their liquor license was taken

away from them. I don't know the particulars, but I know they moved their operation out to Weldon Spring. So we were obviously getting the same complaints, multiple fight calls, a lot of DWIs coming from the Monkey Bar. So we were just asked to go down there to see what we could see, drum up, whatever the case may be.

Q. Were you and Deputy Hunt in plain clothes?

A. I don't recall.

Q. On the night when you encountered D.B. were you in plain clothes?

A. No, I was in inform.

Q. Fully marked car?

A. Fully marked car in uniform, correct.

Q. So you had been to the Monkey Bar that evening on a call?

A. Correct.

Q. Call for service?

A. Correct. Multiple deputies showed up. I think it was a fight call, so we all showed -- you know, we just all go just to make sure we, you know, squash whatever the problem may be.

Q. Did that call conclude?

A. I don't know. I think deputies were

still -- the deputies that were initially tasked
with the call I think were still staying around to
just kind of get everybody out of the parking lot,
just to remain present.  I think myself and some
other deputies left the scene just because at that
point we weren't needed.

          Q.    I see.  I take it then it was not your
call, you were an assist?

          A.    Correct, that I recall.  That I recall.

          Q.    Well, it stands to reason you wouldn't
leave if it was your call?

          A.    Correct, right.

          Q.    Where did you go after you left the
Monkey Bar?

          A.    Beings it was getting towards the end of
the shift, I was going to make my way home going
94 to 40 towards the O'Fallon area.

          Q.    I don't want to ask where you live, but
the direction that you were traveling when you saw
D.B., what you described of her actions, were you
on the route that would take you home?

          A.    Yes.

          Q.    So at the time you saw D.B. is it
accurate to say you were going home?

          A.    Correct, yes.

1      Q.   Your shift was actually over or at

2  least --

3      A.   Getting ready to be over, over, yes.

4      Q.   And you talked about how you go on duty

5  from your home.  Same protocol apply when you go

6  off duty, you drive to your home and say I'm off

7  duty?

8      A.   Correct.

9      Q.   Until you get there you're still on

10 duty?

11     A.   Correct.  Because on the way home

12 something could happen.

13     Q.   All right.  When you left the Monkey Bar

14 did you drive in a continuous route moving toward

15 your home or did you stop somewhere?

16     A.   You know, I don't recall.  I remember,

17 like I said, there were several cars that were

18 leaving the area that I'm, you know, just once

19 again trying to make sure the people are sober and

20 driving correctly and not going to cause an

21 accident or whatever.  So when I noticed her

22 vehicle at one point it came to the point where it

23 was just kind of us two traveling towards 94 and

24 40.  So it was just -- at that point it was just,

25 you know, that was pretty much the only car that I

was within sight of.

Q.   You didn't stop anywhere else and surveil the scene or anything?

A.   You know, I may have.  I don't recall that.

Q.   Do you recall seeing D.B. before she got in her car?

A.   I don't -- I don't believe so, no.

Q.   Do you recall -- as you were driving towards your home do you recall knowing whether she had come from the Monkey Bar or not?

A.   The car, you know, because we was in the parking lot obviously, the car was in front of me and we were leaving the Monkey Bar.

Q.   You saw her leave the Monkey Bar?

A.   Correct.  The car was leaving the parking lot of the Monkey Bar.

Q.   Did you have any intention to follow her?

A.   No.

Q.   In the car that you were driving the night you encountered D.B., did you have the ability to make any recordings, either video, audio, or otherwise?

A.   No, I did not.

Q.   And I take it from that answer you did not carry a hand-held recorder either?

A.   No.

Q.   Have you ever?

A.   No.

Q.   And the car was not equipped with a video camera, is that correct?

A.   Correct.  And I don't even know -- bear with me, I don't even know if it was against policy to have a recorder unless you were issued one.  I don't know, but I think there may have been a policy that said you couldn't have one unless you were -- later on when the DWI unit started getting the cameras where the activation of the audio and the video would take place immediately on a traffic stop.  But I think initially when I first got there, I think there may have been a policy I believe that said you couldn't even have one.  I don't know.

Q.   When you observed what you described of her driving, you initiated a traffic stop, is that correct?

A.   Correct.

Q.   And to put a point on it, to accomplish that you turned on your lights, your overhead

emergency lights, correct?

    A.    Correct.

    Q.    Maybe a siren, maybe not?

    A.    Yeah, correct.

    Q.    Did she pull over immediately?

    A.    I don't recall what her -- you know, within, yeah, within a good amount of time.

    Q.    All right.  I mean there was nothing about her actions after the lights went on that raised your suspicion?

    A.    Right.  As far as a pursuit or anything like that, no.  But as far as her actions, as far as whether she straddled the line or pulled over slow, I don't recall.

    Q.    Okay.  So as far as you know there's no recording of your encounter with her?

    A.    As far as I know, yeah.

    Q.    When you initiated the traffic stop or when you actually came to a stop or sometime in between, did you make a radio call?

    A.    I did not.

    Q.    Why didn't you make a radio call?

    A.    It actually was not uncommon for deputies not to call out on traffic stops.  I know they were supposed to, for safety purposes you're

supposed to call out.  Whether you thought someone had drugs and you wanted to get out of the car quickly, you know, to get up on somebody before they had a chance to kind of think about what they were doing, or the radio was busy with people already on the radio and so you didn't want to sit there, once again depending on what type of night it was or who you were pulling over, so it wasn't uncommon.  I was pretty good about it, but it wasn't uncommon for me or other people I worked with not to call out initially on the traffic stop.

Q.   Did you ever call out?

A.   No, I did not.

Q.   Do you know if it's department policy that you shall call out when you --

A.   Once again, I don't know if it was policy or not.  I mean, obviously they frowned upon it.  But supervisors alike, there was multiple people that we just didn't call out all the time.

Q.   I want to -- I want to talk about that just a bit.  I think I may have asked you before whether there's in your experience with St. Charles County whether there are things that

you do day to day that are directed by policy.
And then there might be things that are not
directed by policy but become just common practice
or habit. And when you tell me that it was not
uncommon for deputies not to call out --

          A.   Right.

          Q.   -- and I'm going to make a leap and
assume that that was contrary to policy, that it
probably was.

          A.   Okay.

          Q.   But I may be proven wrong. That is
something, that is the enforcement of that rule
you shall call out, is something that the
supervisors up through to including the sheriff
could have enforced if they wanted to; is that
correct?

          A.   Correct.

          Q.   We talked about the rumor mill and kind
of the close-knit society in your department. And
when you say it was not uncommon for deputies to
call out, is that just Jason King talking or is
that something that you believe was commonly
understood in the department?

          A.   No, I think it was pretty common
knowledge that, you know -- not all officers.

Like I said, maybe you'd call out 90 percent of
the time and then every deputy maybe 10 percent of
the time.  Once again, depending on the situation,
the radio traffic, the nature of the stop, that
there was times when you made contacts with
individuals officially, not just hey, kids, here's
a quarter for lemonade, but you officially were on
an official stop or contact or whatever, but you
did not initially call out.  You might call out as
you delve into the case or delve into the
incident, but, once again, supervisors alike,
there was plenty of times that I would, you know,
drive down location and see lights and pull up
behind one of my own supervisors on a traffic stop
and they never called out on the radio, you know.
So something I would do, hey, county I'll be out
with, you know, whatever DSN it was here at this
location, you know.

     Q.   Uh-huh.

     A.   That they initially didn't call out.

     Q.   To your knowledge in your experience
while you were with St. Charles County, was there
ever any effort on the part of the supervisors,
again from the sergeants up to the sheriff, to try
to enforce a rule that you shall call out every

time you initiate a traffic stop?

A.    I think that as incidences occurred
they, you know, were more apt to hey, we need to
make sure we call out.  It was more of a safety
issue, you know, just for your own safety so they
know where you're at.  I mean it was talked about
several times, but up until the day I left it was,
there was still people not calling out on the
radio, to include captains.  I mean, I knew, like
I said, Captain Kaiser in particular, he was well
known for coming out and being on a traffic stop
and somebody pulling up behind him and the
deputies even say did you call out -- or they
would call dispatch and say hey, did Captain
Kaiser ever call out?  No, he never called out.
Okay, just wanted to know.

Q.    Your cars were not equipped with GPS
tracking?

A.    After I left I believe that some of
their -- like I said, some of them.  Whether they
all are or some of them, I know that they were
talking about doing that, but I'm not for sure.

Q.    Okay.  From the time you stopped your
car until D.B. drove away, how much time elapsed?

A.    15 minutes, 15, 20 minutes.  I'm not

exact on the time.

Q.   When you left the scene of the stop where did you go?

A.   Home.

Q.   When you got home or at some point along the way did you make a radio call that you were off duty?

A.   When I got home.

Q.   When was the first time that you had knowledge or awareness that there was some trouble or controversy over this traffic stop with D.B.?

A.   I was off for four days after that traffic stop, just normal days off.  And I believe the first day I came back I was immediately called in on it.

Q.   And when you say called in, what does that mean, who called you in?

A.   I came in the department.  Sergeant Ostemeier basically led me to Lieutenant Tiefenbrunn's office who was the acting IA lieutenant at the time, internal affairs investigator at the time.

Q.   Tiefenbrunn you said?

A.   Correct.

Q.   And what were you told?

A.   He just immediately -- he just asked me
about the traffic stop, you know.  And immediately
upon confirming I said yeah, you know, whatever.
His exact words were oh, I thought you were going
to lie about it.  I said no, I'm got going to lie
about it, I got nothing to lie about.

Q.   Can you detail the conversation beyond
just describing generically what was said?

A.   I mean that was it.  I didn't call out a
traffic stop, but I did run her through my
computer system for wants and warrants.  So I knew
that was recordable data that I had ran her to
make sure she didn't have any wants or warrants
and make sure her license was valid.  So like I
said, I knew that was recordable data that the
traffic stop, you know, that a contact had taken
place.

Q.   But you said he asked you about the
stop?

A.   He just immediately said, you know, this
complaint came in about this stop.  You know, I
don't -- bear with me, I don't recall the exact
words.  But I just immediately said yeah, I
stopped or whatever, here's my note pad with her
-- I had my note pad with all her information

written in the note pad, vehicle information like
I would normally do on a traffic stop.  And he
just kind of was like wow!  I go what?  Because I
didn't think you would tell the truth, I thought
you were going to come in and lie about it.  I
said why would I lie about it?  I'm like it was a
traffic stop, I ran it through the computer.  I
mean, like I said, I ran it through the computer.
I pulled out my notebook and said here's the
information right here in my notebook, I wrote it
all down.  So at that point it was just I wrote my
statement.

      Q.   So you wrote a statement at that point?

      A.   Correct, yes.

      Q.   Was that voluntary or did they --

      A.   It's basically, yeah, it's basically if
you don't write it, then you're fired; or yeah.

      Q.   How long did that encounter take?

      A.   I don't recall.  Not very long.

      Q.   And then did you leave that office and
go back to work?

      A.   Correct.

      Q.   What was the next encounter relative to
that traffic stop that you recall?

      A.   Bear with me.  I don't remember.  There

was so much stuff happening.  By that point my
mind was mush.  I don't know the sequence, but,
you know, I still had the drugs and evidence in my
patrol car.  Tiefenbrunn knew that and never asked
for that evidence.  He allowed me to drive around
in the car with that stuff still in the car.  I
remember I was at home on my off time.
Tiefenbrunn showed up at my house unexpectedly,
took my patrol car to take it to -- you know,
which to me is a conflict of interest, but my IA
investigator took it to St. Louis County
investigators to have the car, you know,
processed.  I told them prior to leaving, hey,
remember the drugs are in the car, whatever.  He
drove away with the drugs and the evidence still
in the car, drove it to St. Louis County.  Came
back and was still in the vehicle.  I guess they
didn't see it, find it, or whatever.  And then,
like I said, I don't remember where it went from
there.  At that point just I was put on
administrative, you know, working the front desk.
And I don't know how long that went on for.

        Q.   And how was it that you -- and then you
were charged with a crime, correct?

        A.   Correct.

1      Q.   When you were charged were you still
2  working -- strike that.  After you were charged,
3  did you stay working?
4      A.   I don't recall.  I don't know what the
5  time frame was there.
6      Q.   How is it that you came to be separated
7  from the department?
8      A.   Sheriff Neer -- I basically had a
9  one-on-one conversation with Sheriff Neer who
10 pretty much said he was going to fire me.  So he
11 allowed me to resign.  So I typed up a resignation
12 letter and resigned from the department.
13     Q.   Did he call you in?
14     A.   I believe so.  I don't recall, but I
15 believe so.
16     Q.   He was going to fire you, he said I'll
17 permit you to resign?
18     A.   Something to that effect, correct.
19     Q.   And again was that before or after the
20 disposition of the criminal case?
21     A.   Definitely before the disposition.
22     Q.   Do you have any -- do you recall
23 anything else that was said in that conversation
24 with Sheriff Neer?  Did he talk to you about the
25 incident or about you or about her or about

                                              50

anything?

A.    No.    But like I said during the
investigation, like I said, I was not thinking
clearly, whatever.

Q.    I'm sorry, what did you say?

A.    Obviously during the investigation I
wasn't thinking clearly, I was a big wreck.  But I
told you about how Greg Chross came to me in-house
and verbatim said what the complaint was.  I even
called Tiefenbrunn, and Tiefenbrunn said I can
guarantee you that didn't get out.  But basically
it got out through the detective bureau.  So they
all knew about it.  So my investigation was not
closed, it was open, open knowledge at that point.
I remember the -- bear with me, let me think about
it one second.  I was even told that -- I was even
given information that at the time -- Lieutenant
Mateja was not in my direct line of supervision;
and per policy he should not have been in the
meeting with the sheriff.  But because they wanted
to do a polygraph, I guess, with her or whatever,
that Mateja being the lieutenant over the
detective unit, St. Charles County Sheriff's
Detective Bureau, that he was brought in to my IA
meeting with the sheriff.  I don't remember if

Captain Kaiser was in there. I don't remember if
Captain Hudson was in there, the administrative
captain. But Lieutenant Mateja was brought in.
So I know that I guess -- I mean, I was told that
Captain Kaiser came in and just said I want him
gone, I want --

MS. TEMPLE: I'm sorry, I didn't hear.

A. I was told that Captain Kaiser came in
to that meeting and basically wanted me gone, and
whatever. And the sheriff just kind of washed his
hands of it and didn't really -- I don't know if
he had anything to say one way or the other, I
don't know.

Q. (By Mr. Ryals) This is stuff you heard,
you weren't present at the meeting?

A. Correct. I was not present at the
meeting, no.

MS. TEMPLE: Here's where I object and
move to strike that it's hearsay.

Q. (By Mr. Ryals) But of course it has --
whether it happened or not, the fact that people
were relating information about what should have
been a private meeting was something that came to
you?

A. Correct, immediately.

1     Q.   And did you have any allies in the
2   sheriff's department around this event?
3     A.   I think -- I talked about this before.
4   Unfortunately all of my allies were either getting
5   messed with or in fear of getting messed with, you
6   know, had the boot taken to them already.  And so
7   I really didn't have any schtick as far as -- I
8   already told you that, you know, Sheriff Neer,
9   Major Todd, Captain Kaiser, Lieutenant Koch, the
10  big wigs, the main supervisors that oversaw patrol
11  and the bureau or whatever were definitely not in
12  favor of me.  The sheriff, I kind of really didn't
13  know whether he -- my thing is the sheriff just
14  basically let Todd, Kaiser, and Koch do whatever
15  they wanted.  I don't know if Captain Hudson --
16  once again, Captain Hudson really didn't have much
17  to do with the patrol.  He was an administrative
18  captain.  Captain Simcox over the detective bureau
19  wouldn't have much conversations with him.  I
20  think I was well liked among the peers and the
21  rank and file.  But probably my only ally would
22  have been Lieutenant Martchink.  But as far as
23  anybody with rank or --
24    Q.   Do you think anybody tried to stand up
25  for you?

1          A.   No.  I mean I can only say no.

2          Q.   You have no knowledge of it?

3          A.   I have no knowledge of it.  I mean

4    certainly people came to me or whatever; but like

5    I told you before, this is just typical at the

6    sheriff's department, that anytime you try to go

7    against anything that you don't believe in at the

8    sheriff's department, you can either pull out of

9    the unit in fear of getting pulled out of your

10   specialized unit, maybe not get promoted.  People

11   got promoted because of possible grievances filed,

12   but, you know, they got promoted because of that.

13   So there was certainly always that fear of pretty

14   much that everybody kept to themselves and

15   basically let -- if there was somebody in trouble,

16   even if they didn't feel it was right, they pretty

17   much just let them go off by themselves.

18        Q.   You made a statement earlier, something

19   about getting the boot.  I take it that's a

20   colloquialism, but could you explain what it

21   means?

22        A.   Well, I mean, just like I said, getting

23   written up, getting, you know, getting written up

24   for things -- like the same culture we talked

25   about before, where people got written up for

things that other people didn't get written up

for.  So once again, if you weren't liked or you

spoke up or you may have been somebody who called

them on things repeatedly that they didn't like,

that once you gave them an opportunity to write

you up, they would take that to full advantage.

For example, after I left, Lieutenant Martchink

who I really respected, who I sat under his tenure

while I was under Lieutenant Martchink, I

flourished, never got written up, never got

written up for late reports.  That's when I got

Deputy of the Year.  He's the one that nominated

me for it.  I was in the papers all the time.

After I left he was kind of a buffer between Koch

and Kaiser.  They did not like Martchink.

Martchink obviously did not like them.  After I

left the department -- well, another thing that

was kind of widely practiced is we started work

from our house.  Well, a lot of guys would say

they were 1041 and still be in shorts and sandals

and basically supposed to be at work.  But they're

not ready for work yet, but they're saying they're

ready for work.  It all depends on if they lived

in the zone for which they worked, they could kind

of flub on leaving the house.  You could go back

to your house and eat lunch, but guys would stay at their house hours at a time and not be out, whatever. Well, Captain Kaiser started following Martchink around individually and he caught him at his house when he said he was at the station or whatever. And subsequently Martchink was made a deputy and sent to the courthouse. But once again, these are things that everybody did, including Lieutenant Koch and including Captain Kaiser, misuse of county vehicles going to Home Depot and loading up wood in his county car when that was not what the use of county vehicles are supposed to be for.

Q. Who did that?

A. Captain Kaiser was known to use his vehicle for personal use. So these are all things that people, they all did and whatever, but Captain Kaiser specifically went after Lieutenant Martchink because once again Martchink was a buffer for a lot of deputies who are hardworking with the higher-ups and us.

MR. RYALS: May we take a break?

MS. TEMPLE: Yes.

(A break was taken after which the following proceedings were held:)

1     Q.   (By Mr. Ryals)   We talked a little bit

2  about enforcement or lack of enforcement of a rule

3  that requires deputies to call out.   And I'd like

4  to follow up with that discussion by asking if

5  there are any other policies, procedures,

6  practices or rules that were not enforced -- let's

7  leave it without qualifications, were not

8  enforced.   And you know it occurs to me you talked

9  about deputies keeping evidence in their cars.

10 That was one of the things we discussed before.

11     A.   Correct.

12     Q.   Stuff like that.

13     A.   Okay.   Well, that's obviously big,

14 that's the one I'm going to start off with.

15 Evidence, you know, per policy is supposed to be

16 turned in prior to the end of your shift.   Routine

17 evidence was kept in a deputy's car, maybe over a

18 weekend.   And I know a deputy one time had

19 evidence in his car for three weeks prior to

20 turning it in.   Certainly being at your assigned

21 duty station on time, you had to call out, you

22 know, 15 minutes prior.   That 15 minutes gave you

23 that travel time to get to your assigned zone.

24 Once again, people would routinely lie about their

25 location prior to GPS saying hey, I'm here, but

they weren't obviously in that spot. You know,
personal, like I said personal, definitely the
personal vehicle use thing. There was a -- it got
to the point too where you were allowed to use
your vehicle to go like come to the station for
paperwork, even on your off time come to the
station to work out, to go to training, but any
time you were in your vehicle you had to be in
some sort of appropriate attire. So if you had to
stop and enforce traffic or whatever, then you
were presentable, that they knew you were police
affiliated, you were part of the sheriff's
department; you know, gun, badge, whatever the
case may be. That was, you know, we had an
incident where a SWAT team member traveling 70
westbound had left his handgun on top of his car.
And I guess he heard it hit the back of his car
and I guess realized oh, crap, and bounced down
the highway. He was out in the middle of
Highway 70 in the grass area looking for his gun
obviously not -- in sweat pants and a T-shirt.
Nobody knew he was a cop. Multiple people called
in and said hey, there's a county car out here,
there's a guy in the middle of the road walking
around. Somebody actually stopped and picked the

gun up, and luckily a citizen had wrote that plate down and they were able to retrieve the gun at a later time. It was all chewed up where it bounced down the highway. But that's where people weren't wearing the proper attire, that was a major incident where we almost lost another handgun; and then he wasn't in proper attire or whatever. You know, the whole late report thing. Like I said, I was written up for it numerous times, suspended for it, actually went to a review board to fight it and they reduced the days. Reports, you'd get a report log on the late reports and there may be 80 late reports; but I was getting written up and nobody else was getting written up. That was a biggie. Your reports not being -- your DWIs had to be turned in within three days. You know, for the state sometimes, those obviously were late, not turned in in the appropriate time.

I'm trying to think of anything else. Like I said certainly being out of the area when, you know, you're supposed to be in the area, being at your house. You know, the big one too is, you know, as cops, I mean, we like to party or whatever, and, you know, numerous times going out drinking with guns. You know, state law is you're

not supposed to be under the influence of alcohol
and be in possession of a firearm even if you're a
police officer.  It's against state law.  And
numerous times, you know, guns and drinking went
hand and hand at bars, and guns were pulled out
and guns were spun on tables.  That happened quite
a bit too.

Q.    Those events were common knowledge in
the department?

A.    There was, you know, usually supervisors
present at the parties.

Q.    You talked about reports being returned.
We talked about it last time and again today.  Are
you aware of either because you were a witness to
it or you were told about it by a participant or
based on rumors of any incident where a report was
changed in a way that was dishonest or false?

A.    I never saw it done.  Certainly none of
mine ever were.  I can say this, that there were a
couple of instances where a supervisor -- and I
don't want to say the supervisor, so just bear
with me -- but came to me and said the sheriff
wants to kind of insulate himself and would like
this DWI to disappear based upon a political
whatever, do you care?  And usually we had a DWI

unit who a lot of times I was not big into writing

DWI's, so I would make an initial traffic stop,

determine that there was probably, you know, an

offense that was taking place based upon the BAC,

whatever, called for one of the DWI units who then

would obviously take the case over from there and

write it in full, whatever.

But being the initiating officer I would

be asked, and unless they were ignorant or there

was something specific to that stop where I did

not want something to take place, I a couple of

times said I don't care as long as I'm not doing

it, you know, whatever.

Q. You were approached by a supervisor,

right?

A. Correct.

Q. I'm going to break this down. On more

than one occasion?

A. At least two I would say.

Q. Where you were the initiating officer

for a, some offense. And were both of them DWIs?

A. Correct.

Q. And the question that was asked of you

by the supervisor was --

A. One particular, and the other one just

hey, do you mind if this disappears.  The other
one was specifically hey, the sheriff kind of, you
know, whatever, do you mind if this, take care of
this, do you care?  I'm kind of being the
mediator, whatever, kind of doing the insulation,
whatever, that was basically the gist of what they
were saying, and do you mind, do you care.  No
different than fixing a ticket.  We all fixed
tickets.  The first thing someone would do is call
you up and say hey, was that person a jerk to you,
were they an ass, did they do anything in
particular where you don't want this ticket fixed.
And, you know, we would fix tickets.  We would say
no, I don't care, if that's a brother or that's
your cousin or your sister, your wife's sister,
whatever, it's kind of the same thing.  But this
is in reference to DWIs, yes.  And I said -- and I
basically gave it the green light and said I'm not
touching it, I don't want to do anything with it;
but certainly if it disappears at that point --
due to the fact it was a DWI usually you never
got, even though you initiated that, you never got
called in on it anyway.  Once the DWI officer got
there, they basically took it over from there.
Basically you were never -- I don't think I was

ever called in as being the initiating stop on a
DWI case.

Q.   Are you able to identify any particulars
about that particular stop where the information
you got Sheriff Neer wanted the DWI to disappear?
That is, when it occurred, where it occurred, who
the subject was?

A.   I couldn't -- I mean, I'd have to
really, really dig.  I don't know if I could ever
recall that.

Q.   And there was a second incident that --

A.   A couple of times I was asked to take
care of a DWI; hey, do you mind if this DWI
disappears, and, you know.

Q.   What I was going to get at was you
described one time where you perceived it came
from the sheriff himself?

A.   Correct.

Q.   Was that every time or was that just one
occasion?

A.   The two times that I can recall, the
other was just hey -- it was kind of inferred, the
sheriff wasn't mentioned, nobody was mentioned, it
was just kind of deferred, but hey, this is a
friend of somebody, political support or whatever

the case may be, do you care or whatever.  You
know, I was offered Cardinals tickets on probably
at least one occasion, you know.

Q.   In what context?

A.   Not hey, you can have these Cardinals
tickets if you fix the ticket.  It's just hey,
here's some Cardinal tickets in relation to --

Q.   A traffic ticket or DWI?

A.   Probably one of the DWIs.

Q.   I think we started this discussion with
the question generally are you aware of any
instances when rules were not enforced.  And is
there anything else you want to add to that?
While you're thinking, let me ask you another
question.  Did your department have a policy
against you receiving gratuities from the public
specifically -- actually I've seen it work, a
police officer discount at a restaurant.  Is there
a policy against that?

A.   Yeah, I'm sure there's a policy that
obviously when you're getting bribed, that that's
obviously state law that you're not supposed to be
bribed.  As far as the discount, I mean that was
standard practice that everywhere we went was
either eat free or half price or free sodas at

every gas station we went to. And everybody partook in that. I mean the supervisors, whatever, you know, everybody. So as far as having a policy, I don't know if there was a policy you weren't allowed to accept free food or drinks or whatever. I mean, obviously taking gifts in relation to a report written, I'm sure that's, yeah, I'm sure that's against policy. But not for sure.

Q. You described the culture of the department consisting of -- and these are my words so you correct me if I mischaracterize it -- but consisting of I think you called them the good old boys, the group that, for example, somebody who's within the good old boys would be late for writing a report or do something, that you would get written up for but they wouldn't?

A. Correct.

Q. Okay. And that's just one example that I think you've given. Was it your perception when you worked at St. Charles County Sheriff's Department that the lines between those two groups were clear and well known to people in the department? Specifically if you were within the good old boys group, did they understand you were,

and if were you outside of it, did those people
understand they were outside of it?

     A.   Oh, yeah.  It was both sides knew.  And,
I mean, I was friends with both sides.  And the
people that were, you know -- and a lot of them
were SWAT, you know, that you would tell them like
well this isn't right.  Well, you're right, it's
not right.  But if I say something it falls on
deaf ears.  It takes someone like you saying it,
whatever.  But that would never occur, that's the
whole point is that, you know, this side over here
would be left kind of fledging for themselves and
whatever, but yet they could do kind of pretty
much whatever they want.

     Q.   And you described a number of specific
instances where members of the good old boys group
were involved in events that had no consequences
or less consequences.  You testified about that.
Are there any other incidents that you recall
since last time?

     A.   Well, I mean, you know, I do actually
have some things.  To my knowledge like we talked
about Sergeant Streck and how he went downtown and
tore up a restaurant downtown and left a, how he
was in the FBI task force at the time and then

stalked a girl in St. Peters and shot a shotgun
through his car. And then he was out on SWAT
training and left his MP5 with full auto loaded
while Lieutenant Koch and somebody else were down
range. They were absolutely furious about that.
He then gets promoted to sergeant after all those
incidences. He then apparently sexually harassed
a female deputy within the department. Either she
was moved or he was moved. He then was given the
drug unit commander spot, which I think is where
he currently is now. And there may or may not
be -- this is just something that somebody told me
and I don't know -- but there may be new sexual
harassment allegations within the department or
outside the department.

        MS. TEMPLE: Objection, hearsay.

    A.    But once again I can't confirm those at
this point. So routinely he was doing things
where he was promoted drug unit commander, you
know, but yet had a history of these incidences.
You know, talking about the alcohol, something
else that comes to mind is Mark Brown who has
since now passed away a couple years ago who was a
really bad alcoholic, had been in the sheriff's
department for 20-plus years; I don't know how

many times I was at the range with him in the lane
next to him and I could smell the alcohol on his
breath and he would routinely fail qualifying
because he was drunk. And the only reason they
eventually ended up getting rid of him was Captain
Kaiser got on a vehicle inspection kick because we
had new vehicles and his car was just stuff poured
down the side of the door or whatever. And then a
couple of times they made him take a breath test
and sent him home. I think they let him retire.
I don't think they fired him. Like I said he's
since passed away. But routinely I would say man,
I'm getting a contact buzz over here on my lane
from Mark, yet he's drunk as a skunk out here
qualifying and working the street every day.
Nobody -- the entire time I worked there, every
time I saw that guy there was alcohol on his
breath and I was under the assumption, you know, I
pretty much knew he probably was well over the
limit. Another big one too is, you know, I know
like, you know, like the SWAT thing, there was a
SWAT shooting where there was a subject in a
house, and to my knowledge he was by himself.
There was no hostage. He was in there by himself.
He had no visual, no contact of any kind within

the house.  And at some point I think possibly
negotiators had been called.  At some point
Lieutenant Koch ordered assault on the house.  We
joked with Sergeant Ochs who was the first in the
house at the time saying I'm not going in it.  If
there's no hostage in there and we think this
guy's armed and suicide by cop, I'm not going to
be the first one in the house and die for no
reason.  Apparently when we got in the house he
had a gun to his throat.  Sergeant Ochs shot a
shotgun beanbag round hitting him in the arm
causing his hand to flinch, shooting himself in
the head.  Apparently the SWAT members outside
while family members were present were giving each
other high fives.  And to my knowledge there was a
lawsuit and a payout on that.  But I can't confirm
that.  I just know that when we went to training
we would ask about it and Sergeant Ochs, well,
that's in litigation, I can't talk about it.  Once
again, you know, my thing on that is why did they
go in the house, there was no reason for that.
There was other tactics that could have been used.
You know, was anybody reprimanded for that or
whatever?  I don't know.  But, you know, possibly.
I don't think I ever got drug tested while I was

there.  I think there was possible steroid use.  I
think there may even have been a couple people
using marijuana.

We talked about all these sexual
harassment things or whatever.  You know, you
asked me last time about the culture from the
supervisors or the people that had been there for
a long time.  There are stories like Lieutenant
McGuire in his patrol car drunk, got in an
accident while drinking in his patrol car.  Once
again, just can't confirm it or not that he was.
Major Todd at the time, a deputy -- or I'm sorry,
a female dispatch or somebody within the
department filed a sexual harassment complaint
against him.  They did not do a good
investigation, so obviously it went nowhere.  When
they had a promotional process he did not test
number one in the promotional process, he wasn't
going to get the lieutenant spot, filed a
grievance and ended up getting promoted to
lieutenant.  You know, so you hear things like
that.  Once again these are the people that are
leading the department.  What else?

There was a story too -- I could never
confirm this -- somebody kind of came to me in

confidence when my thing went down and said that
Larry Cannon -- I don't even know if he's still at
the department -- apparently went to a call. A
mother called up and said that he had
inappropriately touched her teenage daughter,
fondled her. I don't know what the complaint was.
He then got in an accident on a county motorcycle.
He was a county motorcycle officer. He got in an
accident and broke his leg, and then I guess they
just kind of swept it underneath the rug because
he was out for awhile. Once again, can't confirm
that. Somebody came to me in confidence right
about the time my stuff went on and said hey, Eric
Cannon, he gets a complaint that he fondled
somebody and it goes nowhere.

     Q.  (By Mr. Ryals)  Go back to Lieutenant
Koch. You talked about his alcohol accident where
he almost hurt -- he did hurt himself out in
Wentzville. He has a son in the department, I
think it's a stepson or half son, Meyer. And he
got in a really bad accident out there by their
house near Incline Village and hurt himself really
bad. And Travis Jones who's no longer with the
department -- Travis Jones was one of our traffic
DWI gurus at the time -- wanted to write him a DWI

and I guess was basically told not to.  Travis was

known for keeping copies of all his reports so

that if they disappeared that he had paperwork to

show that hey, this did happen.  What's

interesting is he then got hired on with the

department.  And once again I can't confirm this,

at one point he got in the drug unit.  Whether he

was in the drug unit or prior to getting in the

drug unit, the SWAT team I heard did a search

warrant on a house and his uniform and gun were in

the house of the search warrant.

        MS. TEMPLE:  I'm sorry, I don't know who

we're talking about right now.

    A.   Meyers -- I forget his -- I don't know

his first name, James Meyers or Meyers.  It's

Lieutenant Koch's, I believe it's a stepson, half

son.  I forget what it is.  But those are just a

few things.

    Q.   (By Mr. Ryals)  Where's Travis Jones

now, do you know?

    A.   Travis is a very smart guy.  He had a

master's degree.  When I talked to him last he was

somewhere about the mid Minnesota prison system or

something.  I don't know what, I don't know what

he was going to do but he had a master's degree.

He was actually flowing all around the country as
a traffic expert and they would actually fly --
no, he wouldn't flow all around the country.  He
was asked to go to different places to be a
traffic expert.  And I know that numerous
attorneys were actually bringing people om from
all over the country to try to refute his
testimony as a DWI DRE expert.  So I don't know if
he -- I know he was talking about multiple
positions of going somewhere else, but I don't
know where it was.

     Q.    Anybody get in touch with him now?

     A.    I could make -- I mean, like I said, I
could maybe make a phone call to somebody, but I
don't know if --

     Q.    Would you kindly do that and see and
then pass it along to your attorney?

     A.    Okay.

     Q.    The one question I haven't asked you is
why is there this divide in the department between
those who have free rein and those who don't?

     A.    You know, I said before it's such a
shame because it has the potential to be the best
place to work in the metropolitan area.  I mean it
does, it does based upon the things you can do and

the training, the multiple positions that you can
get. I think personally it's the leadership. It
always comes back to the leadership. It always
comes back to, you know, people getting positions
based upon the fact that they deserve it, not the
fact that this is somebody that, you know, these
favors and these sayings and whether people know
stuff about other people and they've got baggage
on them and, you know, they got that, I got
something on you, you got something on me and
these things that go way back. There's a lot of
that. There's a lot of that stuff that's gone
back multiple years of, you know, partying and
doing stuff together, and the old sheriff's
department when there was really nothing in St.
Charles County but the sheriff's department, it
was fairly rural. And so the leadership had all
been there through that. They've all been there
25, 30 years. And I think that a lot of that has
come into play. And so you've got a lot of that.

       Whenever you have leadership that is
specific in one area, meaning Major Todd,
Lieutenant Koch are a very SWAT oriented; well,
guess what, they're going to take care of their
boys and they're going to take care of that unit.

And they're going to make sure they don't get in
trouble, and they're going to make sure that they
get what they want, and they're going to make sure
that they stay in the fugitive task force, and
they're going to make sure they get the positions
they want.  And so it always comes back to
leadership.

You know, someone like me, like I said,
I come in and not overly intelligent, not overly
educated, intelligent enough to know and crafty
enough to know and have enough friends that tell
me stuff and talk about stuff and willing to call
them out on stuff and say -- I've never had a
problem with getting written up for things that
I'm doing wrong.  Certainly correct me, write me
up, slap my hand, call me in the office and chew
me out; but I'll be damned if I'm doing my job and
I'm kicking ass and taking names and I'm putting
reports in and I'm out there doing what I'm
supposed to be doing which is going 100 miles an
hour protecting this county and answering calls to
the best of my ability to make sure that not only
that call is handled for that specific moment, but
that that incident may never resurface again based
upon the way I handled it at that moment, and I'll

be damned if this guy over here who doesn't do
shit, who doesn't do a damn thing, who doesn't
answer calls, who doesn't do any self-initiative
stuff, who's not out, everything is shiny, he's
got shiny boots and shiny buttons and he's on SWAT
or he's whatever, that he can go do something and
not get in trouble for it or get a specialty
position or get promoted or whatever.  And so, you
know, there was me and a couple other people that
called them out on that.  And they did not like
that.  And I know that that infuriated Captain
Kaiser to no end, but I called him out on, you
know, different things, or Lieutenant Koch or
whatever the case may be.  And they did everything
they could to make my life miserable over that
period of time.

    Q.    They, Koch and Kaiser?

    A.    Koch, Kaiser, you know, they're the
primary ones.

    Q.    You kind of talked about the strata
between lieutenants and captains and maybe Major
Todd as well.  And you haven't really talked as
much about the sheriff.  And, I mean, you've
described a couple incidents when you had direct
contact with them.

1      A.   Right.

2      Q.   But if you had to describe the
3 authority, not the legal authority but the
4 day-to-day practical authority who runs the
5 department, what would you say about that?

6      A.   Well, in specific when you're talking
7 about the patrol division which is basically the
8 heart and soul of any department, it would have
9 been Captain Kaiser.  I mean the sheriff certainly
10 oversees that and certainly, you know, makes
11 recommendations; but if he's out being political
12 and he's doing this and he's doing that, then it
13 pretty much falls to Captain Kaiser and Lieutenant
14 Koch to basically take care of whatever comes in,
15 you know, as far as patrol goes; as well as Simcox
16 for the detective bureau as well as Captain Hudson
17 for the administrative side or whatever the case
18 may be, and Major Todd for the specialty units,
19 bomb, SWAT team, drug unit -- not drug unit, bomb
20 unit, the drug dogs, you know, whatever the case
21 may be.

22      Q.   I want you to complete your answer if
23 there's more to say about that.

24      A.   I know like when -- I know, once again
25 hearsay, but I know when Swope took over, you

know, Neer didn't like the fact that, you know,
Swope was the sheriff and now here I've been here,
you know, I've been here 25, 30 years and I'm not
going to have this little punk tell me what to do
kind of what -- I think that was kind of what I
heard what his attitude might have been towards
that.

MS. TEMPLE: Move to strike,
speculative, it's insinuary (sic), inflammatory,
and it's not true.

A. But when he became sheriff then
certainly, you know, I think it's a power thing.
It's no different than the -- it's no different
than him basically pushing to make it a police
department. So he doesn't have to run anymore so
he can basically entrench himself in that
leadership with not having to fight for it, not
having to run for it, not having to show that he's
the leader.

MS. TEMPLE: Same objection.

A. Another thing that I've heard since this
all took place -- once again, this is just
hearsay, that there might be two active lawsuits
in reference to a ballot issue in reference to
that particular incident turning the county into a

police department as well as they lost.  The
wording of it as well as another lawsuit maybe of
a missing ballot box that showed up towards the
end.  So I don't know if those are true or not,
but that, you know, whatever.

    Q.   (By Mr. Ryals)  All right.  And talking
again about D.B. and the events that transpired
between you and D.B., you gave, you wrote a
statement, correct, and you also testified before
the grand jury; is that correct?

    A.   Correct.

    Q.   And if I asked you the same questions
that you were asked at the grand jury or if I
asked you questions that you responded to when you
wrote the statement, would your answers be any
different here today about the event?

    A.   Other than I haven't, I haven't read
those particular documents over in a while; but
no, they would --

    Q.   Okay.

    A.   -- be the same.

    Q.   Well, why don't you, rather than have
you read it and confirm it, why don't you just
tell me after you made the traffic stop, between
the time you stopped her and she left the scene,

what occurred?

A. In generic form I would say once again came up, it smelled, you know, intoxicating odor of alcohol, so I knew she had been drinking. She said she had come from the Monkey Bar. So --

Q. Did you know that, that she had come from the Monkey Bar?

A. Well, remember when I told you that when vehicles left the lot I followed several vehicles out of the lot, they all headed that direction. So I pretty much figured that maybe she had come from there.

Q. Okay.

A. Had she not made that abrupt pullover, I was going to get on 40 westbound and head home. She made that abrupt turnover, whatever, and I decided to pull her over. I smelled the alcohol obviously. I asked her if there was anything in the vehicle. I don't recall if she said there was anything in vehicle or not initially. I had her get out and do some just preliminarily tests, you know, PBT test -- not PBT test. I had a portable breath test in my vehicle, so I had her give her ABCs. She gave them forwards and backwards. Which like I said she gave them forwards and

backwards. I gave her the PBT. I think she was a
.02, so well under the legal limit in the State of
Missouri. At some point I went to search the car;
and based upon the fact that she had been drinking
or whatever, I don't know if she gave me
permission, I don't recall, but I think at some
point she said she had drugs in the console. So I
located what she said was hash. It ended up being
marijuana. I believe I found a pipe. Once again
I don't recall all the stuff that I found. I
found stuff in her possession. I went back to my
vehicle. Sitting in the car, she was obviously in
the back seat, the back seat not handcuffed. I
ran her through the computer once again to check
for her license status as well as any wants or
warrants, write some information down. At that
point, you know, she's freaking out, making
numerous comments that, you know, I can't pay for
a DWI, I can't do this. She then started making
references to how can I get out of this, whatever
the case may be. I had decided, you know, based
on my investigation at that point, I was trying to
-- she even had a camera in the car that she said
I could look at. So I checked the camera trying
to see if there were any pictures from inside the

Monkey Bar to see if there was any drug issues
inside the bar.  She offered me money to not write
her.  Obviously -- she worked at a restaurant, she
offered me free food in reference not to write
her.  Once I determined that there was really no
major connection with the Monkey Bar, I determined
that I was probably going to, you know, let her
go.  At that point, once again, she's -- and this
entire time she was making references, and
obviously they were becoming, progressing more
into sex for letting her go, whatever.  She then
showed herself.  When I went to release her from
the vehicle, like I said she showed herself, at
which point she kind of went for my crotch area,
unzipped my zipper.  And at that point I basically
said what are you doing and step away from it.
And at that point I released her from the scene.

     Q.   Never charged her?

     A.   Never charged her, no.

     Q.   We talked about your friend, Christopher
Hunt, Deputy Hunt?

     A.   Yes.

     Q.   And I think the record will reflect that
he was actually found guilty of a felony and he, I
think it's fair to characterize, has the

unqualified support of the sheriff.

        MS. TEMPLE:  Objection, that's speculative --

        MR. RYALS:  Go head, I don't want to interrupt your objection.

        MS. TEMPLE:  It's speculative and I move to strike whatever question you're about to ask with that preceding.

    Q.  (By Mr. Ryals)  The sheriff posted Deputy Neer's (sic) bond, his appeal bond, correct?

        MS. TEMPLE:  Objection, that is not true.  It's hearsay.  He wouldn't know.  He wasn't there when the bond was posted.

    A.  Correct.

    Q.  (By Mr. Ryals)  Correct?

    A.  Correct.

    Q.  And Deputy Hunt --

    A.  My dad was actually going to post it and they went ahead and posted it prior.  My dad was going to post it for him.

    Q.  Okay.  And Deputy Hunt is still, as far as you know, employed and --

    A.  Yes.

    Q.  -- working at the sheriff's department,

albeit behind a desk?

         A.   Correct.  And he has appealed through
the Missouri Supreme Court.

         Q.   Okay.  He stands found guilty convicted
of a felony.  You weren't convicted of anything,
they were going to fire you if you didn't resign,
yet he stays employed.  Why -- do you have an
explanation for why the two of you were treated
differently?

              MS. TEMPLE:  Objection, calls for
speculation.

         A.   I thought a lot about it.  You know,
Chris and I talked about it.  Once again, it is
what it is.  And, you know, although there are a
lot of similarities, the circumstances are
different in a lot of ways based upon the cases,
so it was apples to oranges type thing.

         Q.   (By Mr. Ryals)  Yeah.

         A.   But once again, the totality of the
charges against those other four detectives versus
me were -- I mean, I was charged with a
misdemeanor, and they were charged with felonies,
multiple felonies.  I don't know.  I don't know if
it was county versus county power thing.  I don't
know, I don't know.  I don't know if just -- you

know, I stand behind Chris.  I think it was

wrongly, they were wrongly convicted.  I mean I'll

go to my grave saying he was wrongly convicted.

It's a sad situation.  It's once again because of

the circumstances of the fact that they feel like

he was wrongly convicted and, you know, that hey,

you know, who's to say that he didn't see the meth

head sitting in the window.  You can't tell.  Just

because you guys didn't see him doesn't mean he

didn't see him.  So once again it's hard to say

why, you know, but -- I don't know.

    Q.   Go ahead.

    A.   I was going to say certainly there was

discussions I know with my incident that said

well, why isn't she going to get charged with

narcotics.  She came in and, yeah, those are my

drugs and I had the drugs.  And why she wasn't

charged with a crime as well in relation to that

incident.  The prosecutor didn't feel like he

wanted, you know, retroactive, you know, with the

fact that well, she's coming in with a complaint,

we're not going to charge her with that crime

versus saying that I guess a lot people felt like

she should have been charged with that incident as

well.  So that's the only thing I was going to say

in reference to my incident.

Q.   With you and Deputy Hunt, there are two incidents of complaints against a St. Charles County deputy.  They both resulted in criminal charges, you a misdemeanor, and he a felony.  One of you resigned under threat of being terminated, and the other is still employed there.  Are you aware of any other deputies with the same or similar circumstance as what I've just described as applying to you and Deputy Hunt?

A.   There's numerous people who have left there under not the best of circumstances.  One person -- and I don't know if this will apply or not, I'll just throw it out there -- Kary Kamp was a really good worker, one of the top three, four DWI -- he wasn't even a DWI, you know, attached to their DWI team or whatever, but one of the top three DWI writers, wrote dope cases.  I mean he was once again very active.  He was a little strange, but I liked Kary.  I know you could count on him.  Like I said, he was a really hard worker.

There was an incident one night where a kid had, I don't know if he had assaulted his girlfriend and his grandmother, just this little punk or whatever; but he took the keys to the car

so the girlfriend couldn't leave the house. And I
think Kary, they were kind of -- he kind of moved
down to the end of the court, it was a little dark
and like, look, I need to know where the keys are,
she needs to leave, this is ridiculous or
whatever. The kid wouldn't tell him. I think he
gave him a mandibular pressure point behind the
ear. He ended up leaving a nail mark where I
guess the nail kind of poked in there. And he was
subsequently -- he was subsequently fired over
that. And another deputy didn't see it, but said
he moved down to the end of the -- he said he
moved his car down to the end of the lane. There
was a whole bunch of stuff that went on with that.
The deputy left him a voicemail. That deputy got
written up. The deputy that said that Kary moved
down the street, that deputy left him a voicemail
basically, you know, why did you do -- you know,
you rat, or why did you do that or whatever. He
was subsequently written up, you know. And I know
that that's another reason why Kaiser like while I
was sitting in house while my investigation was
going on -- I think while my investigation was
going on -- the kid didn't want to come in and
complain. The kid did not want to file a

complaint, did not want to whatever. Captain
Kaiser actually called that kid and said you're
coming in. And the kid's like, I don't want to
come in. Captain Kaiser went and got him because
he didn't like Kary. Once again this is about he
didn't like Kary Kamp. He got the kid and made
him come in, fill out paperwork, whatever. I
think Kary ended up going to the, I don't know
what you call it, the review board or the county
oversight or whatever. And he ended up getting
fired for it or whatever. So I don't know if Kary
had write-ups, you know, numerous write-ups or
complaints, I don't remember, you know, what his
-- I just know as far as productivity as far as
what I consider good police work, his productivity
was definitely up there. But he was not charged
with anything, was not charged with a crime or
whatever.

     Q.   Any other instances you can think of?

     A.   Not at the moment. I'm trying to
recall. Like I said, there was a lot of people
that came and went, and even now there's so many
people that have come that are new that I'm just
trying to think. I can't think of anything right
now.

1    Q.   All right.

2         MR. RYALS:   Well, thank you, that's all

3    the questions I have.

4         THE WITNESS:   Okay.

5                        **EXAMINATION**

6    **QUESTIONS BY MS. TEMPLE:**

7         Q.   I have some questions for you.   Who

8    offered you Cardinals tickets for forgiving a DWI?

9         MR. RYALS:   Objection,

10   mischaracterization.   Please rephrase your

11   question.

12        Q.   (By Ms. Temple)   You can answer.

13        A.   I don't recall.

14        Q.   Who offered you tickets for taking care

15   of a DWI?

16        (CERTIFIED QUESTION.)

17        A.   I don't -- I don't recall at this time.

18        Q.   You choose not to recall or you don't

19   know?

20        A.   I really don't recall.   I just know that

21   --

22        Q.   What supervisor came and asked you if

23   you cared that the DWI disappeared?

24        (CERTIFIED QUESTION.)

25        A.   I don't recall that either.

```
 1        Q.   Sir, before you said I know his name, I
 2   just don't want to say it.
 3        A.   Okay.  But I'm saying now --
 4        Q.   So what is his name?  Did you hear the
 5   question?
 6        A.   I did.  I'm just --
 7        Q.   Do you understand the question?
 8        A.   Uh-huh.
 9        Q.   Are you refusing to answer the question?
10        A.   I'm not refusing at this time.  I just
11   don't recall.
12        Q.   Okay.  We'll have to certify that
13   question if you don't want to answer it today.
14        A.   Okay.
15        Q.   And the same for the Cardinals tickets,
16   did you hear the question?
17        A.   I did hear the question.
18        Q.   Did you understand the question?
19        A.   I did understand the question.
20        Q.   And are you refusing to answer that
21   question?
22        A.   I'm not refusing at this moment, I just
23   don't recall who offered me Cardinals tickets.
24        Q.   Okay.  We'll certify that question for
25   the judge too to decide whether or not you need to
```

answer it.

A.   Okay.

Q.   Who was the deputy who lost his gun when it was on the hood of his car?

A.   Deputy Cochran, Jerry Cochran.

Q.   What deputy had drugs in his car for three weeks without putting them into evidence?

A.   I didn't say drugs, I said evidence for approximately three weeks.  I don't remember the -- I don't think that deputy is even there anymore, but I don't recall his name.  There was numerous incidences where people had evidence in their trunks for certainly longer than the shift they were supposed to turn in on.  And I know like I said one -- one I think he particularly got in trouble because that was one of the things about him was I think that he was coming to work with alcohol on his breath.  When they got in his trunk he had evidence in his trunk and it had been in there for a month.  He's no longer there.

Q.   I'm asking you about the deputy that you were talking about before who routinely kept evidence in his car for three weeks.

A.   I don't recall saying routinely.  What I said was that I know there was a particular

incident, but I don't recall whatever somebody said. I know somebody said -- we were talking about getting into trouble for having evidence in our car, and this deputy said I've had stuff in my --

Q. Who was that deputy?

A. I don't recall.

Q. What did he look like then?

A. Ma'am, there was numerous deputies over seven years. It's been six years since I left that department. I don't recall who that was. These are things that have just come to me that are conversations that I know I had with people that did take place. But so many times --

Q. Do you have a way to corroborate what you're saying?

A. Apparently not on this question, no. You won't be able to corroborate this question, no.

Q. Would we be able to corroborate who offered you Cardinals tickets?

A. No, not offered me Cardinals tickets, no. I do not even recall who that was.

Q. So did you make it up?

A. No, I did not make it up.

1          Q.   Okay.   Would we be able to corroborate

2     who was the go-between between the sheriff and you

3     for a DWI to disappear?

4          A.   I'll have to think about it.   At this

5     time I don't recall who that is.

6          Q.   But the question was would we be able

7     corroborate that?

8          A.   I don't know.   If that person doesn't

9     say that they did it, I don't know how you're

10    going to corroborate other than me saying that

11    they did it.   If this person, whoever it may be,

12    if I can ever recall it, if they don't admit to

13    it, then I don't know how you're going to --

14         Q.   Did you utilize discretion in your job

15    as a patrol officer on a day-to-day basis?

16         A.   Did I have discretion?

17         Q.   Did you use discretion?

18         A.   At times.

19         Q.   Did you use discretion when you chose

20    not to charge D.B. but let her go for marijuana?

21         A.   Yes.

22         Q.   Did you use discretion in calling out

23    when you would say you were going to do this or

24    that?   You said people didn't always do it.   Did

25    you utilize discretion in that instance?

```
 1        A.   I did.  But I also believe at that time,
 2    like I said, I made reference to the fact that on
 3    times when we didn't call it might be because of
 4    radio traffic or whatever.  I also believe that at
 5    that time that I pulled her over, not that I can
 6    recall whether there was radio traffic going on,
 7    but initially I did not call out due to other
 8    radio traffic.  I jumped out on the traffic stop.
 9    And then, you're right, during the traffic stop I
10    did not call out after I had secured the scene
11    other than making the information known through my
12    computer system.
13        Q.   Did you use discretion in making that
14    decision?
15        A.   Yes.
16        Q.   Did you use to use discretion when you
17    would run lights and sirens to go to an accident
18    or to respond to a call and going through the red
19    lights?
20        A.   Per my training and also some department
21    policy and memorandums based upon how we were
22    going to drive to a scene, how fast we were going
23    to drive and use of our lights and sirens, yes.
24        Q.   So you used discretion in those cases
25    too?
```

1      A.   Yes.

2      Q.   Mr. Ryals was in my opinion trying to

3   make it seem like the policy was that you had to

4   call out.  And my question to you is did you have

5   discretion in how you handled your day-to-day

6   traffic stops?

7      A.   No.  I can't confirm that it was policy,

8   but I'm pretty sure that it was you had to call

9   out.

10     Q.   Then why didn't you call out?  Why are

11  you upset that you got in trouble for not calling

12  out if you were supposed to?

13     A.   Ma'am, I'm not upset.  I'm just speaking

14  the truth now to let you know that based upon

15  being at the sheriff's department for seven years

16  that I began to do things based upon what the

17  department was doing, what was accepted practice,

18  and what I felt comfortable doing.  And when I saw

19  supervisors do it, when I saw other people do it,

20  when I rolled up on supervisors and other deputies

21  who were on traffic stops who had not called out,

22  it became -- I didn't like doing it because a lot

23  of times I didn't normally do it because normally

24  when I was making traffic stops I was on a hot

25  call or doing drug investigations.  So most of the

time I did call out because, guess what, I usually had four people in the car on a dark desolate highway and I wanted somebody to come and back me up because I'm not made of stone.

There were particular instances though, like I said, based on radio traffic, nature of call, location you were at, traffic stop or whatever the case may be where you might not call out initially.  I know there was times we made contacts and never called out at all based upon those things I just talked about.

Q.   And that is why you used discretion; is that correct or incorrect?

A.   Once again it doesn't mean --

Q.   Sir, is it correct or incorrect?

A.   -- that I was supposed to do that.

Q.   (By Ms. Temple)  Is it correct or incorrect that you used discretion?

A.   I did what I felt the department would accept.

Q.   Do you understand the word discretion?

A.   I do understand the word discretion.

Q.   What is your understanding of the definition of discretion?

A.   I'm not -- I don't need to give you --

if you want me to give you the definition of
discretion, I'll say that's --

Q.    No, sir.    You're not answering the
question.

MR. HOOD:    Objection.    I think we're
misunderstanding each other here, and I think that
you're working at something.    Maybe if you
rephrased your question, it would be more
understandable to him and you could get an answer
that is legitimate for what you want.

MS. TEMPLE:    Okay.

Q.    (By Ms. Temple)    My question now is what
is the definition of discretion.

MR. HOOD:    He's not a dictionary.

MS. TEMPLE:    He said that he used
discretion in making callouts or not making them.
So I need to know what his mindset of discretion
was in making those decisions.

MR. HOOD:    Maybe he needs to understand
what discretion means in your head because
otherwise he doesn't understand the question
you're asking.

MS. TEMPLE:    Well, that's why I need to
ask his --

MR. HOOD:    We're going back and forth on

```
 1   this.  You want a definition of discretion from my
 2   client?
 3             MS. TEMPLE:  The discretion that he
 4   utilized on a day-to-day basis, yes.
 5             MR. HOOD:  Do you have the departmental
 6   definition of discretion?
 7             MS. TEMPLE:  I'm not asking him for
 8   that.
 9             MR. HOOD:  I'm asking that.
10             MS. TEMPLE:  I'm asking him for his
11   discretion.  Sir, it's up to you to do your own
12   discovery.
13             MR. HOOD:  I see.  Sure, give her a
14   definition of discretion.
15        A.   My opinion of discretion working at the
16   St. Charles County Sheriff's Department was that
17   based upon the training I had received, the
18   accepted practices of the sheriff's department,
19   that I would make a decision based upon those
20   things, based upon accepted practice that may go
21   against policy, but once again was accepted and
22   something that became routine; that I made
23   discretion, I made that decision and make that
24   decision based upon the fact of how I went, how I
25   and the people around me went about doing
```

day-to-day business.

Q. (By Ms. Temple) Did you take into consideration your training and education when you made those decisions?

A. Your education in the police academy is basic, it's basic information about just becoming certified as a police officer. When you get to the department and that department has its own sets of procedures, policies, common practices, whatever, you mold yourself into what your department does want you to do or whatever. So based upon the fact that when I was at the St. Charles County Sheriff's Department, I did based on what those things were.

Q. Did that differ from what you were taught in the academy?

A. I just said the academy doesn't teach you policies, individual policies, procedures, and accepted practices because they're not a department. They're just teaching you general information on law, on Mace, on verbal judo, whatever the case may be. They're not specific to each individual department which has its own set of policies, rules and accepted practices. That's what you go by.

1          Q.   Did St. Charles County Sheriff's
2    Department differ from Breckenridge Hills?
3          A.   In some cases, yes; in others, no.
4          Q.   What?
5               MR. RYLES:  So was the question why?
6               MS. TEMPLE:  What.
7          A.   Well, I mean just the basic things of
8    size, the fact that you didn't have to take home
9    vehicles, the fact that they didn't have specialty
10   units other than a detective bureau, the fact that
11   I had to keep a log, a daily log of my traffic
12   stops and tickets and case numbers pulled and
13   written, the fact that we didn't have our own
14   jail, the fact that we didn't have our own
15   dispatch center, we went through St. Ann.
16         Q.   (By Ms. Temple)  Were you allowed to
17   accept gratuities at Breckenridge Hills?
18         A.   Ma'am, you were never allowed to accept
19   -- you're not supposed to ever accept a lot of
20   gratuities except for, once again, free food, free
21   drinks, free coffees.  You know, I guess if you're
22   saying accept free gratuities, then yes, that was
23   a common practice at all three departments that I
24   worked in.
25         Q.   Would sexual favors be considered a

gratuity in your opinion?

A.   Yes, ma'am.

Q.   Did D.B. offer you a sexual favor --

A.   She did.

Q.   -- in exchange?

A.   She did.

Q.   Did you accept that favor?

A.   No, I did not.

Q.   You did not ask her to touch herself as alleged in the complaint?

A.   No, I did not.

Q.   Did you allow her or ask her to fondle you, your private area, as alleged in the complaint?

A.   No, I did not.

Q.   Why were you fired then?

THE WITNESS:  May I tell her?

A.   Well, as you know I wasn't fired, I was pressured into resigning.  So I wasn't actually fired, I was pressured into resigning.  If I didn't resign, I would have been fired.  Ma'am, for the fact that I have never lied about this incident from day one to the point where I openly came into St. Louis County and spoke openly, the fact that my statement in the sheriff's department

and the statement in St. Louis County and
everything that I've talked about from day one has
been the same; I have not wavered from that.  The
recommendation of my attorney was that because of
the one statement you made or the one sentence you
made, when you go into a court of law especially
as a police officer it's a 50/50 gamble.  And with
my wife and kids, I was not willing to put that on
the line to possibly go to prison when I was being
offered --

Q.   What --

A.   When I was being offered -- let me
finish my statement.  When I was being offered a
misdemeanor, SIS, was off my record, unsupervised
probation, and basically the loss of my job.  When
I weighed that out, I talked with my wife and
family -- they were the only thing that mattered
at that point -- the decision that we made
collectively was to take that deal versus taking
the risk of going to court and always running the
chance of being found guilty and going to prison.
So that's why I did what I did.

Q.   What was that one statement?

A.   I don't even remember what the statement
-- just the tail end of my -- I don't even

remember what it was.  Just the point that I was
honest to the point where I never tried to hide
anything.  I openly came into St. Louis County.  I
could have gone in there and said nothing, said I
got no statement, I got nothing to say to you, do
what you got to do.  The fact that I went in there
and openly gave a statement right there says that
I've hid nothing from day one of this
investigation, of this incident, not one thing.

        Q.    Okay.  Then I'm not understanding.  So
you're saying that you did not accept the gratuity
from this woman; is that correct?

        A.    That's correct.

        Q.    But you pled guilty to what?

        A.    I pled guilty to acceding to corruption.

        Q.    Would that be -- what was the acceding
to corruption?

        A.    Since you're going to ask me this
question I'll just tell you this:  That I was told
by my attorney that when St. Louis County
investigator who led this investigation went into
Jack Banas's office -- he's the St. Charles County
prosecutor -- with his write-up, and it was a
sexual crime, which is what he wrote the paperwork
up as, Jack Banas wanted to charge with acceding

to corruption. And the detective even said that
doesn't fit what the incident is that took place.
And under the advisement of my attorney, I only
accepted -- I did not want the wording -- it was
an Alford plea, I did not want the wording of --

Q. You took an Alford plea?

A. I did. Because I did not want -- I did
not want the wording of acceding to corruption on
there because I didn't accept, I didn't accept the
gratuities as far as acceding to corruption. But
unfortunately in order to get the deal, I had to
have that wording left in there. So, yes, I was
not happy about acceding to corruption because
that's not what happened.

Q. The regional drug task force was
detached from St. Charles County, isn't that
correct?

A. It's not detached from anywhere. It's
all the departments within St. Charles County that
make up the task force.

Q. Right. But it's not an entity of
St. Charles County government; is that correct?

A. Other than I don't think the other -- I
don't think -- I don't know if the unit -- I don't
know if the other departments could form a drug

task force without the sheriff's department and
get the grant without the sheriff's department
being involved or St. Charles County being
involved. And the fact that the county had it
written in there that at all times they will have
a supervisor, one supervisor within the drug task
force. You're right, I don't know the particulars
of any more than that.

Q. Okay. The regional drug task force does
not work for St. Charles County government, isn't
that correct?

MR. HOOD: Objection, this is
speculation. Would you know that?

Q. (By Ms. Temple) You were on the drug
task force, weren't you?

MR. HOOD: You were on the task force as
an officer. He wasn't on the task force as an
organizer or administrator.

MS. TEMPLE: I didn't ask him if he was.

MR. HOOD: But you're asking him for
knowledge that's outside --

MS. TEMPLE: And we haven't speculated
at all throughout this thing?

MR. HOOD: And you made your objections
about it, didn't you?

```
 1          Q.   (By Ms. Temple)  Subject to the
 2    objection does the regional drug task force work
 3    for St. Charles County government?
 4          A.   I would say that the St. Charles County
 5    Regional Drug Task Force works for every
 6    government within the confines of the St. Charles
 7    County boundaries, all the departments and cities.
 8          Q.   How long did you work for St. Charles
 9    County government in the sheriff's department?
10          A.   I was employed at the sheriff's
11    department for I believe a little over seven
12    years.
13          Q.   The power shift -- which could also be
14    called the fourth shift, isn't that correct?
15          A.   Correct.
16          Q.   Was denoted as the power shift only
17    because of the hours, not any special assignment
18    like the drug task force, like the drug
19    interdiction team; isn't that correct?
20          A.   With the emphasis on not answering calls
21    and being assigned to a zone and having free rein
22    to go do what we want as long as there was no
23    calls for service where we needed to step in and
24    assist with calls for service.
25          Q.   It was denoted as the power shift
```

because it encompassed two shifts so the county would not be unguarded during shift changes; isn't that correct?

A.  That was one of the reasons, yes.

Q.  And because 6:00 p.m. is when most people generally get home from work, and that's when criminal activity was likely to start or you would likely get called?

A.  Correct.  We were there to help with the influx of criminal activity to go out and seek out that criminal activity and enforce it.

Q.  You were a normal patrol deputy, isn't that correct?

A.  I was a patrol deputy, yes.

Q.  The power shift was not organized like the SWAT team, was it?

A.  When you say organized, we were designated to be on that shift.  So I don't know what -- I mean, you're right, there was no additional training to be on the power shift or fourth shift, no.

Q.  And there was no commander like there is at the SWAT team?

A.  No.  I had -- whatever supervisor was on either shift was my supervisor at that time.

Q.   And the power shift was not organized like the bomb squad?

A.   Ma'am, once again, the power shift was no additional training beyond just your regular patrol deputy training.

Q.   Your previous testimony on May the 2nd, you referred to the drug task force as the St. Charles County Drug Task Force.  It's the regional drug task force, isn't that correct?

A.   St. Charles County Regional Drug Task Force.

Q.   That's your understanding of what the name of the entity --

A.   That was the name of it when I left.  If it's changed, I have no idea; but that was the name.

Q.   Were you ever in a squad car with Ryan Streck?

A.   If I was, I don't recall.

Q.   So you don't know for sure that he was, quote, driving around in his car playing with the trigger of his shotgun when a hole went through his engine block; is that correct?

A.   No, I was not in the car with him when he shot his shotgun through his car into his

engine block.  I was not in the car with him when
he did that.

Q.   And you don't know whether or not he was
disciplined for his shotgun discharging, do you?

A.   Yeah, I don't know what the discipline
was, no, if there was any.

Q.   Lieutenant Koch -- and that's K-o-c-h --
did get in a motorcycle accident.  That was off
duty however, wasn't it?

A.   That's correct.

Q.   And was it a department-issued vehicle?

A.   No, it was not.

Q.   Were you at St. Joseph's West Hospital
when he arrived there?

A.   No, I was not.

Q.   So you don't know for a fact that
Lieutenant Koch was under the influence of alcohol
when the accident happened; isn't that correct?

A.   Yeah, other than hearsay and information
being told me that his blood alcohol content was
over the legal limit, over the limit.

Q.   It was mere hearsay?

A.   Correct.

Q.   Detective Weston Cox's weapon was stolen
when his home was burglarized.  It had nothing to

do with drinking, did it?

    A.   I don't know about that particular incident. Once again, the conversation of the things that I had heard was that he had lost several handguns from people that may be affiliated with the range that he had lost several handguns. So whether that particular handgun was stolen out of his house when it was burglarized, I don't know, I'm not aware.

    Q.   In your May 2nd testimony you mentioned that Sergeant Ochs, O-c-h-s, was speeding back from Jeff. City running lights and sirens because he wanted to get back quickly. You don't know whether or not he received progressive discipline or not, do you?

    A.   I don't know if there was any discipline or not; no, I do not. Probably some now.

    Q.   St. Charles County has a merit system which you were talking about with Kary Kamp -- and that's two k's, Kary and Kamp -- which employs progressive discipline; isn't that correct?

    A.   I believe. I'm not for sure on the merit system; but if you're saying so, then yes.

    Q.   The first step in progressive discipline is counseling or as you have put it talked to,

```
 1   isn't that correct?
 2        A.   Okay.
 3        Q.   Previously you testified you never
 4   received any specific training as to the contents
 5   of your department's policies.  You received that
 6   training during your orientation and probationary
 7   period, didn't you?
 8        A.   I don't think that at that time -- I
 9   don't think at that time when I came into the
10   department, I don't think that that was, that
11   reading over the entire policy and all the new
12   policies that came in was part of the training.  I
13   think it is now, but I don't think it was when I
14   went through, I'm not for sure.
15        Q.   So it is now under Sheriff Neer, but it
16   wasn't when you came in under Sheriff Salters; is
17   that what you're saying?
18        A.   But I was under Sheriff Neer for part of
19   that time as well.  I think he came in during
20   Sheriff's Neer's tenure.
21        Q.   It was your duty and responsibility as a
22   deputy in the department to remain current on
23   policies and procedures of the sheriff's
24   department?
25        A.   Once they started giving you the new
```

policies and made you sign for them.  I believe
before that it was you may get it, you may not get
it.

Q.   And Sheriff Neer had it so that you
signed for them, isn't that correct?

A.   I don't know if Sheriff Neer had to sign
for them or we had to sign for them.

Q.   I'm sorry?

A.   I don't know if it was Sheriff Neer --
Sheriff Neer did not make me sign for it, but I
had to sign for whoever gave them to me.

Q.   While Sheriff Neer was the sheriff, not
Captain Neer, but Sheriff Neer --

A.   Towards the end of my tenure, yes, that
would have been Sheriff Neer that would have been
in charge of the department.

Q.   And he required that you all sign for
them, isn't that correct?

A.   I just said yes, we would have to sign
for the policies.

Q.   And my question then was did you not
have to sign for them under Swope or Salters?  I
just added Swope.

A.   And I don't recall when it took effect,
I don't know.

1          Q.    You've testified about dumping of
2     evidence into a dumpster, and I think that you
3     said that that was the drug task force team?
4          A.    Okay.
5          Q.    But it was the regional drug task force
6     that threw out the syringes and marijuana, not
7     St. Charles County deputies --
8          A.    Supervised -- both are supervised by
9     St. Charles County supervisors.
10         Q.    Did a St. Charles County deputy throw
11    out evidence?
12         A.    Yes.
13         Q.    Okay.  Who threw out the evidence, who
14    threw out the syringes?
15         A.    It would have been I think all of us.
16    Me --
17         Q.    You threw out syringes?
18         A.    Yes.  That was our practice.
19         Q.    Who else?
20         A.    Anybody that was in the drug unit.  I
21    don't recall.  Maybe Sergeant Koester, I don't
22    know.  I don't recall who else would have done
23    that.  I just know that when I had syringes -- let
24    me rephrase that.  When I had syringes, I would
25    actually take my syringes to Barnes-St. Peters

Hospital right down the road and actually have
them deposit them in their sharp container boxes.
Did I ever have evidence left over from meth labs
or whatever, we would throw in the dumpsters, yes.
When the syringes were thrown in, I did not
partake in that particular incident where the
syringes were thrown in.  When we came back to the
office the next day and they were strewn
throughout the parking lot and a kid bicycling
down the street with a bong in his hand, I don't
know who threw those in the dumpster.  But the two
supervisors in the drug unit were St. Charles
County supervisors supervising the drug unit and
their disposal of the evidence from our cases.

    Q.   Were there supervisors there when the
syringes --

    A.   I don't recall, ma'am.  They were there
the next day when we came to work and they were
all throughout the parking lot, yes.

    Q.   So are you testifying that supervisors
in the sheriff's department allowed these syringes
and marijuana to be dumped?

    A.   Once again, whether they were there when
the dumping took place or whether they were aware
of it after the fact, they were aware of it.

1       Q.   Okay.  Did they allow it?

2       A.   Ma'am, I just said I don't know if they

3 allowed it in the sense that they were there and

4 gave the directive or they just knew about it

5 after the fact.  You know, like with the kid

6 bicycling down the street with a marijuana pipe, a

7 St. Peters police officer -- because our office at

8 the time was in St. Peters -- actually stopped the

9 kid and said what are you doing?  He said I got it

10 behind the dumpster over there or whatever.  At

11 which time it was brought to our attention.  At

12 which time my our supervisor was like oh, crap,

13 you guys are just throwing whatever.

14       Q.   Who was that supervisor?

15       A.   At the time it would have been Sergeant

16 Koester.  I don't know if it would have been

17 Lieutenant Tiefenbrunn.  Probably Lieutenant

18 Tiefenbrunn would have been the supervisor.

19       Q.   Who else was on the drug task force when

20 you were on there?

21       MR. HOOD:  I would imagine all of that

22 information is available in the county records.

23       A.   Correct.

24       MS. TEMPLE:  Thank you.

25       Q.   (By Ms. Temple)  Who else?

```
 1        A.   Ma'am, I don't know.  We had two teams.
 2   When I initially went in there there were seven
 3   people.  And then we had a regular undercover buy
 4   team.  And then we actually had a meth team.  And
 5   so I don't recall all of names of the people that
 6   came in out of the unit.  I don't know.  Like I
 7   said, if you gave me a list of the people that
 8   were in there, then I'm sure that the list is
 9   accurate.
10        Q.   When you interviewed to be a supervisor
11   you testified that Peggy Neer was on the interview
12   panel?
13        A.   Correct.
14        Q.   Sheriff Neer wasn't sheriff at that
15   time, isn't that correct?
16        A.   I don't recall.  I think he was the
17   acting sheriff.  I think at that time Swope had
18   vacated the office and Captain Neer was then the
19   acting sheriff in charge of the sheriff's
20   department.
21        Q.   Didn't Lieutenant Neer retire once
22   Sheriff Neer became sheriff?
23        A.   Ma'am, I don't know what her retirement
24   was.
25             MS. TEMPLE:  Thank you.  I don't have
```

anything further of this witness at this time.
And we'll certify those questions that you refused
to answer.

MR. RYALS: Well, of course, the record
is going to reflect the words that were stated,
but he didn't refuse to answer anything. I mean
you can certify them if you want, take them to the
judge, but he said he didn't recall. So I don't
want to sit silently by while you mischaracterize
what's stated on the record. But I don't have any
other questions. You want to talk about
signature?

**EXAMINATION**

**QUESTIONS BY MR. HOOD:**

Q. Very briefly. Earlier to Mr. Ryals you
indicated that you were offered Cardinals tickets,
but did you not also say that it was not as a
payment for fixing a DWI?

A. Right. There was no -- there was no
you'll get these tickets if this happens. It was,
you know, hey, appreciate the other day, whatever,
and if you want, you know, whatever, you want some
tickets. So it was not take these tickets -- hey,
here's four tickets if you let me get rid of this
DWI. It came to me as do you care. My answer was

```
 1   I don't care, my hands aren't on it, whatever.

 2       Q.   Okay.  So the county counselor's

 3   characterization of being given Cardinals tickets

 4   to relieve a DWI --

 5       A.   Right.  That I accepted tickets on

 6   behalf of a lot of DWI's --

 7       Q.   That was incorrect then?

 8       A.   Right.  This is just after the fact down

 9   the road, hey, thanks, you know, or whatever.

10            MR. HOOD:  Thank you.  Nothing further.

11                        EXAMINATION

12   QUESTIONS BY MS. TEMPLE:

13       Q.   Who thanked you with the tickets?

14       A.   Once again, I don't recall.  It was just

15   generalization of saying whoever at the time it

16   came to me.  Once again, I don't recall who it

17   was.

18            MR. HOOD:  Finished?

19            MR. RYALS:  I don't have anything else.

20            THE WITNESS:  I'll waive.

21

22                    (SIGNATURE WAIVED)

23

24

25
```

REPORTER'S CERTIFICATE

      I, DEBRA L. BURRIS, a Certified Court
Reporter in and for the States of Missouri and
Illinois, do hereby certify that, pursuant to
agreement of counsel, the witness named above came
before me and was by me duly sworn to testify to
the truth and nothing but the truth; that the said
examination was thereafter caused to be
transcribed into typewriting; that this deposition
is a true and accurate transcription of the
testimony given by the witness as aforesaid.

      BY THE AUTHORITY BESTOWED UPON ME, I have
hereunto set my hand on this _____ DAY OF
_____, 2013.


                  _____
                  DEBRA L. BURRIS, MO CCR #789,
                  IL CSR #084.004545

# #

**#084.004545** [1] - 119:22
**#205** [1] - 1:23
**#789** [1] - 119:21

# 0

**02** [1] - 81:2
**084-004545** [1] - 1:17

# 1

**10** [1] - 44:2
**100** [2] - 3:14, 75:20
**1041** [1] - 55:20
**117** [1] - 3:23
**118** [1] - 3:24
**14th** [1] - 31:9
**15** [4] - 45:25, 57:22
**15-minute** [1] - 17:19
**167** [1] - 1:23

# 2

**20** [1] - 45:25
**20-plus** [1] - 67:25
**2004** [1] - 5:24
**2006** [2] - 5:24, 23:13
**2007** [1] - 31:10
**2013** [3] - 1:15, 2:12, 119:16
**216** [1] - 3:15
**220366** [1] - 3:9
**25** [2] - 74:19, 78:3
**29** [1] - 1:15
**29th** [1] - 2:12
**2:00** [2] - 34:3, 34:4
**2:30** [2] - 34:3, 34:4
**2nd** [2] - 108:6, 110:10

# 3

**30** [2] - 74:19, 78:3
**3120** [2] - 2:15, 3:4
**314** [2] - 1:24

# 4

**40** [5] - 32:6, 32:8, 37:17, 38:24, 80:15
**4:12-CV-00654-JAR** [2] - 1:6, 2:5

# 5

**5** [1] - 3:21
**50/50** [1] - 102:7

# 6

**63017** [1] - 1:23
**63103** [2] - 2:16, 3:5
**63301** [2] - 3:10, 3:16
**6:00** [1] - 107:5

# 7

**70** [2] - 58:15, 58:20
**726-0800** [1] - 1:24
**726-0849** [1] - 1:24
**789** [1] - 1:17

# 8

**80** [1] - 59:13
**800** [2] - 12:21, 12:22
**840** [1] - 12:22
**89** [3] - 3:22, 4:2, 4:6

# 9

**90** [1] - 44:1
**94** [4] - 32:6, 32:8, 37:17, 38:23

# A

**A.D** [1] - 2:12
**ABCs** [1] - 80:24
**ability** [2] - 39:23, 75:22
**able** [7] - 13:17, 59:2, 63:3, 92:18, 92:20, 93:1, 93:6
**abrupt** [2] - 80:14, 80:16
**absolutely** [1] - 67:5
**academy** [5] - 10:24, 12:20, 99:5, 99:16, 99:17
**Academy's** [1] - 10:19
**acceding** [6] - 103:15, 103:16, 103:25, 104:8, 104:10, 104:13
**accept** [10] - 65:5, 96:20, 100:17, 100:18, 100:19, 100:22, 101:7, 103:11, 104:9
**accepted** [8] - 95:17, 98:18, 98:20, 98:21, 99:19, 99:24, 104:4, 118:5
**accident** [9] - 38:21, 70:10, 71:7, 71:9, 71:17, 71:21, 94:17, 109:8, 109:18

**accomplish** [1] - 40:24
**account** [3] - 9:14, 18:15, 19:8
**accurate** [6] - 19:11, 33:15, 33:18, 37:24, 116:9, 119:11
**acting** [3] - 46:20, 116:17, 116:19
**action** [1] - 17:10
**actions** [4] - 15:5, 37:20, 41:9, 41:12
**activation** [1] - 40:14
**active** [3] - 7:8, 78:23, 86:19
**activity** [4] - 7:9, 107:7, 107:10, 107:11
**add** [1] - 64:13
**added** [1] - 112:23
**additional** [3] - 10:6, 107:20, 108:4
**administrative** [4] - 49:21, 52:2, 53:17, 77:17
**administrator** [1] - 105:18
**admit** [1] - 93:12
**advantage** [1] - 55:6
**advisement** [1] - 104:3
**affairs** [1] - 46:21
**affiliated** [2] - 58:12, 110:6
**aforesaid** [1] - 119:12
**after-action** [1] - 17:10
**after-actions** [1] - 15:5
**afternoon** [1] - 2:14
**afterwards** [1] - 5:7
**age** [1] - 5:12
**agencies** [1] - 13:5
**agency** [1] - 30:16
**ago** [2] - 25:17, 67:23
**agreed** [1] - 2:10
**AGREED** [1] - 5:2
**agreement** [2] - 25:13, 32:25, 33:22, 37:17, 38:18, 58:20, 59:20, 59:21, 73:24, 74:22, 82:14, 101:13
**ahead** [4] - 19:4, 23:3, 83:20, 85:12
**albeit** [1] - 84:1
**alcohol** [10] - 60:1, 67:21, 68:2, 68:17, 71:17, 80:4, 80:17, 91:18, 109:17, 109:20
**alcoholic** [1] - 67:24
**Alford** [2] - 104:5, 104:6
**alike** [2] - 42:19, 44:11
**allegations** [1] - 67:14
**alleged** [2] - 101:10,

101:13
**allies** [2] - 53:1, 53:4
**allow** [2] - 101:12, 115:1
**allowed** [8] - 49:5, 50:11, 58:4, 65:5, 100:16, 100:18, 114:21, 115:3
**ally** [1] - 53:21
**almost** [4] - 21:16, 22:9, 59:6, 71:18
**American** [1] - 6:20
**amount** [1] - 41:7
**AND** [1] - 5:2
**angrily** [1] - 24:20
**Ann** [1] - 100:15
**answer** [12] - 40:1, 76:3, 77:22, 89:12, 90:9, 90:13, 90:20, 91:1, 97:9, 117:3, 117:6, 117:25
**answering** [4] - 9:16, 75:21, 97:3, 106:20
**answers** [1] - 79:15
**anytime** [1] - 54:6
**anyway** [1] - 62:23
**appeal** [1] - 83:10
**appealed** [1] - 84:2
**APPEARANCES** [1] - 3:2
**apples** [1] - 84:17
**application** [1] - 7:17
**applied** [3] - 7:12, 7:16, 13:4
**apply** [3] - 6:13, 38:5, 86:13
**applying** [2] - 15:25, 86:10
**appreciate** [2] - 35:15, 117:21
**approached** [1] - 61:14
**appropriate** [2] - 58:9, 59:18
**apt** [1] - 45:3
**area** [12] - 25:13, 32:25, 33:22, 37:17, 38:18, 58:20, 59:20, 59:21, 73:24, 74:22, 82:14, 101:13
**areas** [1] - 5:19
**arisen** [1] - 14:19
**Arizona** [1] - 12:18
**arm** [1] - 69:11
**armed** [1] - 69:7
**arrest** [4] - 14:10, 14:13, 14:14
**arrived** [1] - 109:14
**ass** [2] - 62:11, 75:18
**assault** [3] - 10:19,

35:14, 69:3
**assaulted** [1] - 86:23
**assigned** [4] - 5:20, 57:20, 57:23, 106:21
**assignment** [2] - 10:11, 106:17
**assist** [2] - 37:8, 106:24
**assistant** [1] - 30:5
**assume** [1] - 43:8
**assumption** [1] - 68:18
**attach** [1] - 17:8
**attached** [1] - 86:16
**attend** [1] - 12:2
**attention** [1] - 115:11
**attire** [3] - 58:9, 59:5, 59:7
**attitude** [1] - 78:6
**attorney** [4] - 73:17, 102:4, 103:20, 104:3
**attorneys** [1] - 73:6
**audio** [2] - 39:24, 40:15
**Augusta** [1] - 28:1
**AUTHORITY** [1] - 119:14
**authority** [5] - 32:21, 33:2, 77:3, 77:4
**auto** [1] - 67:3
**available** [1] - 115:22
**award** [1] - 6:23
**aware** [7] - 29:21, 60:14, 64:11, 86:8, 110:9, 114:24, 114:25
**awareness** [1] - 46:10
**awhile** [1] - 71:11

# B

**BAC** [1] - 61:4
**backwards** [2] - 80:24, 81:1
**bad** [4] - 14:16, 67:24, 71:21, 71:23
**badge** [3] - 22:3, 58:13
**baggage** [1] - 74:8
**ballot** [2] - 78:24, 79:3
**Banas** [2] - 30:21, 103:25
**Banas's** [1] - 103:22
**bar** [10] - 34:14, 34:16, 34:20, 34:22, 34:24, 35:14, 35:16, 35:20, 35:22, 82:2
**Bar** [16] - 35:2, 35:6, 35:13, 35:21, 36:5, 36:16, 37:14, 38:13,

1

39:11, 39:14, 39:15, 39:17, 80:5, 80:7, 82:1, 82:6
**Barnes** [1] - 113:25
**Barnes-St** [1] - 113:25
**bars** [1] - 60:5
**based** [20] - 60:16, 60:24, 61:4, 73:25, 74:5, 75:24, 81:4, 81:21, 84:16, 94:21, 95:14, 95:16, 96:6, 96:10, 98:17, 98:19, 98:20, 98:24, 99:12, 99:14
**basic** [3] - 99:6, 100:7
**basics** [1] - 13:18
**basis** [2] - 93:15, 98:4
**baton** [1] - 13:23
**battle** [1] - 23:2
**beanbag** [1] - 69:11
**bear** [4] - 40:8, 47:22, 51:15, 60:21
**Bear** [1] - 48:25
**beard** [1] - 6:2
**became** [8] - 9:22, 16:24, 16:25, 28:4, 78:11, 95:22, 98:22, 116:22
**Becky** [1] - 27:5, 30:2
**become** [3] - 10:22, 12:24, 43:3
**becoming** [5] - 26:24, 27:2, 29:5, 82:10, 99:6
**began** [1] - 95:16
**beginning** [1] - 34:6
**behalf** [2] - 1:14, 118:6
**behind** [11] - 16:13, 16:16, 21:17, 21:22, 21:23, 44:14, 45:12, 84:1, 85:1, 87:7, 115:10
**beings** [1] - 37:15
**belief** [1] - 18:17
**best** [3] - 73:23, 75:22, 86:12
**BESTOWED** [1] - 119:14
**better** [5] - 14:18, 14:21, 19:17, 23:24, 32:19
**between** [12] - 2:12, 5:3, 17:7, 41:20, 55:14, 65:22, 73:20, 76:21, 79:8, 79:24, 93:2
**Beverly** [1] - 3:17
**beyond** [4] - 21:7, 30:15, 47:7, 108:4

**bicycling** [1] - 114:9, 115:6
**big** [9] - 25:8, 26:7, 30:19, 51:7, 53:10, 57:13, 59:22, 61:1, 68:20
**biggie** [1] - 59:15
**bit** [4] - 19:16, 42:23, 57:1, 60:7
**blend** [1] - 6:5
**block** [2] - 108:23, 109:1
**blocks** [1] - 11:10
**blood** [1] - 109:20
**board** [5] - 30:23, 30:25, 31:2, 59:10, 88:9
**bomb** [1] - 77:19, 108:2
**bond** [3] - 83:10, 83:14
**bong** [1] - 114:10
**boot** [2] - 53:6, 54:19
**boots** [1] - 76:5
**bothered** [1] - 24:9
**bounced** [2] - 58:18, 59:3
**boundaries** [1] - 106:7
**box** [1] - 79:3
**Box** [1] - 3:9
**boxes** [1] - 114:2
**boys** [5] - 65:14, 65:15, 65:25, 66:16, 74:25
**break** [3] - 56:22, 56:24, 61:17
**breath** [5] - 68:3, 68:9, 68:18, 80:23, 91:18
**Breckenridge** [2] - 100:2, 100:17
**bribed** [2] - 64:21, 64:23
**briefly** [1] - 117:15
**bringing** [3] - 27:6, 28:17, 73:6
**broad** [1] - 13:21
**broke** [1] - 71:9
**broken** [1] - 11:10
**brother** [2] - 26:6, 62:14
**brought** [3] - 51:24, 52:3, 115:11
**Brown** [1] - 67:22
**buffer** [1] - 55:14, 56:20
**bunch** [2] - 27:12, 87:14
**bureau** [5] - 51:12, 53:11, 53:18, 77:16, 100:10

**Bureau** [1] - 51:24
**burglarized** [2] - 109:25, 110:8
**BURRIS** [1] - 119:21
**Burris** [3] - 1:16, 2:16, 5:5
**bURRIS** [1] - 119:3
**Bush** [6] - 25:18, 26:1, 26:5, 27:22, 28:2, 28:5
**Bush's** [1] - 27:20
**business** [1] - 99:1
**busy** [1] - 42:5
**buttons** [1] - 76:5
**buy** [1] - 116:3
**buzz** [1] - 68:13

# C

**callouts** [1] - 97:16
**camera** [3] - 40:7, 81:23, 81:24
**cameras** [1] - 40:14
**Cannon** [2] - 71:2, 71:14
**Captain** [27] - 24:11, 24:12, 24:14, 24:19, 45:10, 45:14, 52:1, 52:2, 52:5, 52:8, 53:9, 53:15, 53:16, 53:18, 56:3, 56:9, 56:15, 56:18, 68:5, 76:11, 77:9, 77:13, 77:16, 88:1, 88:4, 112:13, 116:18
**captain** [2] - 52:3, 53:18
**captains** [2] - 45:9, 76:21
**car** [46] - 16:2, 21:15, 36:14, 36:15, 38:25, 39:7, 39:12, 39:13, 39:17, 39:21, 40:6, 42:2, 45:24, 49:4, 49:6, 49:9, 49:12, 49:14, 49:16, 56:11, 57:17, 57:19, 58:16, 58:17, 58:23, 67:2, 68:7, 70:9, 70:10, 81:3, 81:12, 81:23, 86:25, 87:13, 91:4, 91:6, 91:23, 92:4, 96:2, 108:17, 108:21, 108:24, 108:25, 109:1
**Cardinal** [1] - 64:7
**Cardinals** [9] - 64:2,

64:5, 89:8, 90:15, 90:23, 92:21, 92:22, 117:16, 118:3
**care** [15] - 4:3, 60:25, 61:12, 62:3, 62:4, 62:7, 62:14, 63:13, 64:1, 74:24, 74:25, 77:14, 89:14, 117:25, 118:1
**cared** [2] - 4:8, 89:23
**career** [1] - 13:5
**carry** [1] - 40:2
**cars** [4] - 21:12, 38:17, 45:17, 57:9
**case** [18] - 7:8, 16:3, 22:9, 34:21, 36:7, 44:10, 50:20, 58:14, 61:6, 63:2, 64:1, 76:14, 77:17, 77:20, 81:21, 96:8, 99:22, 100:12
**cases** [9] - 9:17, 34:20, 34:22, 35:19, 84:16, 86:18, 94:24, 100:3, 114:14
**CATLETT** [1] - 1:22
**caught** [1] - 56:4
**caused** [1] - 119:9
**causing** [1] - 69:12
**CCR** [1] - 119:21
**center** [1] - 100:15
**certain** [1] - 2:17
**certainly** [14] - 13:15, 15:4, 15:18, 54:4, 54:13, 57:20, 59:20, 60:18, 62:20, 77:9, 77:10, 78:12, 85:13, 91:13
**Certainly** [1] - 75:15
**CERTIFICATE** [1] - 119:1
**certification** [1] - 10:25
**Certified** [3] - 2:17, 5:5, 119:3
**certified** [2] - 12:24, 99:7
**CERTIFIED** [3] - 4:1, 89:16, 89:24
**certify** [5] - 90:12, 90:24, 117:2, 117:7, 119:5
**chain** [3] - 7:19, 24:10, 30:14
**chance** [2] - 42:4, 102:21
**change** [1] - 32:10
**changed** [2] - 60:17, 108:15
**changes** [3] - 18:20,

29:21, 107:2
**characterization** [1] - 118:3
**characterize** [1] - 82:25
**charge** [6] - 8:4, 85:22, 93:20, 103:25, 112:16, 116:19
**charged** [12] - 49:24, 50:1, 50:2, 82:18, 82:19, 84:21, 84:22, 85:15, 85:18, 85:24, 88:16, 88:17
**charges** [2] - 84:20, 86:5
**Charles** [55] - 2:21, 3:16, 6:20, 7:2, 8:4, 8:22, 9:8, 10:9, 10:18, 13:8, 13:11, 21:3, 22:4, 22:16, 27:17, 27:24, 29:8, 29:13, 30:5, 30:15, 30:17, 30:20, 32:16, 32:18, 33:2, 33:8, 33:11, 35:11, 35:22, 42:25, 44:22, 51:23, 65:21, 74:16, 86:3, 98:16, 99:13, 100:1, 103:22, 104:16, 104:19, 104:22, 105:3, 105:10, 106:3, 106:4, 106:6, 106:8, 108:8, 108:10, 110:18, 113:7, 113:9, 113:10, 114:12
**CHARLES** [3] - 1:7, 2:6, 3:13
**check** [1] - 81:14
**checked** [1] - 81:24
**Chesterfield** [1] - 1:23
**chew** [1] - 75:16
**chewed** [1] - 59:3
**chiefs** [3] - 22:25, 30:21, 31:4
**choose** [1] - 89:18
**chose** [1] - 93:19
**Chris** [3] - 34:18, 84:13, 85:1
**Christopher** [1] - 82:20
**Chross** [1] - 51:8
**circumstance** [1] - 86:9
**circumstances** [3] - 84:15, 85:5, 86:12
**cities** [1] - 106:7
**citizen** [1] - 59:1
**City** [4] - 21:3, 22:16,

2

27:24, 110:12

**class** [1] - 33:6

**clear** [6] - 14:23, 18:13, 24:7, 24:24, 29:20, 65:23

**clearly** [2] - 51:4, 51:7

**client** [1] - 98:2

**client's** [1] - 18:1

**close** [2] - 24:3, 43:19

**close-knit** [1] - 43:19

**closed** [3] - 35:3, 35:4, 51:14

**clothes** [3] - 6:2, 36:9, 36:12

**Cochran** [2] - 91:5

**coffees** [1] - 100:21

**collectively** [1] - 102:19

**colloquialism** [1] - 54:20

**combat** [1] - 8:15

**combatting** [1] - 8:17

**comfortable** [2] - 24:16, 95:18

**coming** [8] - 5:16, 16:20, 35:21, 36:5, 45:11, 85:21, 88:3, 91:17

**command** [3] - 7:19, 24:10, 30:14

**commander** [13] - 8:1, 8:3, 8:4, 8:7, 8:21, 9:2, 9:5, 9:6, 30:24, 31:3, 67:10, 67:19, 107:22

**comments** [1] - 81:18

**common** [5] - 43:3, 43:24, 60:8, 99:9, 100:23

**commonly** [1] - 43:22

**company** [1] - 26:9

**complain** [1] - 87:25

**complaint** [5] - 31:17, 47:21, 51:9, 70:14, 71:6, 71:14, 85:21, 88:1, 101:10, 101:14

**complaints** [6] - 34:22, 35:23, 35:24, 36:4, 86:3, 88:13

**complete** [1] - 77:22

**completed** [3] - 12:19, 12:23, 13:3

**computer** [5] - 47:11, 48:7, 48:8, 81:14, 94:12

**conclude** [1] - 36:24

**conduct** [2] - 33:15, 33:18

**confidence** [2] - 71:1, 71:12

**confines** [1] - 106:6

**confirm** [8] - 67:17, 69:16, 70:11, 70:25, 71:11, 72:6, 79:23, 95:7

**confirming** [1] - 47:3

**conflict** [1] - 49:10

**connection** [3] - 26:10, 82:6

**consequences** [2] - 66:17, 66:18

**consider** [1] - 88:15

**consideration** [1] - 99:3

**considered** [2] - 6:17, 100:25

**consistent** [1] - 10:4

**consisting** [2] - 65:11, 65:13

**console** [1] - 81:7

**contact** [4] - 44:8, 47:16, 68:13, 68:25, 76:25

**contacts** [2] - 44:5, 96:10

**container** [1] - 114:2

**content** [1] - 109:20

**contents** [1] - 111:4

**context** [1] - 64:4

**continuation** [1] - 2:11

**continuing** [2] - 10:14, 11:8, 13:2

**continuous** [1] - 38:14

**contrary** [1] - 43:8

**control** [1] - 13:24

**controversy** [1] - 46:11

**conversation** [8] - 20:22, 28:16, 29:2, 29:18, 47:7, 50:9, 50:23, 110:3

**conversations** [2] - 53:19, 92:13

**convicted** [5] - 84:4, 84:5, 85:2, 85:3, 85:6

**cop** [2] - 58:22, 69:7

**copies** [1] - 72:2

**cops** [1] - 59:23

**corporations** [1] - 33:4

**correct** [100] - 5:21, 6:7, 7:6, 7:11, 7:20, 8:20, 9:10, 9:18, 9:21, 11:6, 11:7, 11:9, 11:11, 11:15, 11:21, 11:25, 12:4, 12:5, 13:6, 14:1, 14:7, 17:2, 18:16,

20:8, 20:9, 20:23, 28:3, 28:5, 29:14, 31:11, 31:14, 31:15, 31:17, 31:18, 32:15, 33:13, 35:6, 36:15, 36:18, 37:12, 37:25, 38:8, 38:11, 40:7, 40:8, 40:22, 40:23, 41:1, 41:2, 41:4, 43:16, 43:17, 48:14, 48:22, 49:24, 49:25, 50:18, 52:25, 57:11, 61:16, 61:22, 63:18, 65:12, 65:18, 75:15, 79:9, 79:10, 79:11, 83:11, 83:15, 83:16, 83:17, 84:2, 96:13, 96:15, 96:17, 103:12, 103:13, 104:17, 104:22, 105:11, 106:14, 106:15, 106:19, 107:3, 107:9, 107:13, 108:9, 108:23, 109:10, 109:18, 110:21, 111:1, 112:5, 112:18, 115:23, 116:13, 116:15

**Correct** [11] - 6:4, 11:18, 13:6, 14:4, 32:23, 36:20, 37:9, 39:16, 46:24, 52:16, 109:23

**correctly** [1] - 38:20

**corroborate** [6] - 92:15, 92:18, 92:20, 93:1, 93:7, 93:10

**corruption** [6] - 103:15, 103:17, 104:1, 104:8, 104:10, 104:13

**counsel** [2] - 17:7, 119:6

**Counsel** [2] - 5:3

**counseling** [1] - 110:25

**Counselor's** [1] - 3:13

**counselor's** [1] - 118:2

**count** [1] - 86:20

**counties** [1] - 30:19

**country** [3] - 73:1, 73:3, 73:7

**county** [25] - 15:17, 25:16, 25:22, 25:25, 26:21, 27:24, 33:6, 33:19, 33:21, 44:16, 56:10, 56:11, 56:12, 58:23, 71:7, 71:8,

75:21, 78:25, 84:24, 88:9, 105:4, 107:1, 115:22, 118:2

**COUNTY** [2] - 1:7, 2:6

**County** [60] - 2:21, 3:13, 7:2, 8:4, 8:8, 8:9, 8:22, 9:8, 10:9, 10:18, 13:8, 13:11, 22:5, 27:17, 29:8, 29:13, 30:5, 30:16, 30:17, 30:20, 32:16, 32:18, 33:2, 33:8, 33:12, 35:11, 35:22, 42:25, 44:22, 49:11, 49:16, 51:23, 65:21, 74:16, 86:4, 98:16, 99:13, 100:1, 101:24, 102:1, 103:3, 103:20, 103:22, 104:16, 104:19, 104:22, 105:3, 105:10, 106:3, 106:4, 106:7, 106:9, 108:8, 108:10, 110:18, 113:7, 113:9, 113:10, 114:13

**couple** [11] - 25:14, 27:10, 28:13, 60:20, 61:11, 63:12, 67:23, 68:9, 70:2, 76:9, 76:24

**course** [6] - 12:19, 13:20, 16:25, 25:4, 52:20, 117:4

**courses** [1] - 12:8

**Court** [3] - 2:18, 84:3, 119:3

**court** [5] - 87:3, 102:6, 102:20

**COURT** [2] - 1:1, 2:1

**courthouse** [1] - 56:7

**cousin** [1] - 62:15

**cover** [1] - 32:25

**covered** [2] - 11:2, 26:11

**Cox's** [1] - 109:24

**crafty** [1] - 75:10

**crap** [2] - 58:18, 115:12

**crime** [5] - 49:24, 85:18, 85:22, 88:17, 103:24

**criminal** [5] - 50:20, 86:4, 107:7, 107:10, 107:11

**crotch** [1] - 82:14

**CSR** [1] - 119:22

**cuffs** [1] - 17:15

**culture** [3] - 54:24,

65:10, 70:6

**current** [2] - 11:20, 111:22

## D

**D.B** [18] - 1:4, 2:3, 2:20, 31:13, 31:24, 34:12, 34:24, 36:11, 37:20, 37:23, 39:6, 39:22, 45:24, 46:11, 79:7, 79:8, 93:20, 101:3

**dad** [3] - 26:1, 83:19, 83:20

**daily** [1] - 100:11

**damn** [1] - 76:2

**damned** [2] - 75:17, 76:1

**dark** [2] - 87:3, 96:2

**data** [2] - 47:12, 47:15

**daughter** [1] - 71:5

**DAY** [1] - 119:15

**day-to-day** [5] - 77:4, 93:15, 95:5, 98:4, 99:1

**days** [7] - 24:19, 25:14, 28:13, 46:12, 46:13, 59:11, 59:16

**deaf** [1] - 66:9

**deal** [2] - 102:19, 104:11

**dealing** [1] - 6:25

**DEBRA** [1] - 119:3

**Debra** [3] - 1:16, 2:16, 5:5

**dEBRA** [1] - 119:21

**decide** [1] - 90:25

**decided** [2] - 80:17, 81:21

**decision** [7] - 15:3, 16:2, 94:14, 98:19, 98:23, 98:24, 102:18

**decisions** [2] - 97:18, 99:4

**declined** [1] - 12:13

**Defendants** [4] - 1:8, 2:8, 2:22, 5:4

**deferred** [1] - 63:24

**definitely** [4] - 50:21, 53:11, 58:2, 88:16

**definition** [6] - 96:24, 97:1, 97:13, 98:1, 98:6, 98:14

**degree** [3] - 30:3, 72:22, 72:25

**delve** [2] - 44:10

**denoted** [2] - 106:16, 106:25

**Department** [8] -

3

10:10, 22:5, 30:18, 35:12, 65:22, 98:16, 99:13, 100:2

**department** [61] - 12:7, 23:3, 23:8, 23:22, 25:18, 42:15, 43:19, 43:23, 46:18, 50:7, 50:12, 53:2, 54:6, 54:8, 55:17, 58:13, 60:9, 64:15, 65:11, 65:24, 67:8, 67:14, 67:15, 67:25, 70:14, 70:23, 71:3, 71:19, 71:24, 72:6, 73:20, 74:15, 74:16, 77:5, 77:8, 78:15, 79:1, 83:25, 92:11, 94:20, 95:15, 95:17, 96:19, 98:18, 99:8, 99:11, 99:20, 99:23, 101:25, 105:1, 105:2, 106:9, 106:11, 109:11, 111:10, 111:22, 111:24, 112:16, 114:21, 116:20

**department's** [1] - 111:5

**department-issued** [1] - 109:11

**departmental** [1] - 98:5

**departments** [6] - 8:5, 33:5, 100:23, 104:19, 104:25, 106:7

**depo** [1] - 5:17

**deposes** [1] - 5:13

**deposit** [1] - 114:2

**Deposition** [1] - 1:14

**deposition** [3] - 2:11, 5:4, 119:10

**Depot** [1] - 56:11

**deputies** [26] - 15:10, 16:11, 16:15, 18:8, 18:14, 18:24, 19:15, 27:17, 29:8, 29:11, 36:20, 36:25, 37:1, 37:5, 41:24, 43:5, 43:20, 45:13, 56:20, 57:3, 57:9, 86:8, 92:9, 95:20, 113:7

**Deputy** [6] - 6:19, 6:21, 35:16, 36:8, 55:12, 82:21, 83:10, 83:18, 83:22, 86:2, 86:10, 91:5

**deputy** [28] - 15:15, 16:9, 16:10, 27:21, 33:2, 33:7, 44:2,

56:7, 57:18, 67:8, 70:12, 86:4, 87:11, 87:15, 87:16, 87:17, 91:3, 91:6, 91:10, 91:21, 92:4, 92:6, 107:12, 107:14, 108:5, 111:22, 113:10

**deputy's** [1] - 57:17

**describe** [1] - 77:2

**described** [8] - 9:12, 37:20, 40:20, 63:16, 65:10, 66:15, 76:24, 86:9

**describing** [1] - 47:8

**deserve** [1] - 74:5

**designated** [2] - 8:17, 107:18

**desk** [2] - 49:21, 84:1

**desolate** [1] - 96:2

**detached** [2] - 104:16, 104:18

**detail** [1] - 47:7

**detective** [9] - 8:19, 9:23, 10:5, 51:12, 51:23, 53:18, 77:16, 100:10, 104:1

**Detective** [3] - 8:20, 51:24, 109:24

**detectives** [3] - 8:12, 35:11, 84:20

**determine** [1] - 61:3

**determined** [2] - 82:5, 82:6

**development** [1] - 10:23

**dictionary** [1] - 97:14

**die** [1] - 69:8

**differ** [2] - 99:15, 100:2

**different** [11] - 9:13, 13:22, 25:12, 30:6, 62:8, 73:4, 76:13, 78:13, 79:16, 84:16

**differently** [2] - 15:25, 84:9

**dig** [1] - 63:9

**direct** [2] - 51:18, 76:24

**directed** [2] - 43:1, 43:3

**direction** [3] - 18:19, 37:19, 80:10

**directive** [1] - 115:4

**directly** [1] - 30:25

**disappear** [3] - 60:24, 63:5, 93:3

**disappeared** [4] - 4:8, 72:3, 89:23

**disappears** [3] - 62:1,

62:20, 63:14

**disbanded** [3] - 27:3, 30:2, 30:11

**discharging** [1] - 109:4

**discipline** [5] - 109:5, 110:14, 110:16, 110:21, 110:24

**disciplined** [1] - 109:4

**discount** [2] - 64:18, 64:23

**discovery** [1] - 98:12

**discretion** [27] - 93:14, 93:16, 93:17, 93:19, 93:22, 93:25, 94:13, 94:16, 94:24, 95:5, 96:12, 96:18, 96:21, 96:22, 96:24, 97:2, 97:13, 97:16, 97:17, 97:20, 98:1, 98:3, 98:6, 98:11, 98:14, 98:15, 98:23

**discussed** [2] - 17:21, 57:10

**discussion** [3] - 23:24, 57:4, 64:10

**discussions** [4] - 17:8, 18:5, 19:23, 85:14

**dishonest** [1] - 60:17

**dispatch** [3] - 45:14, 70:13, 100:15

**disposal** [1] - 114:14

**disposition** [2] - 50:20, 50:21

**dissolved** [1] - 28:14

**District** [2] - 2:18, 2:19

**DISTRICT** [4] - 1:1, 1:1, 2:1, 2:1

**divide** [1] - 73:20

**DIVISION** [2] - 1:2, 2:2

**division** [1] - 77:7

**Division** [1] - 2:20

**documents** [1] - 79:18

**dogs** [1] - 77:20

**Donald** [1] - 3:11

**done** [6] - 5:18, 14:22, 15:8, 15:9, 60:18, 113:22

**door** [1] - 68:8

**dope** [1] - 86:18

**dove** [1] - 22:10

**down** [23] - 11:10, 35:3, 35:10, 35:22, 36:6, 44:13, 48:11, 58:18, 59:2, 59:4, 61:17, 67:4, 68:8, 71:1, 81:16, 87:3, 87:12, 87:13, 87:17, 114:1, 114:10,

115:6, 118:8

**downtown** [2] - 66:23, 66:24

**downward** [1] - 22:6

**drama** [1] - 26:19

**DRE** [1] - 73:8

**drinking** [6] - 59:25, 60:4, 70:10, 80:4, 81:4, 110:1

**drinks** [2] - 65:6, 100:21

**drive** [7] - 21:13, 38:6, 38:14, 44:13, 49:5, 94:22, 94:23

**driver** [2] - 21:25, 34:12

**driving** [6] - 22:8, 38:20, 39:9, 39:21, 40:21, 108:21

**drove** [3] - 45:24, 49:16, 49:16

**Drug** [3] - 106:5, 108:8, 108:10

**drug** [77] - 5:21, 6:6, 6:10, 6:22, 7:10, 8:1, 8:4, 8:7, 8:17, 8:21, 9:2, 9:15, 9:17, 9:22, 10:5, 10:13, 20:6, 20:25, 21:3, 21:6, 21:11, 21:14, 22:21, 24:1, 24:3, 24:6, 25:7, 25:16, 26:20, 26:21, 26:22, 26:24, 26:25, 27:4, 28:15, 28:18, 29:6, 29:19, 29:21, 30:8, 30:14, 30:23, 30:24, 31:2, 34:22, 35:20, 35:24, 67:10, 67:19, 69:25, 72:7, 72:8, 72:9, 77:19, 77:20, 82:1, 95:25, 104:15, 104:25, 105:6, 105:9, 105:14, 106:2, 106:18, 108:7, 108:9, 113:3, 113:5, 113:20, 114:12, 114:13, 115:19

**drugs** [8] - 6:19, 6:25, 27:2, 42:2, 49:3, 49:14, 49:15, 81:7, 85:17, 91:6, 91:8

**drum** [2] - 34:20, 36:6

**drunk** [3] - 68:4, 68:14, 70:9

**DSN** [1] - 44:17

**due** [2] - 62:21, 94:7

**duly** [1] - 119:7

**dumped** [1] - 114:22

**dumping** [2] - 113:1, 114:24

**dumpster** [3] - 113:2, 114:11, 115:10

**dumpsters** [1] - 114:4

**during** [8] - 10:9, 23:21, 51:2, 51:6, 94:9, 107:2, 111:6, 111:19

**duties** [1] - 13:9

**duty** [11] - 28:3, 31:19, 31:21, 38:4, 38:6, 38:7, 38:10, 46:7, 57:21, 109:9, 111:21

**DWI** [28] - 4:4, 4:8, 40:13, 60:24, 60:25, 61:5, 62:21, 62:23, 63:2, 63:5, 63:13, 64:8, 71:25, 73:8, 81:19, 86:16, 86:17, 86:18, 89:8, 89:15, 89:23, 93:3, 117:18, 117:25, 118:4

**DWI's** [2] - 61:2, 118:6

**DWIs** [5] - 36:4, 59:15, 61:21, 62:17, 64:9

**E**

**ear** [1] - 87:8

**ears** [1] - 66:9

**east** [1] - 32:6

**eastbound** [2] - 32:6, 32:8

**Eastern** [2] - 2:19

**EASTERN** [4] - 1:1, 1:2, 2:1, 2:2

**eat** [2] - 56:1, 64:25

**ed** [3] - 10:14, 11:8, 13:3

**educated** [1] - 75:10

**education** [2] - 99:3, 99:5

**effect** [2] - 50:18, 112:24

**effort** [1] - 44:23

**eight** [2] - 2:13, 2:14

**either** [11] - 12:2, 18:2, 39:23, 40:2, 53:4, 54:8, 60:14, 64:25, 67:8, 89:25, 107:25

**elapsed** [1] - 45:24

**emergency** [1] - 41:1

**emphasis** [1] - 106:20

**employed** [4] - 83:23, 84:7, 86:7, 106:10

**employee** [1] - 8:22

**employs** [1] - 110:20

**empty** [1] - 13:24

**empty-handed** [1] -

13:24

**encompassed** [1] - 107:1

**encounter** [6] - 6:6, 31:23, 32:1, 41:16, 48:18, 48:23

**encountered** [2] - 36:11, 39:22

**end** [15] - 25:22, 27:23, 34:7, 34:8, 34:9, 34:10, 37:15, 57:16, 76:12, 79:4, 87:3, 87:12, 87:13, 102:25, 112:14

**ended** [12] - 24:8, 26:11, 28:11, 28:14, 28:24, 68:5, 70:20, 81:8, 87:8, 88:8, 88:10

**enforce** [4] - 33:3, 44:25, 58:10, 107:11

**enforced** [4] - 43:15, 57:6, 57:8, 64:12

**enforcement** [6] - 11:3, 32:22, 33:11, 43:12, 57:2

**engine** [2] - 108:23, 109:1

**entire** [3] - 68:16, 82:9, 111:11

**entity** [2] - 104:21, 108:13

**entrench** [1] - 78:16

**entry** [3] - 16:11, 16:14, 16:15

**equipped** [2] - 40:6, 45:17

**Eric** [1] - 71:13

**especially** [1] - 102:6

**Esq** [3] - 3:6, 3:11, 3:17

**estimation** [1] - 32:13

**evening** [1] - 36:17

**event** [5] - 20:24, 31:9, 33:25, 53:2, 79:16

**events** [4] - 19:9, 60:8, 66:17, 79:7

**eventually** [1] - 68:5

**everyplace** [1] - 33:11

**everywhere** [1] - 64:24

**evidence** [19] - 35:13, 49:3, 49:5, 49:15, 57:9, 57:15, 57:17, 57:19, 91:7, 91:8, 91:12, 91:19, 91:23, 92:3, 113:2, 113:11, 113:13, 114:3, 114:14

**exact** [6] - 19:7, 22:24,

---

34:2, 46:1, 47:4, 47:22

**exactly** [2] - 12:10, 19:14

**EXAMINATION** [4] - 5:14, 89:5, 117:13, 118:11

**examination** [1] - 119:9

**examinations** [1] - 12:24

**examined** [1] - 5:12

**example** [4] - 14:9, 55:7, 65:14, 65:19

**except** [2] - 23:7, 100:20

**exchange** [1] - 101:5

**exclude** [1] - 23:18

**EXHIBITS** [1] - 4:10

**exhibits** [1] - 4:11

**exist** [1] - 30:8

**expandable** [1] - 13:23

**expanded** [1] - 13:16

**experience** [2] - 42:24, 44:21

**expert** [3] - 73:2, 73:5, 73:8

**explain** [1] - 54:20

**explanation** [1] - 84:8

**extend** [1] - 21:7

**eye** [1] - 6:1

---

**F**

**fact** [25] - 10:12, 52:21, 62:21, 74:5, 74:6, 78:1, 81:4, 85:5, 85:21, 94:2, 98:24, 99:12, 100:8, 100:9, 100:10, 100:13, 100:14, 101:22, 101:25, 103:6, 105:4, 109:16, 114:25, 115:5, 118:8

**fail** [1] - 68:3

**fair** [1] - 82:25

**fairly** [1] - 74:17

**faith** [1] - 16:16

**falls** [2] - 66:8, 77:13

**false** [1] - 60:17

**family** [2] - 69:14, 102:17

**far** [22] - 8:15, 9:19, 11:20, 13:17, 15:21, 19:17, 32:17, 35:24, 41:11, 41:12, 41:15, 41:17, 53:7, 53:22, 64:23, 65:3, 77:15,

---

83:22, 88:14, 104:10

**faring** [1] - 10:3

**fast** [1] - 94:22

**favor** [3] - 53:12, 101:3, 101:7

**favors** [2] - 74:7, 100:25

**fax** [1] - 1:24

**FBI** [1] - 66:25

**fear** [3] - 53:5, 54:9, 54:13

**felonies** [2] - 84:22, 84:23

**felony** [3] - 82:24, 84:5, 86:5

**felt** [4] - 13:9, 85:23, 95:18, 96:19

**female** [6] - 25:9, 26:20, 26:21, 28:9, 67:8, 70:13

**few** [2] - 14:5, 72:18

**fight** [6] - 22:25, 34:15, 36:4, 36:21, 59:10, 78:17

**figured** [1] - 80:11

**file** [2] - 53:21, 87:25

**filed** [4] - 31:17, 54:11, 70:14, 70:19

**fill** [1] - 88:7

**finish** [2] - 21:5, 102:13

**finished** [1] - 118:18

**fire** [3] - 50:10, 50:16, 84:6

**firearm** [1] - 60:2

**firearms** [4] - 10:16, 11:13, 13:19, 13:23

**fired** [8] - 48:17, 68:11, 87:10, 88:11, 101:16, 101:18, 101:20, 101:21

**Firm** [2] - 2:15, 3:3

**first** [7] - 9:3, 23:16, 33:6, 40:17, 46:9, 46:14, 62:9, 69:4, 69:8, 72:15, 110:24

**first-class** [1] - 33:6

**fit** [1] - 104:2

**fives** [1] - 69:15

**fix** [2] - 62:13, 64:6

**fixed** [2] - 62:8, 62:12

**fixing** [2] - 62:8, 117:18

**fledging** [1] - 66:12

**flinch** [1] - 69:12

**flourished** [1] - 55:10

**flow** [1] - 73:3

**flowing** [1] - 73:1

**flub** [1] - 55:25

**fly** [1] - 73:2

---

**focusing** [1] - 7:10

**follow** [3] - 16:16, 39:18, 57:4

**followed** [1] - 80:9

**following** [3] - 18:3, 56:3, 56:25

**fondle** [1] - 101:12

**fondled** [2] - 71:6, 71:14

**food** [3] - 65:5, 82:4, 100:20

**FOR** [5] - 1:1, 2:1, 3:3, 3:8, 3:13

**Force** [3] - 106:5, 108:8, 108:11

**force** [25] - 5:21, 6:10, 9:12, 9:15, 9:22, 20:6, 20:25, 26:25, 66:25, 75:4, 104:15, 104:20, 105:1, 105:7, 105:9, 105:15, 105:16, 105:17, 106:2, 106:18, 108:7, 108:9, 113:3, 113:5, 115:19

**forenoon** [1] - 2:13

**forget** [6] - 15:16, 16:12, 24:18, 25:9, 72:14, 72:17

**forgiving** [1] - 89:8

**form** [2] - 80:2, 104:25

**forth** [1] - 97:25

**forward** [1] - 19:17

**forwards** [2] - 80:24, 80:25

**four** [5] - 46:12, 84:20, 86:15, 96:2, 117:24

**fourth** [2] - 106:14, 107:21

**frame** [1] - 50:5

**freaking** [1] - 81:17

**free** [10] - 64:25, 65:5, 73:21, 82:4, 100:20, 100:21, 100:22, 106:21

**friend** [2] - 63:25, 82:20

**friends** [4] - 24:2, 24:24, 66:4, 75:11

**front** [4] - 16:9, 16:11, 39:13, 49:21

**frowned** [1] - 42:18

**fugitive** [2] - 6:10, 75:4

**full** [3] - 55:6, 61:7, 67:3

**fully** [2] - 36:14, 36:15

**furious** [1] - 67:5

---

**G**

**gamble** [1] - 102:7

**gas** [3] - 21:14, 22:10, 65:1

**general** [1] - 99:20

**generalization** [1] - 118:15

**generally** [2] - 64:11, 107:6

**generic** [1] - 80:2

**generically** [1] - 47:8

**gifts** [1] - 65:7

**girl** [1] - 67:1

**girlfriend** [2] - 86:24, 87:1

**gist** [1] - 62:6

**given** [9] - 18:10, 18:18, 18:23, 19:16, 51:17, 65:20, 67:9, 118:3, 119:12

**go-between** [1] - 93:2

**goings** [1] - 24:1

**government** [2] - 104:22, 105:10, 106:3, 106:6, 106:9

**GPS** [2] - 45:17, 57:25

**grand** [6] - 26:23, 27:3, 29:24, 30:1, 79:10, 79:13

**grandmother** [1] - 86:24

**grant** [3] - 8:13, 8:14, 105:2

**grass** [2] - 21:11, 58:20

**gratuities** [5] - 64:16, 100:17, 100:20, 100:22, 104:10

**gratuity** [2] - 101:1, 103:11

**grave** [1] - 85:3

**green** [1] - 62:18

**Greg** [1] - 51:8

**grievance** [1] - 70:20

**grievances** [1] - 54:11

**group** [3] - 65:14, 65:25, 66:16

**groups** [1] - 65:22

**Growich** [1] - 9:4

**guarantee** [1] - 51:11

**guess** [12] - 49:17, 51:21, 52:4, 58:17, 58:18, 71:9, 72:1, 74:24, 85:23, 87:9, 96:1, 100:21

**guilty** [5] - 82:24, 84:4, 102:21, 103:14, 103:15

**gun** [9] - 22:4, 22:5,

58:13, 58:20, 59:1, 59:2, 69:10, 72:10, 91:3
**guns** [5] - 15:21, 59:25, 60:4, 60:5, 60:6
**gurus** [1] - 71:25
**guy** [4] - 58:24, 68:17, 72:21, 76:1
**guys** [5] - 24:25, 55:19, 56:1, 85:9, 115:13

## H

**habit** [1] - 43:4
**hair** [1] - 6:2
**half** [4] - 26:6, 64:25, 71:20, 72:16
**hall** [1] - 23:19
**hammered** [1] - 15:22
**hand** [8] - 22:4, 40:2, 60:5, 69:12, 75:16, 114:10, 119:15
**hand-held** [1] - 40:2
**handcuffed** [1] - 81:13
**handed** [1] - 13:24
**handgun** [3] - 58:16, 59:6, 110:7
**handguns** [2] - 110:5, 110:7
**handled** [4] - 17:6, 75:23, 75:25, 95:5
**hands** [2] - 52:11, 118:1
**happy** [1] - 104:13
**harassed** [1] - 67:7
**harassment** [3] - 67:14, 70:5, 70:14
**hard** [2] - 85:10, 86:21
**hardworking** [1] - 56:20
**hash** [1] - 81:8
**Hawaii** [1] - 12:16
**head** [6] - 30:4, 69:13, 80:15, 83:4, 85:8, 97:20
**headed** [1] - 80:10
**hear** [7] - 11:22, 27:15, 52:7, 70:21, 90:4, 90:16, 90:17
**heard** [7] - 29:7, 52:14, 58:17, 72:9, 78:6, 78:21, 110:4
**hearsay** [7] - 52:19, 67:16, 77:25, 78:23, 83:13, 109:19, 109:22
**heart** [1] - 77:8
**held** [2] - 40:2, 56:25

**hello** [1] - 23:19
**help** [2] - 5:23, 107:9
**hereby** [2] - 2:10, 119:5
**HEREBY** [1] - 5:2
**hereunto** [1] - 119:15
**herself** [3] - 82:12, 82:13, 101:9
**hid** [1] - 103:8
**hide** [1] - 103:2
**high** [2] - 26:10, 69:15
**higher** [1] - 56:21
**higher-ups** [1] - 56:21
**Highway** [4] - 32:6, 32:7, 58:20
**highway** [3] - 58:19, 59:4, 96:3
**Hills** [2] - 100:2, 100:17
**himself** [10] - 22:17, 22:19, 60:23, 63:17, 68:23, 68:24, 69:12, 71:18, 71:22, 78:16
**hired** [1] - 72:5
**history** [1] - 67:20
**hit** [2] - 21:16, 58:17
**hitting** [1] - 69:11
**hold** [1] - 34:5
**holding** [1] - 22:6
**hole** [1] - 108:22
**home** [9] - 15:22, 21:10, 37:16, 37:21, 37:24, 38:5, 38:6, 38:11, 38:15, 39:10, 46:4, 46:5, 46:8, 49:7, 68:10, 80:15, 100:8, 107:6, 109:25
**Home** [1] - 56:10
**honest** [1] - 103:2
**honking** [2] - 21:17, 21:18
**hood** [1] - 91:4
**Hood** [3] - 3:8, 3:11, 3:23
**HOOD** [15] - 97:5, 97:14, 97:19, 97:25, 98:5, 98:9, 98:13, 105:12, 105:16, 105:20, 105:24, 115:21, 117:14, 118:10, 118:18
**Hospital** [2] - 109:13, 114:1
**hostage** [2] - 68:24, 69:6
**hot** [1] - 95:24
**hour** [1] - 75:21
**hours** [7] - 2:13, 11:5, 11:13, 12:21, 12:22, 56:2, 106:17

**house** [29] - 16:10, 16:19, 16:20, 16:21, 25:23, 28:3, 49:8, 51:8, 55:19, 55:25, 56:1, 56:2, 56:5, 59:22, 68:23, 69:1, 69:3, 69:5, 69:8, 69:9, 69:21, 71:22, 72:10, 72:11, 87:1, 87:22, 110:8
**Hudson** [4] - 52:2, 53:15, 53:16, 77:16
**hung** [1] - 24:18
**Hunt** [9] - 34:18, 35:16, 36:8, 82:21, 83:18, 83:22, 86:2, 86:10
**hurriedly** [1] - 22:1
**hurt** [2] - 71:18, 71:22
**hypothetical** [1] - 14:11

## I

**IA** [3] - 46:20, 49:10, 51:24
**idea** [2] - 19:21, 108:15
**identified** [3] - 22:19, 31:12, 31:24
**identify** [1] - 63:3
**ignorant** [1] - 61:9
**II** [1] - 1:13
**IL** [2] - 1:17, 119:22
**Illinois** [1] - 119:5
**imagine** [1] - 115:21
**immediately** [9] - 22:1, 40:16, 41:5, 46:14, 47:1, 47:2, 47:20, 47:23, 52:25
**IN** [2] - 1:1, 2:1
**in-house** [1] - 51:8
**inappropriately** [1] - 71:5
**incidences** [5] - 27:10, 45:2, 67:7, 67:20, 91:12
**incident** [35] - 15:12, 16:24, 17:5, 17:12, 17:25, 18:4, 18:8, 19:22, 23:9, 23:15, 25:17, 27:8, 27:19, 28:6, 31:6, 34:18, 44:11, 50:25, 58:15, 59:6, 60:16, 63:11, 75:24, 78:25, 85:14, 85:19, 85:24, 86:1, 86:22, 92:1, 101:23, 103:9, 104:2, 110:3, 114:6

**incidents** [4] - 16:6, 66:19, 76:24, 86:3
**Incline** [1] - 71:22
**include** [1] - 45:9
**including** [3] - 43:14, 56:9
**incorrect** [4] - 96:13, 96:15, 96:18, 118:7
**INDEX** [1] - 3:20
**indicated** [1] - 117:16
**individual** [2] - 99:18, 99:23
**individually** [1] - 56:4
**individuals** [1] - 44:6
**inferred** [1] - 63:22
**inflammatory** [1] - 78:9
**influence** [2] - 60:1, 109:17
**influx** [1] - 107:10
**inform** [2] - 22:22, 36:13
**information** [13] - 24:15, 47:25, 48:1, 48:10, 51:17, 52:22, 63:4, 81:16, 94:11, 99:6, 99:21, 109:19, 115:22
**informed** [1] - 28:19
**infraction** [2] - 32:7, 32:9
**infuriated** [1] - 76:11
**initial** [1] - 61:2
**initials** [1] - 31:13
**initiate** [1] - 45:1
**initiated** [5] - 7:9, 33:14, 40:21, 41:18, 62:22
**initiating** [3] - 61:8, 61:20, 63:1
**initiative** [1] - 76:3
**inside** [3] - 15:1, 81:25, 82:2
**insinuary** [1] - 78:9
**inspection** [1] - 68:6
**instance** [1] - 93:25
**instances** [5] - 60:20, 64:12, 66:16, 88:19, 96:5
**instruct** [1] - 10:24
**Instructor** [1] - 10:22
**instructor** [1] - 10:23
**insulate** [1] - 60:23
**insulation** [1] - 62:5
**intelligent** [2] - 75:9, 75:10
**intention** [1] - 39:18
**interaction** [1] - 23:23
**interdepartmental** [1] - 10:15

**interdiction** [2] - 6:9, 106:19
**interest** [1] - 49:10
**interested** [1] - 17:3
**interesting** [1] - 72:5
**internal** [1] - 46:21
**internally** [2] - 17:5, 17:11
**interrupt** [1] - 83:5
**interview** [1] - 116:11
**interviewed** [1] - 116:10
**intoxicating** [1] - 80:3
**investigation** [10] - 14:3, 51:3, 51:6, 51:13, 70:16, 81:22, 87:22, 87:23, 103:9, 103:21
**investigations** [3] - 10:20, 95:25
**investigator** [4] - 7:23, 46:22, 49:11, 103:21
**investigators** [1] - 49:12
**invited** [1] - 12:2
**involved** [16] - 16:8, 18:9, 25:1, 25:3, 28:9, 66:17, 105:3, 105:4
**involving** [2] - 27:16, 29:8
**IS** [1] - 5:2
**issue** [3] - 22:13, 45:5, 78:24
**issued** [4] - 21:14, 22:4, 40:10, 109:11
**issues** [4] - 12:14, 28:17, 29:5, 82:1
**IT** [1] - 5:2
**It'll** [1] - 18:3

## J

**Jack** [3] - 30:21, 103:22, 103:25
**jail** [1] - 100:14
**James** [1] - 72:15
**JASON** [5] - 1:7, 1:14, 2:7, 2:11, 5:11
**Jason** [2] - 2:21, 43:21
**Jeff** [1] - 110:12
**jerk** [1] - 62:10
**Jerry** [1] - 91:5
**job** [8] - 7:1, 7:14, 9:25, 13:17, 20:7, 75:17, 93:14, 102:15
**Johnson** [3] - 20:3, 23:10, 23:15
**joked** [1] - 69:4
**Jones** [3] - 71:23,

71:24, 72:19
**Joseph's** [1] - 109:13
**judge** [2] - 90:25, 117:8
**judo** [1] - 99:21
**jumped** [2] - 21:25, 94:8
**jurisdiction** [2] - 32:20, 32:22
**jury** [6] - 26:23, 27:3, 29:24, 30:2, 79:10, 79:13
**justification** [1] - 18:25

## K

**k's** [1] - 110:20
**Kaiser** [25] - 24:11, 24:12, 24:14, 24:19, 45:10, 45:15, 52:1, 52:5, 52:8, 53:9, 53:14, 55:15, 56:3, 56:10, 56:15, 56:18, 68:6, 76:12, 76:17, 76:18, 77:9, 77:13, 87:21, 88:2, 88:4
**Kamp** [4] - 86:14, 88:6, 110:19, 110:20
**Kary** [10] - 86:14, 86:20, 87:2, 87:16, 88:5, 88:6, 88:8, 88:11, 110:19, 110:20
**keep** [2] - 23:1, 100:11
**keeping** [2] - 57:9, 72:2
**kept** [3] - 54:14, 57:17, 91:22
**Kesterer** [1] - 29:16
**Kestor** [1] - 29:16
**keys** [2] - 86:25, 87:4
**kick** [1] - 68:6
**kicking** [1] - 75:18
**kid** [9] - 86:23, 87:6, 87:24, 87:25, 88:2, 88:6, 114:9, 115:5, 115:9
**kid's** [1] - 88:3
**kids** [2] - 44:6, 102:8
**kind** [36] - 10:11, 13:13, 16:3, 21:17, 21:18, 21:24, 35:23, 37:3, 38:23, 42:4, 43:18, 48:3, 52:10, 53:12, 55:14, 55:18, 55:24, 60:23, 62:2, 62:4, 62:5, 62:16, 63:22, 63:24, 66:12, 66:13, 68:25, 70:25,

71:10, 76:20, 78:5, 82:14, 87:2, 87:9
**kindly** [1] - 73:16
**king** [1] - 5:16
**KING** [6] - 1:7, 1:14, 2:7, 2:11, 3:8, 5:11
**King** [2] - 2:21, 43:21
**Kirkwood** [1] - 3:10
**knack** [1] - 6:24
**knit** [1] - 43:19
**knowing** [3] - 15:1, 17:3, 39:10
**knowledge** [13] - 13:21, 30:2, 43:25, 44:21, 46:10, 51:14, 54:2, 54:3, 60:8, 66:22, 68:23, 69:15, 105:21
**known** [5] - 45:11, 56:15, 65:23, 72:2, 94:11
**Koch** [16] - 24:4, 24:22, 53:9, 53:14, 55:14, 56:9, 67:4, 69:3, 71:17, 74:23, 76:13, 76:17, 76:18, 77:14, 109:7, 109:17
**KOCH** [1] - 109:7
**Koch's** [1] - 72:16
**KOESTER** [1] - 29:17
**Koester** [10] - 25:15, 25:21, 26:14, 27:19, 27:21, 27:24, 29:15, 29:17, 113:21, 115:16
**Koester's** [3] - 25:20, 25:23, 28:2
**Koester/Bush** [1] - 27:19

## L

**labs** [2] - 10:3, 114:3
**lack** [2] - 23:23, 57:2
**Lamp** [1] - 1:23
**lane** [4] - 32:10, 68:1, 68:13, 87:13
**Lantern** [1] - 1:23
**Larry** [1] - 71:2
**last** [7] - 5:17, 18:7, 34:17, 60:13, 66:20, 70:6, 72:22
**lasted** [1] - 21:6
**late** [6] - 55:11, 59:8, 59:12, 59:13, 59:17, 65:15
**law** [16] - 11:3, 11:16, 13:25, 15:1, 15:24, 32:14, 32:21, 33:3, 33:10, 33:16, 33:22,

59:25, 60:3, 64:22, 99:21, 102:6
**Law** [3] - 2:15, 3:3, 3:8
**lawful** [1] - 5:12
**laws** [1] - 15:19
**lawsuit** [3] - 17:1, 69:16, 79:2
**lawsuits** [1] - 78:23
**lawyers** [1] - 17:9
**leader** [1] - 78:19
**leadership** [6] - 74:2, 74:3, 74:17, 74:21, 75:7, 78:17
**leading** [1] - 70:23
**leads** [1] - 34:20
**leap** [1] - 43:7
**least** [4] - 29:12, 38:2, 61:19, 64:3
**leave** [7] - 25:13, 37:11, 39:15, 48:20, 57:7, 87:1, 87:5
**leaving** [7] - 21:15, 38:18, 39:14, 39:16, 49:13, 55:25, 87:8
**led** [2] - 46:19, 103:21
**left** [26] - 22:11, 24:8, 30:9, 37:5, 37:13, 38:13, 45:7, 45:19, 46:2, 55:7, 55:14, 55:17, 58:16, 66:12, 66:24, 67:3, 79:25, 80:9, 86:11, 87:15, 87:17, 92:10, 104:12, 108:14, 114:3
**leg** [1] - 71:9
**legal** [3] - 77:3, 81:2, 109:21
**Legion** [2] - 6:20, 6:21
**legitimate** [1] - 97:10
**lemonade** [1] - 44:7
**less** [1] - 66:18
**letter** [1] - 50:12
**letting** [1] - 82:11
**License** [2] - 1:17
**license** [3] - 35:25, 47:14, 81:15
**lie** [6] - 47:5, 47:6, 48:5, 48:6, 57:24
**lied** [2] - 26:23, 101:22
**lieutenant** [10] - 9:5, 9:6, 9:7, 19:19, 21:3, 30:15, 46:21, 51:22, 70:19, 70:21
**Lieutenant** [27] - 9:10, 9:11, 24:3, 24:22, 26:6, 46:19, 51:17, 52:3, 53:9, 53:22, 55:7, 55:9, 56:9, 56:18, 67:4, 69:3,

70:8, 71:16, 72:16, 74:23, 76:13, 77:13, 109:7, 109:17, 115:17, 116:21
**lieutenants** [3] - 9:1, 9:9, 76:21
**life** [1] - 76:15
**light** [1] - 62:18
**lights** [8] - 40:25, 41:1, 41:9, 44:13, 94:17, 94:19, 94:23, 110:12
**likely** [2] - 107:7, 107:8
**limit** [4] - 68:20, 81:2, 109:21
**limits** [1] - 13:25
**line** [4] - 41:13, 51:18, 102:9
**lines** [1] - 65:22
**liquor** [1] - 35:25
**list** [2] - 116:7, 116:8
**litigation** [1] - 69:19
**live** [1] - 37:18
**lived** [2] - 27:24, 55:23
**LLC** [1] - 3:8
**loaded** [1] - 67:3
**loading** [1] - 56:11
**located** [1] - 81:8
**location** [5] - 12:14, 44:13, 44:18, 57:25, 96:7
**Locust** [2] - 2:15, 3:4
**log** [2] - 59:12, 100:11
**look** [2] - 81:24, 87:4, 92:8
**looking** [1] - 58:20
**loss** [1] - 102:15
**lost** [5] - 59:6, 79:1, 91:3, 110:4, 110:6
**Louis** [7] - 2:16, 3:5, 10:18, 35:23, 49:11, 49:16, 101:24, 102:1, 103:3, 103:20
**lower** [2] - 27:7, 30:3
**luckily** [1] - 59:1
**lunch** [1] - 56:1

## M

**Ma'am** [4] - 100:18, 101:21, 115:2, 116:23
**ma'am** [6] - 92:9, 95:13, 101:2, 108:3, 114:17, 116:1
**Mace** [5] - 10:16, 13:19, 13:23, 15:21, 99:21
**main** [1] - 53:10

**major** [3] - 59:5, 70:12, 82:6
**Major** [5] - 53:9, 74:22, 76:21, 77:18
**man** [2] - 28:4, 68:12
**mandibular** [1] - 87:7
**manpower** [1] - 12:14
**marijuana** [6] - 70:3, 81:9, 93:20, 113:6, 114:22, 115:6
**mark** [1] - 87:8
**Mark** [2] - 67:22, 68:14
**marked** [3] - 4:11, 36:14, 36:15
**married** [2] - 25:14, 28:25
**marry** [2] - 25:10, 28:12
**Martchink** [9] - 53:22, 55:7, 55:9, 55:15, 55:16, 56:4, 56:6, 56:19
**martial** [1] - 13:23
**master's** [2] - 72:22, 72:25
**Mateja** [3] - 51:18, 51:22, 52:3
**matter** [1] - 23:18
**mattered** [1] - 102:17
**McGuire** [1] - 70:9
**ME** [1] - 119:14
**mean** [38] - 13:18, 13:22, 16:7, 16:22, 18:6, 23:12, 23:18, 32:17, 41:8, 42:18, 45:6, 45:9, 46:17, 47:9, 48:8, 52:4, 54:1, 54:3, 54:22, 59:23, 63:8, 64:23, 65:2, 65:6, 66:4, 66:21, 73:13, 73:24, 76:23, 77:9, 84:21, 85:2, 85:9, 86:18, 96:14, 100:7, 107:19, 117:6
**meaning** [1] - 74:22
**means** [3] - 6:1, 54:21, 97:20
**meant** [1] - 19:8
**mediator** [1] - 62:5
**meet** [2] - 25:12, 31:3
**meeting** [8] - 31:1, 31:2, 51:20, 51:25, 52:9, 52:15, 52:17, 52:23
**meetings** [3] - 17:19, 18:4
**Melle** [1] - 27:25
**Melton** [1] - 9:10
**member** [2] - 26:7,

58:15
**members** [3] - 66:16, 69:13, 69:14
**memo** [2] - 6:16, 17:16
**memorandum** [1] - 17:17
**memorandums** [1] - 94:21
**memos** [2] - 18:4, 19:22
**mentioned** [4] - 17:4, 63:23, 110:10
**mere** [1] - 109:22
**merit** [2] - 110:18, 110:23
**messed** [2] - 53:5
**meth** [4] - 10:3, 85:7, 114:3, 116:4
**Methamphetamine** [1] - 8:13
**methamphetamine** [3] - 8:15, 8:18, 10:7
**metropolitan** [1] - 73:24
**Meyer** [1] - 71:20
**Meyers** [3] - 72:14, 72:15
**mid** [1] - 72:23
**middle** [3] - 34:6, 58:19, 58:24
**might** [10] - 12:10, 17:14, 17:20, 29:10, 43:2, 44:9, 78:6, 78:23, 94:3, 96:8
**miles** [1] - 75:20
**mill** [1] - 43:18
**mind** [4] - 14:8, 14:16, 16:23, 49:2, 62:1, 62:3, 62:7, 63:13, 67:22
**mind's** [1] - 6:1
**mindset** [1] - 97:17
**mine** [2] - 18:10, 60:19
**Minnesota** [1] - 72:23
**minutes** [4] - 45:25, 57:22
**mischaracterization** [1] - 89:10
**mischaracterize** [2] - 65:12, 117:9
**misdemeanor** [3] - 84:22, 86:5, 102:14
**miserable** [1] - 76:15
**missing** [2] - 10:20, 79:3
**Missouri** [12] - 2:16, 2:19, 2:21, 3:5, 3:10, 3:16, 8:13, 11:4, 11:12, 81:3, 84:3,

119:4
**MISSOURI** [4] - 1:1, 1:7, 2:1, 2:7
**misunderstanding** [1] - 97:6
**misuse** [1] - 56:10
**MO** [3] - 1:17, 1:23, 119:21
**mode** [1] - 21:18
**mold** [1] - 99:10
**moment** [6] - 13:14, 34:5, 75:23, 75:25, 88:20, 90:22
**money** [1] - 82:2
**Monkey** [16] - 35:1, 35:6, 35:12, 35:21, 36:5, 36:16, 37:14, 38:13, 39:11, 39:14, 39:15, 39:17, 80:5, 80:7, 82:1, 82:6
**month** [1] - 91:20
**monthly** [2] - 31:1, 31:2
**morning** [2] - 34:3, 34:4
**MoSMART** [1] - 8:13
**most** [3] - 30:19, 95:25, 107:5
**mother** [1] - 71:4
**motor** [1] - 15:13
**motorcycle** [3] - 71:7, 71:8, 109:8
**move** [4] - 5:17, 52:19, 78:8, 83:6
**moved** [8] - 27:7, 36:2, 67:9, 87:2, 87:12, 87:13, 87:16
**moving** [2] - 19:17, 38:14
**mower** [1] - 21:15
**mowing** [1] - 21:11
**MP5** [1] - 67:3
**MR** [24] - 5:15, 19:4, 56:22, 83:4, 89:2, 89:9, 97:5, 97:14, 97:19, 97:25, 98:5, 98:9, 98:13, 100:5, 105:12, 105:16, 105:20, 105:24, 115:21, 117:4, 117:14, 118:10, 118:18, 118:19
**MS** [26] - 19:2, 26:3, 52:7, 52:18, 56:23, 67:16, 72:12, 78:8, 78:20, 83:2, 83:6, 83:12, 84:10, 89:6, 97:11, 97:15, 97:23, 98:3, 98:7, 98:10, 100:6, 105:19,

105:22, 115:24, 116:25, 118:12
**Multiple** [1] - 58:22
**multiple** [11] - 18:8, 18:13, 18:14, 32:10, 36:4, 36:20, 42:20, 73:9, 74:1, 74:13, 84:23
**municipal** [1] - 33:3
**mush** [1] - 49:2

## N

**nail** [2] - 87:8, 87:9
**name** [10] - 14:5, 18:1, 25:9, 72:15, 90:1, 90:4, 91:11, 108:13, 108:14, 108:16
**named** [1] - 119:6
**names** [2] - 75:18, 116:5
**narcotics** [1] - 85:16
**natural** [1] - 25:4
**nature** [4] - 44:4, 96:6
**near** [1] - 71:22
**nearly** [1] - 21:16
**need** [10] - 24:7, 24:13, 24:23, 26:16, 45:3, 87:4, 90:25, 96:25, 97:17, 97:23
**needed** [4] - 13:9, 29:20, 37:6, 106:23
**needless** [2] - 22:10, 26:18
**needs** [2] - 87:5, 97:19
**Neer** [23] - 20:21, 29:19, 50:8, 50:9, 50:24, 53:8, 63:5, 78:1, 111:15, 111:18, 112:4, 112:6, 112:9, 112:10, 112:12, 112:13, 112:15, 116:11, 116:14, 116:18, 116:21, 116:22
**Neer's** [2] - 83:10, 111:20
**negotiators** [1] - 69:2
**neighborhood** [1] - 21:15
**never** [21] - 10:24, 44:15, 45:15, 49:4, 55:10, 60:18, 62:21, 62:22, 62:25, 66:10, 70:24, 75:13, 75:24, 82:18, 82:19, 96:10, 100:18, 101:22, 103:2, 111:3
**new** [5] - 67:13, 68:7,

88:23, 111:11, 111:25
**New** [1] - 27:25
**next** [6] - 24:19, 25:4, 48:23, 68:2, 114:8, 114:18
**night** [5] - 33:25, 36:11, 39:22, 42:7, 86:22
**Nobody** [2] - 58:22, 68:16
**nobody** [2] - 59:14, 63:23
**nominated** [2] - 6:21, 55:12
**non** [2] - 22:12, 27:16, 29:8
**none** [1] - 60:18
**normal** [2] - 46:13, 107:12
**normally** [3] - 48:2, 95:23
**North** [1] - 3:14
**Notary** [1] - 5:6
**note** [3] - 47:24, 47:25, 48:1
**notebook** [2] - 48:9, 48:10
**nothing** [10] - 25:2, 41:8, 47:6, 74:15, 103:4, 103:5, 103:8, 109:25, 118:10, 119:8
**noticed** [1] - 38:21
**November** [1] - 31:9
**nowhere** [2] - 70:16, 71:15
**number** [4] - 11:5, 11:13, 66:15, 70:18
**numbers** [1] - 100:12
**Numerous** [1] - 27:4
**numerous** [12] - 34:16, 34:21, 35:4, 59:9, 59:24, 60:4, 73:5, 81:18, 86:11, 88:12, 91:12, 92:9
**nut** [1] - 22:9

## O

**o'clock** [2] - 2:13, 2:14
**O'Fallon** [9] - 9:4, 25:10, 25:11, 25:13, 28:8, 28:9, 28:10, 28:23, 37:17
**object** [1] - 52:18
**Objection** [5] - 26:3, 67:16, 84:10, 89:9, 97:5
**objection** [7] - 19:2,

78:20, 83:2, 83:5, 83:12, 105:12, 106:2
**objections** [1] - 105:24
**observed** [4] - 28:6, 34:11, 34:12, 40:20
**obviously** [25] - 10:6, 16:19, 16:23, 17:20, 21:9, 23:13, 24:1, 36:3, 39:13, 42:18, 51:6, 55:16, 57:13, 58:1, 58:21, 59:17, 61:6, 64:21, 64:22, 65:6, 70:16, 80:18, 81:12, 82:3, 82:10
**occasion** [2] - 61:18, 63:20, 64:3
**occasions** [1] - 23:21
**occur** [5] - 32:1, 32:4, 32:16, 34:1, 66:10
**occurred** [8] - 17:11, 31:9, 32:9, 33:23, 45:2, 63:6, 80:1
**occurs** [1] - 57:8
**Ochs** [4] - 69:4, 69:10, 69:18, 110:11
**OCHS** [1] - 110:11
**odor** [1] - 80:3
**OF** [3] - 1:1, 2:1, 119:15
**offense** [4] - 24:14, 33:22, 61:4, 61:21
**offer** [1] - 101:3
**offered** [13] - 4:3, 64:2, 82:2, 82:4, 89:8, 89:14, 90:23, 92:21, 92:22, 102:10, 102:12, 102:13, 117:16
**office** [11] - 2:14, 21:4, 24:4, 27:6, 46:20, 48:20, 75:16, 103:22, 114:8, 115:7, 116:18
**Office** [2] - 3:8, 3:13
**officer** [30] - 7:8, 11:3, 11:4, 11:12, 12:25, 13:4, 13:10, 13:21, 22:7, 22:18, 22:19, 25:9, 25:12, 26:24, 26:25, 27:2, 28:9, 28:23, 31:21, 60:3, 61:8, 61:20, 62:23, 64:18, 71:8, 93:15, 99:7, 102:7, 105:17, 115:7
**officers** [3] - 28:10, 29:12, 43:25
**official** [3] - 23:18, 23:24, 44:8

8

**officially** [2] - 44:6, 44:7
**old** [5] - 65:13, 65:15, 65:25, 66:16, 74:14
**om** [1] - 73:6
**Once** [8] - 29:3, 42:17, 44:3, 71:11, 81:9, 82:5, 111:25, 118:14
**once** [43] - 15:1, 16:12, 18:9, 19:1, 19:5, 19:6, 19:11, 24:5, 35:18, 38:18, 42:7, 44:11, 53:16, 55:2, 55:5, 56:7, 56:19, 57:24, 62:23, 67:17, 69:19, 70:10, 70:22, 72:6, 77:24, 78:22, 80:2, 81:14, 82:8, 84:13, 84:19, 85:4, 85:10, 86:19, 88:5, 96:14, 98:21, 100:20, 108:3, 110:3, 114:23, 116:21, 118:16
**one** [57] - 5:19, 6:8, 8:5, 16:7, 20:7, 22:15, 24:4, 29:13, 32:10, 38:22, 40:11, 40:12, 40:19, 44:14, 50:9, 51:16, 52:12, 55:12, 57:10, 57:14, 57:18, 59:22, 61:5, 61:18, 61:25, 62:2, 63:16, 63:19, 64:3, 64:9, 65:19, 68:20, 69:8, 70:18, 71:24, 72:7, 73:19, 74:22, 86:5, 86:12, 86:15, 86:17, 86:22, 91:15, 91:16, 101:23, 102:2, 102:5, 102:23, 103:8, 103:9, 105:6, 107:4
**one-on-one** [1] - 50:9
**ones** [3] - 16:1, 28:18, 76:19
**OOO** [1] - 5:9
**open** [3] - 24:8, 51:14
**open-ended** [1] - 24:8
**opening** [2] - 6:15, 7:14
**openly** [4] - 101:23, 101:24, 103:3, 103:7
**operated** [1] - 31:5
**operation** [1] - 36:2
**opinion** [3] - 95:2, 98:15, 101:1
**opportunity** [1] - 55:5
**option** [1] - 23:7
**oranges** [1] - 84:17

**order** [4] - 7:22, 8:16, 15:18, 104:11
**ordered** [1] - 69:3
**ordinance** [2] - 33:19, 33:21
**organized** [3] - 107:15, 107:17, 108:1
**organizer** [1] - 105:18
**orientation** [1] - 111:6
**oriented** [2] - 10:16, 74:23
**Ostemeier** [1] - 46:19
**otherwise** [2] - 39:24, 97:21
**outside** [6] - 30:16, 66:1, 66:2, 67:15, 69:13, 105:21
**overhead** [1] - 40:25
**overly** [2] - 75:9
**overpass** [1] - 32:7
**oversaw** [1] - 53:10
**oversees** [3] - 30:22, 30:23, 77:10
**oversight** [1] - 88:10
**own** [11] - 7:8, 9:19, 21:11, 33:4, 44:14, 45:5, 98:11, 99:8, 99:23, 100:13, 100:14

## P

**P.C** [2] - 2:15, 3:3
**p.m** [1] - 107:5
**P.O** [1] - 3:9
**pad** [3] - 47:24, 47:25, 48:1
**Page** [5] - 3:21, 3:22, 3:23, 4:2, 4:6
**page** [1] - 3:24
**panel** [2] - 30:22, 116:12
**pants** [1] - 58:21
**papers** [1] - 55:13
**paperwork** [4] - 58:6, 72:3, 88:7, 103:24
**parking** [5] - 37:3, 39:13, 39:17, 114:9, 114:19
**parole** [1] - 7:7
**part** [9] - 5:13, 10:10, 16:8, 25:1, 32:2, 44:23, 58:12, 111:12, 111:18
**partake** [1] - 114:6
**participant** [1] - 60:15
**particular** [14] - 10:2, 13:14, 17:4, 45:10, 61:25, 62:12, 63:4,

78:25, 79:18, 91:25, 96:5, 110:2, 110:7, 114:6
**particularly** [1] - 91:15
**particulars** [5] - 27:11, 27:15, 36:1, 63:3, 105:7
**parties** [1] - 60:11
**partook** [1] - 65:2
**party** [1] - 59:23
**partying** [1] - 74:13
**pass** [1] - 73:17
**passed** [3] - 12:23, 67:23, 68:12
**passing** [1] - 23:19
**patrol** [14] - 7:5, 31:21, 49:4, 49:9, 53:10, 53:17, 70:9, 70:10, 77:7, 77:15, 93:15, 107:12, 107:14, 108:5
**Paul** [5] - 21:2, 21:4, 22:14, 28:16, 29:2
**pay** [1] - 81:18
**payment** [1] - 117:18
**payout** [1] - 69:16
**PBT** [2] - 80:22, 81:1
**pecking** [2] - 7:22, 8:15
**peers** [1] - 53:20
**Peggy** [1] - 116:11
**pending** [1] - 2:18
**people** [45] - 6:5, 7:13, 9:9, 27:4, 30:1, 38:19, 42:5, 42:10, 42:20, 45:8, 52:21, 54:4, 54:10, 54:25, 55:1, 56:17, 57:24, 58:22, 59:4, 65:23, 66:1, 66:5, 70:2, 70:7, 70:22, 73:6, 74:4, 74:7, 74:8, 76:9, 85:23, 86:11, 88:21, 88:23, 91:12, 92:13, 93:24, 95:19, 96:2, 98:25, 107:6, 110:5, 116:3, 116:5, 116:7
**per** [3] - 51:19, 57:15, 94:20
**perceived** [1] - 63:16
**percent** [2] - 44:1, 44:2
**perception** [1] - 65:20
**perform** [1] - 13:9
**perhaps** [1] - 14:9
**period** [2] - 76:16, 111:7
**perjury** [1] - 26:23
**permission** [1] - 81:6

**permit** [1] - 50:17
**person** [11] - 8:16, 8:22, 8:23, 8:24, 15:12, 21:22, 31:23, 62:10, 86:13, 93:8, 93:11
**personal** [6] - 21:12, 29:2, 56:16, 58:2, 58:3
**personally** [1] - 74:2
**personnel** [1] - 30:13
**persons** [1] - 10:20
**Peters** [4] - 67:1, 113:25, 115:7, 115:8
**phone** [3] - 26:17, 26:19, 73:14
**pick** [2] - 20:16, 23:5
**picked** [4] - 20:17, 20:18, 22:5, 58:25
**pictures** [1] - 81:25
**pipe** [2] - 81:9, 115:6
**place** [14] - 19:9, 23:14, 23:15, 35:1, 35:10, 40:15, 47:17, 61:4, 61:11, 73:24, 78:22, 92:14, 104:2, 114:24
**places** [1] - 73:4
**plain** [3] - 6:2, 36:8, 36:12
**PLAINTIFF** [1] - 3:3
**plaintiff** [1] - 31:12
**Plaintiff** [6] - 1:5, 1:14, 2:4, 2:20, 5:3, 5:13
**plate** [1] - 59:1
**play** [1] - 74:20
**playing** [1] - 108:21
**plea** [2] - 104:5, 104:6
**pleading** [2] - 31:17, 31:24
**pled** [2] - 103:14, 103:15
**plenty** [1] - 44:12
**point** [40] - 7:3, 8:9, 18:13, 20:7, 22:20, 22:21, 23:6, 31:16, 32:19, 37:6, 38:22, 38:24, 40:24, 46:5, 48:11, 48:13, 49:1, 49:20, 51:14, 58:4, 62:20, 66:11, 67:18, 69:1, 69:2, 72:7, 81:3, 81:7, 81:17, 81:22, 82:8, 82:14, 82:15, 82:17, 87:7, 101:23, 102:18, 103:1, 103:2
**poked** [1] - 87:9
**police** [26] - 10:24, 11:3, 11:4, 11:12,

12:24, 13:3, 13:10, 13:20, 21:18, 22:7, 22:18, 22:19, 26:24, 27:2, 28:10, 33:4, 58:11, 60:3, 64:18, 78:14, 79:1, 88:15, 99:5, 99:7, 102:7, 115:7
**policies** [10] - 57:5, 99:9, 99:18, 99:24, 111:5, 111:12, 111:23, 112:1, 112:20
**policy** [22] - 17:15, 40:10, 40:12, 40:18, 42:15, 42:18, 43:1, 43:3, 43:8, 51:19, 57:15, 64:15, 64:19, 64:20, 65:4, 65:5, 65:8, 94:21, 95:3, 95:7, 98:21, 111:11
**political** [3] - 60:24, 63:25, 77:11
**polygraph** [1] - 51:21
**portable** [1] - 80:22
**position** [5] - 22:6, 27:7, 30:4, 30:6, 76:8
**positions** [4] - 73:10, 74:1, 74:4, 75:5
**possession** [2] - 60:2, 81:11
**possible** [6] - 5:19, 16:20, 19:11, 35:14, 54:11, 70:1
**possibly** [5] - 18:21, 28:22, 69:1, 69:24, 102:9
**post** [5] - 11:4, 11:24, 12:3, 83:19, 83:21
**posted** [3] - 83:9, 83:14, 83:20
**posting** [1] - 7:13
**potential** [1] - 73:23
**poured** [1] - 68:7
**power** [9] - 9:14, 20:14, 20:18, 78:12, 84:24, 106:13, 106:16, 106:25, 107:15, 107:20, 108:1, 108:3
**powers** [1] - 33:11
**practical** [1] - 77:4
**practice** [6] - 43:3, 64:24, 95:17, 98:20, 100:23, 113:18
**practiced** [1] - 55:18
**practices** [5] - 57:6, 98:18, 99:9, 99:19, 99:24

9

**preceded** [1] - 20:24
**preceding** [2] - 34:18, 83:8
**precise** [1] - 34:5
**preliminarily** [1] - 80:21
**premise** [1] - 16:14
**present** [5] - 37:4, 52:15, 52:16, 60:11, 69:14
**presentable** [1] - 58:11
**pressure** [1] - 87:7
**pressured** [2] - 101:19, 101:20
**presume** [1] - 17:6
**pretty** [14] - 8:16, 13:18, 17:23, 38:25, 42:9, 43:24, 50:10, 54:13, 54:16, 66:13, 68:19, 77:13, 80:11, 95:8
**previous** [1] - 108:6
**previously** [2] - 5:20, 111:3
**price** [1] - 64:25
**primary** [2] - 15:19, 76:19
**prison** [3] - 72:23, 102:9, 102:21
**private** [3] - 26:8, 52:23, 101:13
**privilege** [1] - 17:7
**privy** [2] - 19:5, 24:15
**probation** [1] - 102:15
**probationary** [1] - 111:6
**problem** [3] - 28:10, 36:23, 75:14
**problems** [4] - 29:1, 29:3, 34:16, 35:4
**procedures** [4] - 57:5, 99:9, 99:18, 111:23
**proceedings** [1] - 56:25
**process** [2] - 70:17, 70:18
**processed** [1] - 49:13
**produced** [1] - 5:12
**productivity** [2] - 88:14, 88:15
**progressing** [1] - 82:10
**progressive** [3] - 110:14, 110:21, 110:24
**promoted** [7] - 54:10, 54:11, 54:12, 67:6, 67:19, 70:20, 76:8
**promotional** [2] -

70:17, 70:18
**proper** [2] - 59:5, 59:7
**prosecutor** [5] - 30:5, 30:22, 31:4, 85:19, 103:23
**prosecutor's** [1] - 27:6
**protected** [1] - 26:1
**protecting** [1] - 75:21
**protocol** [2] - 9:19, 38:5
**proven** [1] - 43:11
**provide** [1] - 12:7
**Public** [1] - 5:6
**public** [1] - 64:16
**pull** [5] - 25:12, 41:5, 44:13, 54:8, 80:17
**pulled** [13] - 21:21, 21:24, 22:21, 22:23, 27:4, 29:4, 30:1, 41:13, 48:9, 54:9, 60:5, 94:5, 100:12
**pulling** [2] - 42:8, 45:12
**pullover** [1] - 80:14
**punk** [2] - 78:4, 86:25
**purely** [1] - 14:10
**purposely** [2] - 25:21, 27:23
**purposes** [1] - 41:25
**pursuant** [1] - 119:5
**pursuit** [2] - 21:23, 41:11
**pushing** [1] - 78:14
**put** [11] - 6:16, 12:9, 17:17, 19:14, 25:21, 30:3, 30:6, 40:24, 49:20, 102:8, 110:25
**putting** [4] - 27:23, 27:25, 75:18, 91:7

## Q

**qualifications** [1] - 57:7
**qualifying** [2] - 68:3, 68:15
**quarter** [1] - 44:7
**QUESTION** [2] - 89:16, 89:24
**questions** [6] - 79:12, 79:14, 89:3, 89:7, 117:2, 117:11
**Questions** [4] - 3:21, 3:22, 3:23, 3:24
**QUESTIONS** [5] - 4:1, 5:15, 89:6, 117:14, 118:12
**quickly** [3] - 5:18, 42:3, 110:13

**quite** [1] - 60:6
**quote** [1] - 108:21
**quoting** [1] - 24:5

## R

**radio** [12] - 41:20, 41:22, 42:5, 42:6, 44:4, 44:15, 45:9, 46:6, 94:4, 94:6, 94:8, 96:6
**raised** [1] - 41:10
**raises** [1] - 33:1
**ramification** [1] - 16:13
**ran** [6] - 8:2, 22:9, 47:12, 48:7, 48:8, 81:14
**range** [5] - 13:21, 26:5, 67:5, 68:1, 110:6
**rank** [3] - 8:23, 53:21, 53:23
**rape** [1] - 35:14
**rapid** [1] - 32:12
**rat** [1] - 87:19
**rather** [1] - 79:22
**reached** [1] - 22:2
**read** [3] - 31:16, 79:17, 79:23
**reading** [2] - 34:2, 111:11
**readjust** [1] - 18:11
**ready** [4] - 21:5, 38:3, 55:22, 55:23
**realized** [1] - 58:18
**really** [18] - 27:10, 33:9, 52:11, 53:7, 53:12, 53:16, 55:8, 63:9, 67:24, 71:21, 71:22, 74:15, 76:22, 82:5, 86:15, 86:21, 89:20
**reason** [8] - 12:14, 14:14, 18:22, 37:10, 68:4, 69:9, 69:21, 87:21
**reasons** [1] - 107:4
**receive** [3] - 9:24, 10:11, 12:9
**received** [9] - 6:23, 10:6, 10:15, 11:19, 14:18, 98:17, 110:14, 111:4, 111:5
**receiving** [1] - 64:16
**recommendation** [1] - 102:4
**recommendations** [1] - 77:11
**record** [6] - 6:17,

18:12, 82:23, 102:14, 117:4, 117:10
**recordable** [2] - 47:12, 47:15
**recorder** [2] - 40:2, 40:10
**recording** [1] - 41:16
**recordings** [1] - 39:23
**records** [1] - 115:22
**red** [1] - 94:18
**reduced** [1] - 59:11
**reference** [6] - 62:17, 78:24, 82:4, 86:1, 94:2
**references** [2] - 81:20, 82:9
**referred** [1] - 108:7
**refers** [1] - 31:13
**reflect** [2] - 82:23, 117:5
**refresher** [1] - 19:9
**refuse** [1] - 117:6
**refused** [1] - 117:2
**refusing** [4] - 90:9, 90:10, 90:20, 90:22
**refute** [1] - 73:7
**refuted** [1] - 27:1
**regard** [1] - 13:7
**regional** [5] - 104:15, 105:9, 106:2, 108:9, 113:5
**Regional** [2] - 106:5, 108:10
**regular** [2] - 108:4, 116:3
**rein** [2] - 73:21, 106:21
**relating** [1] - 52:22
**relation** [3] - 64:7, 65:7, 85:18
**relationship** [1] - 28:14
**relative** [1] - 48:23
**release** [1] - 82:12
**released** [1] - 82:17
**Relief** [1] - 8:14
**relieve** [1] - 118:4
**remain** [2] - 37:4, 111:22
**remember** [18] - 5:23, 22:13, 22:15, 28:15, 29:1, 38:16, 48:25, 49:7, 49:14, 49:19, 51:15, 51:25, 52:1, 80:8, 88:13, 91:9, 102:24, 103:1
**reminder** [2] - 17:18, 17:21
**removed** [1] - 21:2

**repeatedly** [1] - 55:4
**rephrase** [2] - 89:10, 113:24
**rephrased** [1] - 97:8
**report** [13] - 15:5, 17:10, 18:10, 18:18, 18:20, 22:16, 59:8, 59:12, 60:16, 65:7, 65:16
**Reporter** [4] - 1:16, 2:17, 5:6, 119:4
**REPORTER'S** [1] - 119:1
**reporting** [1] - 9:20
**REPORTING** [1] - 1:22
**reports** [19] - 18:9, 18:23, 19:7, 30:25, 35:19, 55:11, 59:11, 59:12, 59:13, 59:15, 60:12, 72:2, 75:19
**reprimanded** [3] - 27:5, 30:3, 69:23
**requested** [1] - 10:17
**required** [4] - 11:23, 12:2, 12:3, 112:17
**requires** [2] - 11:5, 57:3
**resign** [4] - 50:11, 50:17, 84:6, 101:21
**resignation** [1] - 50:11
**resigned** [2] - 50:12, 86:6
**resigning** [2] - 101:19, 101:20
**respected** [1] - 55:8
**respond** [1] - 94:18
**responded** [1] - 79:14
**responsibility** [1] - 111:21
**restaurant** [3] - 64:18, 66:24, 82:3
**result** [2] - 17:12, 32:1
**resulted** [1] - 86:4
**resurface** [1] - 75:24
**retire** [2] - 68:10, 116:21
**retirement** [1] - 116:23
**retrieve** [2] - 35:13, 59:2
**retroactive** [1] - 85:20
**returned** [2] - 18:19, 60:12
**review** [2] - 59:10, 88:9
**rid** [2] - 68:5, 117:24
**ridiculous** [1] - 87:5
**rise** [1] - 31:7
**risk** [1] - 102:20
**road** [7] - 20:11, 20:13, 20:16, 21:20,

10

58:24, 114:1, 118:9
**roll** [1] - 9:20
**rolled** [1] - 95:20
**rotated** [1] - 8:7
**rotating** [1] - 8:3
**roughly** [2] - 5:25, 7:4
**round** [1] - 69:11
**route** [2] - 37:21, 38:14
**routine** [3] - 15:24, 57:16, 98:22
**routinely** [6] - 57:24, 67:18, 68:3, 68:12, 91:22, 91:24
**rug** [1] - 71:10
**rule** [3] - 43:12, 44:25, 57:2
**rules** [3] - 57:6, 64:12, 99:24
**rumor** [1] - 43:18
**rumors** [1] - 60:16
**run** [5] - 26:8, 47:10, 78:15, 78:18, 94:17
**running** [3] - 21:3, 102:20, 110:12
**runs** [1] - 77:4
**rural** [1] - 74:17
**Ryals** [17] - 2:15, 3:3, 3:6, 3:21, 19:18, 27:14, 52:14, 52:20, 57:1, 71:16, 72:19, 79:6, 83:9, 83:16, 84:18, 95:2, 117:15
**RYALS** [8] - 5:15, 19:4, 56:22, 83:4, 89:2, 89:9, 117:4, 118:19
**Ryan** [1] - 108:17
**RYLES** [1] - 100:5

## S

**sad** [1] - 85:4
**safety** [3] - 41:25, 45:4, 45:5
**sales** [2] - 35:20, 35:24
**Salters** [2] - 111:16, 112:22
**sandals** [1] - 55:20
**sat** [1] - 55:8
**saw** [8] - 25:12, 37:19, 37:23, 39:15, 60:18, 68:17, 95:18, 95:19
**sayings** [1] - 74:7
**scene** [8] - 22:11, 37:5, 39:3, 46:2, 79:25, 82:17, 94:10, 94:22
**schtick** [1] - 53:7

**scooters** [1] - 15:13
**Sean** [2] - 20:3, 23:14
**search** [5] - 14:15, 35:12, 72:9, 72:11, 81:3
**searching** [1] - 16:2
**seat** [2] - 81:13
**second** [3] - 15:3, 51:16, 63:11
**secondary** [1] - 8:1
**secret** [5] - 25:19, 25:25, 26:12, 26:13, 28:4
**secured** [1] - 94:10
**security** [1] - 26:9
**see** [15] - 21:24, 35:18, 36:6, 37:7, 44:13, 49:18, 73:16, 81:25, 82:1, 85:7, 85:9, 85:10, 87:11, 98:13
**seeing** [4] - 28:21, 28:22, 39:6
**seek** [1] - 107:10
**seem** [1] - 95:3
**selected** [1] - 6:13
**self** [5] - 7:9, 76:3
**self-initiated** [1] - 7:9
**self-initiative** [1] - 76:3
**semi** [1] - 21:18
**sending** [1] - 12:16
**sense** [1] - 115:3
**sent** [2] - 56:7, 68:10
**sentence** [1] - 102:5
**separated** [2] - 20:7, 50:6
**separating** [1] - 20:25
**sequence** [1] - 49:2
**Sergeant** [19] - 9:4, 25:8, 25:15, 25:18, 25:21, 26:1, 26:5, 26:14, 27:22, 28:5, 29:15, 46:18, 66:23, 69:4, 69:10, 69:18, 110:11, 113:21, 115:15
**sergeant** [10] - 8:2, 8:6, 8:9, 19:19, 25:10, 25:16, 25:20, 27:22, 28:12, 67:6
**sergeants** [1] - 44:24
**service** [9] - 9:16, 25:19, 25:25, 26:12, 26:13, 28:4, 36:19, 106:23, 106:24
**set** [2] - 99:23, 119:15
**sets** [1] - 99:9
**seven** [6] - 8:11, 92:10, 95:15, 106:11, 116:2

**several** [5] - 38:17, 45:7, 80:9, 110:5, 110:6
**sex** [3] - 25:24, 27:19, 82:11
**sexual** [4] - 10:19, 35:14, 67:13, 70:4, 70:14, 100:25, 101:3, 103:24
**sexually** [1] - 67:7
**Shaffar** [2] - 27:5, 30:2
**Shake** [1] - 30:13
**shake** [1] - 30:12
**shake-up** [1] - 30:12
**Shake-up** [1] - 30:13
**shall** [3] - 42:16, 43:13, 44:25
**shame** [1] - 73:23
**sharp** [1] - 114:2
**sheriff** [38] - 20:15, 20:20, 22:14, 22:22, 22:24, 23:17, 23:23, 24:7, 24:12, 24:17, 24:21, 27:8, 30:21, 31:4, 43:14, 44:24, 51:20, 51:25, 52:10, 53:12, 53:13, 60:22, 62:2, 63:17, 63:23, 76:23, 77:9, 78:2, 78:11, 83:1, 83:9, 93:2, 112:12, 116:14, 116:17, 116:19, 116:22
**Sheriff** [20] - 8:13, 20:21, 29:19, 50:8, 50:9, 50:24, 53:8, 63:5, 111:15, 111:16, 111:18, 112:4, 112:6, 112:9, 112:10, 112:12, 112:13, 112:15, 116:14, 116:22
**sheriff's** [20] - 12:7, 23:22, 53:2, 54:6, 54:8, 58:12, 67:24, 74:14, 74:16, 83:25, 95:15, 98:18, 101:25, 105:1, 105:2, 106:9, 106:10, 111:23, 114:21, 116:19
**Sheriff's** [10] - 10:10, 22:5, 30:17, 35:11, 51:23, 65:21, 98:16, 99:13, 100:1, 111:20
**shift** [26] - 17:19, 20:14, 20:17, 20:18, 23:6, 34:6, 34:7, 34:8, 34:10, 37:16, 38:1, 57:16, 91:13,

106:13, 106:14, 106:16, 106:25, 107:2, 107:15, 107:18, 107:20, 107:21, 107:25, 108:1, 108:3
**shifts** [1] - 107:1
**shiny** [2] - 76:4, 76:5
**shirt** [1] - 58:21
**shit** [1] - 76:2
**shooting** [2] - 68:22, 69:12
**shorthand** [1] - 5:5
**Shorthand** [2] - 2:17, 5:6
**shorts** [1] - 55:20
**shot** [3] - 67:1, 69:10, 108:25
**shotgun** [6] - 13:24, 67:1, 69:11, 108:22, 108:25, 109:4
**show** [2] - 72:4, 78:18
**showed** [6] - 6:18, 36:20, 36:21, 49:8, 79:3, 82:12, 82:13
**shown** [1] - 6:24
**sic** [2] - 78:9, 83:10
**side** [5] - 21:20, 32:10, 66:11, 68:8, 77:17
**sides** [2] - 66:3, 66:4
**sight** [1] - 39:1
**sign** [9] - 21:17, 112:1, 112:6, 112:7, 112:10, 112:11, 112:17, 112:19, 112:22
**signal** [1] - 32:12
**signature** [1] - 117:12
**SIGNATURE** [1] - 118:22
**signed** [1] - 112:5
**silently** [1] - 117:9
**Simcox** [2] - 53:18, 77:15
**similar** [4] - 10:12, 28:7, 35:24, 86:9
**similarities** [1] - 84:15
**siren** [1] - 41:3
**sirens** [3] - 94:17, 94:23, 110:12
**SIS** [1] - 102:14
**sister** [2] - 62:15
**sit** [3] - 30:22, 42:6, 117:9
**sitting** [2] - 85:8, 87:22
**Sitting** [1] - 81:12
**situation** [4] - 14:19, 15:25, 44:3, 85:4
**six** [1] - 92:10

**size** [1] - 100:8
**skills** [2] - 13:23, 14:6
**skunk** [1] - 68:14
**slap** [1] - 75:16
**slow** [1] - 41:14
**smart** [1] - 72:21
**smell** [1] - 68:2
**smelled** [2] - 80:3, 80:17
**sober** [1] - 38:19
**society** [1] - 43:19
**sodas** [1] - 64:25
**someone** [4] - 42:1, 62:9, 66:9, 75:8
**sometime** [1] - 41:19
**sometimes** [1] - 59:17
**somewhere** [3] - 38:15, 72:23, 73:10
**son** [3] - 71:19, 71:20, 72:17
**sorry** [6] - 20:2, 51:5, 52:7, 70:12, 72:12, 112:8
**sort** [4] - 7:13, 16:19, 18:19, 58:9
**sought** [4] - 10:21, 11:1, 11:23, 12:1
**soul** [1] - 77:8
**sound** [1] - 31:10
**sounded** [1] - 19:17
**sounds** [2] - 20:4, 31:11
**source** [1] - 33:22
**speaking** [1] - 95:13
**special** [1] - 106:17
**specialized** [6] - 6:9, 6:11, 9:24, 10:11, 10:13, 54:10
**specializing** [1] - 6:18
**specialty** [3] - 76:7, 77:18, 100:9
**specific** [10] - 10:7, 17:5, 61:10, 66:15, 74:22, 75:23, 77:6, 99:22, 111:4
**specifically** [5] - 17:24, 56:18, 62:2, 64:17, 65:24
**speculated** [1] - 105:22
**speculation** [4] - 19:3, 26:4, 84:11, 105:13
**speculative** [2] - 78:9, 83:3, 83:6
**speeding** [1] - 110:11
**split** [2] - 15:3, 16:2
**split-second** [1] - 15:3
**spot** [4] - 8:3, 58:1, 67:10, 70:19
**Spring** [2] - 32:24,

36:3
**spun** [1] - 60:6
**squad** [3] - 9:14, 108:2, 108:17
**squash** [1] - 36:23
**St** [71] - 2:15, 2:20, 3:5, 3:16, 6:20, 7:2, 8:4, 8:22, 9:8, 10:9, 10:18, 13:8, 13:11, 21:3, 22:4, 22:15, 27:17, 27:24, 29:8, 29:13, 30:5, 30:15, 30:17, 30:20, 32:16, 32:18, 33:2, 33:8, 33:11, 35:11, 35:22, 35:23, 42:25, 44:22, 49:11, 49:16, 51:23, 65:21, 67:1, 74:15, 86:3, 98:16, 99:13, 100:1, 100:15, 101:24, 102:1, 103:3, 103:20, 103:22, 104:16, 104:19, 104:22, 105:3, 105:10, 106:3, 106:4, 106:6, 106:8, 108:8, 108:10, 109:13, 110:18, 113:7, 113:9, 113:10, 113:25, 114:12, 115:7, 115:8
**ST** [3] - 1:7, 2:6, 3:13
**stakeout** [2] - 25:11, 28:7
**stalked** [1] - 67:1
**stand** [3] - 26:25, 53:24, 85:1
**standard** [1] - 64:24
**standards** [1] - 11:4
**stands** [2] - 37:10, 84:4
**start** [2] - 57:14, 107:7
**started** [8] - 22:1, 29:5, 40:14, 55:18, 56:3, 64:10, 81:19, 111:25
**State** [1] - 81:2
**state** [9] - 15:18, 33:7, 33:8, 33:10, 33:16, 59:17, 59:25, 60:3, 64:22
**statement** [13] - 48:12, 48:13, 54:18, 79:9, 79:15, 101:25, 102:1, 102:5, 102:13, 102:23, 102:24, 103:5, 103:7
**STATES** [2] - 1:1, 2:1
**States** [2] - 2:18,

119:4
**station** [5] - 56:5, 57:21, 58:5, 58:7, 65:1
**status** [1] - 81:15
**stay** [5] - 21:9, 21:10, 50:3, 56:1, 75:4
**staying** [1] - 37:2
**stays** [1] - 84:7
**steer** [3] - 24:7, 24:23, 29:20
**step** [3] - 82:16, 106:23, 110:24
**Stephen** [1] - 3:6
**stepson** [2] - 71:20, 72:16
**steroid** [1] - 70:1
**still** [16] - 17:7, 24:2, 30:8, 37:1, 37:2, 38:9, 45:8, 49:3, 49:6, 49:15, 49:17, 50:1, 55:20, 71:2, 83:22, 86:7
**STIPULATED** [1] - 5:2
**stipulated** [1] - 2:10
**stirred** [1] - 26:19
**stolen** [2] - 109:24, 110:8
**stone** [1] - 96:4
**stop** [36] - 21:16, 32:2, 32:4, 33:14, 38:15, 39:2, 40:16, 40:21, 41:18, 41:19, 42:12, 44:4, 44:8, 44:14, 45:1, 45:11, 46:2, 46:11, 46:13, 47:2, 47:10, 47:16, 47:19, 47:21, 48:2, 48:7, 48:24, 58:10, 61:2, 61:10, 63:1, 63:4, 72:9, 94:8, 94:9, 96:7
**stopped** [8] - 21:19, 21:20, 32:5, 45:23, 47:24, 58:25, 79:25, 115:8
**stops** [5] - 41:24, 95:6, 95:21, 95:24, 100:12
**stories** [1] - 70:8
**story** [2] - 25:8, 70:24
**straddled** [1] - 41:13
**strange** [1] - 86:20
**strata** [1] - 76:20
**Streck** [2] - 66:23, 108:18
**street** [5] - 15:16, 68:15, 87:17, 114:10, 115:6
**Street** [3] - 2:15, 3:4,

3:14
**strewn** [1] - 114:8
**strike** [6] - 9:23, 29:11, 50:2, 52:19, 78:8, 83:7
**strikes** [1] - 9:13
**stuff** [22] - 24:6, 24:25, 27:12, 29:19, 29:25, 49:1, 49:6, 52:14, 57:12, 68:7, 71:13, 74:8, 74:12, 74:14, 75:12, 75:13, 76:4, 81:10, 81:11, 87:14, 92:4
**Subject** [1] - 106:1
**subject** [6] - 16:18, 22:8, 22:17, 63:7, 68:22
**subsequently** [4] - 56:6, 87:10, 87:20
**suggestion** [1] - 18:20
**suggestions** [1] - 19:16
**suicide** [1] - 69:7
**suit** [1] - 31:7
**Suite** [1] - 3:15
**supervised** [2] - 29:12, 113:8
**Supervised** [1] - 113:8
**supervising** [1] - 114:13
**supervision** [1] - 51:18
**supervisor** [20] - 4:7, 7:24, 8:2, 8:6, 8:8, 10:22, 29:13, 60:20, 60:21, 61:14, 61:24, 89:22, 105:6, 107:24, 107:25, 115:12, 115:14, 115:18, 116:10
**supervisors** [16] - 42:19, 43:14, 44:11, 44:14, 44:23, 53:10, 60:10, 65:2, 70:7, 95:19, 95:20, 113:9, 114:12, 114:13, 114:15, 114:20
**support** [2] - 63:25, 83:1
**supposed** [15] - 11:13, 28:12, 41:25, 42:1, 55:21, 56:13, 57:15, 59:21, 60:1, 64:22, 75:20, 91:14, 95:12, 96:16, 100:19
**Supreme** [1] - 84:3
**surveil** [1] - 39:3
**suspect** [1] - 16:20
**suspended** [1] - 59:9

**suspicion** [1] - 41:10
**SWAT** [14] - 6:9, 26:7, 58:15, 66:6, 67:2, 68:21, 68:22, 69:13, 72:9, 74:23, 76:5, 77:19, 107:16, 107:23
**sweat** [1] - 58:21
**swept** [1] - 71:10
**Swope** [5] - 77:25, 78:2, 112:22, 112:23, 116:17
**sworn** [2] - 5:12, 119:7
**syringes** [10] - 113:6, 113:14, 113:17, 113:23, 113:24, 113:25, 114:5, 114:7, 114:16, 114:21
**system** [5] - 47:11, 72:23, 94:12, 110:18, 110:23

# T

**T-shirt** [1] - 58:21
**tables** [1] - 60:6
**tactics** [1] - 69:22
**tail** [1] - 102:25
**task** [25] - 5:21, 6:10, 9:12, 9:15, 9:22, 20:6, 20:25, 26:25, 66:25, 75:4, 104:15, 104:20, 105:1, 105:6, 105:9, 105:15, 105:16, 105:17, 106:2, 106:18, 108:7, 108:9, 113:3, 113:5, 115:19
**Task** [3] - 106:5, 108:8, 108:10
**tasked** [3] - 34:19, 35:17, 37:1
**taught** [2] - 13:18, 99:16
**teach** [1] - 99:17
**teaching** [1] - 99:20
**Team** [1] - 8:14
**team** [11] - 26:7, 58:15, 72:9, 77:19, 86:17, 106:19, 107:16, 107:23, 113:3, 116:4
**teams** [1] - 116:1
**techniques** [1] - 14:2
**teenage** [1] - 71:5
**Temple** [11] - 3:17, 3:22, 3:24, 89:12,

96:17, 97:12, 99:2, 100:16, 105:14, 106:1, 115:25
**TEMPLE** [26] - 19:2, 26:3, 52:7, 52:18, 56:23, 67:16, 72:12, 78:8, 78:20, 83:2, 83:6, 83:12, 84:10, 89:6, 97:11, 97:15, 97:23, 98:3, 98:7, 98:10, 100:6, 105:19, 105:22, 115:24, 116:25, 118:12
**tenure** [6] - 10:9, 13:7, 23:22, 55:8, 111:20, 112:14
**terminated** [1] - 86:6
**test** [5] - 68:9, 70:17, 80:22, 80:23
**tested** [1] - 69:25
**testified** [7] - 23:17, 34:11, 66:18, 79:9, 111:3, 113:1, 116:11
**testify** [1] - 119:7
**testifying** [1] - 114:20
**testimony** [5] - 34:23, 73:8, 108:6, 110:10, 119:12
**tests** [1] - 80:21
**thanked** [1] - 118:13
**THE** [8] - 1:1, 1:1, 2:1, 2:1, 89:4, 101:17, 118:20, 119:14
**themselves** [3] - 54:14, 54:17, 66:12
**thereafter** [1] - 119:9
**therefore** [1] - 18:14
**they've** [1] - 74:8
**They've** [1] - 74:18
**thinking** [4] - 5:24, 51:3, 51:7, 64:14
**Third** [1] - 3:14
**third** [1] - 21:9
**threat** [1] - 86:6
**three** [12] - 7:4, 11:5, 11:14, 11:16, 57:19, 59:16, 86:15, 86:18, 91:7, 91:9, 91:23, 100:23
**threw** [5] - 113:6, 113:13, 113:14, 113:17, 114:11
**throat** [1] - 69:10
**throughout** [4] - 13:4, 105:23, 114:9, 114:19
**throw** [3] - 86:14, 113:10, 114:4
**throwing** [1] - 115:13

**thrown** [2] - 114:5, 114:7
**ticket** [5] - 15:12, 62:8, 62:12, 64:6, 64:8
**tickets** [22] - 4:3, 33:7, 62:9, 62:13, 64:2, 64:6, 64:7, 89:8, 89:14, 90:15, 90:23, 92:21, 92:22, 100:12, 117:16, 117:20, 117:23, 117:24, 118:3, 118:5, 118:13
**Tiefenbrunn** [8] - 9:11, 46:23, 49:4, 49:8, 51:10, 115:17, 115:18
**Tiefenbrunn's** [1] - 46:20
**title** [2] - 7:23, 8:19
**today** [4] - 5:20, 60:13, 79:16, 90:13
**Todd** [6] - 53:9, 53:14, 70:12, 74:22, 76:22, 77:18
**together** [3] - 15:6, 25:13, 74:14
**took** [13] - 19:9, 23:15, 35:10, 49:9, 49:11, 62:24, 77:25, 78:22, 86:25, 104:2, 104:6, 112:24, 114:24
**top** [3] - 58:16, 86:15, 86:17
**tore** [1] - 66:24
**totality** [2] - 15:2, 84:19
**touch** [3] - 16:4, 73:12, 101:9
**touched** [1] - 71:5
**touching** [1] - 62:19
**toward** [1] - 38:14
**Towards** [1] - 112:14
**towards** [7] - 22:2, 37:15, 37:17, 38:23, 39:10, 78:6, 79:3
**towing** [1] - 16:2
**track** [1] - 6:17
**tracking** [1] - 45:18
**trade** [2] - 6:6, 7:10
**traffic** [39] - 32:2, 32:4, 32:14, 33:14, 40:16, 40:21, 41:18, 41:24, 42:11, 44:4, 44:14, 45:1, 45:11, 46:11, 46:13, 47:2, 47:10, 47:16, 48:2, 48:7, 48:24, 58:10, 61:2, 64:8, 71:24, 73:2, 73:5, 79:24, 94:4,

94:6, 94:8, 94:9, 95:6, 95:21, 95:24, 96:6, 96:7, 100:11
**trained** [1] - 14:21
**training** [31] - 9:24, 10:4, 10:6, 10:12, 10:13, 10:15, 10:17, 11:4, 11:8, 11:14, 11:16, 11:20, 11:23, 12:3, 12:6, 12:15, 13:8, 14:18, 58:7, 67:3, 69:17, 74:1, 94:20, 98:17, 99:3, 107:20, 108:4, 108:5, 111:4, 111:6, 111:12
**transcribed** [2] - 5:7, 119:10
**transcription** [1] - 119:11
**transpired** [1] - 79:7
**travel** [1] - 57:23
**traveling** [3] - 37:19, 38:23, 58:15
**Travis** [5] - 71:23, 71:24, 72:1, 72:19, 72:21
**treated** [1] - 84:8
**tried** [2] - 53:24, 103:2
**trigger** [1] - 108:22
**trouble** [8] - 23:4, 46:10, 54:15, 75:2, 76:7, 91:16, 92:3, 95:11
**truck** [3] - 21:14, 22:2, 22:3
**true** [4] - 78:10, 79:4, 83:13, 119:11
**trunk** [2] - 91:18, 91:19
**trunks** [1] - 91:13
**truth** [4] - 48:4, 95:14, 119:8
**try** [5] - 5:17, 19:10, 34:20, 35:13, 44:24, 54:6, 73:7
**trying** [7] - 17:25, 35:18, 38:19, 59:19, 81:22, 81:24, 88:20, 88:24, 95:2
**turn** [3] - 25:7, 32:11, 91:14
**turned** [6] - 16:23, 18:9, 40:25, 57:16, 59:16, 59:18
**turning** [1] - 57:20, 78:25
**turnover** [1] - 80:16
**turns** [1] - 14:14
**twice** [1] - 17:20

**two** [13] - 21:6, 24:19, 38:23, 61:19, 63:21, 65:22, 78:23, 84:8, 86:2, 107:1, 110:20, 114:11, 116:1
**type** [3] - 35:24, 42:7, 84:17
**typed** [1] - 50:11
**types** [1] - 15:21
**typewriting** [2] - 5:7, 119:10
**typical** [1] - 54:5
**Typically** [1] - 9:5
**typically** [1] - 21:6

## U

**unaware** [1] - 15:15
**uncommon** [5] - 41:23, 42:9, 42:10, 43:5, 43:20
**under** [15] - 15:18, 16:16, 55:8, 55:9, 60:1, 68:18, 81:2, 86:6, 86:12, 104:3, 109:17, 111:15, 111:16, 111:18, 112:22
**undercover** [3] - 6:2, 34:19, 116:3
**underneath** [1] - 71:10
**understandable** [1] - 97:9
**understood** [2] - 14:22, 43:23
**unexpectedly** [1] - 49:8
**Unfortunately** [1] - 53:4
**unfortunately** [1] - 104:11
**unguarded** [1] - 107:2
**uniform** [2] - 36:15, 72:10
**unincorporated** [1] - 32:17
**unit** [55] - 6:11, 6:22, 7:19, 8:1, 8:7, 8:17, 8:21, 9:2, 9:3, 10:5, 10:13, 21:4, 21:6, 21:11, 21:14, 22:21, 24:1, 24:3, 24:6, 25:16, 26:20, 26:21, 26:22, 27:4, 28:15, 28:18, 29:6, 29:20, 29:22, 30:8, 30:14, 30:23, 30:24, 31:3, 40:13, 51:23, 54:9, 54:10, 61:1, 67:10,

67:19, 72:7, 72:8, 72:9, 74:25, 77:19, 77:20, 104:24, 113:20, 114:12, 114:13, 116:6
**UNITED** [2] - 1:1, 2:1
**United** [1] - 2:18
**units** [4] - 6:9, 61:5, 77:18, 100:10
**unlawful** [1] - 14:15
**unless** [3] - 40:10, 40:13, 61:9
**unqualified** [1] - 83:1
**unsupervised** [1] - 102:14
**unzipped** [1] - 82:15
**up** [68] - 6:15, 6:17, 22:5, 23:5, 24:18, 25:12, 26:11, 26:19, 27:6, 28:11, 28:14, 28:24, 30:12, 30:13, 30:16, 34:20, 36:7, 36:20, 42:3, 43:14, 44:13, 44:24, 45:7, 45:12, 49:8, 50:11, 53:24, 54:23, 54:25, 55:1, 55:3, 55:6, 55:10, 55:11, 56:11, 57:4, 59:1, 59:3, 59:9, 59:13, 59:14, 62:10, 65:17, 66:24, 68:5, 70:20, 71:4, 75:14, 75:16, 79:3, 80:3, 81:8, 87:8, 87:16, 87:20, 88:8, 88:10, 88:16, 92:24, 92:25, 95:20, 96:4, 98:11, 103:23, 103:25, 104:20
**UPON** [1] - 119:14
**ups** [3] - 56:21, 88:12
**upset** [2] - 95:11, 95:13
**utilize** [2] - 93:14, 93:25
**utilized** [1] - 98:4

## V

**vacated** [1] - 116:18
**valid** [1] - 47:14
**vehicle** [16] - 22:1, 34:19, 38:22, 48:1, 49:17, 56:16, 58:3, 58:5, 58:8, 68:6, 80:19, 80:20, 80:23, 81:12, 82:13, 109:11
**vehicles** [8] - 21:12, 21:13, 56:10, 56:12, 68:7, 80:9, 100:9

**verbal** [1] - 99:21
**verbatim** [2] - 24:5, 51:9
**versus** [4] - 84:20, 84:24, 85:23, 102:19
**video** [4] - 35:13, 39:23, 40:7, 40:15
**Village** [2] - 1:23, 71:22
**violated** [2] - 33:16, 33:19
**violating** [1] - 17:15
**violation** [1] - 32:14
**visit** [1] - 5:19
**visual** [2] - 16:20, 68:25
**voicemail** [2] - 87:15, 87:17
**VOLUME** [1] - 1:13
**voluntary** [1] - 48:15
**vs** [2] - 1:6, 2:5

## W

**waive** [1] - 118:20
**WAIVED** [1] - 118:22
**walking** [2] - 22:2, 58:24
**wants** [4] - 47:11, 47:13, 60:23, 81:15
**warrant** [3] - 35:12, 72:10, 72:11
**warrants** [3] - 47:11, 47:13, 81:16
**washed** [1] - 52:10
**wavered** [1] - 102:3
**ways** [1] - 84:16
**weapon** [2] - 22:20, 109:24
**wearing** [1] - 59:5
**week** [4] - 17:20, 21:1, 35:7, 35:9
**weekend** [1] - 57:18
**weeks** [6] - 34:17, 35:8, 57:19, 91:7, 91:9, 91:23
**weighed** [1] - 102:16
**Weldon** [2] - 32:23, 36:2
**Wentzville** [2] - 25:11, 71:19
**West** [6] - 21:2, 21:4, 22:14, 28:16, 29:2, 109:13
**westbound** [2] - 58:16, 80:15
**Weston** [1] - 109:24
**wherein** [1] - 2:20
**whole** [5] - 16:13, 28:13, 59:8, 66:11,

13

87:14

**widely** [1] - 55:18

**wife** [4] - 25:24, 27:20, 102:8, 102:16

**wife's** [1] - 62:15

**wigs** [1] - 53:10

**willing** [4] - 75:12, 102:8

**Wilson** [1] - 26:6

**window** [2] - 16:18, 85:8

**WITNESS** [3] - 89:4, 101:17, 118:20

**witness** [4] - 60:14, 117:1, 119:6, 119:12

**woman** [1] - 103:12

**wood** [1] - 56:11

**word** [3] - 23:24, 96:21, 96:22

**wording** [5] - 79:2, 104:4, 104:5, 104:8, 104:12

**words** [5] - 22:25, 47:4, 47:23, 65:11, 117:5

**worker** [2] - 86:15, 86:21

**works** [2] - 30:20, 106:5

**worth** [1] - 23:1

**wow** [1] - 48:3

**wreck** [1] - 51:7

**write** [15] - 15:11, 15:18, 19:10, 33:7, 48:17, 55:5, 61:7, 71:25, 75:15, 81:16, 82:2, 82:4, 88:12, 103:23

**write-up** [1] - 103:23

**write-ups** [2] - 88:12

**writers** [1] - 86:18

**writing** [3] - 18:14, 61:1, 65:15

**written** [21] - 6:16, 19:7, 22:16, 23:4, 48:1, 54:23, 54:25, 55:1, 55:10, 55:11, 59:9, 59:13, 59:14, 65:7, 65:17, 75:14, 87:16, 87:20, 100:13, 105:5

**wrongly** [4] - 85:2, 85:3, 85:6

**wrote** [10] - 18:24, 18:25, 48:10, 48:11, 48:13, 59:1, 79:8, 79:15, 86:18, 103:24

## Y

**Year** [3] - 6:20, 6:21, 55:12

**year** [2] - 21:9, 23:12

**years** [15] - 7:4, 11:5, 11:14, 11:17, 21:7, 25:17, 67:23, 67:25, 74:13, 74:19, 78:3, 92:10, 95:15, 106:12

**yourself** [1] - 99:10

## Z

**zipper** [1] - 82:15

**zone** [3] - 55:24, 57:23, 106:21