**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| D.B., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:12-CV-00654 JAR |
| | ) | |
| ST. CHARLES COUNTY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S STATEMENT OF FACTS AS TO WHICH A GENUINE ISSUE EXISTS**

COMES NOW Plaintiff, pursuant to Local Rule 7-4.01(E), in response to the motion for summary judgment filed by Defendant St. Charles County, and submits the following facts as to which Plaintiff claims a genuine issue exists.

**St. Charles County and Sheriff Thomas W. Neer**

1.      Thomas W. Neer is the elected sheriff of St. Charles County, Missouri. Depo of Neer: 6:10-14

2.      St. Charles County has a convicted felon on the payroll, Christopher Hunt.  Depo of Neer: 6:18-24.

3.      Christopher Hunt was tried by a jury, found guilty and sentenced.  He was tried and convicted of Burglary, Assault and Property Damage.  Depo of Neer: 6:25-7:9.

4.      Christopher Hunt is employed by the St. Charles County Sheriff's Department as an in-house officer. Depo of Neer: 8:13-16.

5.      From the time that Christopher Hunt was charged until the date of Sheriff Neer's deposition, Christopher Hunt has never been disciplined by St. Charles County.  Depo of Neer: 7:17-24.

6.      He was elected to sheriff in 2006 and 2010. Depo of Neer: 12:4-14

7.      St. Charles County has an Internal Affairs Department. Depo of Neer: 9:7

8.      Two of the last six sheriffs in St. Charles County "weren't qualified to command an outhouse." Depo of Neer 13:12-16

9.      The sheriff of St. Charles County does not have anyone above him in the chain of command. Depo of Neer 18:7-10

10.      The sheriff is solely responsible for the policies of the sheriff's department. Depo of Neer: 18:11-14

11.      The sheriff makes operational policies related to use of force, internal affairs organization, and various units in the sheriff's department. Depo of Neer 19:4-9.

12.      Defendant Jason King resigned from employment. Depo of Neer, 20:9-10.

13.      There was an internal investigation of Jason King. Depo of Neer 21:15-17.

14.      The complete policies and protocol for the internal affairs division of the sheriff's department are three (3) pages long. Depo of Neer. 23:4-18.

15.      The sheriff's department does not keep records of instances where a complaint against a deputy is made, but no discipline is proscribed. Depo of Neer: 27:2-5.

16.      An inquiry is the first step of an internal affairs investigation. Depo of Neer: 29:11-13.

17.      Not all citizen complaints result into an inquiry. Depo of Neer: 29:14-16.

18.      The decision whether a citizen complaint results in an inquiry is made lower in the chain of command at the sergeant or lieutenant level. Depo of Neer: 29:17-21.

19.     There is not a written protocol governing when a citizen complaint is treated as an inquiry. Depo of Neer: 29:22-25.

20.     If a citizen complaint is not treated as an inquiry, the sheriff is generally not informed of the complaint. Depo of Neer: 30:1-4.

21.     There is no requirement that inquiries are reduced to writing or forwarded up the chain of command. Depo of Neer: 30:11-20.

22.     The inquiry process is a custom of the sheriff's department. Depo of Neer: 31:15-18.

23.     The inquiry process is approved by the sheriff. Depo of Neer: 31:19-22.

24.     The inquiry process has operated this way for several years. Depo of Neer 31:23-25 - 32:1-7.

25.     The Sheriff agrees that lax discipline fosters misconduct.  Depo of Neer 60:14-17.

26.     It is important that sworn members understand that if they engage in misconduct they will be held accountable by command staff and that the disciplinary system is administered fairly and equally.  Depo of Neer 60:18-61:4.

27.     The power shift or fourth shift was first started in the middle '90s and was reinstated around 2006. Depo of Neer: 44:18-23.

28.     Sheriff Neer read Mr. Kings accounts of differences in how some members were treated as opposed to others.  If you take the account of Jason King as true it would not the proper way for the disciplinary system to operate in the sheriff's department. Depo of Neer: 61:8-25 - 62:1-5.

29.     If you take the account of Jason King as true he has described lax discipline. Depo of Neer: 62:20-25.

30.     It is the sheriff's discretion by policy when an internal affairs investigation is ordered versus not being ordered. Depo of Neer: 64:3-8.

31.    Q.    Did you assist him [Christopher Hunt] in arranging for the appeal bond?

       A.    No.

       Q.    Had no role in it whatsoever?

       A.    I loaned his family some money. Depo of Neer: 64:17-21.

32.    The only time when a supervisory incident form is prepared and forwarded to the sheriff is when there is a recommendation for some discipline. Depo of Neer: 66:16-25 - 67:1-3.

33.    The internal affairs files of individual officers are not available to anyone other than the sheriff and internal affairs and the investigator per sheriff department policy. Depo of Neer: 70:14-22.

34.    The internal affairs investigator makes periodic reports only to the sheriff. Depo of Neer: 96:8-13.

35.    The sheriff ultimately makes the decision on whether or not to sustain complaints. Depo of Neer: 96:23-25.

36.    The sheriff does not remember a complaint from a sworn member of the sheriff's department. Depo of Neer: 97:22-24.

37.    After a complaint is made the sheriff determines whether or not it warrants an investigation. Depo of Neer: 98:5-12.

38.    Jason King "wanted to do things that he wanted to do. The things that come along with doing your job in law enforcement he didn't want anything to do with, they were troublesome, reports, maybe assignments to a particular zone or something like that." Depo of Neer: 113:11-18.

39.    The sheriff does not in any way track when a sheriff has been sued for a violation of constitutional rights. Depo of Neer: 115:25 - 116:1-3

40.     The filing of a lawsuit does not prompt an internal investigation. Depo of Neer: 116:8-11.

41.     Sheriff could not recall a time that an inquiry was initiated as a result of a suit being filed.

Depo of Neer: 118:10-13

42.     If a case is settled it does not affect the officer or the sheriff's records in any respect.

Depo of Neer: 119:13-16

43.     As a result of the actions of Defendant King there were no changes in policy of the

sheriff's department. Depo of Neer: 120:5-11

44.     Q. Were you aware that Officer King had been sued along with Deputy Cantillion,

Ginnever, and Sherrill arising from an incident involving the attempted apprehension of a

fugitive and entry into a home where excessive force was alleged?

A. I knew of the suit. I didn't know the particulars.

Q. And consistent with what you said before, your knowledge of this suit did not result in any

either change in policy or investigation in your department, correct?

A. No.  Depo of Neer: 121:16-25 - 122:1-2.

45.     Jason King was not reported to POST. Depo of Neer: 131:4-5

46.     Has Sheriff Neer has seen misconduct including excessive force that he didn't report to a

supervisor or others?  He answered, "Sure."   Depo of Neer: 133:7-12

47.     He didn't report these violations because they "weren't so egregious that [he] felt it

necessary to take it to a supervisor." Depo of Neer: 133:13-17.

48.     Sheriff Neer assisted a Deputy who had been alleged to have been in an altercation at a

bar in securing a lawyer and the Deputy was never disciplined and there never was an inquiry

or internal affairs investigation.  Depo of Neer:  139:23-141:2.

49.     Sheriff Neer describes the rumor mill in the Sheriff's Department which he acknowledges is a small and close knit department.  When he acknowledges a rumor mill, he is describing a rumor mill on steroids.  Depo of Neer:  148:2-15.

50.     Officer Jeremy Thom "backhanded a prisoner in the holdover cell" and was suspended, but not terminated. Depo of Neer: 142:9-18.


**Deposition of Jason King**

51.     Jason King was employed by the St. Charles Sheriff's Department from approximately 2001 to 2008. Depo of King: 4:17-23

52.     Q. All right. And were you assigned to a particular beat during that period of time or did it change?

A. When you get the schedule out, the monthly schedule that the supervisor would put out, they would not only put your days off on there, they would put the zone which you would be assigned to. So, once again, we started work from our house; so therefore we would know every day where to go when we came on duty. Sometimes that may change, you know, upon somebody calling in sick or whatever, we may have to, you know, alternate zones or cover a different zone or whatever. But you pretty much knew when you went on duty where you were supposed to be. Obviously you only went to the station twice a week, requirement, Tuesdays and Thursdays for 15 minutes. Other than that you just went on duty from your house. Depo of King: 15:14-25 - 16:1-7.

53.     Jason King worked the power shift. Depo of King: 18:18-23

54.     The power shift was from 6:00 p.m. to 2:00 a.m. Depo of King: 18:18-23

55.     The purpose of the power shift was comprised of individuals that "were a little more active as far as going out and initiating traffic stops, drug investigations, whatever. So if there

was a call, then you'd have a little more freedom to, you know, hit some of these hot spots that

we talked about in roll call or whatever." Depo of King: 19:15-21, 22:2-4

56.     The power shift did not have a specific zone and was "open-ended you go where you go."

Depo of King: 24:15-16

57.     The power shift did not have any written guidelines or directives. Depo of King: 32:10-

13

58.     The power shift typically consisted of one-man cars. Depo of King: 34:13-14

59.      Tom Neer was the sheriff in 2007. Depo of King: 46:17-19

60.     Under Sheriff Neer, supervisors were allowed "free reign" to implement their beliefs.

Depo of King: 50:17-19. This was the culture of the Sheriff's Department. Id. at 51:6-9

"As my time went through the sheriff's department it was clear that certain people could do

things and not get in trouble or minimal punishment." Depo of King: 53:20-23. "And the more

you said something, the worse it seemed to get for you or your friends or whoever the case may

be." Depo of King: 54:1-3

61.     There were different standards for different deputies within the department. Depo of

King: 54:6-8, 55:4-7

62.     Within the St. Charles sheriff's department there existed a "good old boy system" Depo

of King: 58:22-25, 59:1-17

63.     The good old boys group was comprised of a group of officers, either command staff or

deputies, who are in the good graces of the sheriff and the people aligned with the sheriff. Depo

of King: 60:6-14

64.

Q. Okay. Can you think of a specific incident when another officer -- and I'm thinking of a

SWAT officer or somebody on the in group, was involved in a specific transgression that was

not punished?

A. I'm thinking of one specific incident -- and I don't know what the time was, I don't remember

the deputy's name, I don't even think he was a SWAT officer, and I think it was prior to me

leaving the sheriff's department -- where the SWAT team was socializing at a bar in O'Fallon

somewhere, and there may have been two Mexican patrons eyeballing them, mean mugging

them, whatever the term you would want to use. Somewhere outside that deputy who was not

drinking because he had -- I forget, I don't know if he had MS -- he was taking medication for

some disorder that he had -- struck the subject, knocked him to  the ground. I think he hit his

head or whatever. They left the scene not taking care of the person. The ambulance was called. I

know the SWAT members were down at the range; and within the next day or two days later an

O'Fallon detective went down to the range to speak to them about this incident obviously

because police were called. They get there. Oh, yeah, by the way, you know, these guys were

involved. I don't know if somebody knew they were cops or whatever the case may be. But

they're not the ones that called that I recall. And I don't know, but I was told that that deputy that

struck was so nervous about what was going on that he specifically went to Sheriff Neer to ask

for help. Depo of King. 64:23-25, 65:1-25, 66:1-5

65.

"I know he's a lieutenant now, Lieutenant Marshall, Mike Marshall. It was on the news where

they had gotten into an altercation somewhere down there in Cottleville, got into a fist fight or

something and maybe roughed the guy up and it was on tape, and no charges were filed, they

weren't in trouble. As far as I know nothing was put in their file or anything of that nature." Depo of King: 66:12-19

66.

A. There was one particular incident that kind of set a bunch of us off. I ended up liking the guy in the end, but when he first got there he kind of rubbed some people the wrong way, trying to be a SWAT team member, got on the SWAT team. He was up in the jail and there was a prisoner handcuffed to the bench, and the prisoner was running his mouth. I don't know if he was intoxicated, whatever the case may be, and he hit him, knocked him down off the bench while he was still handcuffed to the point where the jailers, which are also St. Charles County employees, they work with us, but where St. Louis County is, the county corrections is under a different, it's not under the sheriff technically, it's separate.

Q. Yeah.

A. So they actually wrote a report up and initiated the investigation to take place. Two of our detectives from St. Charles County Sheriff's Department went down to investigate. I think there was some uprising or uproars from, you know, like, wow, if I had done that, you know, whatever. I think he got two days off was all he got off. Depo of King: 68:20-25, 69:1-17

67.

Q. Other Incidents?

A. ...Later on at the department he, you know, driving down the road, he had gotten a shotgun out of the car, didn't properly download it how you're supposed to, driving around in his car playing with the trigger while he was driving and shot a hole through his car up into his engine compartment. I don't think he got in trouble for that. He was a SWAT team member. Later on he got promoted. Depo of King: 70:23-25, 71:1-6

68.

Q. Keep going. Others?

A. A big one would have been for me Tom Cook, Lieutenant Tom Cook. There's stories he's

been married four times, or whatever the case may be. There's a story -- once again this is just a

rumor -- that he was out in Montgomery County on the highway I guess maybe roughing her up

a little bit and a trooper pulled up and he said who he was or whatever. The trooper kind of let

him go. But  --

MS. TEMPLE: He was roughing who up?

 A. His wife at the time. And I don't know what the dates on this were. Tom Cook actually got in

a motorcycle accident getting off the exit at Wentzville from 70. He lives north of there. And he

almost ripped half of his face off, kind of hit a street sign or whatever. Wentzville showed up.

Once again he was a sheriff's department deputy or sheriff's department, you know, lieutenant.

He was not charged, no blood tests done, no nothing. I'm under fairly good information that his

blood alcohol content was well over the legal limit at St. Joseph's West Hospital. Once again, I

know he was off duty, but, you know, no punishment of any kind or whatever. Depo of King:

71:10-15, 72:1-10

69.

Q. Thank you. Anything else you want to add to what you've testified to?

A. Yeah. Just a lot of gun issues. And once again this is just hearsay. Captain Sincox it's quite

possible has lost several hand guns over the years and --

Q. Forgive me, spell the last name, please.

A. Sincox, S-i-n-c-o-x. Apparently drinks quite heavily, whatever, misplaced some hand guns,

whatever, maybe more than one.

Q. Department-issued you mean?

A. Department-issued, correct, hand guns. Depo of King. 74:20-25, 75:1-9

70.     A. Zansettera. Apparently he was, I think there was a pursuit going on, or whatever the case may be. He pulled a shotgun out of the back of his car, laid it on the back of his car in a case, drove off, bounced down the highway, lost it. That was a shotgun that was out there on the loose. And I don't think -- I don't know if he was written up for that or not. My understanding is he didn't get in any trouble for it. I forget if they ever located the shotgun again.

Q. Was that a department shotgun?

A. Department-issued shotgun as well. I thought it was an assault rifle, but my understanding is maybe it was just a shotgun. Depo of King: 75:13-25, 76:1

71.

A. Jana Walters, Sergeant Walters, once again hearsay, went to the range, asked her to pull out her -- detectives get shotguns that they keep in a bag in their trunk. They don't have the tactical holder in the front seat. Asked her to pull out her shotgun to qualify. And that quite possibly she said I don't have it, I lost it when -- and maybe like a year, she lost it like a year ago and didn't tell anybody, or it was taken out of her car or whatever the case may be. Depo of King: 76:3-12

72.

A. Sergeant Ochs apparently was coming back from -- he was a SWAT team member. He was coming back from training in Jeff. City running code, excessive speed, running lights and sirens on Highway 70 eastbound because he wanted to get back to St. Charles County faster. Numerous complaints came in about why there was a St. Charles County deputy car running eastbound running code way out wherever, in the middle of Missouri, Montgomery County or whatever the

case may be. I don't think he got in trouble for that. I think he got talked to, but I don't think he

got in trouble. Depo of King: 76:14-25

73.    It is a violation of policy to run code when there is no emergency need and outside of St.

Charles County. Depo of King: 79:12-17

74.

A. Sergeant McCarver, supervisor, shift supervisor -- I don't know what shift he was working at

the time -- he was the only supervisor on duty at the time. Apparently he was dating a woman

who lived in St. Louis County. There was another guy involved, something of that nature. He left

the county on duty, leaving the county unsupervised, didn't tell anybody, to go confront this

individual. I don't know how long he was gone during the shift. He got I think 30 days reduced

pay, no time off. Numerous incidents of people having evidence in their trunks for months at a

time, not turning evidence in. Depo of King: 77:10-22

75.    It is against the policy of St. Charles County to keep evidence in a sheriff's vehicle for an

extended period of time. Depo of King: 78:5-13

76.

A. Evidence that let's say was disposed of, not properly in evidence. Anything you seize is

supposed to be, 'til the prosecutor releases that evidence, it's not supposed to be deposed of. That

was maybe much more in the drug unit where we seized things and threw it in the dumpster out

back, and then people would get in the dumpster. I mean there was an incident where there was a

kid bicycling in St. Peters with a bong that one of the guys in the drug unit had thrown away.

And a St. Peters' officer saw him with it. And he said I got it out of that dumpster. Well, it was

our dumpster. Depo of King: 85:18-25, 86:1-5

77.    A. We were just kind of in a strip mall somewhere. Syringes, you know, whatever the

case may be, that there was a lot of evidence that was thrown out that -- things too, I remember

one time we were in the drug unit and he was out lieutenant, he was the evidence sergeant at the

time, he brought in a big box of porn that was evidence at the sheriff's department that was

supposed to seize or dispose of in a proper way. Brought that. You know, just things like that

where evidence just kind of filtered around certain things.

Q. (By Mr. Ryals) Did the porn get distributed?

A. Well, it was king of -- it was more of a joke. It ended up being gay porn, more of whatever.

The was that it was a large box he was supposed to dispose of. It showed up at the drug unit. It

wasn't the first time, let's say, that evidence had, you know, whatever. Or things, like I said,

which we had seized that didn't make it, you know, taken from a house, taken from a scene that

did not make it into the evidence lockers. Depo of King: 86:6-25 - 87:1-3.

78.    A. I don't know anybody that -- I don't know of anybody that had a knife specifically as a

thrown-down knife. I mean certainly there was a lot of the old pat-down for my safety, hey, this

is your knife, don't let me forgot that I have it, I'm going to hold it while we're talking. A lot of

those knives never got back to those people. I know people with boxes and boxes and boxes of

knives that they collected over the years from people. Whether they were using those as throw-

downs, I do have no knowledge of that. Depo of King: 88:1-11.

79.    Q. How about throw-down dope?

A. Once again, I know people that, once again, evidence wasn't getting put in lockers and I know

people that probably had drugs in their car that weren't supposed to have drugs in their car or

whatever and whether they threw it down on somebody, I have no knowledge of that. Depo of

King: 88:12-18.

80.     It was always, you know, I don't want to get written up for things that I've done wrong, but so and so just did something, why are they not getting written up. It was always that under Neer.

Q. Unfair?

A. Unfair punishment. You know, it was always why are they not getting written up or why can they do that; I guarantee if that was someone else, it would have been different. And so it was always that. Not so much effective or not effective, it was just why one person, why not another. Depo of King: 91:7-19

81.     Q. Well maybe what I hear you inferring is that the effectiveness or ineffectiveness depended on whether you were one of the good old boys or in the outside group?

A. Correct. Depo of King: 91:20-24

82.     St. Charles County has backed Christopher Hunt. "But certainly the county has backed him whether to benefit the county for the county's purposes or whether he just happened to be the person that was in the incident that they're behind, or whether it's because they really, you know, believe in what -- I don't know. But I just know that the county has backed him during this incident financially, supportive, in the media." Depo of King: 94:2-10.

83.     Q. [Christopher Hunt's] still employed by the St. Charles County Sheriff's Department?

A. By the county. I don't know what they are classifying him as or whatever.

Q. I also heard that Sheriff Neer put up his appeal bond?

A. It's my understanding. Depo of King: 96:2-8.

84.     Christopher Hunt's approach to police work is similar or the same as Jason King. Depo of King: 97:15-17

85.     The "blue wall of silence" or "blue code" existed in the St. Charles County Sheriff's Department. Depo of King: 106:15-24.

86.     Defendant King observed "quite a few" instances of St. Charles County law enforcement officers engaging in misconduct. Depo of King: 107:1-14.

87.     There were times when Defendant King observed officers going into people's homes without permission. Depo of King: 109:2-6.

88.     Jason King did not call out when he pulled over D.B. Depo of King V.II: 41:18-21.

89.     It was not uncommon for deputies to not call out on traffic stops. Depo of King V.II: 41:22-24.

90.     The rule requiring officers to call out could have been enforced, but was not. Dep of King V.II: 43:11-17.

91.     "I think it was pretty common knowledge that, you know – not all officers. Like I said, maybe you'd call out 90 percent of the time and then every deputy maybe 10 percent of the time. Once again, depending on the situation, the radio traffic, the nature of the stop, that there was times when you made contacts with individuals officially, not just hey, kids, here's a quarter for lemonade, but you officially were on an official stop or contact or whatever, but you did not initially call out. You might call out as you delve into the case or delve into the incident, but, once again, supervisors alike, there was plenty of times that I would, you know, drive down location and see lights and pull u behind one of my supervisors on a traffic stop and they never called out on the radio, you know." Depo of King V.II: 43:24-25-44:1-15.

92.     Those who failed to call out included captains. Depo of King V.II: 45:6-9.

93.     Q. We talked a little bit about enforcement or lack of enforcement of a rule that requires deputies to call out. And I'd like to follow up with that discussion by asking if there are any other

policies, procedures, practices or rules that were not enforced – let's leave it without

qualifications, were not enforced. And you know it occurs to me you talked about deputies

keeping evidence in their cars. That was one of the things we discussed before.

A. Correct.

Q. Stuff like that.

A. Okay. Well, that's obviously big, that's the one I'm going to start off with. Evidence, you

know, per policy is supposed to be turned in prior to the end of your shift. Routine evidence was

kept in a deputy's car, maybe over a weekend. And I know a deputy one time had evidence in his

car for three weeks prior to turning it in. Certain being at your assigned duty station on time, you

had to call out, you know, 15 minutes prior. That 15 minutes gave you that travel time to get to

your assigned zone. Once again, people would routinely lie about their location prior to GPS

saying hey, I'm here, but they weren't obviously in that spot. You know, personal, like I said

personal, definitely the personal vehicle use thing. There was a – it got to the point too where

you were allowed to use your vehicles to go like come to the station for paperwork, even on your

off time come to the station to work out, to go training, but any time you were in your vehicle

you had to be in some sort of appropriate attire. So if you had to stop and enforce traffic or

whatever, then you were presentable, that they knew you were police affiliated, you were part of

the sheriff's department; you know, gun, badge, whatever the case may be. That was, you know,

we had an incident where a SWAT team member traveling 70 westbound had left his handgun on

top of his car. And I guess he heard it hit the back of his car and I guess realized oh, crap, and

bounced down the highway. He was out in the middle of Highway 70 in the grass area looking

for his gun obviously not – in sweat pants and T-shirt. Nobody knew he was a cop. Depo of King

VII: 57:1-25-58:1-22.

-16-

94.     "Like I said certainly being out of the area when, you know, you're supposed to be in the area, being at your house. You know, the big one too is, you know, as cops, I mean, we like to party or whatever and, you know, numerous times going out drinking with guns. You know, state law is you're not supposed to be under the influence of alcohol and be in possession of a firearm even if you're a police officer. It's against state law. And numerous times, you know, guns and drinking went hand and hand at bars, and guns were pulled out and guns were spun on tables. That happened quite a bit too.

Q. Those events were common knowledge in the department?

A. There was, you know, usually supervisors present at the parties." Depo of King V.II: 59:20-25-60:1-11.

95.      "I can say this, that there were a couple of instances where a supervisor – and I don't want to say the supervisor, so just bear with me – but came to me and said the sheriff wants to kind of insulate himself and would like this DWI to disappear based upon a political whatever, do you care?" Depo of King V.II: 60:19-25.

96.     "We all fixed tickets. The first thing someone would do is call you up and say hey, was that person a jerk to you, were they an ass, did they do anything in particular where you don't want this ticket fixed. And, you know, we would fix tickets. We would say no, I don't care, if that's a brother or that's your cousin or your sister, your wife's sister, whatever, it's kind of the same thing." Depo of King V.II: 62:8-16.

97.     Q. I think we started this discussion with the question generally are you aware of any instances when rules were not enforced. And is there anything else you want to add to that? While you're thinking, let me ask you another question. Did your department have a policy

against you receiving gratuities from the public specifically – actually I've seen it work, a police

officer discount at a restaurant. Is there a policy against that?

A. Yeah, I'm sure there's a policy that obviously when you're getting bribed, that that's

obviously state law that you're not supposed to be bribed. As far as the discount, I mean that was

standard practice that everywhere we went was either eat free or half price or free sodas at every

gas station we went to. And everybody partook in that. I mean the supervisors, whatever, you

know, everybody. So as far as having a policy, I don't know if there was a policy you weren't

allowed to accept free food or drinks or whatever. I mean, obviously taking gifts in relation to a

report written, I'm sure that's, yeah, I'm sure that's against policy. But not for sure. Depo of

King V.II: 64:10-25-65:1-9.

98.     Q. And you described a number of specific instances where members of the good old

boys group were involved in events that had no consequences or less consequences. You testified

about that. Are there any other incidents that you recall since last time?

A. Well, I mean, you know, I do actually have some things. To my knowledge like we talked

about Sergeant Streck and how he went downtown and tore up a restaurant downtown and left a ,

how he was in the FBI task force at the time and then stalked a girl in St. peters and shot a

shotgun through his car. And then he was out on SWAT training and left his MP5 with full auto

loaded while Lieutenant Koch and somebody else were down range. They were absolutely

furious about that. He then gets promoted to sergeant after all those incidences. He then

apparently sexually harassed a female deputy within the department. Either she was moved or he

was moved. He then was given the drug unit commander spot, which I think is where he

currently is now. Depo of King V.II: 66:15-25-67:1-11.

99.     "You know, talking about the alcohol, something else that comes to mind is Mark Brown who has since now passed away a couple years ago who was a really bad alcoholic, had been in the sheriff's department for 20-plus years; I don't know how Many times I was at the range with him in the lane next to him and I could smell the alcohol on his breath and he would routinely fail qualifying because he was drunk. And the only reason they eventually ended up getting rid of him was Captain Kaiser got on a vehicle inspection kick because we had new vehicles and his car was just stuff poured down the side of the door or whatever. And then a couple of times they made him take a breath test and sent him home. I think they let him retire. I don't think they fired him. Like I said he's since passed away. But routinely I would say man, I'm getting a contact buzz over here on my lane from Mark, yet he's drunk as a skunk out here qualifying and working the street every day." Depo of King V.II: 67:21-25-68:1-15.

100.    "I don't think I ever got drug tested while I was there. I think there was possible steroid use. I think there may even have been a couple people using marijuana." Depo of King V.II: 69:25-70-1-3.

101.    Defendant King pled guilty to acceding to corruption. Depo of King V.II: 103:14-15.

102.    Defendant King took an Alford plea. Depo of King V.II: 104:6-7.

103.    Q. How is it that you came to be separated from the department?

A. Sheriff Neer -- I basically had a one-on-one conversation with Sheriff Neer who pretty much said he was going to fire me. So he allowed me to resign. So I typed up a resignation letter and resigned from the department. Depo of King V.II: 50:6-12.

Respectfully submitted
7 October 2013

**THE RYALS LAW FIRM, P.C**.

By: _/s/ Stephen M. Ryals_
Stephen M. Ryals #34149MO
3120 Locust Street
St. Louis, Missouri 63103
Tele: 314-862-6262
Fax: 314-880-2027
E-Mail: ryals@rblawstl.com

_Attorney for Plaintiff_

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of October 2013, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system on all parties and counsel of record.

*/s/ Stephen M. Ryals*